**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------X
                                                            :

In Re The Hain Celestial Group Inc.     :    Case No. 16-cv-04581 (ADS) (SIL)
                                                            :
Securities Litigation                        :    <u>JURY TRIAL DEMANDED</u>
                                                            :
                                                            :    <u>LEAVE TO FILE GRANTED</u>
                                                             <u>SEPTEMBER 7, 2017</u>
-------------------------------------------------------X


**[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ............................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................ 7

III.    PARTIES ........................................................................................................... 7

        A.      Lead Plaintiffs..................................................................................... 7

        B.      Defendants ........................................................................................... 8

IV.     CONFIDENTIAL WITNESSES ................................................................... 10

V.      CONTROL PERSON ALLEGATIONS......................................................... 12

VI.     SUBSTANTIVE ALLEGATIONS ................................................................ 14

        A.      Overview of Hain's Business and Growth through Acquisitions....................... 14

        B.      Hain Suffers as the Natural Food Market Tightens ............................ 16

        C.      Hain Resorts to Fraudulent Channel Stuffing to Artificially Boost
                Sales ................................................................................................... 16

                1.      Overview of the Channel Stuffing Fraud................................ 16

                2.      Confidential Witnesses Detail Hain's Channel Stuffing
                        Fraud ....................................................................................... 19

                3.      Confidential Witnesses Detail Hain's Accounting
                        Manipulations ......................................................................... 22

                4.      Confidential Witnesses Describe the Involvement of Hain's
                        Executives and Senior Management in the Fraud.................... 24

                5.      Hain's Lack of Internal Controls Allowed Information at
                        Hain to be Kept Within Senior Management's Inner Circle
                        and Outsiders Were Terminated ............................................. 25

        D.      Hain's Fraudulent Channel Stuffing Becomes Too Big to Hide and
                Hain Is Forced to Disclose Part of the Truth ..................................... 28

        E.      Hain Reveals the Widespread Nature of the Fraud............................. 33

        F.      Post Class Period Developments ........................................................ 34

|   | 1. | Hain Delays Filing While Making Further Executive Changes | 34 |
|---|---|---|---|
|   | 2. | Hain Finally Announces Financial Results for Q4 and Fiscal Year 2016 and Q1, Q2, and Q3 Fiscal Year 2017 and Restates Results for Fiscal Years 2014 and 2015 and Q1, Q2, and Q3 of Fiscal Year 2016 | 35 |
| VII. | | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN HAIN'S FINANCIAL RESULTS | 40 |
|   | A. | First Quarter Fiscal Year 2014 Results – November 2013 | 40 |
|   | 1. | Form 8-K for the First Quarter Fiscal Year 2014 | 40 |
|   | 2. | First Quarter Fiscal Year 2014 Financial Results on Form 10-Q | 42 |
|   | B. | Second Quarter Fiscal Year 2014 Results – February 2014 | 42 |
|   | 1. | Form 8-K for the Second Quarter Fiscal Year 2014 | 42 |
|   | 2. | Second Quarter Fiscal Year 2014 Financial Results on Form 10-Q | 43 |
|   | C. | Third Quarter Fiscal Year 2014 Results – May 2014 | 43 |
|   | 1. | Form 8-K for the Third Quarter Fiscal Year 2014 | 44 |
|   | 2. | Third Quarter Fiscal Year 2014 Financial Results on Form 10-Q | 45 |
|   | D. | Fourth Quarter and Full Fiscal Year 2014 Results – August 2014 | 45 |
|   | 1. | Form 8-K for the Fourth Quarter and Full Fiscal Year 2014 | 45 |
|   | 2. | Fourth Quarter and Full Fiscal Year 2014 Financial Results on Form 10-Q | 47 |
|   | E. | First Quarter Fiscal Year 2015 Results – November 2014 | 47 |
|   | 1. | Form 8-K for the First Quarter Fiscal Year 2015 | 48 |
|   | 2. | First Quarter Fiscal Year 2015 Financial Results on Form 10-Q | 48 |
|   | F. | Second Quarter Fiscal Year 2015 Results – February 2015 | 48 |
|   | 1. | Form 8-K for the Second Quarter Fiscal Year 2015 | 49 |

2.  Second Quarter Fiscal Year 2015 Financial Results on Form 10-Q .................................................................... 50

G.  Third Quarter Fiscal Year 2015 Results – May 2015 ........................................... 50

1.  Form 8-K for the Third Quarter Fiscal Year 2015.................................... 50

2.  Third Quarter Fiscal Year 2015 Financial Results on Form 10-Q ................................................................................ 51

H.  Fourth Quarter and Full Fiscal Year 2015 Results – August 2015 ...................... 51

1.  Form 8-K for the Fourth Quarter and Full Fiscal Year 2015................... 52

2.  Fourth Quarter and Full Fiscal Year 2015 Financial Results on Form 10-K ............................................................................... 53

I.  First Quarter Fiscal Year 2016 Results – November 2015 ................................... 53

1.  Form 8-K for the First Quarter Fiscal Year 2016 .................................... 54

2.  First Quarter Fiscal Year 2016 Financial Results on Form 10-Q ............................................................................... 54

J.  Second Quarter Fiscal Year 2016 Results – February 2016 ................................ 55

1.  Form 8-K for the Second Quarter Fiscal Year 2016................................ 55

2.  Second Quarter Fiscal Year 2016 Financial Results on Form 10-Q .............................................................................. 56

K.  Third Quarter Fiscal Year 2016 Results – May 2016 .......................................... 56

1.  Form 8-K for the Third Quarter Fiscal Year 2016................................... 56

2.  Third Quarter Fiscal Year 2016 Financial Results on Form 10-Q .............................................................................. 58

VIII.  ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .................................................................... 59

A.  Analyst Conferences and Earnings Conference Calls ......................................... 59

1.  2014 ICR Conference – January 14, 2014 .............................................. 59

2.  Earnings Conference Call for Second Quarter Fiscal Year 2014 – February 4, 2014 ....................................................... 59

3.      Earnings Conference Call for Fourth Quarter and Full
        Fiscal Year 2014 – August 20, 2014..................................................... 60

4.      Earnings Conference Call for First Quarter Fiscal Year
        2016 – November 5, 2015...................................................................... 61

5.      2016 ICR Conference – January 12, 2016 .............................................. 62

6.      Simon Responds to Resignation of Hain's Chief
        Accounting Officer – January 22, 2016 ................................................. 63

7.      Earnings Conference Call for Second Quarter Fiscal Year
        2016 – February 1, 2016 ........................................................................ 63

8.      Consumer Analyst Group of New York Conference –
        February 17, 2016 .................................................................................. 64

9.      Earnings Conference Call for Third Quarter Fiscal Year
        2016 – May 4, 2016 ............................................................................... 65

B.    Common Materially False and Misleading Statement Repeated
      Throughout the Class Period................................................................................ 66

        1.      Hain's Critical Accounting Policies........................................................ 66

        2.      Hain's Revenue Recognition Practices ................................................... 67

        3.      Hain's Sales and Promotion Incentives .................................................. 68

        4.      Hain's Trade Promotions ........................................................................ 69

        5.      Sarbanes-Oxley Certifications ................................................................ 69

        6.      Statements Regarding Internal Controls ................................................. 72

IX.     THE TRUTH EMERGES ....................................................................................... 75

A.    Hain's January 21, 2016 Announcement – First Partial Disclosure ..................... 75

B.    Hain's August 15, 2016 Announcement – Second Partial
      Disclosure ............................................................................................................. 76

C.    Hain's November 16, 2016 Audit Committee Review
      Announcement ....................................................................................................... 78

D.    The Truth is Further Revealed on February 10, 2017 – Final
      Corrective Disclosure............................................................................................ 79

X.      DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED
        ACCOUNTING PRINCIPLES ("GAAP").......................................................... 80

XI.     ADDITIONAL EVIDENCE OF SCIENTER ................................................... 82

        A.      The Senior Management Terminations Contribute to a Strong
                Inference of Scienter ............................................................................. 82

        B.      Hain's Core U.S. Segment Was Extremely Important to the
                Company's Success .............................................................................. 84

        C.      Suspicious Stock Sales by Carroll and Simon During the Class
                Period ................................................................................................... 86

        D.      Hain's Significant Remedial Measures Contribute to a Strong
                Inference of Scienter ............................................................................. 87

        E.      Simon and Carroll's Enormous Bonuses Contribute to a Strong
                Inference of Scienter ............................................................................. 88

        F.      Hain's Acquisitions Using Artificially Inflated Stock Contribute to
                a Strong Inference of Scienter .............................................................. 89

XII.    CLASS ACTION ALLEGATIONS .................................................................. 90

XIII.   LOSS CAUSATION/ECONOMIC LOSS ....................................................... 91

        A.      January 21, 2016 – First Partial Disclosure ......................................... 93

        B.      August 15, 2016 – Second Partial Disclosure...................................... 94

        C.      February 10, 2017 – Final Corrective Disclosure ................................. 96

XIV.    PRESUMPTION OF RELIANCE .................................................................... 96

XV.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................. 98

XVI.    CLAIMS FOR RELIEF .................................................................................... 99

        COUNT I For Violations of Section 10(b) of the Exchange Act and Rule
        10b-5 Promulgated Thereunder Against All Defendants..................................... 99

        COUNT II For Violations of Section 20(a) of the Exchange Act Against
        Defendants Simon, Carroll, Smith, and Conte.................................................. 102

PRAYER FOR RELIEF ................................................................................................ 103

JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS.................................... 104

Lead Plaintiffs Rosewood Funeral Home ("Rosewood") and Salamon Gimpel ("Gimpel") (together, "Lead Plaintiffs"), by their undersigned attorneys, hereby bring this Consolidated Class Action Complaint ("Complaint") against Hain Celestial Group, Inc. ("Hain" or the "Company"), Irwin D. Simon ("Simon"), Pasquale Conte ("Conte"), John Carroll ("Carroll"), and Stephen J. Smith ("Smith") (together, "Defendants").  The allegations herein are based on Lead Plaintiffs' personal knowledge and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Hain; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; consultations with an accounting expert; and interviews of former employees of Hain and other persons with knowledge of the matters alleged herein.  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of themselves and the class they seek to represent, Lead Plaintiffs allege as follows:

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) on behalf of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Hain, and call and put options on such publicly traded common stock, (collectively, "Hain Securities"), during the period from November 5, 2013 through February 10, 2017, inclusive (the "Class Period").

-1-

2.     This case arises from Defendants' efforts to artificially inflate Hain's quarterly and annual sales and income by prematurely recognizing millions of dollars in revenue through "channel stuffing" and fabricated sales.  Unbeknownst to investors during the Class Period, Defendants were engaged in a widespread fraudulent scheme to improperly push inventory shipments to distributors and book these shipments as sales and revenue – even though those distributors had no obligation to pay for the shipments and would routinely return them the following fiscal quarter.  When Defendants' statements regarding Hain's sales and income were eventually revealed to be false in the wake of various corrective disclosures, the value of Hain's Securities plunged, wiping out over a billion dollars in market capitalization and causing substantial damages to Lead Plaintiffs and the Class.

3.     Hain manufactures, markets, distributes, and sells organic and natural products in the United States, the United Kingdom, Canada, and Europe under brand names which are sold as "better-for-you" products.  During the Class Period, the majority of Hain's consolidated net sales were generated within the United States, mostly through a few distributors.

4.     One of the key metrics of the organic and natural products industry is product sales.  Hain's reported sales figures provide an indication to investors of, among other things: (1) intrinsic consumer demand for Hain's products; (2) prospects for future growth in product demand and sales revenue; and (3) Hain's relative market strength when compared to its competitors.  Consequently, Defendants have strong reasons to maximize Hain's reported sales.

5.     In addition, because increased sales generally also translate to increased income, it is in Hain's business interest to maximize its sales at profitable levels and to account for the revenue derived from those sales.  As a result, Hain's public filings reporting the amount of sales directly impacts Hain's share price.

6.      Faced with declining margins and sales growth due to deteriorating conditions in the natural food market, during the Class Period, Defendants artificially manufactured millions of dollars in revenue at the end of each fiscal quarter by, among other things, (1) shipping extra inventory to distributors with monetary incentives, termed credits or concessions, (2) offering price discounts for accepting extra product volume beyond the distributors' needs, and (3) offering these credits and discounts to distributors with the absolute right to return expired or unsellable products in the following quarter.  Because the distributors were not obligated to keep the products and Defendants knew the distributors would inevitably return large amounts, collection of the revenue was uncertain and the risk of loss was not transferred to the distributor.

7.      Despite the fall-off in Hain's business during the Class Period, Defendants publicly and repeatedly touted the Company's growth.  Each quarter during the Class Period through Defendants' manipulations, the Company reported sales that outstripped reality, resulting in more and more excess product that needed to be pushed out the door.  Defendants also put tremendous pressure on employees to make quarterly revenue numbers by any means necessary.  To facilitate the fraud and to make it appear that the sales were legitimate, Hain provided an imaginary "IOU" – referred to as credits or concessions – to distributors so that the inventory could be booked as sales.  To further the fraud, the Company required its accounting department to book this "revenue" under circumstances that clearly violated Generally Accepted Accounting Principles ("GAAP").

8.      These booked "sales" artificially shored up Hain's numbers during fiscal years 2014, 2015, and 2016, disguising the decline in demand for Hain's products.  Unbeknownst to investors, during the Class Period, the Company's numbers were being achieved not because of an increased demand for its products, but because Hain had embarked on an unsustainable

strategy to boost its own short term sales and create the illusion of sustainable growth.  What Hain publicly touted as consistent market capture and growth was nothing more than a fraudulent scheme to consistently meet market expectations.  However, despite the Company's best efforts to continue the fraud, by the fourth quarter of 2016, the scheme had reached its limits, with the credits to distributors for taking unwanted inventory reaching several millions of dollars. Defendants' scheme fell apart when distributors reached capacity levels with their Hain-related inventories as end-user demand dried up and Hain's credits became too large to hide from Hain's auditors.

9.      Consistent, first-hand accounts from five former Hain employees have confirmed that throughout the Class Period, the Company's growing sales figures were in fact propelled by classic channel stuffing, as instructed by senior management, to facilitate meeting Wall Street's consensus estimates and the Company's own guidance.

10.     Defendants' failure to disclose Hain's channel stuffing activities and its contribution to the Company's reported sales figures, net income, earnings and future prospects was a material omission making Defendants' statements during the Class Period about these metrics and the Company's future prospects materially false and misleading.  Defendants' channel stuffing scheme also caused Hain to improperly recognize revenue in violation of GAAP, which in turn artificially inflated Hain's publicly reported financial results for fiscal years 2014, 2015, and 2016.

11.     Hain's fraudulent scheme was orchestrated by and directly involved executives at the highest levels of the Company, including CEO Simon, former CFO Smith, former CFO Conte, and former CEO of Hain North America, Carroll.  During the Class Period, these executives repeatedly touted the sales and income growth of the Company while knowing – or

having unfettered access to the truth but recklessly disregarding – that product inventory was parked with distributors with no payment obligations for this shipped inventory, so that the Company could falsely claim that it "sold" the products.  Indeed, the fact that numerous confidential witnesses ("CWs") working for different Hain product brands corroborate the same improper practices demonstrates that Defendants' fraudulent scheme was coordinated centrally by Hain's top executives, including Simon, Conte, Carroll, and Smith.

12.     Moreover, one of the defendants involved in the fraud, Carroll, engaged in a highly suspicious pattern of insider trading during the Class Period – selling more than 300,000 shares of his personal holdings in Hain Securities and generating more than $24 million in illicit insider trading proceeds.  Underscoring the suspicious nature of his trading, Carroll's Class Period sales of Hain Securities represented a dramatic increase over the number of Hain Securities he sold for an equal period of time prior to the Class Period, amounting to a 600% increase in profits over the prior time period.  Simon also greatly profited from Class Period sales of Hain Securities, netting more than $80 million.

13.     Realizing they could no longer hide the fraud, on August 15, 2016, after the market closed, Defendants announced that Hain was unable to timely report its financial results for the fourth quarter and full Fiscal Year 2016.  The August 15, 2016 disclosure, however, was materially misleading in that Defendants failed to disclose the extent of the Company's accounting improprieties and its lack of internal controls, instead only hinting at "concessions that were granted to certain distributors in the United States."  On the improper revenue recognition, Defendants deflected, stating only that the Company was "evaluating whether the revenue associated with those concessions was accounted for in the correct period" and "evaluating its internal control over financial reporting."  The press release added that while

"these transactions should not impact the total amount of revenue ultimately recognized by the Company," the Company did not expect to achieve its previously announced guidance for its fiscal year 2016, ended June 30, 2016.  The news caused Hain's share price to fall precipitously on August 16, 2016, from $53.40 to $39.35, a 26.3% drop and a loss in market capitalization of $1.6 billion.

14.     On February 10, 2017, the end of the Class Period and after the market closed, Hain finally revealed that the Company's "previously-issued financial information" could no longer be relied upon because of "potential errors."  In addition, Defendants' accounting manipulations, intended to obfuscate the Company's channel stuffing, caught regulators' notice and the Company disclosed that the "SEC has issued a formal order of investigation and, pursuant to such order, the SEC issued a subpoena to the Company seeking relevant documents." In response to these disclosures, on February 13, 2017, the prices of Hain shares declined more than 8%, to close at $35.10 on unusually heavy trading volume.

15.     After failing to file any financial reports for almost a year, on June 22, 2017, the Company finally issued revised financial statements for Fiscal Years 2014, 2015, and 2016.  In connection with the preparation of its revised financial statements for these fiscal periods, Hain was forced to clear its "inventory" that had previously been recognized as sales revenue.  As a result, the Company's sales and income for the first three quarters of Fiscal Year 2017 were negatively affected.

16.     As a result of Defendants' misstatements and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiffs and the Class have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a).

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Hain is headquartered in this District and many of the violations of law complained of herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

20.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

21.    Co-Lead Plaintiff Rosewood is a funeral home serving families in the Houston, Texas area since the 1800s.  Rosewood purchased Hain call options transactions during the Class Period and suffered a loss of approximately $1,548,333 from its purchases of Hain call options during the Class Period.

22.    Co-Lead Plaintiff Gimpel purchased Hain common stock during the Class Period. Gimpel suffered a loss of approximately $822,519 from his purchases of Hain common stock during the Class Period.

B.     **Defendants**

23.     Hain is incorporated in Delaware with its principal executive offices located at 1111 Marcus Avenue, Lake Success, NY 11042.  Hain manufactures, markets, distributes, and sells organic and natural products in the United States, the United Kingdom, Canada, and Europe under brand names which are sold as "better-for-you" products.  Hain's product brands include Almond Dream, Arrowhead Mills, Bearitos, BluePrint, Celestial Seasonings, Coconut Dream, Cully & Sully, Danival, DeBoles, Earth's Best, Ella's Kitchen, Empire, Europe's Best, Farmhouse Fare, Frank Cooper's, FreeBird, Gale's, Garden of Eatin', GG UniqueFiber, Hain Pure Foods, Hartley's, Health Valley, Imagine, Johnson's Juice Co., Joya, Kosher Valley, Lima, Linda McCartney's (under license), MaraNatha, Natumi, New Covent Garden Soup Co., Plainville Farms, Rice Dream, Robertson's, Rudi's Gluten-Free Bakery, Rudi's Organic Bakery, Sensible Portions, Spectrum Organics, Soy Dream, Sun-Pat, SunSpire, Terra, The Greek Gods, Tilda, WestSoy, and Yves Veggie Cuisine.  The Company's personal care products are marketed under the Alba Botanica, Avalon Organics, Earth's Best, JASON, Live Clean and Queen Helene brands.  Hain's Securities are traded on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "HAIN."  Hain operates with its fiscal year ending on June 30.

24.     The Company's operations are managed in five operating segments which are integrated under one management team and employ uniform marketing, sales, and distribution programs.  During the Class Period, between 56-60% of Hain's consolidated net sales were generated within the U.S.  Hain's largest customer was United Natural Foods, Inc. ("UNFI"), a distributor that accounted for approximately 12% of Hain's net sales during the Class Period.

25.     Defendant Simon is the founder of Hain and has been the Company's President and CEO and a director since Hain's inception in May 1993, and Chairman of the Board since April 2000.  During the Class Period, Simon signed Hain's annual reports and quarterly and

annual certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Hain's internal controls over financial reporting.  During the Class Period, Simon participated in the Company's quarterly earnings conference calls described herein.  Simon was a direct and substantial participant in the fraud.

26.     Defendant Conte was Hain's CFO and Executive Vice President, Finance, from September 8, 2015 until he resigned on June 22, 2017.  Conte previously served as Hain's Senior Vice President, Finance, from October 2014 to September 2015, and Treasurer and Vice President from July 2009 to October 2014.  Prior to joining Hain, Conte worked at Motorola, Inc. (formerly Symbol Technologies, Inc.) in a series of financial roles of increasing responsibilities. From November 2015 until the end of the Class Period, Conte signed Hain's annual reports and quarterly and annual certifications pursuant to SOX stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Hain's internal controls over financial reporting.  During the Class Period, Conte reported directly to Simon and was listed as either an executive officer or senior management in Hain's annual reports.  Conte was a direct and substantial participant in the fraud.

27.     Defendant Smith was Hain's CFO and Executive Vice President from September 3, 2013 until his resignation on September 30, 2015.  From the beginning of the Class Period until his resignation, Smith signed Hain's annual reports and quarterly and annual certifications pursuant to SOX stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Hain's internal controls over financial reporting.  During that same time frame, Smith participated in the Company's quarterly earnings conference calls described herein.  During the Class Period, Smith reported directly to

Simon and was listed as an executive officer in Hain's annual reports.  Smith was a direct and substantial participant in the fraud.

28.     Defendant Carroll has been Hain's Executive Vice President, Global Brands, Categories and New Business Ventures since March 6, 2017.  Carroll previously served as Hain's Executive Vice President and Chief Executive Officer for Hain Celestial North America from February 2015 to March 6, 2017.  Carroll served as Chief Executive Officer of Hain Celestial United States, President of Grocery and Snacks Division and President of Personal Care since May 2008, since September 12, 2005, and since August 22, 2006, respectively. Carroll served as Hain's Executive Vice President of Melville Businesses since February 10, 2004 and also served as Hain's President of Grocery and Frozen since July 1, 2004.  During the Class Period, Carroll participated in the Company's quarterly earnings conference calls described herein.  During the Class Period, Carroll reported directly to Simon and was listed as an executive officer in Hain's annual reports.  Carroll was a direct and substantial participant in the fraud.

29.     Defendants Simon, Conte, Smith, and Carroll are collectively referred to as the "Individual Defendants."  Hain and the Individual Defendants are collectively referred to as "Defendants."

## IV.     CONFIDENTIAL WITNESSES

30.     As part of its investigation into the facts underlying this action, counsel for Lead Plaintiffs interviewed several former Hain and UNFI employees (to avoid revealing the gender of any of the confidential witnesses, the Complaint uses masculine pronouns to refer to all confidential witnesses):

31.     Confidential Witness ("CW") 1 is a former Hain employee who worked for the Company from September 2012 through June 2016 as a Senior Finance Manager.  CW 1 was

responsible for finances related to Hain's manufacturing costs associated with creating products in the United States (excluding operations in India and the United Kingdom), including posting accruals quarterly to Hain's accounting department so Hain's Senior Vice President and Controller, Marla Hyndman, could justify the quarterly numbers to Hain's auditor, EY (formerly known as Ernst & Young).  CW 1 reported to Marco Guerrero, Hain's current Senior Director of Supply Chain Finance, and ultimately reported to James Meiers, Hain's former Chief Operations Officer.  As detailed below, Meiers was a direct and substantial participant in the fraud who reported to Carroll.  Throughout the Class Period, Hain's annual Form 10-K listed Meiers as senior management for Hain Celestial United States.

32.     CW 2 is a former Hain employee who worked for the Company from January 2016 through February 2017 as a Senior Sales Analyst.  CW 2 was responsible for forecasting, trade planning and profit and loss analysis at the BluePrint brand business at Hain.  BluePrint products consist of raw, organic cold-pressed fruit and vegetable juice beverages, including a raw juice cleanse program designed to detoxify the body.  BluePrint's products are delivered nationwide.  CW 2 reported directly to the General Manager for BluePrint, who reported directly to Simon.

33.     CW 3 is a former Hain employee who worked for the Company from June 2014 to July 2016 as an Executive Assistant to Meiers.  In addition to general administrative duties for Meiers, CW 3's responsibilities included reviewing Hain's financial results each quarter prior to its public release.

34.     CW 4 is a former Hain employee who worked for the Company from January 2012 through June 2014 as a Brand Manager and from June 2014 to June 2017 as a Senior Brand Manager.  CW 4 reported to Hain's former Director of Marketing, who reported to Hain's Vice

President of Marketing.  CW 4's responsibilities included product development and strategy, profit and loss analysis, and budgeting for non-dairy products such as Spectrum.  Spectrum products consist of a premium line of culinary oils and vinegars in addition to omega 3 supplements.

35.     CW 5 is a former employee of NFI Industries, a company that provided warehousing services for Hain, from August 2011 to 2013 as a Senior General Manager in a warehouse in Ontario, CA that was leased by Hain.

36.     CW 6 is a former Hain employee who worked for the Company from 2000 until October 2016.  During the Class Period, CW 6 served as the Senior Manager of Customer Support at Hain and reported directly to Hain's Director of Customer Satisfaction who reported directly to Meiers.  CW 6's responsibilities included all customer service tasks including processing the Company's quarterly numbers and product returns with its financial operations and accounting departments.

## V.     CONTROL PERSON ALLEGATIONS

37.     Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and had access to the adverse undisclosed information about the Company's business, operations, financial statements and present and future business prospects via access to internal corporate documents.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Hain's net sales within the U.S. comprised the majority of Hain's total sales during the Class Period and sales through distributors were fundamental aspects of

Hain's business that the Individual Defendants followed, tracked, and were aware of, or should have followed, tracked, and been aware of, at all times.

38.     The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants had access to and were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

39.     As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

40.     In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Hain, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

VI.    SUBSTANTIVE ALLEGATIONS

   A.    Overview of Hain's Business and Growth through Acquisitions

   41.    Hain manufactures, markets, distributes, and sells organic and natural products under brand names which are sold as "better-for-you" products.  Hain's products are sold throughout the United States with a customer base consisting principally of specialty and natural food distributors, supermarkets, natural food stores, and e-commerce retailers.  A significant portion of Hain's products are sold through independent food distributors.  According to CW 1, Hain relied on only two or three distributors.

   42.    Hain consists of a collection of what were once small, successful, independent natural and organic brands.  Since Hain became a publicly traded company in 1993, it has rapidly acquired small natural food companies, making its biggest purchase in 2000 with Celestial Seasonings.

   43.    These acquisitions fueled Hain's business growth for a long time.  Hain was one of the first companies to embrace the natural and organic movement.  Simon's goal was to spend a minimum of $100 million every year acquiring natural and organic food companies.  By aggressively acquiring the best-selling small, independent organic food companies and integrating them under Hain's umbrella, the Company was able to consistently generate double-digit growth in sales.

   44.    Hain's growth translated into higher share prices as its stock price responded in kind to this momentum, increasing over 800% between 2010 and Hain's last annual report filed prior to the public disclosure of the fraud.



45.     Hain's acquisition strategy involved integrating the Company's brands under one management team and employing uniform marketing, sales, and distribution programs.  Meiers described this process for the BluePrint brand at the Bank of America Merrill Lynch Conference on March 12, 2014: "as we acquire these businesses, it's about getting the efficiencies aligned, taking costs out of the business and then we will optimize the manufacturing."  In reality, Meiers' use of the word "efficiencies" referred to how Hain achieved economies of scale by cutting the acquired brand's operations down to the bare bones, to eke out greater profitability. This practice immediately had a positive impact on revenue, but Hain's strategy of underinvesting in its brands was doomed for shareholders over the long run.

46.     Hain's failure to invest in the branding of its acquired companies made it vulnerable to private-label competitors moving into the organic market under the labels of Kroger, Walmart, Target, and Costco.  Outside the power of the brand, there was little competitive advantage with Hain's acquired companies.  What consumers really cared about was that a product was labeled "organic."  After that, customers purchased the cheapest option available – which often meant private label brands.

**B.      Hain Suffers as the Natural Food Market Tightens**

47.      By the beginning of the Class Period, Hain began to suffer as the largest domestic

organic grocery, Whole Foods Market, struggled.  After years of profiting from its role as the

dominant and virtually exclusive provider in the organic foods market, Whole Foods' growth

wilted under pressure from both smaller players such as Sprouts and established players such as

Costco that began offering the same fare at competitive prices.  With more chains moving to sell

natural and organic foods, it became harder for Hain to command a price premium.

48.      The challenges in the organic and natural food market also had a direct impact on

UNFI – one of the largest distributors of organic foods and Hain's largest customer.

49.      During the Class Period, better prices and increased competition allowed Costco,

Walmart, and Target, key retailers for organic products, to cut back on the number of Hain items

they stocked and to reduce the prices on the Hain items they did stock.  According to an analysis

by Piper Jaffray, the average number of Hain products on the shelves of these stores dropped

11% from 202 products in the fourth quarter of fiscal year 2014 to 180 products in fourth quarter

of 2015.  *See* Piper Jaffray, *Hain Celestial Group, Inc. (HAIN), Negative Pre-Announcement Not*

*a Huge Surprise, Multiple Expansion Delayed*, Jan. 12, 2016.  According to the analysis, the

remaining Hain products on the shelves were subject to clearance pricing with a 5.1% discount

on prices of like items.  Piper Jaffray, *Hain Celestial Group, Inc. (HAIN), Items Increase*

*Sequentially at Mass Merchants, But Pricing Pressure Remains*, Apr. 12, 2016.

**C.      Hain Resorts to Fraudulent Channel Stuffing to Artificially Boost Sales**

**1.      Overview of the Channel Stuffing Fraud**

50.      As corroborated by several of the CWs, the impetus for Defendants' channel-

stuffing scheme and fraudulent accounting was the failure of Hain's sales to meet the Company's

- 16 -

and Wall Street's projections, combined with the knowledge that the natural food market was experiencing enhanced competition.

51.     Each quarter, Hain reported on its performance and provided guidance to Wall Street analysts and investors with respect to its projected net sales and earnings per share for the year.  Wall Street, in turn, provided its own analysis establishing consensus quarterly estimates – figures that analysts believed the Company should be able to achieve in view of the information provided by the Company.  Not surprisingly, these figures predicted continued growth consistent with Hain's guidance.

52.     As a result, the Defendants needed to find a way to increase sales and earnings or else be forced to disclose the declining prospects for Hain.  To mask Hain's declining prospects, Defendants concocted a multi-faceted fraudulent channel stuffing scheme to make it appear as if the Company was meeting its guidance and Wall Street expectations and that the future of the Company was promising.

53.     In general, channel stuffing is the practice of intentionally oversupplying distributors with products to artificially inflate reported revenues by effectively turning what should have been inventory into "sales."  Channel stuffing accelerates product shipments and inflates sales and revenues in one quarter while stealing business from future periods.  Channel stuffing both misrepresents the true state of a company's current business, and has a materially adverse effect on a company's business going forward.  As used by Defendants, channel stuffing also misleadingly creates the impression of a strong and sustainable underlying customer demand to meet the Company's projected targets.  Furthermore, for those products that were not returned, this practice created a massive hole in future quarters where those sales would otherwise be made which the Defendants never disclosed.

54.     Defendants' egregious and repeated channel stuffing also violated the most basic principles of GAAP because these shipments were not genuine sales but rather consignment arrangements where the risk of loss was not transferred to the distributor and revenue collection was not probable.  Moreover, Hain granted its distributors an unconditional right to return the goods if the distributors could not sell the products and the distributors were not obligated to pay for the goods until and unless the distributor sold them.  Despite the distributors having no payment obligation unless the product was sold and having the absolute right to return the product, Hain nevertheless claimed that it "sold" the products.  These facts made Defendants' statements about "sales" and "distribution" false because this practice misleadingly created the impression of a strong and sustainable demand for Hain's products, which did not exist.

55.     To facilitate the fraud, Hain engaged in accounting manipulations that included shipping millions of dollars in products to distributors with the absolute right to return the product the following fiscal quarter with no obligation to pay for those returns.  Hain then provided the distributors with free "credits" to track the amount of inventory being shipped. Hain booked these "credits" into its internal accounting system and later altered the accounting numbers to make them appear legitimate.

56.     Defendants' scheme involved three different segments of Hain's finance team: (1) financial planning and analysis led by Carroll; (2) supply chain/operations finance led by Meiers (who also reported to Carroll); and (3) revenue recognition and SEC filings led by Smith and, later, Conte.

57.     The scheme began with Carroll obtaining the Hain mid-quarter financial sales so he would know the sales shortfall before negotiating with distributors to take more inventory. After Carroll negotiated the credits and "off-invoice" concessions in exchange for distributors

taking the amount of inventory necessary for Hain to meet its quarterly sales numbers, Carroll and Simon communicated to the managers of Hain's brands the amount to be loaded onto the distributors' trucks.  At the end of each quarter, Hain sent inventory to the distributors – primarily UNFI – with the understanding that the distributor was free to return the products the following fiscal quarter.

58.     Next, Meiers' group accounted for the credits and off-invoice concessions as revenue as soon as the shipments left the warehouse.  This involved posting millions of dollars in credits and off-invoice concessions onto Hain's internal system for financial reporting that was linked to an enterprise-wide JD Edwards reporting system.  Meiers and his inner circle then smoothed out the sales and revenue numbers to avoid discovery of the fraud.

59.     Meiers then sent the modified sales and revenue numbers to Hain's CFO for inclusion in the Company's SEC filings where Smith and, later, Conte prepared Hain's financial reports for the public.

60.     Finally, in the following fiscal quarter, the distributors returned the excess inventory that was shipped in the prior quarter and the process would begin again although with an increasingly larger deficit due to the prior quarter's credits and off-invoice concessions.

**2.     Confidential Witnesses Detail Hain's Channel Stuffing Fraud**

61.     According to CW 6, who worked in both Hain's sales and operations teams during his tenure, both before and throughout the Class Period, Hain coordinated with UNFI and other distributors to make up for earnings shortfalls by giving distributors "off-invoice" concessions.  CW 6 recalled how Defendants would realize about halfway into a quarter that the Company would not meet its expectations and would negotiate concessions with distributors based on the mid-quarter sales numbers.  CW 6 explained that these off-invoice concessions ranged from 10-25% discount on total sales for the quarter and the distributor was "free to

- 19 -

return" any of that inventory after the quarter ended.  After the concessions were negotiated, Hain would load the distributors' trucks for delivery.

62.     CW 6 processed returns at Hain and recalled that generally 6-8 weeks after the quarter ended, Hain would start to receive the products that were loaded the previous quarter. CW 6 detailed how product returns normally were heavily scrutinized, but no one asked any questions of UNFI's product returns.  According to CW 6, $500,000 returns were on the "low-end" of the quarterly returns he processed and he recalled a $700,000 product return in 2015. CW 6 remembered the employees in Hain's office would joke about they would love to be UNFI because you can return whatever you want.  CW 6 recalled frequently spending entire days processing returns of inventory that was sold to distributors the previous quarter.

63.     CW 4 referred to Hain's channel stuffing as "loading" and "de-loading" that took place throughout CW 4's five-year tenure at Hain and involved Hain offering concessions to the distributor saying "here's a discount to load."  According to CW 4, at the end of each quarter, Hain would ship inventory to distributors – primarily UNFI and KeHE Distributors LLC – to increase reported revenue and then "de-load" (*i.e.*, return the product) in the following quarter.

64.     According to CW 2, who worked in Hain's BluePrint brand, Hain's "core business practice" during the Class Period was to load distributors with inventory at the end of the quarter to increase "financial reporting."  CW 2 understood that Hain would send "actual inventory" to distributors so the Company could recognize the inventory as additional sales revenue for that quarter.

65.     In a specific instance near the end of Q4 Fiscal Year 2016, CW 2 recalled that all of Hain's brands were struggling and the Company was struggling to meet its Wall Street consensus estimates and the Company's guidance numbers.  CW 2 reported that the BluePrint

brand decided to miss its numbers for the quarter because of a concern that if BluePrint ran too many promotions to get inventory out the door, it would negatively impact subsequent quarters. According to CW 2, the following day, BluePrint's General Manager received a call from Simon with a directive that BluePrint "needs to make this quarter"—referring to Hain's forecasted sales for BluePrint. Based on Simon's directive, CW 2 "pushed inventory" to BluePrint's distributor, DSD Distributors, so Hain could recognize the revenue for that quarter. CW 2 added that every brand at Hain was doing this (not just BluePrint) to recognize additional revenue before the end of the quarter and fiscal year.

66.     CW 4 performed profit and loss analysis and budgeting for Hain's Spectrum brand (oils and vinegars) and observed that the majority of loading was done with brand products that had a longer shelf life such as Spectrum, Westbrae (beans), and MaraNatha (nut butters) products. Both CW 6 and CW 1 also confirmed that Spectrum and MaraNatha were among the most frequent brands where accruals were being posted. Other Hain brands carrying goods with longer perishable lives such as JASON (natural cosmetics), ALBA (beauty products) and Earth's Best (baby food) were also used for channel stuffing. CW 6 added that Hain also chose to channel stuff using these brands because they were more expensive so Hain could make larger sales using "less inventory."

67.     Hain's channel stuffing was not limited only to longer lasting perishable goods. CW 2 stated that while most of the products involved in channel stuffing were longer lasting non-perishable goods such as snacks, teas, and beauty products, Hain was forced to use all of its brands to load to the distributors as part of the channel stuffing scheme. Indeed, CW 2, who worked at the BluePrint brand selling raw perishable juices, observed channel stuffing with BluePrint's products.

68.     According to CW 4, the practice became more apparent internally in 2015 as Hain faced increased competition and lower sales – thus, making the channel stuffing even more egregious.  CW 4 recounted how at the end of each quarter during his tenure, he would see $5-6 million in transactions for the last week of the quarter.  CW 4 would see these transactions, knowing they could not be real, on Spectrum's shipment reports.  CW 4 explained that because his brand (Spectrum) was the "heaviest loaded brand" he knew the numbers could not be real. CW 4 added that UNFI and other distributors would historically stock on average seven to nine weeks of Spectrum inventory but leading up to Hain's August 15, 2016 announcement, CW 4 saw on UNFI's weekly inventory reports circulated within Hain that UNFI was stocking eighteen (18) to nineteen (19) weeks of Spectrum inventory.

69.     CW 3 prepared budget materials for Meiers and constantly saw products being returned and credits being issued, especially with UNFI.  CW 3 recalled a significant increase in returns and credits at the end of 2015 and early 2016 when Hain began to lay-off employees.

### 3.     Confidential Witnesses Detail Hain's Accounting Manipulations

70.     Despite granting distributors an absolute right to return the pushed inventory, Hain would book the revenue from the sales of its products at the same time the products were shipped to the distributors.  CW 6, who was responsible for Hain's end of quarter numbers and processing Hain's sales, explained that Hain recognized revenue as soon as the pushed inventory was "off the dock."  CW 4 corroborated that Hain recognized revenue as soon as the shipments left the warehouse as he saw the recognized revenue on Spectrum's shipment reports generated by an internal system called Business Objects.

71.     CW 1 was responsible for reporting Hain's financial results (led by Meiers), and explained that he was instructed to post the distributor credits onto Hain's internal financial overview for unofficial reporting.  CW 1 explained that the credits were booked into Hain's

financial system as money that distributors owed Hain and the credits directly affected Hain's overall gross profit.  CW 1 also observed that the credits were spread out and broken down by brand.  CW 3 separately corroborated that CW 1 was responsible for handling the paperwork related to the returns and credits during the Class Period.

72.     CW 1 posted and tracked the credits for the operations team using Hain's Hyperion software system which would feed into the Company's enterprise-wide JD Edwards system.  According to CW 6, the sales team used internal software called Prism to track concessions and returns that was also linked to the JD Edwards system.

73.     CW 5, a former employee at a warehouse leased by Hain, described how Hain used an enterprise resource planning system to ensure that the Company "would always have visibility" into its inventory at the warehouse.  These systems synced on a monthly basis according to CW 5.

74.     CW 1, who was responsible for booking the credits, corroborated that by June 2015, the credit numbers became suspicious as sales were declining but the credits continued to grow.  CW 1 personally observed that the credits were going up every quarter and eventually reached millions of dollars each quarter.  CW 1 began to believe that "someone's trying to fill in [the] gap" in the hope that sales would increase the following quarter to offset returns.  CW 1 explained that the credits were a running concern at Hain.  Indeed, CW 1 left Hain in June 2016 because he believed "something screwy" was going on with Hain's financial numbers.

75.     CW 6 also stated that in the years leading up to the revelation of the fraud, Hain was using concessions more aggressively as Hain's sales continued to decline.

4.      **Confidential Witnesses Describe the Involvement of Hain's Executives and Senior Management in the Fraud**

76.      Hain's executives and senior management knew about and directly participated in the channel stuffing by directing the credits to distributors to turn Hain's inventory into sales. CW 4 stated that employees and executives at Hain referenced channel stuffing as "loading."  As CW 4 was responsible for profit and loss analysis and budgeting he presented state of the business, forecasts, revenue, and shipment information directly to Carroll regarding problems with the "loading" practice.  CW 4 recalled numerous brand strategy meetings where loading was openly discussed with Carroll such as shipments being down a certain amount because Hain had loaded inventory to distributors at the end of the previous quarter.  As an example, CW 4 explained that her presentation to Carroll included that Spectrum was down in Q1 because Spectrum had "loaded" in Q4.  Indeed, after the Company's August 15, 2016 announcement, CW 4 recalled that Hain's management met with Carroll and that Carroll demanded that employees refrain from using the term "loading" and rephrase it as "inventory reduction."

77.      CW 6 recalled that Carroll would request CW 6 to provide certain numbers, usually by mid-quarter, so Carroll would know of the sales shortfall before negotiating the concessions with UNFI.  According to CW 6, Carroll then provided an incentive for UNFI to take the amount of Hain's inventory necessary for Hain to meet its quarterly sales revenue numbers.  CW 6 attended internal Hain sales calls where Carroll would inform the other attendees that he had negotiated the concessions with UNFI that would make up the sales deficit for that quarter, which was referred to as "OIs" or "off-invoice."

78.      CW 2 similarly believed that the channel stuffing directives came from Hain's upper management based on discussions with Hain's General Manager for the BluePrint brand who reported directly to Simon.

- 24 -

79.     Hain's executives and senior management also knew about and directly participated in Hain's fraudulent accounting practices to make the fabricated sales appear legitimate.  CW 4 explained how Hain tracked sales, inventory, and Company guidance targets using weekly business reviews and executive transaction reports sent by email to Hain's upper management, including Simon and Carroll.

80.     CW 1, who worked under Meiers, described how Meiers directly participated in the fraud by telling Hain's Senior Vice President of Manufacturing, Steve Powhida, to book the credits with accounting.  CW 1 recalled Powhida describing a $3 million credit that Powhida submitted to accounting and CW 1 observed the $3 million credit in Hain's financial reports.

81.     CW 6, who worked in Hain's financial operations with Meiers, added that Meiers was definitely aware of the channel stuffing because he was responsible for all of Hain's warehousing, transportation, and carriers.  CW 6 explained that anything that was sent from Hain or returned was done under Meiers' supervision.

82.     As Meiers' executive assistant, CW 3 had first-hand knowledge of Meiers' actions.  CW 3 confirmed that Powhida, who previously worked at Heinz with Meiers, was Meiers' right hand man and that Meiers was "well known for changing numbers left and right." CW 3 added that Meiers worked long days during the last two weeks of the quarter as the financial numbers were constantly changing.

### 5.     Hain's Lack of Internal Controls Allowed Information at Hain to be Kept Within Senior Management's Inner Circle and Outsiders Were Terminated

83.     As Carroll stated at a Bank of America Merrill Lynch Conference on March 12, 2014, he "run[s] the US, along with Jim Meiers."  CW 1 confirmed this stating that Hain's finance team was run by Meiers' operations group and Carroll's financial planning and analysis group which worked together.

84.     CW 1 described Hain's internal controls as "not good."  CW 1 explained that if Meiers did not like the financial numbers, Meiers would go to accounting and say "this number has to change" and it would change.  CW 1 recalled that Hain's current Senior Vice President and Controller, Marla Hyndman, and Hain's Senior Vice President of Finance/Business Planning, Rose Ng, would tell Meiers to provide justification for the sales numbers based on discussions with auditors, but ultimately Meiers could get what he wanted done.

85.     Moreover, CW 1, who worked under Meiers, stated that Meiers "openly controlled" the credits with limited involvement from others.  CW 1's direct supervisor, Marco Guerrero, also told CW 1 that Meiers controlled the credits.  When CW 1 asked Powhida or Meiers about the credits, they would respond "don't worry about it."

86.     CW 3 was responsible for preparing materials for quarterly budget meetings led by Meiers and similarly recounted that Meiers would attend "closed door" quarterly meetings with three other accounting employees "changing numbers" for the sales results for the quarter. CW 3 stated Meiers was always changing the numbers but he found it hard to believe because they were sales results for the quarter, not forecasts.  CW 3 noted that Marco Guerrero, Hain's Senior Director of Supply Chain Finance, was part of Hain's inner circle and would smooth out the numbers for Meiers.  Meiers, meanwhile, would sit in a room for a week to make the numbers "look pretty," according to CW 3.

87.     In addition, the Individual Defendants were hands on and obsessively controlling. CW 1 recalled that Simon "wanted to know everything that was happening" at Hain and that Simon "treated [Hain] as if it was still privately held by him."  CW 1 added that Simon was "very much in control" of everything at Hain.  For example, CW 6 recalled that Simon knew

specifics regarding the channel stuffing concessions negotiated with the distributors, adding that Simon "is in everything" that happens at Hain.

88.     CW 3 recalled that Simon, Meiers, and Carroll would drink together frequently on Fridays in Simon's office.  CW 1 added that Simon and Carroll were "very friendly" with one another.  CW 2 described Meiers as Simon's "right-hand man."

89.     Simon also had unfettered power at the Company.  Simon served as Chairman of the Board, President, and CEO, allowing him to control both the Board and Company management as well as statements made to investors.  Indeed, according to Hain's proxy statement filed with the SEC on October 9, 2015, Simon's employment agreement assured that he would always serve as Chairman of the Board as long as he was with the Company.  Simon's employment agreement also specified that "[i]f [Simon] is not re-appointed as Chairman of the Board, he will be entitled to terminate his employment with the rights and entitlements available to him under his employment agreement as if his employment was terminated by him for good reason as defined therein."  The October 9, 2015 proxy statement further detailed that if Simon unilaterally decided he had been terminated for good reason, he "would be entitled to receive approximately $89,259,325."

90.     Employees that questioned the channel stuffing scheme were fired.  On September 8, 2015, after only two years as Hain's CFO, the Company announced that Smith was departing the Company and would be replaced by Conte.

91.     CW 1 believed that Smith lasted only two years at Hain because he was not willing to be one of Simon's puppets unlike Smith's successor, Conte, who CW 1 described as one of Simon's guys.

92.     CW 1 explained that throughout his tenure at Hain, he witnessed various people that "did not agree" with Simon and they did not last long and eventually Simon would replace them with one of his people.  As another example, CW 1 added that Simon replaced Hain's Head of Human Resources for not agreeing with Simon.

93.     Indeed, while Simon explained that Smith departed Hain to "pursue other opportunities," as of December 2016, Smith's LinkedIn page shows that Smith was still "seeking new opportunities."

94.     CW 3 recalled that Meiers did not like to have anyone looking over his shoulder and that everyone was afraid of Meiers and "if you fight back [with Meiers] . . . goodbye." According to CW 1, Rose Ng attempted to operate as a check and balance within Hain's finance team but Ms. Ng was fired the same month as Smith for being a "bottleneck" to Meiers.  CW 3 confirmed that Ms. Ng was always chasing Meiers and told CW 3 that Meiers "owes [Ms. Ng] numbers" and that Hain fired Ms. Ng after she was constantly butting heads with Meiers because she was unwilling to manipulate the financial numbers.

95.     Also, the same month that Smith departed Hain, the Company fired Powhida because, as CW 1 believed, Meiers wanted Powhida to take the hit for the credits scheme.

**D.     Hain's Fraudulent Channel Stuffing Becomes Too Big to Hide and Hain Is Forced to Disclose Part of the Truth**

96.     Eventually, distributors reached their inventory capacity and would no longer serve as Hain's inventory warehouse.  Faced with the mounting pressure of increasingly larger credits to distributors, Hain's credit scheme became "too big to hide" and the Company could not "cover" its numbers anymore, according to CW 1.

97.     CW 3 described how by December 2015, Hain was being audited.  CW 4 heard that Hain's external auditor, EY, identified the channel stuffing accounting issue and Hain's

"whole right wing" of its corporate headquarters was filled with auditors.  CW 6 corroborated

that around December 2015, Hain was caught by its auditors and that during that audit "UNFI

kept popping up."  CW 2 also recalled the auditors remaining at Hain for a long time.

98.    CW 3 also recalled that D&B Consultants ("D&B") conducted an internal audit at

Hain in early 2016.  CW 3 recalled that D&B asked Meiers directly for all of their information

and inferred that Meiers was concerned with what the internal audit would uncover.  CW 3 also

sensed distrust at the Company during this time and knew that Hain would need to restate and

not release their numbers.

99.    On January 11, 2016, after EY began to question Hain's accounting and only

months after Smith's resignation, Hain cut its quarterly and annual guidance stating that it

anticipated full-year sales of $2.9-$3.04 billion and earnings per share in the range of $1.95-

$2.10, below its previous issued guidance of $2.97 billion to $3.11 billion in sales revenue and

earnings per share of $2.11-$2.26.

100.    On January 21, 2016, after the market closed, Hain revealed in a Report on Form

8-K that Ross Weiner resigned from his position of Vice President – Finance, Chief Accounting

Officer.  CW 6 recalled that Weiner – like Smith  before him – left Hain because he did not like

what he was seeing regarding the channel stuffing with distributors.

101.    Analysts at J.P. Morgan noted that Weiner's resignation was "weighing on the

shares" as concerns regarding the Company's accounting grew.  Analysts at Wells Fargo stated

that "the news adds to the broader adjustments around the Hain story."  Meanwhile, Simon

continued to mislead investors by telling the J.P. Morgan analysts on January 22, 2016 that there

is "***nothing wrong with Hain's accounting at all***."

102.     Following this news, the price of Hain shares declined $2.64 per share, or over

7%, from a close of $36.10 per share on January 21, 2016 to close at $33.46 per share on January

25, 2016.  However, Simon's January 22, 2016 misstatement caused the price of Hain's stock

from falling even further.

103.     On August 15, 2016, after the market closed, Hain disclosed a delay in the release

of the Company's 2016 financial results.  However, Defendants continued to downplay any

issues with Hain's accounting:

> [Hain] announced today that it will delay the release of its fourth
> quarter and fiscal year 2016 financial results. During the fourth
> quarter, the Company identified concessions that were granted to
> certain distributors in the United States. The Company is currently
> evaluating whether revenue associated with those concessions was
> accounted for in the correct period and is also currently evaluating
> its internal control over financial reporting.
>
> Previously, the Company has recognized revenue pertaining to the
> sale of its products to certain distributors at the time the products
> are shipped to such distributors. The Company is evaluating
> whether the revenue associated with the concessions granted to
> certain distributors should instead have been recognized at the time
> the products sell through its distributors to the end customers. . . .
> There can be no assurance that the Company will complete the
> preparation and filing of the Form 10-K within the extension
> period. . . . Separately, the Company does not expect to achieve its
> previously announced guidance for fiscal year 2016.

104.     Although Defendants represented that any potential errors would not "impact the

total amount of revenue ultimately recognized by the Company," the public reacted quickly

causing the price of Hain's shares to fall by $14.05 per share, or over 26%, from a close of

$53.40 per share on August 15, 2016, to close of $39.35 per share on August 16, 2016, a loss of

$1.6 billion in market capitalization.

105.     Upon this news, analysts at Atlantic Securities, Bank of America Merrill Lynch,

UBS, Oppenheimer, Barclays, BMO Capital Markets, Piper Jaffray, Jefferies, Maxim Group,

Wedbush, and J.P. Morgan all lowered their price targets for Hain stock.  The analysts at Piper

Jaffray acknowledged the "internal financial control risk makes the stock difficult to own" while

noting "the departure of the CFO and resignation of the chief accounting officer in a short period

of time left us concerned on the state of the finance management."  J.P. Morgan analysts further

questioned the Company's "vague" disclosure asking "what the revenue recognition issue

actually entails" and "what happens if [] Hain's evaluation of its financial reporting controls

turns up additional problems."

106.    According to CW 2, Hain made the August 15, 2016 announcement because of

the channel stuffing activity and that there was "a lot of bad stuff going on" that the Company

was now trying to "clean up."

107.    On August 30, 2016, Hain filed a Notification of Late Filing on Form 12b-25

informing the SEC that the Company would not be able to file its annual report on Form 10-K

for Fiscal Year 2016, by the filing deadline.  Hain repeated its claim that the filing was late

because "[t]he Company is currently evaluating whether the revenue associated with those

concessions was accounted for in the correct period and is also currently evaluating its internal

control over financial reporting."

108.    Due to Hain's inability to file its annual report, the Company received a letter

from NASDAQ dated August 31, 2016, stating that the Company was non-compliant with

NASDAQ rules.  The Company revealed on November 3, 2016 that it submitted its plan to

regain compliance with NASDAQ on October 31, 2016, and on November 2, 2016, NASDAQ

granted the Company an extension, through February 27, 2017, to file its reports with the SEC.

109.    On September 26, 2016, Hain announced that it obtained a limited waiver from its credit facility lenders covering an extension of certain financial reporting obligations until December 27, 2016.

110.    On November 16, 2016, Hain issued a press release entitled "Hain Celestial Announces Completion of Independent Audit Committee Review."  This press release contained the purported results of Hain's internal Audit Committee's investigation into the Company's financial statements and claimed that the Audit Committee found no evidence of "intentional" wrongdoing in connection with the Company's financial statements.  The Audit Committee came to this conclusion while at the same time disclosing, "Hain Celestial has begun to implement a remediation plan to strengthen its internal controls and organization."

111.    Commenting on the results of the Audit Committee investigation, Simon admitted the Company's need to remediate its financial reports and to strengthen Hain's internal controls stating:

> Hain Celestial is committed to transparency of our financial reporting, and we are taking concrete measures to remediate as well as strengthen our internal controls.  We are extremely pleased that the Company can now move forward with its reporting process as we put these challenges behind us.

112.    The results of the Audit Committee investigation were a farce.  Despite the Audit Committee somehow completing its investigation, the Company announced it "will not be in a position to release financial results until the completion of the Company's internal accounting review and the audit process."  The internal accounting review and audit process would continue for another seven months.

113.    On December 7, 2016, Hain began to clean house by moving Meiers to a new position as Chief Executive Officer for Hain Pure Protein Corp. and appointed a new Chief

Operations Officer, Gary W. Tickle.  Hain also appointed a new Chief Supply Chain Officer, a new Chief Customer Officer, and a new Vice President of Marketing.

114.    On December 20, 2016, Hain announced that it obtained a second limited waiver from its credit facility lenders covering an extension of certain financial reporting obligations until February 27, 2017.

**E.      Hain Reveals the Widespread Nature of the Fraud**

115.    On February 10, 2017, after the market closed, Hain filed a Notification of Late Filing on Form 12b-25 that revealed the wide ranging scope of the Company's wrongdoing. While the Company had initially focused on the recognition of revenue associated with concessions granted to certain distributors during the fourth quarter of Fiscal Year 2016, Hain now revealed in a regulatory filing that the Company had expanded the scope of its internal accounting review "to perform an analysis of previously-issued financial information in order to identify and assess any potential errors."  Further, Hain announced that the SEC had launched a formal investigation into the Company: "The SEC has issued a formal order of investigation and, pursuant to such order, the SEC issued a subpoena to the Company seeking relevant documents."

116.    In reaction to this news, the price of Hain's stock fell $3.43 per share, or more than 8%, from a close of $38.53 per share on February 10, 2017, to close at $35.10 per share on February 13, 2017, the next trading day, on unusually heavy trading volume.

117.    On this news, analysts at The Buckingham Research Group lowered their price target for Hain stock stating, "we are lowering our estimates to reflect our 'best guess' that HAIN is likely to undergo an earnings revision or meaningful earnings rebase as a result of this process."

118.    As of the date of filing the Complaint, the SEC investigation into Hain's accounting practices is still ongoing.

F.      **Post Class Period Developments**

1.      **Hain Delays Filing While Making Further Executive Changes**

119.    The Company did not file its corrected financial results by February 27, 2017, as required by the SEC.  Instead, Hain announced that it obtained a third limited waiver from its credit facility lenders covering an extension of certain financial reporting obligations until May 30, 2017.

120.    On February 28, 2017, NASDAQ informed Hain that it was not in compliance with listing requirements and therefore its stock was subject to delisting unless the Company timely requested a hearing before a NASDAQ Hearings Panel.

121.    On March 6, 2017, Hain announced that the Company was removing Carroll from his role with U.S. sales and that he would no longer serve as the CEO for Hain North America. Hain appointed Gary W. Tickle to take over Carroll's position.

122.    On May 11, 2017, Hain filed a Notification of Late Filing on Form 12b-25 informing the SEC that the Company would be unable to file its third quarter report on Form 10-Q for the quarter ended March 31, 2017, by the filing deadline.  Hain also revealed that it anticipated that it would be in a position to file its financial results by the end of May 2017.

123.    On May 30, 2017, Hain announced that it obtained a fourth limited waiver from its credit facility lenders covering an extension of certain financial reporting obligations until June 15, 2017.

124.    On June 15, 2017, Hain announced that it obtained a fifth limited waiver from its credit facility lenders covering an extension of certain financial reporting obligations until June 22, 2017.

      **2.      Hain Finally Announces Financial Results for Q4 and Fiscal Year 2016 and Q1, Q2, and Q3 Fiscal Year 2017 and Restates Results for Fiscal Years 2014 and 2015 and Q1, Q2, and Q3 of Fiscal Year 2016**

125.     On June 22, 2017, after obtaining two extensions from NASDAQ and five waivers from its credit facility lenders, Hain finally released its Fiscal Year 2016 Form 10-K annual report, as well as the Company's Form 10-Q quarterly reports for the first, second, and third quarters of Fiscal Year 2017.

126.     Without the aid of fraudulent channel stuffing and improper revenue recognition, Hain's business plummeted.  For the first nine months of Fiscal Year 2017, Hain reported a 14% year-over-year decrease in U.S. net sales, a 51.1% year-over-year decrease in net income, and a 51.1% year-over-year decrease in earnings per share:

| Metric (in thousands except per share amount) | Fiscal 2016, First 9 Months* | Fiscal 2017, First 9 Months | Change (YoY) |
|---|---|---|---|
| U.S. net sales | 1,025,398 | 882,273 | (14.0%) |
| Net income (loss) | $137,234 | $67,117 | (51.1%) |
| Earnings (loss) per share | $1.33 | $0.65 | (51.1%) |

*As reported in Hain's Form 10-Q filed May 10, 2016

127.     Hain vaguely acknowledged that the U.S. sales decline was a result of ending the Company's improper channel stuffing and fraudulent revenue recognition, attributing the decline to a "realignment of customer inventories."

128.     Hain also admitted in the Fiscal Year 2016 Form 10-K that "both fiscal 2016 and fiscal 2015 net sales benefited from certain concessions provided to our largest distributors, including payment terms beyond the customer's standard terms, rights of return of product and post-sale concessions, most of which were associated with sales that occurred at the end of each respective quarter."

129.    Hain also corrected certain errors in its prior financial statements for fiscal years 2014, 2015, and the first nine months of fiscal year 2016.  As the Company's June 22, 2017 investor presentation showed, Hain over reported $167 million in net sales during the Class Period:

## Summary Financial Impact

| | | FY 2014A | FY 2015A | 9 Months FY 16A |
|---|---|---|---|---|
| **Net Sales** | Original | $2,154 | $2,689 | $2,190 |
| | % YoY Growth | | 24.8% | |
| | Revised | $2,108 | $2,610 | $2,148 |
| | % YoY Growth | | 23.8% | |
| | $ - difference | ($46) | ($79) | ($42) |
| | % - difference | (2.1%) | (2.9%) | (1.9%) |
| **GAAP EPS** | Original | $1.42[1] | $1.62 | $1.32 |
| | Revised | $1.32[1] | $1.60 | $1.31 |
| | $ - difference | ($0.10) | ($0.02) | ($0.01) |
| | % - difference | (7.0%) | (1.2%) | (0.8%) |
| **Non-GAAP EPS** | Original | $1.59 | $1.88 | $1.42 |
| | Revised | $1.51 | $1.83 | $1.42 |
| | $ - difference | ($0.08) | ($0.05) | $ - |
| | % - difference | (5.0%) | (2.7%) | 0.0% |

130.    However, Hain's adjusted financials did not tell the full story.  A closer analysis corroborates what the CWs reported: that Hain used channel stuffing to meet Wall Street's consensus quarterly sales expectations.  As the below chart shows, as the demand for Hain's products fell and Hain's sales fell below Wall Street's consensus estimates, Hain relied on channel stuffing to "beat" or minimize the miss of those estimates.

| NET SALES (GAAP) ($ millions) | | | | | | |
|---|---|---|---|---|---|---|
| | Q1 FY 15 | Q2 FY 15 | Q3 FY 15 | Q4 FY 15 | Q1 FY 16 | Q2 FY 16 |
| | 9/30/2014 | 12/31/2014 | 3/31/2015 | 6/30/2015 | 9/30/2015 | 12/31/2015 |
| Consensus Estimate* | 639 E | 717 E | 659 E | 695 E | 703 E | 750 E |
| | | | | | | |
| As Reported | 631 | 696 | 663 | 698 | 687 | 753 |
| As Restated | 597 | 680 | 652 | 681 | 668 | 743 |
| | | | | | | |
| As Reported | Miss | Miss | Beat | Beat | Miss | Beat |
| As Restated | Miss | Miss | Miss | Miss | Miss | Miss |

*Source: S&P Capital IQ

131.     After narrowing the sales misses for the first and second quarters in Fiscal Year 2015, Hain's revised numbers disclosed on June 22, 2017 show that the Company used improper channel stuffing practices to beat consensus estimates for the third and fourth quarter of Fiscal Year 2015 and the second quarter of Fiscal Year 2016.  Indeed, Hain's restated numbers show that, but for these accounting improprieties, Hain would have missed consensus Wall Street estimates by huge margins for six straight quarters.  While the Company classified its revisions as "immaterial errors," the fact that Hain had six-straight fiscal quarters below consensus estimates would certainly have been material to investors at the time those results were reported.

132.     Knowing that it could not continue its channel stuffing practices, Hain was forced to release a dismal forecast for its fiscal fourth quarter and Fiscal Year 2017.  Based on the forecast, Hain expects to earn between $1.19 to $1.22 a share, on an adjusted basis, for the fiscal year.  This is well short of consensus estimate of $1.94 a share.  Hain's revenue was projected at $2.84 billion to $2.86 billion, shy of the $2.906 billion expected.

133.     In each of the June 22, 2017 filings, the Company admitted that it suffered from material weaknesses in financial reporting.  Hain's Form 10-K reports:

> Under the supervision and with the participation of our management, including the CEO and CFO, we conducted an evaluation of the effectiveness of our internal control over

financial reporting as of June 30, 2016. In making this assessment, management used the criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, management, including our CEO and CFO, has concluded that our internal control over financial reporting was not effective as of June 30, 2016 due to material weaknesses in our internal control over financial reporting, which are disclosed below.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. In connection with the assessment of our internal control over financial reporting described above, management identified the following deficiencies that constituted individually, or in the aggregate, material weaknesses in our internal control over financial reporting as of June 30, 2016:

- *Ineffective Control Environment* - The Company's control environment did not sufficiently promote effective internal control over financial reporting, which contributed to the other material weakness described below. Principle contributing factors included: (i) an insufficient number of personnel appropriately qualified to perform control design, execution and monitoring activities; (ii) an insufficient number of personnel with an appropriate level of U.S. GAAP knowledge and experience and ongoing training in the application of U.S. GAAP commensurate with our financial reporting requirements; and (iii) in certain instances, insufficient documentation or basis to support accounting estimates.

- *Revenue Recognition* - The Company's internal controls to identify, accumulate and assess the accounting impact of certain concessions or side agreements on whether the Company's revenue recognition criteria had been met were not adequately designed or operating effectively. The Company's controls were not effective to ensure (i) consistent standards in the level of documentation of agreements required to support accurate recording of revenue transactions, and (ii) that such documentation is retained, complete, and independently reviewed to ensure certain terms impacting revenue recognition were accurately reflected in the Company's books and records.

> In addition, the Company did not design and maintain
> effective controls over the timing and classification of trade
> promotion spending.

134.    In addition to the revised financial statements, the Company announced that,

similar to Smith before him, Conte was leaving Hain "to pursue other opportunities" effective

June 23, 2017.

135.    Later that day, the Company hosted an earnings conference call with various

securities analysts to discuss Hain's financial results for Fiscal Year 2016 as well as the first,

second, and third quarters of Fiscal Year 2017.  Simon opened the call by thanking Hain's

"finance teams, legal teams for getting us across the finish line."

136.    Simon also described the "thorough and time-intensive effort" to complete the

accounting review, seemingly unaware that in the previous year he stated there was "nothing

wrong with Hain's accounting at all":

> The review was self-initiated and involved a fully independent
> review led by our audit committee with independent counsel, our
> independent auditors; we also engaged the revenue recognition
> expert and a global consulting firm to assist in this review. This
> was an intensely comprehensive effort encompassing three years of
> audited financials as well as numerous customer transactions
> related entries dating back to fiscal year 2014.
>
> * * *
>
> So, I want to thank once again all our employees. And let me tell
> you something, they deserve a big round of applause, because, I
> don't think there is one weekend that most people have not been
> here whether it's Father's Day, Mother's Day, Thanksgiving, et
> cetera and they deserve a lot.

137.    Also on the conference call, the Company's new CFO, James Langrock,

recognizing the utter lack of internal controls at place at Hain, referenced the massive

remediation efforts that were necessary to fix the problems at Hain:

> We have expanded our team with new hires including a new
> controller for the U.S. segment, a global revenue controller ahead
> of internal audit, and a Chief Compliance Officer. We have also
> improved our financial controls globally through enhanced
> standardized contract accounting policies; expanded review
> processes and monitoring controls over contracts with customers,
> customer payments in incentives, and the implementation of an
> extensive revenue recognition and contract review training
> program as well as new policies and procedures around revenue
> recognition and other significant accounting matters.

138.    It is CW 3's understanding that Hain recently terminated Marla Hyndman, Hain's

Controller, and Marco Guerrero, who worked directly with Meiers.  Indeed, the Company has

removed Ms. Hyndman's name from its website, where she had been previously listed as Senior

Management for Hain Celestial North America and Hain's Senior Vice President and Controller.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN HAIN'S FINANCIAL RESULTS

### A.    First Quarter Fiscal Year 2014 Results – November 2013

139.    The Class Period begins on November 5, 2013.  On that date, Hain filed with the

SEC a Report on Form 8-K signed by Smith providing financial results for the first fiscal quarter

ended September 30, 2013 (the "Q1 FY 2014 8-K").  Additionally, on November 12, 2013, Hain

filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Smith,

containing Hain's financial results for the first quarter ended September 30, 2013 (the "Q1 FY

2014 10-Q").

#### 1.    Form 8-K for the First Quarter Fiscal Year 2014

140.    The Q1 FY 2014 8-K touted "net sales of $477.5 million, a 33% increase,

compared to net sales of $359.8 million in the first quarter of fiscal year 2013."  Additionally,

"Hain Celestial US reported record first quarter sales of $312.0 million, a 23% increase,

including strong sales from Ella's Kitchen® and BluePrint® brands acquired after the first

quarter of fiscal year 2013."

141.    The Company attributed the growth in net sales to "***strong brand contribution***" with "***double-digit growth***" by, amongst other brands, Spectrum.

142.    The Q1 FY 2014 8-K also boasted "earned income from continuing operations of $27.7 million compared to $19.8 million in the prior year first quarter, a 40% increase, and reported earnings per diluted share from continuing operations of $0.57 compared to $0.42 in the prior year first quarter."  "Adjusted net income was $25.3 million compared to $19.2 million in the prior year first quarter, a 32% increase and adjusted earnings per diluted share was $0.52 compared to $0.41, a 27% increase."

143.    The Q1 FY 2014 8-K also reconfirmed the Company's annual guidance for Fiscal Year 2014 and updated its first half of Fiscal Year 2014 earnings guidance:

- Total net sales range of $2.025 billion to $2.050 billion for fiscal year 2014; an increase of approximately 17% as compared to fiscal year 2013.

- Earnings range of $2.95 to $3.05 per diluted share for fiscal year 2014; an increase of 16% to 20% as compared to fiscal year 2013.

- Earnings range of $1.37 to $1.42 per diluted share for the first half of fiscal year 2014.

144.    Analysts were quick to praise the Company's results.  For example, on the same day Hain filed the Q1 FY 2014 8-K, analysts at Jeffries noted in a report that Hain's earnings per share for the quarter was 1 cent ahead of the Company's guidance and increased their price target.  The analysts were well aware that the natural and organic food market was "suffering from overcapacity and poor demand" but unaware of the channel stuffing fraud the analysts referred to Hain as "one of the few bright spots" in the natural and organic food market.

145.    Also on November 5, 2013, analysts at BMO Capital Markets reported on Hain's "strong growth" in MaraNatha and Spectrum brands while stating that Hain's EPS growth guidance "appears to be conservative."

## 2.    First Quarter Fiscal Year 2014 Financial Results on Form 10-Q

146.    The Q1 FY 2014 10-Q contained information concerning the Company's current financial condition for the first quarter ended September 30, 2013, including the figures provided above in the Q1 FY 2014 8-K.

## B.    Second Quarter Fiscal Year 2014 Results – February 2014

147.    On February 4, 2014, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the second fiscal quarter ended December 31, 2013 (the "Q2 FY 2014 8-K").  Additionally, on February 10, 2014, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the second quarter ended December 31, 2013 (the "Q2 FY 2014 10-Q").

## 1.    Form 8-K for the Second Quarter Fiscal Year 2014

148.    The Q2 FY 2014 8-K touted "record net sales of $535 million in the second quarter, an 18% increase, compared to net sales of $455 million in the second quarter of fiscal year 2013."  Additionally, "Hain Celestial US reported record second quarter net sales of $328 million, a 17% increase."

149.    The Q2 FY 2014 8-K also touted "earned net income of $41 million compared to $32 million in the prior year second quarter, a 30% increase, and reported earnings per diluted share of $0.84, which includes $0.03 earnings per diluted share from discontinued operations, compared to $0.67, a 25% increase compared to last year."  "Adjusted net income was $43 million compared to $35 million in the prior year second quarter, a 23% increase, and adjusted earnings per diluted share was $0.87 compared to $0.74, an 18% increase compared to last year."

150.     Simon attributed the Company's "*record second quarter results, the highest in the Company's history and our twelfth consecutive quarter of year-over-year double digit sales*" to "*strong sales driven by expanded distribution and brand contribution as well as robust operating margin expansion as we leveraged our selling, general and administrative expenses with a higher sales base.*"

151.     The Q2 FY 2014 8-K also raised the Company's annual guidance for Fiscal Year 2014:

- Total net sales range of $2.115 billion to $2.145 billion for fiscal year 2014; an increase of approximately 22% to 24% as compared to fiscal year 2013.

- Earnings range of $3.07 to $3.15 per diluted share for fiscal year 2014; an increase of 21% to 25% as compared to fiscal year 2013."

152.     Defendants' channel stuffing had its desired effect.  In response to the Q2 FY 2014 8-K, Piper Jaffray issued an analyst report titled "Distribution Gains Remain Compelling; Reiterate Overweight" noting that "HAIN reported FQ2 adjusted EPS of $0.87 which came in line with our estimate and consensus" and stating the "U.S. business remains strong."

**2.     Second Quarter Fiscal Year 2014 Financial Results on Form 10-Q**

153.     The Q2 FY 2014 10-Q contained information concerning the Company's current financial condition for the three and six months ended December 31, 2013, including the figures provided above in the Q2 FY 2014 8-K.

**C.     Third Quarter Fiscal Year 2014 Results – May 2014**

154.     On May 8, 2014, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the third fiscal quarter ended March 31, 2014 (the "Q3 FY 2014 8-K"). Additionally, on May 12, 2014, Hain filed with the SEC a Report on Form 10-Q, signed and

- 43 -

certified as accurate by Simon and Smith, containing Hain's financial results for the third quarter ended March 31, 2014 (the "Q3 FY 2014 10-Q").

### 1.    Form 8-K for the Third Quarter Fiscal Year 2014

155.    The Q3 FY 2014 8-K boasted record "net sales of $557.4 million, a 22% increase, compared to net sales of $456.1 million in the third quarter of fiscal year 2013.  Hain Celestial US reported record third quarter net sales of $319.5 million, a 15% increase."

156.    The Q3 FY 2014 8-K also published "earned adjusted net income from continuing operations of $44.5 million compared to $34.4 million in the prior year third quarter, a 29% increase and reported adjusted earnings per diluted share from continuing operations of $0.88 compared to $0.72, a 22% increase."  "Net income was $35.2 million compared to $40.7 million in the prior year third quarter."

157.    Simon attributed the "***record third quarter results, the highest net sales in the Company's history and our 13th consecutive quarter of year-over-year double digit net sales and adjusted earnings growth***" to "***strong demand for our organic and natural brands as demonstrated by the increasing consumption of our products***."

158.    The Q3 FY 2014 8-K also raised the Company's guidance for Fiscal Year 2014:

- Total net sales range of $2.145 billion to $2.150 billion for fiscal year 2014; an increase of approximately 24% as compared to fiscal year 2013.

- Earnings range of $3.14 to $3.17 per diluted share for fiscal year 2014; an increase of 24% to 25% as compared to fiscal year 2013."

159.    Analysts at Piper Jaffray in a May 8, 2014 report referred to the results reported in the Q3 FY 2014 8-K as "Impressive" and noted that Hain again beat Wall Street expectations: "HAIN's FQ3 adjusted EPS of $0.88 came in above our estimate and consensus while net sales of $557M was in-line with consensus expectations but beat our model."

160.    In a May 8, 2014 report, analysts at SunTrust Robinson Humphrey reiterated their buy recommendation because of Hain's "solid 3Q14 results" with revenue of $557M and EPS of $0.88 just ahead of consensus estimates of $556M and $0.86.  The analysts remarked that the U.S. business was "hitting on all cylinders."

### 2.    Third Quarter Fiscal Year 2014 Financial Results on Form 10-Q

161.    The Q3 FY 2014 10-Q contained information concerning the Company's current financial condition for the three and nine months ended March 31, 2014, including the figures provided above in the Q3 FY 2014 8-K.

### D.    Fourth Quarter and Full Fiscal Year 2014 Results – August 2014

162.    On August 20, 2014, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the fourth fiscal quarter and fiscal year ending June 30, 2014 (the "FY 2014 8-K").  Additionally, on August 27, 2014, Hain filed with the SEC a Report on Form 10-K, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the Fiscal Year ending June 30, 2014 and the interim quarters (the "FY 2014 10-K").

### 1.    Form 8-K for the Fourth Quarter and Full Fiscal Year 2014

163.    The FY 2014 8-K contained information concerning the Company's fourth quarter and full fiscal year 2014 financial condition boasting record sales.  Indicated as performance highlights were "net sales for the fourth quarter of fiscal year 2014 were a record $583.8 million, an increase of 26.0% compared to net sales of $463.5 million in the prior year fourth quarter." Additionally, "Hain Celestial US reported record net sales of $323.0 million, a 13.2% increase."

164.    The FY 2014 8-K included the following financial results for the fourth quarter of

fiscal year 2014:

> The Company earned income from continuing operations of $35.7
> million compared to $25.9 million in the prior year fourth quarter
> and reported earnings per diluted share from continuing operations
> of $0.70 compared to $0.53 in the prior year fourth quarter, a
> 32.1% increase. Adjusted income from continuing operations was
> $46.0 million compared to $31.7 million, a 45.3% increase, and
> adjusted earnings per diluted share from continuing operations was
> $0.90 compared to $0.65, a 38.5% increase, from the prior year
> fourth quarter. Adjusted EBITDA reached a record $79.4 million
> during the fourth quarter.

165.    The FY 2014 8-K also included the following financial results for the full fiscal

year 2014:

> Worldwide net sales for fiscal year 2014 were a record $2.154
> billion, an increase of 24.2% compared to net sales of $1.735
> billion in the prior year. Hain Celestial US reported record net
> sales of $1.282 billion, a 17.0% increase.

> * * *

> The Company earned income from continuing operations of
> $141.5 million compared to $119.8 million in the prior year and
> reported earnings per diluted share from continuing operations of
> $2.83 compared to $2.52 in the prior year, a 12.3% increase.
> Adjusted income from continuing operations was $158.6 million
> compared to $120.2 million, a 32.0% increase, and adjusted
> earnings per diluted share from continuing operations was $3.17
> compared to $2.53 in the prior year, a 25.3% increase. Adjusted
> EBITDA reached a new high of $300.0 million for the fiscal year
> ended June 30, 2014.

166.    Simon attributed the record net sales for the fiscal year to the "***US business***

***continu[ing] to generate strong results as momentum for organic and natural products builds***

***across various channels of distribution.***"

167.    The FY 2014 8-K provided annual guidance for fiscal year 2015 including "[t]otal

net sales range of $2.725 billion to $2.80 billion; an increase of approximately 27% to 30% as

- 46 -

compared to fiscal year 2014" and "[e]arnings range of $3.72 to $3.90 per diluted share; an increase of 17% to 23% as compared to fiscal year 2014."

168.    After Hain filed the FY 2014 8-K, analysts became increasingly bullish on Hain stock.  For example, analysts at Piper Jaffray issued a report on August 20, 2014 increasing its price target stating "Hain Celestial reported better than expected top and bottom line results reflecting solid productivity gains, high single digit organic growth, and guidance better than we expected."  BB&T Capital Markets issued a report the same day noting that "the beat was driven by strong sales which grew 26% to $583.8M, above our 24.9% forecast and consensus at 24.6%."

169.    Analysts at SunTrust Robinson Humphrey were "most impressed with" the "8.5% organic growth in the US" considering the "lingering concern from investors of how choppy trends in the natural/organic channel would impact HAIN's results."

**2.    Fourth Quarter and Full Fiscal Year 2014 Financial Results on Form 10-Q**

170.    The FY 2014 10-K contained information concerning the Company's current financial condition for the fourth quarter and full fiscal year ended June 30, 2014, including the figures provided above in the FY 2014 8-K.

**E.    First Quarter Fiscal Year 2015 Results – November 2014**

171.    On November 6, 2014, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the first fiscal quarter ended September 30, 2014 (the "Q1 FY 2015 8-K").  Additionally, on November 7, 2014, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the first quarter ended September 30, 2014 (the "Q1 FY 2015 10-Q").

**1.      Form 8-K for the First Quarter Fiscal Year 2015**

172.      The Q1 FY 2015 8-K boasted record "net sales of $631.3 million; adjusted net sales of $642.6 million, a 35% increase over the prior year period net sales."  Additionally, "Hain Celestial US reported record first quarter net sales of $336.9 million."

173.      The Q1 FY 2015 8-K also publicized "earned net income of $18.9 million and adjusted net income of $34.7 million for the first quarter."  "Earnings per diluted share was $0.37 and on an adjusted basis was $0.68, a 31% increase from the prior year first quarter."

174.      Simon attributed "***the highest quarterly net sales in the Company's history***" to Hain's "***diverse portfolio of brands and products across multiple categories and our customer base across various channels of distribution.***"

175.      The Q1 FY 2015 8-K also reiterated the Company's annual guidance for Fiscal Year 2015:

- Total net sales range of $2.725 billion to $2.80 billion; an increase of approximately 27% to 30% as compared to fiscal year 2014.

- Earnings range of $3.72 to $3.90 per diluted share; an increase of 17% to 23% as compared to fiscal year 2014.

**2.      First Quarter Fiscal Year 2015 Financial Results on Form 10-Q**

176.      The Q1 FY 2015 10-Q contained information concerning the Company's current financial condition for the first quarter ended September 30, 2014, including the figures provided above in the Q1 FY 2015 8-K.

**F.      Second Quarter Fiscal Year 2015 Results – February 2015**

177.      On February 4, 2015, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the second fiscal quarter ended December 31, 2014 (the "Q2 FY 2015 8-K").  Additionally, on February 9, 2015, Hain filed with the SEC a Report on

Form 10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the second quarter ended December 31, 2014 (the "Q2 FY 2015 10-Q").

### 1.     Form 8-K for the Second Quarter Fiscal Year 2015

178.    The Q2 FY 2015 8-K touted "net sales of $696.4 million; record adjusted net sales of $701.7 million, a 31% increase over the prior year period adjusted net sales." Additionally, "Hain Celestial US reported record second quarter net sales of $354.0 million and record second quarter adjusted net sales of $359.3 million, an increase of 10% over the prior year second quarter."

179.    The Q2 FY 2015 8-K also disclosed "earned net income of $44.6 million and adjusted net income of $55.5 million for the second quarter" and "[e]arnings per diluted share was $0.43 and on an adjusted basis was $0.54, a 26% increase from the prior year second quarter."

180.    Simon attributed the "***record results***" to Hain's "***diverse portfolio of worldwide brands, overcoming foreign currency impacts to deliver our 17th consecutive quarter of year-over-year double digit sales and adjusted earnings growth.***"

181.    The Q2 FY 2015 8-K also updated the Company's annual guidance for Fiscal Year 2015:

- Total net sales range of $2.650 billion to $2.675 billion; an increase of approximately 23% to 24% as compared to fiscal year 2014.

- Earnings range of $1.85 to $1.89 per diluted share; an increase of 17% to 19% as compared to fiscal year 2014.

2.      **Second Quarter Fiscal Year 2015 Financial Results on Form 10-Q**

182.    The Q2 FY 2015 10-Q contained information concerning the Company's current financial condition for the three and six months ended December 31, 2014, including the figures provided above in the Q2 FY 2015 8-K.

G.      **Third Quarter Fiscal Year 2015 Results – May 2015**

183.    On May 6, 2015, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the third fiscal quarter ended March 31, 2015 (the "Q3 FY 2015 8-K"). Additionally, on May 11, 2015, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the third quarter ended March 31, 2015 (the "Q3 FY 2015 10-Q").

1.      **Form 8-K for the Third Quarter Fiscal Year 2015**

184.    The Q3 FY 2015 8-K touted record "net sales of $662.7 million, a 19% increase over the prior year period."  Additionally, "Hain Celestial US reported record third quarter net sales of $343.7 million, an increase of 8%, over the prior year third quarter."

185.    The Q3 FY 2015 8-K also disclosed "earned net income of $33.4 million and adjusted net income of $46.5 million for the third quarter" and "[e]arnings per diluted share of $0.32; adjusted earnings per diluted share of $0.45."

186.    Simon attributed the Company's "*18th consecutive year-over-year double digit net sales growth*" to "*the strength of our core brands and contributions from acquisitions.*"

187.    The Q3 FY 2015 8-K also updated the Company's annual guidance for Fiscal Year 2015:

- Total net sales range of $2.692 billion to $2.700 billion; an increase of approximately 25% as compared to fiscal year 2014.

- Earnings range of $1.86 to $1.90 per diluted share; an increase of 17% to 20% as compared to fiscal year 2014.

188.     Defendants' statements gave assurances to analysts.  Analysts at Imperial Capital stated in a report the same day as the Q3 FY 2015 8-K titled "Growth Rates Appear Stable" and "Consistent with Consensus."  J.P. Morgan analysts remained "Overweight" on the stock, stating in a report the following day, May 7, 2015, that "[w]e are constructive on the HAIN story, which we think has legs over the long term. We expect continued high organic sales growth."  Wells Fargo Securities noted in a May 7, 2015 analyst report that "Hain's U.S. distribution story continues to show solid momentum."

189.     As the Company later reported in its annual report for Fiscal Year 2016 filed on June 22, 2017, Hain's original statements regarding sales and overall health and trajectory were false.  In fact, the revised statements for the third quarter of Fiscal Year 2015 reveal that, but for Hain's improper channel stuffing and accounting, the Company would have missed Wall Street consensus net sales estimates for the quarter.

## 2.     Third Quarter Fiscal Year 2015 Financial Results on Form 10-Q

190.     The Q3 FY 2015 10-Q contained information concerning the Company's current financial condition for the three and nine months ended March 31, 2015, including the figures provided above in the Q3 FY 2015 8-K.

## H.     Fourth Quarter and Full Fiscal Year 2015 Results – August 2015

191.     On August 18, 2015, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the fourth fiscal quarter and fiscal year ended June 30, 2015 (the "FY 2015 8-K").  Additionally, on August 21, 2015, Hain filed with the SEC a Report on Form 10-K, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the Fiscal Year ended June 30, 2015 and the interim quarters (the "FY 2015 10-K").

### 1. Form 8-K for the Fourth Quarter and Full Fiscal Year 2015

192.    The FY 2015 8-K contained information concerning the Company's fourth quarter of fiscal year 2015 financial condition boasting "[r]ecord fourth quarter net sales of $698.1 million, a 20% increase over the prior year period" and full year "[r]ecord net sales of $2.69 billion, a 25% increase; adjusted net sales of $2.71 billion."  Additionally, "Hain Celestial US reported record fourth quarter net sales of $332.8 million" and for the full fiscal year, "record net sales of $1.367 billion."

193.    The FY 2015 8-K included the following financial results for the fourth quarter of fiscal year 2015:

> The Company earned net income from continuing operations of $71.1 million, a 99% increase, and adjusted net income of $57.2 million, a 24% increase, compared to the prior year fourth quarter. Earnings per diluted share for the fourth quarter were $0.68, a 94% increase versus the prior year period, which includes a $20.7 million tax benefit resulting from an election made during the quarter to change the tax status of one of the Company's international subsidiaries. On an adjusted basis earnings per diluted share for the fourth quarter were $0.55, a 22% increase.

194.    The FY 2015 8-K included the following financial results for the full fiscal year 2015:

> The Company earned net income from continuing operations of $167.9 million, a 19% increase, and adjusted net income of $193.9 million, a 22% increase, for the fiscal year. Earnings per diluted share for the fiscal year were $1.62, a 16% increase, and on an adjusted basis were $1.88, an 18% increase.

195.    Simon attributed the "***record net sales and earnings growth***" to "***strong worldwide demand for our diverse portfolio of leading organic and natural brands across many product categories, sales channels and geographies.***"

196.     The FY 2015 8-K also provided annual guidance for fiscal year 2016:

- Total net sales range of $2.97 billion to $3.11 billion, an increase of approximately 10% to 15% as compared to fiscal year 2015;

- Earnings range of $2.11 to $2.26 per diluted share, an increase of 12% to 20% as compared to fiscal year 2015.

197.     Analysts and investors responded positively to Hain's sales numbers meeting Wall Street's expectations.  Analysts at Maxim Group stated in a report published the same day as the FY 2015 8-K that Hain's sales were "inline with our estimate and $6M above the consensus" adding that "[c]oncerns over a slowdown in the natural channel are overblown."

198.     Similarly, analysts at BMO Capital Markets stated in a report the following day that "investor concerns of a sales growth slowdown are misplaced; HAIN's U.S. organic sales growth is poised to accelerate in F2016."

199.     As the Company later reported in its annual report for Fiscal Year 2016 filed on June 22, 2017, Hain's original statements regarding sales and overall health and trajectory were false.  In fact, the revised statements for the fourth quarter of Fiscal Year 2015 reveal that, but for Hain's improper channel stuffing and accounting, the Company would have missed Wall Street consensus net sales estimates for the quarter.

> **2.     Fourth Quarter and Full Fiscal Year 2015 Financial Results on Form 10-K**

200.     The FY 2015 10-K contained information concerning the Company's current financial condition for the fourth quarter and full year ended June 30, 2015, including the figures provided above in the FY 2015 8-K.

**I.     First Quarter Fiscal Year 2016 Results – November 2015**

201.     On November 5, 2015, Hain filed with the SEC a Report on Form 8-K signed by Conte providing financial results for the first fiscal quarter ended September 30, 2015 (the "Q1

FY 2016 8-K"). Additionally, on November 9, 2015, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Conte, containing Hain's financial results for the first quarter ended September 30, 2015 (the "Q1 FY 2016 10-Q").

### 1.    Form 8-K for the First Quarter Fiscal Year 2016

202.    The Q1 FY 2016 8-K disclosed "[r]ecord first quarter net sales of $687.2 million, a 9% increase over the prior year period or, on a constant currency basis, an 11% increase over prior year adjusted net sales of $642.6 million." Additionally, "[t]he United States segment reported first quarter net sales of $331 million."

203.    Simon attributed this success to "***the diversification of our business across our branded organic and natural product categories, sales channels and geographies, which fueled solid worldwide results in our typically lowest sales and profitability quarter.***"

204.    The Q1 FY 2016 8-K announced "earned net income of $31.3 million, a 67% increase, and adjusted net income of $38.2 million, a 10% increase, compared to the prior year first quarter. Earnings per diluted share for the first quarter were $0.30, a 67% increase versus the prior year period. On an adjusted basis earnings per diluted share for the first quarter were $0.37, a 9% increase."

205.    The Q1 FY 2016 8-K also announced the Company's annual guidance for fiscal year 2016 which proposed an increase of 10% to 15% in total net sales from fiscal year 2015 at a predicted range of $2.97 billion to $3.11 billion. The report indicated an earnings range of $2.11 to $2.26 per diluted share which is an increase of 12% to 20% over fiscal year 2015.

### 2.    First Quarter Fiscal Year 2016 Financial Results on Form 10-Q

206.    The Q1 FY 2016 10-Q contained information concerning the Company's current financial condition for the three months ended September 30, 2015, including the figures provided above in the Q1 FY 2016 8-K.

J.     **Second Quarter Fiscal Year 2016 Results – February 2016**

207.    On February 1, 2016, Hain filed with the SEC a Report on Form 8-K signed by Conte providing financial results for the second fiscal quarter ended December 31, 2015 (the "Q2 FY 2016 8-K").  Additionally, on February 9, 2016, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Conte, containing Hain's financial results for the second quarter ended December 31, 2015 (the "Q2 FY 2016 10-Q").

1.     **Form 8-K for the Second Quarter Fiscal Year 2016**

208.    The Q2 FY 2016 8-K contained information concerning the Company's financial condition announcing again record results.  The Q2 FY 2016 8-K touted "Record net sales of $752.6 million, an 8% increase, or 11% on a constant currency basis, over prior year net sales of $696.4 million" and called for a 28% increase in earnings per diluted share of $0.55 as compared to the same period in the prior year.  Additionally, "[t]he United States segment reported second quarter net sales of $342.3 million," nearly half of the Company's net sales.

209.    Simon commented that: "***Our strong sales growth was impacted in the quarter primarily by reductions in inventories at certain customers in the United States segment.***"

210.    "The Company earned net income of $56.9 million, a 28% increase, and adjusted net income of $59.2 million, a 7% increase, compared to the prior year period. Earnings per diluted share for the second quarter were $0.55, a 28% increase compared to the prior year period. On an adjusted basis earnings per diluted share for the second quarter were $0.57, a 6% increase compared to the prior year period."

211.    The Q2 FY 2016 8-K also reiterated the Company's Fiscal Year 2016 guidance expectations of "[t]otal net sales range of $2.90 billion to $3.04 billion, an increase of approximately 7% to 12% as compared to fiscal year 2015, and [e]arnings per diluted share

range of $1.95 to $2.10, an increase of approximately 4% to 12% as compared to fiscal year 2015."

212.     As the Company later reported in its annual report for Fiscal Year 2016 filed on June 22, 2017, Hain's original statements regarding sales and overall health and trajectory were false.  In fact, the revised statements for the second quarter of Fiscal Year 2016 reveal that, but for Hain's improper channel stuffing and accounting, the Company would have missed Wall Street consensus net sales estimates for the quarter.

### 2.     Second Quarter Fiscal Year 2016 Financial Results on Form 10-Q

213.     The Q2 FY 2016 10-Q contained information concerning the Company's current financial condition for the three and six months ended December 31, 2015, including the figures provided above in the Q2 FY 2016 8-K.

### K.     Third Quarter Fiscal Year 2016 Results – May 2016

214.     On May 4, 2016, Hain filed with the SEC a Report on Form 8-K signed by Conte providing financial results for the third fiscal quarter ended March 31, 2016 (the "Q3 FY 2016 8-K"). Additionally, on May 10, 2016 Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Conte, containing Hain's financial results for the third quarter ended March 31, 2016 (the "Q3 FY 2016 10-Q").

### 1.     Form 8-K for the Third Quarter Fiscal Year 2016

215.     The Q3 FY 2016 8-K contained information concerning the Company's financial condition boasting once again record sales.  Indicated as performance highlights, were "Net sales of $750.0 million, a 13% increase, or 15% on a constant currency basis, over prior year period net sales of $662.7 million."  Net income for the three months ended March 31, 2016, accordingly increased from $96.8 million in 2015 to $137.2 million in 2016.  Additionally, earnings per diluted share increased 47% reaching $0.47 over the prior year period.

216.     The Q3 FY 2016 8-K also announced "earned net income of $49.0 million, a 47% increase, and adjusted net income of $50.6 million, a 9% increase, compared to the prior year period. Earnings per diluted share for the third quarter were $0.47, a 47% increase compared to the prior year period."

217.     The Company also increased financial projections for fiscal year 2016.  In particular, the Company stated that total net sales would increase 9% to 10% over the prior year period indicating a predicted range of $2.946 billion to $2.966 billion and earnings per diluted share increase of 6% to 9% at a range of $2.00 to $2.04.

218.     Simon ascribed these strong financial results to "*[t]he diversification of our product portfolio with leading organic, natural and better-for-you brands around the world, combined with our team's solid execution of our operational initiatives [which] fueled our financial performance.*"

219.     Simon also applauded the performance of the Company's United States segment which reported net sales of $351.9 million for the third quarter, a growth of 2.4% over the prior year period, stating, "*We are extremely pleased with our US results where we returned to growth in the third quarter and expect these trends to continue.*"

220.     Hain's positive quarter due to channel stuffing had its intended effect as analysts at Morningstar noted in a May 4, 2016 report that the "result aligns with our view that much of Hain's recent challenges are transitory" and that "Hain's [r]eturn to U.S. [g]rowth [s]upports [o]ur [l]ong-[t]erm [o]utlook."

221.     Also, in response to Hain's announcement of the Company's financial results, analysts at Maxim Group in a May 4, 2016 report noted "we would continue to be buyers of HAIN after the better-than-expected FY3Q16 (Mar) results."

222.     Analysts at SunTrust Robinson Humphrey also reiterated a buy rating for Hain stock in a May 4, 2016 report noting that the financial results were "above our estimate . . . and the consensus estimate."  The SunTrust analysts added, "HAIN expects the growth to accelerate in the coming quarter, aided by favorable comparisons and new distribution wins, and the company now expects a return to their historical target of mid-single-digit growth for the US business in FY17."

### 2.     Third Quarter Fiscal Year 2016 Financial Results on Form 10-Q

223.     The Q3 FY 2016 10-Q contained information concerning the Company's current financial condition for the three and nine months ended March 31, 2016, including the figures provided above in the Q3 FY 2016 8-K.

224.     Hain, Simon, and Conte knew, or were deliberately reckless in disregarding that the statements set forth in paragraphs 140 through 223 were materially false and misleading when made and omitted material information because the financial statements failed to properly disclose that the Company was improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  Correspondingly, all of the announced net sales, net income and earnings relating to the corresponding fiscal quarter and fiscal year were artificially overstated by $167 million during the Class Period as admitted by the Company in their June 22, 2017 restatement (as detailed in paragraphs 125 through 137).  In addition, Hain's undisclosed channel stuffing practices artificially increased estimates of future sales, future net income and earnings estimates and misrepresented the underlying customer demand represented by these financial reports.  Hain's estimates of future sales, future net income and earnings estimates also omitted to disclose that Hain would need to overcome enormous product returns in the following quarter as a result of Hain's channel stuffing practices

during the reported fiscal quarter.  Further, Simon and Conte did not expect the growth of U.S. sales to continue because distributors' inventory levels had reached capacity and they could no longer handle Hain's improper channel stuffing. These false statements and/or omissions were material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

## VIII.   ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.   Analyst Conferences and Earnings Conference Calls

#### 1.   2014 ICR Conference – January 14, 2014

225.    In a speech given at the 2014 ICR Conference on January 14, 2014, Simon discussed how sales in the BluePrint brand had doubled because "***We expanded distribution, and we will continue to expand the product line and new offerings into other categories.***"

226.    Simon knew, or was deliberately reckless in disregarding, that the statement set forth in paragraph 225 was materially false and misleading when made and omitted material information because the statement failed to mention that BluePrint's expanded distribution involved improperly turning inventory into sales by booking shipments to distributors as sales and booking revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.

#### 2.   Earnings Conference Call for Second Quarter Fiscal Year 2014 – February 4, 2014

227.    On February 4, 2014, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Smith participated, with various securities analysts to discuss Hain's second quarter fiscal year 2014 results.

228.    During the question and answer portion of the conference call, Carroll was asked "if consumption is 9% and you are saying core sales growth is mid- to high-single digit, are we

having some inventory issues [with] some of the larger customers that is causing the wheels to slow down?"  Carroll, responded, "***No, no, actually -- no, I think whatever slowdown we are seeing here is a function of the inventory build, the pipeline builds for some major distribution gains that we got in the beginning of the fiscal.***"

229.    Another analyst followed up on this response noting, "So just to paraphrase you, John, things going out the door, retailers are a little higher right now than what you are shipping to them, but you think that will square itself in the second half?"  Carroll responded, "***Yes, they will catch up***."

230.    Carroll knew, or was deliberately reckless in disregarding, that the statements set forth in paragraphs 228 and 229 were materially false and misleading when made and omitted material information because the inventory build and major distribution gains were the result of improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  Further, Simon and Smith were present during the conference call and did not correct Carroll's statement.  These false statements and/or omissions were material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

**3.    Earnings Conference Call for Fourth Quarter and Full Fiscal Year 2014 – August 20, 2014**

231.    On August 20, 2014, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Smith participated, with various securities analysts to discuss Hain's second quarter fiscal year 2014 results.

232.    During the question and answer portion of the conference call, an analyst asked Carroll to "touch on UNFI inventory reduction."  Carroll responded, "***UNFI has been***

- 60 -

*implementing their IO system, which is obviously their inventory optimization system . . . and it has been reflected in our guidance*."  Carroll added that UNFI's inventory reduction was "*between one to two weeks of inventory.*"  Simon said the UNFI's inventory reduction was "*somewhere between $16 million to $20 million that came out in the second half of this year and that was built into our guidance and built into our guidance going into fiscal 2015.*"

233.   Carroll and Simon knew, or were deliberately reckless in disregarding, that the statements set forth in paragraph 232 were materially false and misleading when made and omitted material information because UNFI's inventory reduction was the result of improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  Further, Smith was present during the conference call and did not correct Carroll's and Simon's statements.  These false statements and/or omissions were material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

### 4.   Earnings Conference Call for First Quarter Fiscal Year 2016 – November 5, 2015

234.   On November 5, 2015, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Conte participated, with various securities analysts to discuss Hain's first quarter fiscal year 2016 results.

235.   During Carroll's prepared remarks he attributed Hain Celestial US's "Q1 net sales shortfall" to "*lost sales and inventory from distributor and account shifts.*"

236.   Carroll knew, or was deliberately reckless in disregarding, that the statement set forth in paragraph 235 was materially false and misleading when made and omitted material information because the lost sales and inventory from distributor and account shifts was the

result of Hain previously improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  As distributors' inventory levels reached capacity they could no longer handle Hain's improper channel stuffing.  Further, Simon and Conte were present during the conference call and did not correct Carroll's statement. This false statement and/or omission was material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

### 5.   2016 ICR Conference – January 12, 2016

237.   On January 11, 2016, after the market closed, Hain cut its quarterly and annual guidance stating that it anticipated full-year sales of $2.9-$3.04 billion and earnings per share in the range of $1.95-$2.10, below its previous-issued guidance of $2.97 billion to $3.11 billion in sales revenue and earnings per share of $2.11-$2.26.

238.   The next afternoon on January 12, 2016 at the 2016 ICR Conference, Carroll acknowledged the guidance cut was "***in the area of inventory***" but attributed Hain's problems as "***one-offs***" and would alleviate the pressure on profits with a major cost reduction plan totaling about $100 million.

239.   Carroll knew, or was deliberately reckless in disregarding, that the statement set forth in paragraph 238 was materially false and misleading when made and omitted material information because the inventory one-offs was the result of Hain's previous practice of improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  Indeed, the inventory issues were not a one-off but an increasing problem as distributors' inventory levels reached capacity and could no longer handle

Hain's improper channel stuffing.  This false statement and/or omission was material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

   **6.    Simon Responds to Resignation of Hain's Chief Accounting Officer – January 22, 2016**

240.    On January 22, 2016, J.P. Morgan published a report entitled "Hain Celestial Group, Inc. (HAIN US) Comments from CEO on CAO" discussing Hain's recent revelation that Hain's Chief Accounting Officer, Ross Weiner, resigned from his position.  The report quoted Simon as stating there is "***nothing wrong with Hain's accounting at all***" and the Chief Accounting Officer is merely leaving to pursue another opportunity where he may ultimately have the chance to be CFO.

241.    Simon knew, or was deliberately reckless in disregarding, that the statement set forth in paragraph 240 was materially false and misleading when made and omitted material information because Hain's accounting and financial statements failed to properly account that the Company was improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  As a result of the improper accounting, Hain's financial results would have to be restated as detailed in paragraphs 125 through 137.   This false statement and/or omission was material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

   **7.    Earnings Conference Call for Second Quarter Fiscal Year 2016 – February 1, 2016**

242.    On February 1, 2016, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Conte participated, with various securities analysts to discuss Hain's second quarter fiscal year 2016 results.

243.   During the question and answer portion of the conference call an analyst asked Simon about "inventory de-stock" in the most recent quarter.  Simon responded, "from a sales decline right now, it was not because we have too many SKUs and we've got all these dying SKUs out there; *the biggest part of it was inventory reduction.*"

244.   Simon knew, or was deliberately reckless in disregarding, that the statement set forth in paragraph 243 was materially false and misleading when made and omitted material information because the inventory reduction was the result of Hain previously improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  As distributors' inventory levels reached capacity they could no longer handle Hain's improper channel stuffing.  Further, Carroll and Conte were present during the conference call and did not correct Simon's statement.  This false statement and/or omission was material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

**8.   Consumer Analyst Group of New York Conference –
February 17, 2016**

245.   On February 17, 2016, in a speech given at the Consumer Analyst Group of New York Conference, Conte stated "As John [Carroll] has previously discussed on our earnings call, the US segment declined due to Walmart's clean floor policy, losing Sensible Portion displays, discontinuing unprofitable club baby and nut butter SKUs; *loss of sales and inventory from a distributor and account shifts*; and loss of private-label sales, primarily in nut butters."

246.   Conte knew, or was deliberately reckless in disregarding that the statement set forth in paragraph 245 was materially false and misleading when made and omitted material information because the "loss of sales and inventory from distributor and account shifts" was the

- 64 -

result of Hain previously improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  As distributors' inventory levels reached capacity they could no longer handle Hain's improper channel stuffing.  Further, this purported excuse for the Company's sales decline was the same Carroll used in the prior fiscal quarter. This false statement and/or omission was material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

9.     **Earnings Conference Call for Third Quarter Fiscal Year 2016 – May 4, 2016**

247.     On May 4, 2016, the Company hosted an earnings conference call, in which Simon, Carroll, Meiers, and Conte participated, with various securities analysts to discuss Hain's third quarter fiscal year 2016 results.

248.     During the question and answer portion of the conference call, Simon and Carroll were asked about the U.S. segment "What gives you confidence to be able to get back up to that mid- single-digit rate next fiscal year?"  Carroll responded, in part:

> We're starting to see more distribution wins, particularly against our top 500 to 800 SKUs. We're resolving some of the issues that we had with retailers, for example, with the clean floor policy or **with distributors as we had accounts shift. . . . So we're pretty optimistic that we can drive the sort of growth that we are targeting here.**

249.     Carroll knew, or was deliberately reckless in disregarding, that the statement set forth in paragraph 248 was materially false and misleading when made and omitted material information because the distributor accounts shift was the result of Hain previously improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  As distributors' inventory levels reached capacity they could

no longer handle Hain's improper channel stuffing.  Further, this purported excuse for the

Company's sales decline was the same Carroll used in the prior fiscal quarter.  Further, Simon

and Conte were present during the conference call and did not correct Carroll's statement.  These

false statements and/or omissions were material to Hain investors because they would have

considered it when deciding to purchase Hain Securities.

**B.      Common Materially False and Misleading Statement Repeated Throughout
the Class Period**

250.     During the Class Period, Hain, Smith, and Conte issued a series of statements that

were repeated in the Company's various filings with the SEC.  These statements and the times

when they were issued to the investing public are detailed below.

**1.      Hain's Critical Accounting Policies**

251.     Throughout the Class Period, Hain, Simon, Smith, and Conte stated that Hain's

accounting policies with respect to revenue recognition, sales, promotional incentives, and

inventory were critical to accurately portray the financial condition of the Company and that

Hain complied with GAAP:

> Critical Accounting Estimates
>
> ***Our financial statements are prepared in accordance with
> accounting principles generally accepted in the United States***.
> The accounting principles we use require us to make estimates and
> assumptions that affect the reported amounts of assets and
> liabilities at the date of the financial statements and amounts of
> income and expenses during the reporting periods presented. We
> believe in the quality and reasonableness of our critical accounting
> policies; however, materially different amounts may be reported
> under different conditions or using assumptions different from
> those that we have applied. ***The accounting policies that have
> been identified as critical to our business operations and
> understanding the results of our operations pertain to revenue
> recognition, sales and promotional incentives, valuation of
> accounts and chargebacks receivable, inventory***, property, plant
> and equipment, accounting for acquisitions, stock based

- 66 -

compensation, goodwill and intangible assets and valuation allowances for deferred tax assets.

252.   Hain, Simon, and Smith signed the filings in which this statement appeared in connection with Hain's Q1 FY 2014 10-Q; Q2 FY 2014 10-Q; Q3 FY 2014 10-Q; Q1 FY 2015 10-Q; Q2 FY 2015 10-Q; and Q3 FY 2015 10-Q.  Hain, Simon, and Conte signed the filings in which this statement appeared in connection with Hain's Q1 FY 2016 10-Q; Q2 FY 2016 10-Q; and Q3 FY 2016 10-Q.

253.   Hain, Simon, Smith, and Conte knew, or were deliberately reckless in disregarding, that the statements set forth in paragraph 251 were materially false and misleading when made and omitted material information because the Company's financial statements were not prepared in accordance with accounting principles generally accepted in the United States because the Company was improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  Further, the Company had no regard for treating generally accepted accounting policies regarding revenue recognition, sales, promotional incentives and inventory as critical to Hain's business operations.

### 2.   Hain's Revenue Recognition Practices

254.   Throughout the Class Period, Hain disclosed the Company's purported practices for revenue recognition:

> Sales are recognized when the earnings process is complete, which occurs when products are shipped in accordance with terms of agreements, ***title and risk of loss transfer to customers, collection is probable*** and pricing is fixed or determinable. ***Sales are reported net of sales and promotion incentives, which include trade discounts and promotions and certain coupon costs.*** Shipping and handling costs billed to customers are included in reported sales. Allowances for cash discounts are recorded in the period in which the related sale is recognized.

255.    Hain, Simon, and Smith signed the filings in which this statement appeared in connection with Hain's FY 2014 10-K and the FY 2015 10-K.

256.    Hain, Simon, and Smith knew, or were deliberately reckless in disregarding, that the statements set forth in paragraph 254 were materially false and misleading when made and omitted material information because, contrary to what Defendants disclosed regarding the Company's revenue recognition practices, the Company was improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  Thus, no title or risk of loss transferred to the distributors.  These false statements and/or omissions were material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

### 3.    Hain's Sales and Promotion Incentives

257.    Throughout the Class Period, Hain made statements regarding the Company's purported practices for sales and promotion incentives: "Sales incentives and promotions include price discounts, slotting fees and coupons and are used to support sales of the Company's products. ***These incentives are deducted from our gross sales to determine reported net sales.***"

258.    Hain, Simon, and Smith signed the filings in which this statement appeared in connection with Hain's FY 2014 10-K and the FY 2015 10-K.

259.    Hain, Simon, and Smith knew, or were deliberately reckless in disregarding, that the statements set forth in paragraph 257 were materially false and misleading when made and omitted material information because the Company did not deduct promotion incentives from gross sales to determine reported net sales.  Instead, the Company improperly turned inventory into sales by booking shipments to distributors as sales and revenue even though those

distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.

### 4.      Hain's Trade Promotions

260.    Throughout the Class Period, Hain made statements regarding the Company's purported practices regarding trade promotions: "***Accruals for trade promotions are recorded primarily at the time a product is sold to the customer based on expected levels of performance. Settlement of these liabilities typically occurs in subsequent periods primarily through an authorization process for deductions taken by a customer from amounts otherwise due to the Company***."

261.    Hain, Simon, and Smith signed the filings in which this statement appeared in connection with Hain's FY 2014 10-K and the FY 2015 10-K.

262.    Hain, Simon, and Smith knew, or were deliberately reckless in disregarding, that the statements set forth in paragraph 260 were materially false and misleading when made and omitted material information because the Company improperly turned inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter. Thus, there was no expected level of performance for these improper sales.  These false statements and/or omissions were material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

### 5.      Sarbanes-Oxley Certifications

263.    SOX requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually and that the principal officers certify their responsibilities for financial reports in each quarterly and annual filing.

264.     Simon, Smith, and Conte completed certifications pursuant to Section 302 of

SOX certifying that:

1.     I have reviewed this quarterly report on Form 10-Q of The Hain Celestial Group, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in

this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

265.     Pursuant to Section 906 of SOX, Simon, Smith, and Conte further certified that:

The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

266.     Simon and Smith issued these certifications in connection with the Q1 FY 2014 10-Q; Q2 FY 2014 10-Q; Q3 FY 2014 10-Q; FY 2014 10-K; Q1 FY 2015 10-Q; Q2 FY 2015 10-Q; Q3 FY 2015 10-Q; and FY 2015 10-K.  Simon and Conte issued these certifications in connection with the Q1 FY 2016 10-Q; Q2 FY 2016 10-Q; and Q3 FY 2016 10-Q.

267.     Simon, Smith, and Conte knew, or were deliberately reckless in disregarding, that the statements set forth in paragraphs 264 and 265 were materially false and misleading when made and omitted material information because the financial statements did not fairly present the financial condition of the Company and the Company did not have adequate internal controls in place for the purpose of accounting.  Instead, the Company improperly turned inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  These false statements and/or omissions were material to Hain investors because they would have considered it when deciding to purchase Hain Securities.

### 6.     Statements Regarding Internal Controls

268.     In each filing with the SEC, Simon, Smith, and Conte made statements regarding the effectiveness of Hain's internal controls over financial reporting, stating that the Company's internal controls were effective.

269.     The statements were made on November 12, 2013 (Q1 FY 2014 10-Q); February 10, 2014 (Q2 FY 2014 10-Q); May 12, 2014 (Q3 FY 2014 10-Q); November 7, 2014 (Q1 FY 2015 10-Q); February 9, 2015 (Q2 FY 2015 10-Q); May 11, 2015 (Q3 FY 2015 10-Q); and May 10, 2016 (Q3 FY 2016 10-Q):

**Item 4.      Controls and Procedures**
**Evaluation of Disclosure Controls and Procedures**

Our Chief Executive Officer and Chief Financial Officer have reviewed our disclosure controls and procedures as of the end of the period covered by this report. Based upon this review, these officers concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is (1) recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (2) accumulated and communicated to our management, including our Chief

Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

270.    On November 9, 2015 (Q1 FY 2016 10-Q) and February 9, 2016 (Q2 FY 2016

10-Q), Simon and Conte represented:

**Item 4.        Controls and Procedures**
**Evaluation of Disclosure Controls and Procedures**

Our Chief Executive Officer and Chief Financial Officer have reviewed our disclosure controls and procedures as of the end of the period covered by this report. Based upon this review, these officers concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is (1) recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

During the first quarter of fiscal 2016, the Company implemented the Hyperion Financial Management system for consolidation and financial reporting resulting in changes to our processes and related internal controls over financial reporting. We expect this new reporting tool will enhance our internal control over financial reporting. Pre-implementation testing and post-implementation reviews were conducted by management to ensure that controls surrounding the system implementation process, the reporting tool, and the closing process were effective to prevent material financial statement errors. Other than changes related to this new reporting tool, no other changes in our internal control over financial reporting occurred during the period covered by this quarterly report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

271.    On August 27, 2014 (FY 2014 10-K) and August 21, 2015 (FY 2015 10-K),

Simon and Smith represented:

> **Item 9A.        Controls and Procedures**
> **Evaluation of Disclosure Controls and Procedures**
>
> As required by Rule 13a-15(b) of the Exchange Act, our management has carried out an evaluation, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the Exchange Act, as of the end of the period covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.
>
> **Management's Report on Internal Control over Financial Reporting**
>
> Management, including our Chief Executive Officer and our Chief Financial Officer, is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control system was designed to provide reasonable assurance to the Company's management and Board of Directors regarding the preparation and fair presentation of the published financial statements in accordance with generally accepted accounting principles.
>
> * * *
>
> Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2015. Management's assessment was based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria).
>
> Based on this assessment, the Company's management concluded that as of June 30, 2015, our internal control over financial reporting is effective.
>
> The Company's internal control over financial reporting as of June 30, 2015 has been audited by Ernst & Young LLP, the independent registered public accounting firm who also audited the Company's consolidated financial statements. Ernst & Young's attestation

report on management's assessment of the Company's internal
control over financial reporting follows.

272.    As stated above, Simon, Smith, and Conte completed the required certifications
stating that Hain had established and maintained both disclosure controls and procedures as well
as internal controls over financial reporting.

273.    Despite the wording in the certifications, Hain's disclosure controls and
procedures as well as its internal controls over financial reporting were not effective.  Moreover,
despite publicly acknowledging its responsibility to maintain adequate disclosure controls and
procedures as well as internal controls over financial reporting and certifying that the controls
were effective, in reality Hain's controls were deficient, rendering its financial statements false
and misleading.

## IX.    THE TRUTH EMERGES

### A.    Hain's January 21, 2016 Announcement – First Partial Disclosure

274.    On January 21, 2016, after the market closed, Hain disclosed, in a Report on Form
8-K, that Ross Weiner resigned from his position of Vice President – Finance, Chief Accounting
Officer.

275.    Following this disclosure, the price of Hain shares declined $2.64 per share, or
over 7%, from a close of $36.10 per share on January 21, 2016 to close at $33.46 per share on
January 25, 2016.

276.    Analysts at J.P. Morgan noted that Weiner's resignation was "weighing on the
shares" as concerns regarding the Company's accounting grew.  Analysts at Wells Fargo stated
that "the news adds to the broader adjustments around the Hain story."

B.      **Hain's August 15, 2016 Announcement – Second Partial Disclosure**

277.    On August 15, 2016, after the market closed, Hain admitted that it had made

materially false and misleading statements concerning its accounting and that the Company

would miss its filing deadline.  The Company filed with the SEC a Form 8-K, signed by Conte,

which stated:

> **The Hain Celestial Group, Inc. Announces Delay in the Release
> of its Fourth Quarter and Fiscal Year 2016 Financial Results
> Lake Success, NY, August 15, 2016** - The Hain Celestial Group,
> Inc. (NASDAQ: HAIN), a leading organic and natural products
> company with operations in North America, Europe and India
> providing consumers with A Healthier Way of Life™, announced
> today that it will delay the release of its fourth quarter and fiscal
> year 2016 financial results. During the fourth quarter, the
> Company identified concessions that were granted to certain
> distributors in the United States. The Company is currently
> evaluating whether the revenue associated with those concessions
> was accounted for in the correct period and is also currently
> evaluating its internal control over financial reporting. The Audit
> Committee of the Company's Board of Directors is conducting an
> independent review of these matters and has retained independent
> counsel to assist in that review.
>
> Previously, the Company has recognized revenue pertaining to the
> sale of its products to certain distributors at the time the products
> are shipped to such distributors. The Company is evaluating
> whether the revenue associated with the concessions granted to
> certain distributors should instead have been recognized at the time
> the products sell through its distributors to the end customers. ***The
> Company expects that any potential changes in the timing of the
> recognition of revenue with respect to these transactions should
> not impact the total amount of revenue ultimately recognized by
> the Company with respect to such distributors and does not
> reflect on the validity of the underlying transactions with respect
> to such distributors.***
>
> The Company will experience a delay in the timely filing of its
> Annual Report on Form 10-K for its fiscal year ended June 30,
> 2016 (the "Form 10-K") and expects to file a notification of late
> filing on Form 12b-25 with the Securities and Exchange
> Commission to obtain an automatic 15-day extension of the filing
> deadline for the Form 10-K. There can be no assurance that the

- 76 -

Company will complete the preparation and filing of the Form 10-
K within the extension period.

The Company will not be in a position to release financial results
until the completion of the independent review of the Audit
Committee and of the audit process relating to the 2016 fiscal year.
The Company is working diligently on this matter and will, as soon
as practicable, make a further announcement regarding the updated
timing of the release of financial results and a conference call on
its financial results. Separately, the Company does not expect to
achieve its previously announced guidance for fiscal year 2016.

278.    However, this disclosure was materially misleading in that Hain and Conte knew,

or were deliberately reckless in disregarding, that the statements set forth in paragraph 277 were

materially false and misleading when made and omitted material information because Hain and

Conte failed to disclose that the Company's practice was to improperly turn inventory into sales

by booking shipments to distributors as sales and revenue even though those distributors had no

obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.

Hain and Conte knew, or were deliberately reckless in not knowing, that the total amount of

revenue ultimately recognized by the Company would be impacted as a result of the improper

accounting.  These false statements and/or omissions were material to Hain investors because

they would have considered it when deciding to purchase Hain Securities.

279.    The next day, August 16, 2016, analysts at J.P. Morgan spoke with Simon and

reiterated the "key takeaways" from what Simon said:

We took it as a given after reading the press release that Hain
would have to restate prior revenue and/or earnings; however, we
no longer are sure this is the case. Clearly, there remains a
reasonably high probability that historicals will need to change, but
Mr. Simon emphasized that the company is still only "reviewing"
the issue and that no conclusions have been drawn yet. It is
possible, in other words, that nothing needs to be restated.

The company seems confident – though it is too early to be sure –
that this accounting issue will prove to be isolated. One of the lines
of the press release that spooked us was that Hain is "also currently

evaluating its internal control over financial reporting." This
suggests that other problems potentially could be discovered.
Though Mr. Simon emphasized that the review is still going on, he
seemed hopeful – almost confident, to our ears – that this particular
issue would be isolated and not indicative of additional problems.
We will see; for now, we remain guarded on the subject.

**C.    Hain's November 16, 2016 Audit Committee Review Announcement**

280.    On November 16, 2016, Hain Celestial issued a press release entitled "Hain

Celestial Announces Completion of Independent Audit Committee Review."  This press release

contained the supposed results of the Audit Committee's investigation into the Company's

financial statements.  In particular, the press release claimed, "[t]he [Audit Committee] review,

which was extensive, found no evidence of intentional wrongdoing in connection with the

Company's financial statements."

281.    Of the results of the Audit Committee investigation, Simon stated:

Hain Celestial is committed to transparency of our financial
reporting, and we are taking concrete measures to remediate as
well as strengthen our internal controls.  We are extremely pleased
that the Company can now move forward with its reporting process
as we put these challenges behind us.

282.    However, these disclosures were materially misleading in that Simon knew, or

was deliberately reckless in disregarding, that the statements set forth in paragraphs 280 and 281

were materially false and misleading when made and omitted material information because

Simon failed to disclose that Hain had material weaknesses in its internal controls over financial

reporting that were inadequate to prevent a material misstatement due to Company's practice of

improperly turning inventory into sales by booking shipments to distributors as sales and revenue

even though those distributors had no obligation to pay for the shipments and were free to return

the inventory the next fiscal quarter.  These false statements and/or omissions were material to

- 78 -

Hain investors because they would have considered it when deciding to purchase Hain Securities.

> ### D. The Truth is Further Revealed on February 10, 2017 – Final Corrective Disclosure

283. On February 10, 2017, after the market closed, Hain filed a Notification of Late Filing on Form 12b-25 that revealed the wide ranging scope of the Company's wrongdoing. While the Company had initially focused on the recognition of revenue associated with concessions granted to certain distributors during the fourth quarter of Fiscal Year 2016, Hain now revealed in a regulatory filing that the Company had expanded the scope of its internal accounting review "to perform an analysis of *previously-issued financial information* in order to identify and assess any potential errors." Further, Hain announced that the SEC had launched a formal investigation into the Company: "The SEC has issued a formal order of investigation and, pursuant to such order, the SEC issued a subpoena to the Company seeking relevant documents."

284. In reaction to these disclosures, the price of Hain's stock fell $3.43 per share, or more than 8%, from a close of $38.53 per share on February 10, 2017, to close at $35.10 per share on February 13, 2017, the next trading day, on unusually heavy trading volume.

285. On this news, analysts at The Buckingham Research Group lowered their price target for Hain stating, "we are lowering our estimates to reflect our 'best guess' that HAIN is likely to undergo an earnings revision or a meaningful earnings rebase as a result of this process."

286. As of the date of filing the Complaint, the SEC investigation into Hain's accounting practices is still ongoing.

X.     **DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP")**

287.    As detailed herein, Defendants' channel stuffing scheme caused Hain to improperly recognize revenue in violation of GAAP, which in turn artificially inflated Hain's publicly reported financial condition.  Consequently, Hain's publicly-issued financial statements during the Class Period intentionally, or with deliberate recklessness, reported materially overstated net sales, which in turn inflated Hain's net income, and earnings per share.  Specifically, Hain's concessions set forth in its multi-year revised financial statements evidence that the previously-filed Class Period financial results were materially false, misleading, and could no longer be relied upon and violated GAAP and SEC guidance throughout the Class Period.

288.    Defendants represented to investors during the Class Period that Hain's financial statements were prepared in accordance with GAAP—representations highly material to the total mix of information available for investors' evaluation of whether or not to purchase Hain Securities.

289.    In fact, the Company's financial statements violated GAAP by improperly recording revenue when the distributors had the right to return Hain's inventory.  According to Accounting Standards Codification ("ASC") 605-15-25, *Revenue recognition when right of return exists*, if a customer has a right of return, Hain was not permitted to recognize revenue on its sales to distributors until the right of return expired.  Thus, when Hain recognized the entire revenue on its sales immediately after the inventory left the warehouse, Hain's SEC filings violated GAAP when that revenue was reported.  Hain also violated GAAP by failing to estimate the amounts of future returns it expected in the following fiscal quarter and accruing such estimates in the period the products were sold.

290.     The Company's financial statements further violated GAAP by recognizing revenue prior to the transfer of title and risk of loss to the distributors.  Pursuant to ASC 605-10-S99, *Revenue Recognition – Overall – SEC Materials*, Hain was not permitted to recognize revenue until delivery has occurred.  Delivery is not considered to have occurred unless the customer has taken title and assumed the risks and reward of ownership of the products.  Here, Hain ignored this criteria and recognized revenue at the time of shipment, when in fact, Hain still owned that inventory.  As detailed herein, Hain's channel stuffing scheme involved merely parking Hain's inventory with the distributors until the following fiscal quarter.  Hain maintained substantially all of the risks of ownership—even after shipment.  Thus, Hain was not permitted to recognize revenue for the pushed inventory.  Indeed, Hain was later forced to restate this practice of premature revenue recognition.  Therefore, the Company violated GAAP when it reported revenue in the current fiscal period for the pushed inventory.

291.     Hain's financial statements also failed to properly recognize costs associated with sales promotions and incentives offered to customers.  ASC 605-50-25-3, *Revenue Recognition – Customer Payments and Incentives – Recognition*, addresses incentives that will not result in a loss on the sale of the product, and states that if offered voluntarily by a vendor and without charge to customers as a result of a single exchange transaction, a vendor shall recognize the cost of such a sales incentive at the later of the following: (i) the date at which the related revenue is recognized by the vendor, or (ii) the date at which the sales incentive is offered.  Hain admitted to violating ASC 605-50-25-3 when the Company restated its annual report for Fiscal Year 2016 on June 22, 2017 and corrected "errors related to the appropriate timing of customer payments and incentives associated with trade promotions."  Further, the Company concealed the impact of these promotions and incentives by failing to offset these costs from reported revenue.  In this

way, the Company's financial statements also violated ASC 650-50-45, *Revenue Recognition –*
*Customer Payments and Incentives – Other Presentation Matters*.

292.    Consequently, Defendants' statements during the Class Period that Hain's
financial statements were prepared in accordance with GAAP were also materially false and
misleading.  By failing to file financial statements with the SEC which conformed to the
requirements of GAAP, such statements were presumptively misleading and inaccurate pursuant
to Regulation S-X, 17 CFR § 210.1.

## XI.    ADDITIONAL EVIDENCE OF SCIENTER

293.    As alleged herein, Defendants knew or disregarded with deliberate recklessness
that the public documents and statements they issued and disseminated throughout the Class
Period were materially false and misleading and they knowingly and substantially participated or
acquiesced in the issuance or dissemination of such statements.  Indeed, Defendants, by virtue of
their receipt and knowledge of information reflecting the true facts regarding Hain's improper
channel stuffing and accounting practices, their control over, and/or receipt and/or modification
of Hain's materially incomplete, false and misleading misstatements and/or their access to inside
information concerning Hain and its improper channel stuffing and accounting, knowingly or
recklessly participated in the fraudulent course of conduct alleged herein.  Indeed, the fraudulent
scheme described in this Complaint could not have been perpetuated over such a substantial
period of time without the knowledge and complicity, or at a minimum reckless disregard, of the
personnel at the highest level of the Company, including the Individual Defendants.

### A.    The Senior Management Terminations Contribute to a Strong Inference of Scienter

294.    During the Class Period, and in the months after Hain first announced it was
improperly recognizing revenue based on concessions to distributors, Hain replaced most of the

senior executives involved and created entirely new positions.  The temporal proximity between Hain's restatement and these departures and new hires strongly support an inference of scienter on the part of Defendants.

295.    On September 3, 2013, Smith joined Hain as the Company's new CFO.  On September 8, 2015, after only two years as Hain's CFO, the Company announced that Smith was departing the Company to "pursue [] other opportunities" and would be replaced by Conte. Simon described the reason for Smith's departure was to "pursue [] other opportunities," however, as written on Smith's LinkedIn page as of December 2016, Smith was still "seeking new opportunities."

296.    Also in September 2015, the Company fired Senior Vice President of Manufacturing, Powhida, who worked under Meiers and Senior Vice President of Finance/Business Planning, Rose Ng, who worked under Carroll.

297.    On January 21, 2016, only four months after Smith's resignation, Hain revealed in a Form 8-K that "Ross Weiner resigned from his position of Vice President – Finance, Chief Accounting Officer."

298.    Despite the major shakeups and movements among the executives responsible for reporting Hain's financial earnings, Simon sought to allay analysts' concerns regarding Hain's accounting by stating on January 22, 2016, that there is "nothing wrong with Hain's accounting at all."

299.    On December 7, 2016, Hain announced that Gary Tickle would become Chief Operating Officer for Hain Celestial U.S. and Meiers would move to Hain's Pure Protein Corporation in addition to being Chief Operations Officer for Hain's Project Terra.  CW 1 stated that he has heard that this new position was a demotion for Meiers but Hain wanted the market to

think it was a promotion.  Hain also appointed a new Chief Supply Chain Officer, a new Chief

Customer Officer, and a new Vice President of Marketing.

300.    On March 6, 2017, Hain announced that the Company was removing Carroll from

his role with U.S. sales as he would no longer serve as the CEO for Hain North America and

changed Carroll's position to Executive Vice President, Global Brands, Categories and New

Business Ventures of Hain Celestial.  Hain appointed Gary W. Tickle to take over Carroll's prior

position as CEO for Hain North America.

301.    On June 22, 2017, Hain announced that Conte would be resigning from his CFO

position effective the next day, June 23, 2017.

302.    The same day, the Company announced an expanded "team with new hires

including a new controller for the U.S. segment, a global revenue Controller, a Head of Internal

Audit, and a Chief Compliance Officer."

303.    Hain also recently terminated its Senior Vice President and Controller, Marla

Hyndman and removed her name from the Company's management webpage.

304.    The employee turnover at Hain's executive level indicates that certain individuals

at the Company (*e.g.*, the Board of Directors) had determined that Defendants were aware of the

deficiencies in their accounting staff and intentional and/or reckless conduct with respect to its

financial reporting, and that the deficiencies and conduct were significant and severe enough to

warrant the replacement of the Company's CFO and the CEO of Hain North America.

## B.    Hain's Core U.S. Segment Was Extremely Important to the Company's Success

305.    As the Company's highest executives, the Individual Defendants were deeply

involved in Hain's U.S. sales, accounting, and revenue recognition and had access to all material

information regarding the Company's core operations, including the U.S. sales of Hain's

products.  As such, they had knowledge of all material facts regarding Hain's core U.S. business – or at the very least had full and unfettered access to this same information.  The Individual Defendants therefore knew or were reckless in disregarding the fact that the adverse facts specified herein that the amount of U.S. sales, net income, and earned income per share were being falsely reported to (in order to mislead) the investing public.

306.    As noted in a May 3, 2016 report by analysts at RBC Capital Markets, "[i]nternal sales trends of Hain Celestial's US division (51% of revenue and 75% of profit) have historically been the key driver of its valuation."  Further, during the Class Period, between 56-60% of the Company's consolidated net sales were generated within the United States.  Given the crucial importance of U.S. sales to Hain's operations and financial success, the sales figures and the improper methods employed to achieve those sales were among Hain's most important internal metrics, a subject of intense market scrutiny and concern, and a topic on which Defendants made numerous public statements throughout the Class Period.  As such, the Individual Defendants were plainly aware of the means by which the Company's core products were sold – namely, through improper channel stuffing through distributors and accounting and revenue recognition through non-existent sales. Indeed, as CEO of Hain, North America, Carroll was specifically responsible for monitoring and understanding Hain's relationship with its distributors in the United States and therefore knew or was reckless as to the fact that Hain engaged in channel stuffing and accounting and revenue recognition of non-existent sales.  As CFOs, Defendants Smith and Conte were specifically responsible for monitoring and understanding how Hain generated revenues from its core U.S. products and therefore knew or were reckless as to the fact that Hain engaged in channel stuffing and accounting and revenue recognition of non-existent sales.

C.      **Suspicious Stock Sales by Carroll and Simon During the Class Period**

307.    During the Class Period, Carroll and Simon reaped the rewards of their fraud while Hain's stock price was artificially inflated.  To evaluate Carroll and Simon's selling activity, Plaintiffs used the publicly-available trading data that Carroll and Simon were required to report to the SEC on Form 4.  Plaintiffs analyzed the trading by Carroll and Simon during the Class Period and then compared that to an equal length period immediately preceding the Class Period (the "Control Period").  The Form 4s filed during the Class Period and Control Period are hereby incorporated by reference.

308.    Plaintiffs calculated the total sales by each individual together with the cash proceeds from such sales, during the Control and Class Periods.  Those totals were then compared.

309.    The number of shares sold and the net proceeds from sales during the Class Period by Carroll and Simon were extraordinarily large compared to the Control Period:

| Person | Control Period | | Class Period | |
|---|---|---|---|---|
| | **Number of Shares Sold** | **Net Proceeds** | **Number of Shares Sold** | **Net Proceeds** |
| Carroll | 100,000 | $3,816,328 | 308,916 | $24,388,112 |
| Simon | 915,000 | $42,052,050 | 983,798 | $80,227,263 |

310.    Carroll's Class Period stock sales were not only large in absolute terms, but also inconsistent with Carroll's own prior selling activity during the Control Period.

311.    Carroll increased his stock sales from 100,000 shares during the Control Period to 308,916 shares during the Class Period – a startling increase of more than 300%.

312.    The contrast between Carroll's sales during the Control Period and Class Period is even more striking when measured in dollars.  Carroll's net proceeds from stock sales increased

more than 600% from the Control Period to the Class Period, from $3,816,328 million during the

Control Period to over $24,388,112 during the Class Period.

313.    Simon similarly reaped the rewards of the fraud as net proceeds from his stock

sales increased almost 200% from $42,052,050 during the Control Period to $80,227,263 during

the Class Period.

**D.    Hain's Significant Remedial Measures Contribute to a Strong Inference of Scienter**

314.    Following Hain's disclosure of financial reporting errors and breakdown in

internal controls, Hain enacted several significant, wide-sweeping "remediation efforts."  Hain

described these "remediation efforts" within its Fiscal Year 2016 Form 10-K, under the section

titled "Remediation of the Material Weaknesses in Internal Control Over Financial Reporting,"

in pertinent part as follows:

> *Organizational Enhancements* - The Company has identified and
> begun to implement several organizational enhancements as
> follows: (i) the creation of a new position, Global Revenue
> Controller, which has been filled and will be responsible for all
> aspects of the Company's revenue recognition policies, procedures
> and the proper application of accounting to the Company's sales
> arrangements; (ii) the identification and hiring of a new Controller
> for the Company's United States segment, which has been filled,
> who is responsible for all accounting functions in the United States
> segment; (iii) the establishment of an internal audit function that
> reports directly to the Audit Committee; (iv) the bifurcation of the
> General Counsel and Chief Compliance Officer roles in order to
> have a more dedicated focus on establishing standards and
> implementing procedures to ensure that the compliance programs
> throughout the Company are effective and efficient in identifying,
> preventing, detecting and correcting noncompliance with
> applicable rules and regulations; and (v) the enhancement of the
> Company's organizational structure over all finance functions and
> an increase of the Company's accounting personnel with people
> that have the knowledge, experience, and training in U.S. GAAP to
> ensure that a formalized process for determining, documenting,
> communicating, implementing and monitoring controls over the
> period-end financial close and reporting processes is maintained.

*Revenue Practices* - The Company has evaluated its revenue practices and has begun implementing improvements in those practices, including: (i) the development of more comprehensive revenue recognition policies and improved procedures to ensure that such policies are understood and consistently applied; (ii) better communication among all functions involved in the sales process (e.g., sales, business unit, legal, accounting, finance); (iii) increased standardization of contract documentation and revenue analyses for individual transactions; and (iv)  the development of a more comprehensive review process and monitoring controls over contracts with customers, customer payments and incentives, including corporate review of related accruals and presentation of trade promotions and incentives.

*Training Practices* - The Company has developed a comprehensive revenue recognition and contract review training program. This training is focused on senior-level management, customer-facing employees as well as finance, sales and marketing personnel.

315.    The extent and breath of these actions reveal the severity of the accounting errors and material weaknesses within the Company's financial reporting.  That such actions were taken demonstrate the utter lack of oversight and control that needed correction.  Given that Hain responded proportionately to Defendants' intentional and/or reckless conduct, the Company's remediation efforts strongly suggest an inference of scienter.

### E.    Simon and Carroll's Enormous Bonuses Contribute to a Strong Inference of Scienter

316.    Simon and Carroll were motivated to misrepresent Hain's financial results because of the large cash bonuses and stock option grants that were closely tied to the Company's financial performance, including Hain's net sales.  According to the Company's proxy statement filed with the SEC on October 9, 2015, executive compensation was tied to the Company hitting target net sales, diluted earnings per share, and EBITDA adjusted.  The target net sales measure was to achieve the middle range of the Company's net sales guidance.

317.    Due to the fraud detailed herein, the Company's net sales, net income, diluted earnings per share, and EBITDA adjusted, among other things, were materially overstated during

the Class Period, allowing Simon and Carroll to receive undeserved and exorbitant compensation.  Specifically, in Fiscal Year 2015, Simon's annual salary was $1,850,000, his bonus tied to the above corporate financial objectives was $5,565,725, and $8,787,355 in stock awards, with his total compensation coming to $16,310,640.  As further shown in the Company's proxy statement, Simon met his bonus target for net sales by only 0.1%.  Likewise, Carroll received an annual salary of $693,000, a bonus of $711,711, and $1,119,854 in stock awards, with his total compensation coming to $2,553,575.

318.    Had Simon and Carroll reported Hain's true financial results, they would not have received this level of compensation. Because Simon and Carroll's compensation was tied to the Company's financial performance, they were motivated to falsify key financial figures to obtain additional incentive compensation.

**F.    Hain's Acquisitions Using Artificially Inflated Stock Contribute to a Strong Inference of Scienter**

319.    Defendants were further motivated to artificially inflate Hain's share price because during the Class Period, Defendants were negotiating the purchase price to acquire additional natural and organic food companies using Hain shares.  On January 13, 2014, Hain acquired Tilda Limited in exchange for, *inter alia*, 1,646,173 shares of Hain stock valued at $148,400,000.  On April 28, 2014, Hain acquired Charter Baking Company in exchange for, *inter alia*, 133,744 shares of Hain stock valued at $11,168,000.  On July 17, 2014, Hain acquired the remaining 51.3% of Hain Pure Protein Corporation that it did not already own in exchange for, *inter alia*, 231,428 shares of Hain stock valued at $19,690,000.  On July 24, 2015, Hain acquired Formatio Beratungs und Beteiligungs GmbH and its subsidiaries in exchange for, *inter alia*, 240,207 shares of Hain stock valued at $16,308,000.

320.     By artificially inflating Hain's share price, Defendants caused Hain to acquire the above companies using fewer shares than if Defendants fully revealed the channel stuffing scheme.

## XII.   CLASS ACTION ALLEGATIONS

321.     Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise acquired Hain Securities during the Class Period and that were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Hain during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Hain's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

322.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Hain stock actively traded on the NASDAQ under the ticker symbol "HAIN."  According to the Company's Report on Form 10-Q for the quarter ended March 31, 2017, as of June 16, 2017, Hain had 103,697,237 shares outstanding.

323.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether the Exchange Act was violated by Defendants;

(b)      whether Defendants misrepresented material facts;

(c)      whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      whether Defendants knew or recklessly disregarded that their statements were false and misleading, and/or omitted material facts;

(e)      whether the price of HAIN Securities was artificially inflated; and

(f)      the extent of damage sustained by Class members and the appropriate measure of damages.

324.      Lead Plaintiffs' claims are typical of the claims of members of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

325.      Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

326.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   LOSS CAUSATION/ECONOMIC LOSS

327.      Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiffs' and class members' economic loss.  Lead Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory of reliance.  The market price of Hain Securities, actively traded on the NASDAQ, were artificially inflated by the false and misleading

statements and material omissions complained of herein, including misleading statements and omissions concerning consumer demand for Hain's products, Hain's accounting practices, recognition of revenue, inventory, and internal controls over financial reporting.  Instead of truthfully disclosing during the Class Period that Hain was improperly turning inventory into sales by booking shipments to distributors as revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory, Hain did not have the underlying customer demand to meet the Company's projected targets, and that Hain lacked internal controls on financial reporting, Defendants falsely reassured investors concerning the Company's business and internal controls.  Further, once the Company disclosed its fraudulent accounting practices and investors learned Hain was improperly recognizing revenue through concessions with distributors, the Company continued to misrepresent the nature of this practice and its impact on the Company's business.

328.    These false and misleading statements had the intended effect and caused Hain Securities to trade at artificially inflated levels throughout the Class Period.

329.    The Class Period inflation in Hain Securities was removed when the Company's lack of sales concealed by Defendants' false and misleading statements and omissions, or the financial, regulatory, and operational impacts thereof, were revealed to the market.  The information was disseminated through several partial disclosures that slowly revealed the nature and extent of Hain's deliberate disregard for proper accounting, manipulation of inventory, and internal controls.  These disclosures, more particularly described below, removed artificial inflation from Hain Securities and causing economic injury to Lead Plaintiffs and other members of the Class.

330.     The corrective impact of the individual disclosures alleged herein was, however, tempered by Defendants' continued false and misleading statements about the Company's channel stuffing, accounting, and regulatory compliance.  These continued misrepresentations maintained the price of Hain Securities at a level that was inflated by fraud, inducing members of the Class to continue purchasing Hain Securities even after the Company disclosed it improperly provided concessions to distributors and leading to further price declines that caused additional injury to the Class upon the disclosure of additional information about the true condition of Hain's operations.

331.     The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.

### A.     January 21, 2016 – First Partial Disclosure

332.     On January 21, 2016, after the market closed, Hain revealed in a Form 8-K that "Ross Weiner resigned from his position of Vice President – Finance, Chief Accounting Officer."   CW 6 recalled that Weiner – like Smith  before him – left Hain because he did not like what he was seeing regarding the channel stuffing with distributors.

333.     Analysts at J.P. Morgan noted that Weiner's resignation was "weighing on the shares" as concerns regarding the Company's accounting grew.  Analysts at Wells Fargo stated that "the news adds to the broader adjustments around the Hain story."  Meanwhile, Simon continued to mislead investors by telling the J.P. Morgan analysts on January 22, 2016 that there is "***nothing wrong with Hain's accounting at all.***"

334.     Following this disclosure, the price of Hain shares declined $2.64 per share, or over 7%, from a close of $36.10 per share on January 21, 2016 to close at $33.46 per share on January 25, 2016.

B.      **August 15, 2016 – Second Partial Disclosure**

335.    On August 15, 2016, after the market closed, Defendants revealed that the

Company would miss its filing deadline in a press release which stated:

> **The Hain Celestial Group, Inc. Announces Delay in the Release of its Fourth Quarter and Fiscal Year 2016 Financial Results**
>
> **Lake Success, NY, August 15, 2016** - The Hain Celestial Group, Inc. (NASDAQ: HAIN), a leading organic and natural products company with operations in North America, Europe and India providing consumers with A Healthier Way of Life™, announced today that it will delay the release of its fourth quarter and fiscal year 2016 financial results. During the fourth quarter, the Company identified concessions that were granted to certain distributors in the United States. The Company is currently evaluating whether the revenue associated with those concessions was accounted for in the correct period and is also currently evaluating its internal control over financial reporting. The Audit Committee of the Company's Board of Directors is conducting an independent review of these matters and has retained independent counsel to assist in that review.
>
> Previously, the Company has recognized revenue pertaining to the sale of its products to certain distributors at the time the products are shipped to such distributors. The Company is evaluating whether the revenue associated with the concessions granted to certain distributors should instead have been recognized at the time the products sell through its distributors to the end customers. The Company expects that any potential changes in the timing of the recognition of revenue with respect to these transactions should not impact the total amount of revenue ultimately recognized by the Company with respect to such distributors and does not reflect on the validity of the underlying transactions with respect to such distributors.
>
> The Company will experience a delay in the timely filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016 (the "Form 10-K") and expects to file a notification of late filing on Form 12b-25 with the Securities and Exchange Commission to obtain an automatic 15-day extension of the filing deadline for the Form 10-K. There can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period.

> The Company will not be in a position to release financial results until the completion of the independent review of the Audit Committee and of the audit process relating to the 2016 fiscal year. The Company is working diligently on this matter and will, as soon as practicable, make a further announcement regarding the updated timing of the release of financial results and a conference call on its financial results. Separately, the Company does not expect to achieve its previously announced guidance for fiscal year 2016.

336.    In response, analysts at Atlantic Securities, Bank of America Merrill Lynch, UBS, Oppenheimer, Barclays, BMO Capital Markets, Piper Jaffray, Jeffries, Maxim Group, Wedbush, and J.P. Morgan lowered their price targets for Hain stock.  The analysts at Piper Jaffray acknowledged the "internal financial control risk make[s] the stock difficult to own" while noting "the departure of the CFO and resignation of the chief accounting officer in a short period of time left us concerned on the state of finance management."  The J.P. Morgan analysts further questioned the Company's "vague" disclosure asking "what the revenue recognition issue actually entails" and "what happens if . . . Hain's evaluation of its financial reporting controls turns up additional problems."

337.    In reaction to these disclosures, the price of Hain common stock declined $14.05 per share, or over 26%, from a close of $53.40 per share on August 15, 2016, to close at $39.35 per share on August 16, 2016.

338.    As *The New York Times* remarked in an article on August 19, 2016, titled "Bloated Pay Came Before Hain's Celestial's Error," Hain's announcement was "[n]ot the most transparent disclosure in history, that's for sure."

339.    Because of Defendants' vague statements and their continued misrepresentations and omissions, the price of Hain Securities remained artificially inflated.  Indeed, analysts at Morningstar left their price target for Hain stock unchanged noting that "[i]f the accounting discrepancies are pervasive, we may downgrade our Standard stewardship rating, particularly if

the results of the investigation indicate that management has not sufficiently invested in essential internal controls." Analysts at Jeffries maintained a "buy" rating but asked "[i]s there another shoe to drop" such as "if it is revealed that the SEC is involved."

**C. February 10, 2017 – Final Corrective Disclosure**

340.    On February 10, 2017, after the market closed, the scope of wrongdoing significantly expanded. While the Company initially focused on the timing of the recognition of the revenue associated with concessions granted to certain distributors, Hain now revealed in a regulatory filing that the Company had expanded the scope of its internal accounting review "to perform an analysis of previously-issued financial information in order to identify and assess any potential errors." Further, Hain announced that the SEC had launched a formal investigation: "The SEC has issued a formal order of investigation and, pursuant to such order, the SEC issued a subpoena to the Company seeking relevant documents."

341.    On this news, analysts at The Buckingham Research Group lowered their price target for Hain stock stating, "we are lowering our estimates to reflect our 'best guess' that HAIN is likely to undergo an earnings revision or a meaningful earnings rebase as a result of this process."

342.    In reaction to these disclosures, the prices of Hain common stock declined $3.43 per share, or over 8%, from a close of $38.53 per share on February 10, 2017, to close at $35.10 per share on February 13, 2017, the next trading day.

**XIV.  PRESUMPTION OF RELIANCE**

343.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- 96 -

(b)      The omissions and misrepresentations were material;

(c)      The Company's common stock traded in an efficient market;

(d)      The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)      Lead Plaintiffs and other members of the Class purchased or acquired Hain Securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

344.      At all relevant times, the market for Hain Securities was efficient for the following reasons, among others:

(a)      As a regulated issuer, Hain filed periodic public reports with the SEC;

(b)      Hain regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)      Hain was followed by numerous securities analysts employed by major brokerage firm(s) including, but not limited to:  (1) JPMorgan Chase & Co.; (2) Jefferies LLC; (3) Barclays Capital; (4) Wells Fargo Securities; (5) BB&T Capital Markets; (6) Wright Investors' Service; (7) SunTrust Robinson Humphrey Capital Markets; (8) BMO Capital Markets; (9) Piper Jaffray; (10) Janney Montgomery Scott; (11) S&P Capital IQ; (12) Buckingham Research Group; (13) Canaccord Genuity; (14) RBC Capital Markets; (14) Sadif Investment Analytics; (15) UBS Research; (16) Maxim Group LLC; (17) Oppenheimer & Co.; (18) Wedbush Securities; (19) Morningstar Inc.; (20) Atlantic Securities; and (21) Bank of

America Merrill Lynch, who wrote reports that were distributed to the sales force and certain

customers of their respective brokerage firm(s) and that were publicly available and entered the

public marketplace.

             (d)     Hain Securities were actively traded on an efficient market, the NASDAQ,

where the Company's common stock trades under the ticker symbol "HAIN."

        345.    As a result of the foregoing, the market for Hain Securities promptly digested

current information regarding Hain from all publicly available sources and reflected such

information in Hain Securities.  Under these circumstances, all purchasers and acquirers of Hain

Securities during the Class Period suffered similar injury through their purchases or acquisitions

of Hain Securities at artificially inflated prices, and the presumption of reliance applies.

        346.    Further, to the extent that Defendants concealed or improperly failed to disclose

material facts with regard to the Company and its operations, Lead Plaintiffs are entitled to a

presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406

U.S. 128 (1972).

## XV.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

        347.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to the allegedly false statements and omissions pled in this

complaint.  The statements alleged to be false and misleading herein all relate to then-existing

facts and circumstances.  To the extent certain of the statements alleged to be false and

misleading may be characterized as forward-looking, they were not adequately identified as

"forward-looking" statements when made, and were not accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from

those in the purportedly forward-looking statements.  Alternatively, to the extent that the

statutory safe harbor is intended to apply to any forward-looking statements pled herein, Hain

and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Hain who knew that those statements were false and misleading when made.

## XVI.   CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

348.   Lead Plaintiffs repeat, incorporate, and reallege paragraphs 1 to 347 by reference.

349.   This Count is asserted against Hain and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

350.   During the Class Period, Hain and the Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.

351.   Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Hain Securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Hain Securities at artificially

inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, each one of them, took the actions set forth herein.

352.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, each of the Defendants made statements in quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Hain Securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Hain's finances and business prospects, including that the Company's net sales and revenue numbers were artificially inflated due to improper channel stuffing through distributors.

353.   As described above, Hain and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

354.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Hain.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Hain's businesses, operations, future financial condition, and future prospects.

355.    As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Hain's Securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Hain's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased Hain Securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Hain and the Individual Defendants, and were damaged thereby.

356.    During the Class Period, Hain Securities were traded on an active and efficient market.  Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Hain and the Individual Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Hain Securities at prices artificially inflated by Defendants' wrongful conduct.

357.    Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Hain Securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.  The market price of Hain Securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

358.    By reason of the conduct alleged herein, Hain and the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

359.     As a direct and proximate result of the wrongful conduct of Hain and the

Individual Defendants, Lead Plaintiffs and the other members of the Class suffered damages in

connection with their respective purchases and sales of the Company's securities during the

Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against Defendants Simon, Carroll, Smith, and Conte**

360.     Lead Plaintiffs repeat, incorporate, and reallege paragraphs 1 to 359 by reference.

361.     During the Class Period, the Individual Defendants participated in the operation

and management of Hain, and conducted and participated, directly and indirectly, in the conduct

of Hain's business affairs.  Because of their senior positions, they knew the adverse non-public

information about Hain's business prospects, including that the Company's net sales and revenue

numbers were artificially inflated due to improper channel stuffing through distributors.

362.     As officers and/or directors of a publicly owned company, the Individual

Defendants had a duty to disseminate accurate and truthful information with respect to Hain's

financial condition and results of operations, and to correct promptly any public statements

issued by Hain which had become materially false or misleading.

363.     Because of their positions of control and authority as senior officers of Hain, the

Individual Defendants were able to, and did, control the contents of the various reports, press

releases, public filings, and other statements which Hain made and disseminated in the

marketplace during the Class Period concerning Hain's results of operations.  In their capacities

as senior officers of Hain, the Individual Defendants had direct involvement in the day-to-day

operations of the Company and reviewing and approving the Company's public statements.

Throughout the Class Period, the Individual Defendants exercised their power and authority to

cause Hain to engage in the wrongful acts complained of herein.  The Individual Defendants

therefore, were "controlling persons" of Hain within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Hain's Securities.

364.    Each of the Individual Defendants, therefore, acted as a controlling person of Hain.  By reason of their senior management positions and/or being directors of Hain, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Hain to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Hain and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

365.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Hain.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.    Awarding Lead Plaintiffs reasonable costs, and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND
## <u>APPLICABLE TO ALL CLAIMS</u>

Plaintiffs hereby demand a trial by jury.

DATED:  September 7, 2017                    Respectfully submitted,

*/s/ Jonathan Gardner*
Jonathan Gardner
Michael Canty
Seth M. Jessee
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax:  (212) 818-0477
Email: jgardner@labaton.com
        mcanty@labaton.com
        sjessee@labaton.com

*Counsel for Rosewood Funeral Home and*
*Co-Lead Counsel for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh
122 East 42nd Street
Suite 2920
New York, NY 10168
Tel: (212) 682-5340
Fax: (212) 884-0988
Email:  glinkh@glancylaw.com

Robert Prongay
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160
Email: rprongay@glancylaw.com

*Counsel for Salamon Gimpel and*
*Co-Lead Counsel for the Class*