**FILED**
**CLERK**

11:48 am, Mar 29, 2019

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
In Re The Hain Celestial Group Inc.

Securities Litigation
-------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER**
2:16-cv-04581 (ADS)(SIL)

<u>**APPEARANCES:**</u>

**Labaton Sucharow LLP**
*Co-Lead Counsel for the Plaintiffs*
140 Broadway
New York, NY 10005
      By:    Christopher Joseph Keller, Esq.,
                Eric J. Belfi, Esq.,
                Francis P. McConville, Esq.,
                Jonathan Gardner, Esq.,
                Seth Morgan Jessee, Esq.,
                Christopher Lawrence Mooney, Esq.,
                Howard G. Smith, Esq.,
                Joshua Lon Crowell, Esq.,
                Leanne H. Solish, Esq.,
                Michael P. Canty, Esq., Of Counsel

**Goldberg Law PC**
*Co-Lead Counsel for the Plaintiffs*
1999 Avenue of the Stars Suite 1100
Los Angeles, CA 90067
      By:    Michael Goldberg, Esq.,
                Brian J. Schall, Esq., Of Counsel

**Glancy Prongay & Murray LLP**
*Co-Lead Counsel for the Plaintiffs*
122 East 42nd
Street, Suite 2920
New York, New York 10168
      By:    Lionel Z. Glancy, Esq.,
                Rovert V. Prongay, Esq.,
                Joshua L. Crowell, Esq.,
                Leanna H. Solish, Esq.,
                Lesley F. Portnoy, Esq., Of Counsel

**The Law Offices of Howard G. Smith**
*Co-Lead Counsel for the Plaintiffs*
3070 Bristol Pike Suite 112
Bensalem, PA 19020
      By:    Howard G. Smith, Esq., Of Counsel

**DLA Piper LLP**
*Counsel for the Defendants The Hain Celestial Group, Inc., Irwin D. Simon, Pasquale Conte,
John Carroll and Stephen J. Smith*
1251 Avenue of the Americas
New York, NY 10020-1104
      By:    Timothy E. Hoeffner, Esq.,
              Jason Daniel Gerstein, Esq., Of Counsel

**SPATT, District Judge:**

This case involves allegations that the Defendant Hain Celestial Corp. ("Hain") and certain of its current and former officers and directors (collectively, the "Defendants") made materially false and misleading statements concerning Hain's inventory and revenues by allegedly engaged in the practice of "channel stuffing" in violation of sections 10(b), Rule 10(b)-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Presently before the Court is a motion by the Defendants to dismiss the amended consolidated class action complaint (the "complaint") pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 12(b)(6). For the following reasons, the Defendants' motion is granted, the complaint is dismissed without prejudice, and the Lead Plaintiffs are granted leave to amend the complaint.

## I. BACKGROUND

### A. The Relevant Facts

The following facts are drawn from the complaint, and for the purposes of the instant motion, are presumed to be true.

Hain manufactures, markets, distributes, and sells organic and natural products in the United States and several other countries. During the Class Period, defined *infra*, 55-60% of Hain's net sales were generated within the United States. Hain's products are marketed as "better for you" foods, and its product line includes brands such as Almond Dream, Arrowhead Mills, BluePrint, Celestial Seasonings, Coconut Dream, Earth's Best, Garden of Eatin', Hain Pure Foods, Joya, MaraNatha, Rice Dream, Soy Dream, Terra Chips, The Greek Gods, and WestSoy. Hain's largest customer during the Class Period was United Natural Foods, Inc. ("UNFI"), a distributor that accounted for 12% of Hain's net sales during the Class Period.

The Defendant Irwin Simon ("Simon") founded Hain in May 1993. He has been the President and Chief Executive Officer ("CEO") ever since, and was appointed Chairman of the Board in April 2000. The Defendant Pasquale Conte ("Conte") was Chief Financial Officer ("CFO") from October 2014 to September 2015; and had previously served as Treasurer and Vice President from July 2009 and October 2014. The Defendant Stephen J. Smith ("Smith") was CFO and Executive Vice President from September 3, 2013 to September 30, 2015. The Defendant John Carroll ("Carroll," together with Simon, Conte, and Smith, the "Individual Defendants") was Hain's Executive Vice President and CEO for Hain Celestial North America from February 2015 to March 6, 2017. Carroll has been the Executive Vice President for Global Brands, Categories, and New Business Ventures since March 6, 2017.

Lead Plaintiffs Rosewood Funeral Home ("Rosewood") and Salamon Gimpel ("Gimpel," collectively, the "Lead Plaintiffs"), along with the members of the proposed class, purchased or otherwise acquired the publicly traded common stock of Hain, and call and put options on the publicly traded common stock (collectively, "Hain Securities"), during the period from November 5, 2013 through February 10, 2017 (the "Class Period").

By the early 2010s, Hain allegedly began suffering from stiff competition as generic brands and chain stores began to offer natural and organic foods. As a result, Hain could no longer meet its revenue targets or Wall Street's projections. In order to meet those targets and projections, the Defendants allegedly engaged in a "channel stuffing" scheme. Channel stuffing is the practice of intentionally oversupplying distributors with products in order to artificially inflate sales and revenue. In so doing, a company that stuffs its distribution channels essentially "robs Peter to pay Paul"—that is, the company inflates revenue for one financial quarter by stealing revenue from a future financial quarter or quarters; and it misrepresents the company's financial status.

The complaint alleges that the Defendants engaged in channel stuffing by shipping extra inventory to its distributors with financial incentives; offering discounts to distributors for accepting extra product beyond the distributors' needs; and offering distributors an absolute right to return the products.

The scheme purportedly worked as follows. Carroll would obtain the company's financial sales in the middle of the financial quarter so that he could determine how far the sales shortfall would be. He then negotiated with distributors to take more inventory than they needed to make up for the shortfall in return for credits and "off-invoice" concessions. Carroll and Simon then told the brand managers how much to load onto the distributors' trucks. At the end of the financial quarter, Hain would send the inventory to the distributors with the understanding that the excess inventory could be returned without consequence to the distributors. The group who worked under James Meiers ("Meiers"), the former Chief Operating Officer of Hain, then counted the credits and off-invoice concessions as revenue as soon as the products left the warehouses. "Meiers and his inner circle then smoothed out the sales and revenue numbers to avoid the discovery of the fraud." (*Id.*). The modified sales and revenue numbers were then sent to Hain's CFO, who

included them in Hain's SEC filings. These filings were prepared by Smith and Conte. In the next fiscal quarter, the distributors returned the excess inventory that had been shipped in the prior quarter. This process would repeat each quarter, and the deficit between actual and reported sales would allegedly increase with quarter due to the practice.

The Lead Plaintiffs allege that the Defendants made materially false and misleading statements regarding their sales in SEC filings between November 2013 and May 2016, including the representation of Hain's sales numbers in the 8-K and 10-K forms. The individual Defendants purportedly made misrepresentations during conference calls with investors between January 14, 2014 and May 4, 2016 wherein the individual Defendants misconstrued the nature of their increased sales. Furthermore, the complaint alleges that the Defendants made false and misleading statements in various filings with the SEC as to Hain's accounting practices. Namely, that the Defendants failed to disclose that they were classifying inventory forced onto distributors as revenue even though the distributors were not obligated to pay for the shipments, and had an absolute right to return the products the next quarter.

In support of its allegations, the complaint relies upon six confidential witnesses ("CWs"). CW 1 worked for Hain from September 2012 through June 2016 as a Senior Finance Manager. CW 1 managed Hain's finances related to its manufacturing costs. CW 1 reported to Marco Guerrero, Hain's Senior Director of Supply Chain Finance, and "ultimately reported to James Meiers, Hain's former Chief Operations Officer." (Compl. ¶ 31).

CW 2 worked as a Senior Sales Analyst for the Blue Print brand at Hain from January 2016 through February 2017. CW 2's responsibilities included forecasting, and analyzing profits and losses. CW 2 reported to the Blue Print General Manager, who in turn reported to Simon.

CW 3 worked as an Executive Assistant to Meiers from June 2014 through July 2016. CW 3 apparently reviewed Hain's financial results each quarter before they were released to the public.

CW 4 worked as a Brand Manager for Hain from January 2012 through June 2014, and as a Senior Brand Manager from June 2014 to June 2017. CW was responsible for product development and strategy, budgeting, and profit and loss analysis. CW 4 reported to the former Director of Marketing, who in turn reported to the Vice President of Marketing.

CW 5 worked for UNFI from August 2011 to 2013 as a Senior General Manager in a UNFI warehouse in Ontario, Canada. The warehouse was leased from Hain.

CW 6 worked for Hain from 2000 until October 2016, and during the Class Period served as the Senior Manager of Customer Support. CW 6 was responsible for processing Hain's quarterly numbers and product returns with its financial operations and accounting departments. CW 6 reported to Hain's Director of Customer Satisfaction, who reported to Meiers directly.

CW 6 states that Hain would coordinate with UNFI and other distributors to make up for earnings shortfalls by giving the distributors "off-invoice" concessions. These concessions accounted for 10–25% of the total sales of a given quarter. Approximately six to eight weeks after the quarter ended, the returns would start rolling in. Returns were "normally [] heavily scrutinized, but no one asked any questions [about] UNFI's product returns." (*Id.* ¶ 62). CW 6 would process returns every quarter that totaled at least $500,000, and he processed a $700,000 product return in 2015. He would frequently spend entire days processing returns of inventory that were sold to distributors in previous quarters.

Similarly, CW 4 saw five to six million dollars in transactions during the final week of the fiscal quarters. He apparently observed these transactions on shipping reports while performing profit and loss analysis and budgeting for the Spectrum brand. According to CW 4, distributors

would typically load seven to nine weeks of Spectrum inventory, but by August 2016, they were loading eighteen to nineteen weeks of inventory.

CW 4 notes that the channel stuffing, which he says were referred to as "loading" and "de-loading," took place throughout his five years at Hain. Hain would offer concessions to a distributor saying "here's a discount to load." (*Id.* ¶ 63). Hain would load the inventory to distributors at the end of each quarter, and de-load the next quarter.

CW 2 claims that the practice of loading and de-loading was part of Hain's "core business practice," (*Id.* ¶ 64), and that its purpose was to increase financial reporting. CW 5 asserts that UNFI never purchased the products, but instead merely warehoused them.

CW 2 details a specific instance from 2016 where the BluePrint brand decided to miss its quarterly Wall Street estimates "because of a concern that if [it] ran too many promotions to get inventory out the door, it would negatively impact subsequent quarters." (*Id.* ¶ 65). However, after that decision was made, Simon purportedly called BluePrint's General Manager and told him that BluePrint needed to "make" the forecasted sales estimates for that quarter. As a result of Simon's call, BluePrint "pushed" inventory to one of its distributors in order to make the sales forecasts. CW 2 claims that every Hain brand utilized this practice.

CWs 1, 4, and 6 observed during their tenure at Hain that the majority of the loading was done with brands that had a longer shelf life—such as beans and nut butters. According to CW 6, Hain relied primarily on more expensive brands because it required distributors to load less inventory.

As an executive assistant for Meiers, CW 3 constantly saw returns being processed and credits being issued. The returns and credits increased significantly in late 2015 and early 2016.

The loaded inventory was recognized as revenue as soon as it was shipped, despite the distributors' purported right to return it. CW 4 saw the revenue on the shipment reports. CW 1 was instructed, although the complaint is not clear as to who instructed him, to post the credits as money owed by the distributors to Hain. These credits were booked onto Hain's internal financial overview for unofficial reporting. CW 1 was responsible for reporting Hain's financial results, including the credit and return paperwork. CW 3 confirmed that CW 1 performed these duties. CW 6 recalls that the sales team also tracked the returns and concessions on an internal system. CW 5 maintains that Hain and UNFI shared an inventory tracking system so that Hain could always see how much inventory UNFI had. This system synced on a monthly basis.

According to CW 1, the credit numbers became suspicious around June 2015. CW 1 believed that they were suspicious because sales were declining but credits continued to increase, and eventually reached millions of dollars per quarter. He believed that "someone[] [was] trying to fill in the gap," (*id.* ¶ 74), between targets and revenue in the hopes that revenue would increase the next quarter to offset the returns. CW 1 left the company in June 2016 because he believed that the financial numbers were being manipulated.

### 1. Hain's Executive and Senior Management Involvement

CW 4 remembers that there were a number of brand strategy meetings where Carroll was present where loading was discussed. Specifically, it was mentioned in these meetings that shipments for a particular quarter were down because Hain had loaded inventory in the previous quarter. In fact, CW 4 specifically told Carroll that Spectrum's shipments were down in the first fiscal quarter one year because Spectrum had loaded during the final quarter of the previous year. CW 4 states that after August 2016, Carroll told employees to stop using the word "loading," and to instead refer to the practice as "inventory reduction."

Carroll would ask CW 6 to provide "certain numbers, usually by mid-quarter," (*id.* ¶ 77), so that Carroll would know how far the company was from reaching its quarterly sales targets. Once Carroll estimated Hain's shortfall, he would negotiate with UNFI to have it take enough inventory to make up for the difference between expected revenues and targets. CW 6 participated in internal sales calls where Carroll stated that he had negotiated concessions with UNFI that would make up for the sales deficit for that quarter. "CW 2 similarly believed that the channel stuffing directives came from Hain's upper management based on discussions with Hain's General Manager for the BluePrint brand who reported directly to Simon." (*Id.* ¶ 78).

According to CW 4, the company's sales, inventory, and targets were tracked weekly. The tracking was included in reviews and reports that were sent each week to Hain's upper management, including Simon and Carroll.

CW 1 claims that Meiers told Steve Powhida ("Powhida"), Hain's Senior Vice President of Manufacturing, to book the distributors' credits with accounting. CW 1 specifically remembers that Powhida submitted a $3 million credit to accounting, and CW 1 saw the credit in Hain's financial reports. CW 6 also believes that Meiers knew about the loading because Meiers "was responsible for all of Hain's warehousing, transportation, and carriers. . . . [A]nything that was sent from Hain or returned was done under Meiers' supervision." (*Id.* ¶ 81). Similarly, CW 3 observed that the financial numbers were constantly changing, and that Meiers worked long days and nights at the end of each quarter. Meiers was apparently "well known for changing numbers left and right." (*Id.* ¶ 82).

CW 1 asserts that the finance team at Hain was run by Meiers' operations group and Carroll's financial planning and analysis groups. If Meiers wanted to change the financial numbers, he would tell the accounting team that it had to change, and they would change it. Marla

Hyndman, Hain's Senior Vice President and Controller, and Rose Ng ("Ng"), the Senior Vice President of Finance and Business Planning would ask Meiers for justification for the numbers, but the numbers would eventually reflect Meiers' desire. Meiers "openly controlled the credit with limited involvement from others," (*id.* ¶ 85 (internal quotation marks omitted)), according to CW 1. Marco Guerrero, CW 1's supervisor, affirmed this fact to CW 1. When asked about the credits, Meiers and Powhida would tell CW 1 not to worry about them.

CW 3 corroborated this by stating that he prepared the materials for the quarterly budget meetings, and that Meiers was always changing the sales results for the quarter. Marco Guerrero, Hain's Senior Director of Supply Chain Finance, would "smooth out the numbers for Meiers," (*id.* ¶ 86), and Meiers would spend a week making the numbers "look pretty," (*id.*).

### 2. Termination of Employees Who Purportedly Questioned the Channel Stuffing

The complaint alleges that employees who questioned the channel stuffing scheme were terminated. For example, Smith left Hain after only two years as CFO on September 8, 2015. CW 1 believes that Smith was forced out because, unlike Conte who succeeded him, he was "not willing to be one of Simon's puppets." (*Id.* ¶ 91). Although Smith allegedly left to pursue other opportunities, he had not secured new employment as of December 2016. Ng was also fired in September of 2015, and according to CW 1, she was terminated because she attempted to prevent Meiers from changing the financial numbers. CW 3 corroborated this fact. That same month, Powhida was also fired. CW 1 believes he was fired "to take the hit for the credits scheme." (*Id.* ¶ 95).

CW 1 also claims that the head of Human Resources was replaced "for not agreeing with Simon." (*Id.* ¶ 92). Although he did not provide other examples, CW 1 maintains that people who disagreed with Simon were eventually replaced.

### 3. Alleged Material Disclosures

EY, formerly Ernst & Young, conducted an external audit of Hain around December 2015, and CW 4 "heard" that EY had identified the channel stuffing as an accounting issue. D&B Consultants ("D&B") conducted an internal audit for Hain in early 2016.

On January 11, 2016, Hain announced that it was cutting its anticipated full year sales and earnings per share. Hain cut the anticipated sales revenues from the range of $2.97 billion – $3.11 billion to $2.9 billion – $3.04 billion. It lowered its earnings per share estimates from $2.11–$2.26 to $1.95–$2.10.

Ten days later, on January 21, 2016, Hain revealed in a Form 8-K that Ross Weiner had resigned as Vice President of Finance and Chief Accounting Officer. CW 6 asserts that Weiner left because "he did not like what he was seeing regarding the channel stuffing." (*Id.* ¶ 100). Simon assured J.P. Morgan analysts on January 22, 2016 that there was "nothing wrong with Hain's accounting at all." (*Id.* ¶ 101).

Between January 21, 2016 and January 25, 2016, Hain's shares declined 7% from $36.10 per share to $33.46 per share.

On August 15, 2016, Hain announced that there would be a delay in the release of the company's 2016 financial results, and that it would not be meeting its 2016 targets. In its Form 8-K, Hain said:

> [Hain] announced today that it will delay the release of its fourth quarter and fiscal year 2016 financial results. During the fourth quarter, the Company identified concessions that were granted to certain distributors in the United States. The Company is currently evaluating whether revenue associated with those concessions was accounted for in the correct period and is also currently evaluating its internal control over financial reporting. . . .
> Previously, the Company has recognized revenue pertaining to the sale of its products to certain distributors at the time the products are shipped to such distributors. The Company is evaluating whether the revenue associated with the concessions granted to certain distributors should instead have been recognized at

the time the products sell through its distributors to the end customers. The Company expects that any potential changes in the timing of the recognition of revenue with respect to these transactions should not impact the total amount of revenue ultimately recognized by the Company with respect to such distributors and does not reflect on the validity of the underlying transactions with respect to such distributors. . . .

There can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period. . . . Separately, the Company does not expect to achieve its previously announced guidance for fiscal year 2016.

(*Id.* ¶ 277).

Over the course of the day on August 16, 2016, Hain's shares fell 26%—from $53.40 per share when the market closed on August 15, 2016 to $39.35 per share by the time the market closed on August 16, 2016. This represented a loss of $1.6 billion in market capitalization. Wall Street analysts accordingly lowered their price targets for Hain stock.

On August 30, 2016, Hain informed the SEC that it would not be able to file its Fiscal Year 2016 annual Form 10-K report by the filing deadline. Hain again stated that the filing would be delayed because "[t]he Company [wa]s [] evaluating whether the revenue associated with those concessions was accounted for in the correct period and [was] also [] evaluating its internal control over financial reporting." (*Id.* ¶ 107).

On August 31, 2016, NASDAQ sent Hain a letter informing the company that it was was not complying with NASDAQ rules. After regaining compliance in November 2016, NASDAQ granted Hain an extension of time to file its reports with the SEC through February 27, 2017.

Hain announced on September 26, 2016, that its credit facility lenders had granted it a limited waiver covering an extension of certain financial reporting obligations until December 27, 2016.

On November 16, 2016, Hain issued a press release announcing the completion of the internal audit review. The press release touted the results of the internal audit and stated that the

audit committee found no evidence of intentional wrongdoing in connection with Hain's financial statements. Nevertheless, the audit committee said that "Hain Celestial has begun to implement a remediation plan to strengthen its internal controls and organization." (*Id.* ¶ 110). Hain further stated that it would be unable to release its financial results until the "audit process" and review of accounting procedures was completed.

On December 7, 2016, it was announced that Meiers would no longer be the COO, and was placed into a new position as CEO of Hain Pure Protein Corp. CW 1 apparently "heard" that the new position was actually a demotion for Meiers, but Hain wanted the public and the market to believe that it was a promotion. Gary W. Tickle ("Tickle") replaced Meiers as COO. New individuals were also placed into the roles of Chief Supply Chain Officer, Chief Customer Officer, and Vice President of Marketing.

On December 20, 2016, Hain announced that its credit facility lenders had granted it another extension on the reporting of certain financial obligations until February 27, 2017.

On February 10, 2017, Hain filed another Notification of Late Filing on Form 12b-25. In a regulatory filing, Hain noted that it "had expanded the scope of its internal accounting review to perform an analysis of previously-issued financial information in order to identify and assess any potential errors." (*Id.* ¶ 115 (internal quotation marks omitted)). Hain also revealed that the SEC had begun a formal investigation into the company.

Between the market's close on February 10, 2017 and the close on February 13, 2017, which was the next trading day, Hain's share price fell 8% from $38.53 to $35.10.

### 4. Post-Class Period Disclosures

On February 27, 2017, Hain did not file its corrected financial results, but instead announced that it had obtained a third limited waiver from its credit facility lenders granting an extension until May 30, 2017 to report certain financial obligations.

On February 28, 2017, NASDAQ again informed Hain that it had failed to comply with listing requirements and that its stock could be delisted unless the company sought a hearing.

On March 6, 2017 Hain announced that Carroll was stepping down as CEO for Hain North America and that he would no longer be involved with US sales.  Tickle was appointed as the new CEO for Hain North America.

On May 11, 2017, Hain filed a Notification of Late Filing on Form 12b-25 stating that it would be unable to file its third quarter report by the filing deadline.  Hain further noted that it would be able to file its financial results by the end of May 2017.

On May 30, 2017, and June 15, 2017, Hain obtained further limited waivers from its credit facility lenders granting it an extension of time until June 22, 2017 to report certain financial obligations.

On June 22, 2017, Hain released its Form 10-K annual report for Fiscal Year 2016, as well as the Company's Form 10-Q quarterly reports for the first, second, and third quarters of Fiscal Year 2017.

After the first three quarters of 2017, Hain reported a 14% decrease in net sales compared to the same period in 2016; a 51.1% decrease in net income; and a 51.1% decrease in earnings per share.

| Metric (in thousands except per share amount) | Fiscal 2016, First 9 Months* | Fiscal 2017, First 9 Months | Change (YoY) |
|---|---|---|---|
| U.S. net sales | 1,025,398 | 882,273 | (14.0%) |
| Net income (loss) | $137,234 | $67,117 | (51.1%) |
| Earnings (loss) per share | $1.33 | $0.65 | (51.1%) |

*As reported in Hain's Form 10-Q filed May10, 2016

(*Id.* ¶ 126).

Hain attributed the sales decline to a "realignment of customer inventories." (*Id.* ¶ 127). Hain further stated in its Form 10-K for fiscal year ("FY") 2016 that "both fiscal 2016 and fiscal 2015 net sales benefited from certain concessions provided to our largest distributors, including payment terms beyond the customer's standard terms, rights of return of product and post-sale concessions, most of which were associated with sales that occurred at the end of each respective quarter." (*Id.* ¶ 128). In an explanatory note contained in Hain's 2016 Form 10-K, Hain stated:

> During the fourth quarter of fiscal 2016, the Company identified the practice of granting additional concessions to certain distributors in the United States and commenced an internal accounting review in order to (i) determine whether the revenue associated with those concessions was accounted for in the correct period and (ii) evaluate the Company's internal control over financial reporting. The Audit Committee of the Company's Board of Directors separately conducted an independent review of these matters and retained independent counsel to assist in their review. We delayed the filing of this Form 10-K and our Q1 Form 10-Q, Q2 Form 10-Q and Q3 Form 10-Q with the Securities and Exchange Commission (the "SEC") in order to complete these reviews.

(Defs.' Ex. B at 3). Hain further explained that it had reviewed its policy of recording revenue when transferring the product to the distributor, as well as its practices regarding concessions, payment terms, and rights of returns. Hain concluded that "its historical accounting policy for these distributors is appropriate . . . based on the Company's ability to make a reasonable estimate of future returns and certain concessions at the time of shipment." (*Id.* at 67).

15

In its note of "Correction of Immaterial Errors to Prior Period Financial Statements," the

company said that

> During the year ended June 30, 2016, the Company identified and corrected immaterial errors that affected previously issued consolidated financial statements. . . . [T]he Company determined that these errors were immaterial to the previously-issued financial statements; however, a cumulative correction of these errors would have had a material effect on the financial results for the three and twelve months ended June 30, 2016. . . .
>
> The Company recognizes revenue from the sale of products to its customers when ownership of the product transfers to the customer. Ownership transfers to the customer either upon shipment of the product to the customer or when the product is delivered to the customer. The Company has corrected errors in the timing of revenue recognition for customers whose ownership transferred when the product is delivered to the customer by reducing revenue by $26,144 and $630 for the years ended June 30, 2015 and 2014, respectively.
>
> The Company also offers trade promotions and sales incentives to its customers and consumers to increase demand for its products. The accounting principles of [Accounting Standards Codification ("ASC")] 605-50, Customer Payments and Incentives, requires that the cost of an incentive be recorded at the later of the date on which the related revenue is recognized or the date on which the sales incentive is offered. Revenue was reduced by $5,796 and $6,854 for the years ended June 30, 2015 and 2014, respectively, to correct for errors related to the appropriate timing of customer payments and incentives associated with trade promotions. The two previously described errors reduced income before income taxes and equity in earnings of equity-method investees by $6,214 and $5,982 for the years ended June 30, 2015 and 2014, respectively. The errors also were corrected in the related cost of sales, accounts receivable and inventory accounts.
>
> In addition, the Company reclassified certain customer payments and incentives related to trade promotions from selling, general and administrative expense and cost of goods sold, to be presented as a reduction in revenue in accordance with the provisions of ASC 605-50. This correction reduced revenue by $46,962 and $38,305 for the years ended June 30, 2015 and 2014, respectively, but did not affect operating income in any period.
>
> In total, these three revenue corrections reduced revenue $78,902 and $45,789 for the years ended June 30, 2015 and 2014, respectively.

(Defs.' Ex. B at 68 (all amounts are in the thousands)).

Hain also issued corrections for its financial statements for FY 2014, FY 2015, and Q1–

Q3 of 2016.

| Summary Financial Impact | | | | |
|---|---|---|---|---|
| | | FY 2014A | FY 2015A | 9 Months FY 16A |
| Net Sales | Original | $2,154 | $2,689 | $2,190 |
| | % YoY Growth | | 24.8% | |
| | Revised | $2,108 | $2,610 | $2,148 |
| | % YoY Growth | | 23.8% | |
| | $ - difference | ($46) | ($79) | ($42) |
| | % - difference | (2.1%) | (2.9%) | (1.9%) |
| GAAP EPS | Original | $1.42 | $1.62 | $1.32 |
| | Revised | $1.32 | $1.60 | $1.31 |
| | $ - difference | ($0.10) | ($0.02) | ($0.01) |
| | % - difference | (7.0%) | (1.2%) | (0.8%) |
| Non-GAAP EPS | Original | $1.59 | $1.88 | $1.42 |
| | Revised | $1.51 | $1.83 | $1.42 |
| | $ - difference | ($0.08) | ($0.05) | $ - |
| | % - difference | (5.0%) | (2.7%) | 0.0% |

(*Id.* ¶ 129).

However, the complaint alleges that the true purpose of Hain's channel stuffing was to meet Wall Street expectations or minimize the difference between actual sales and the Wall Street estimates.

| NET SALES (GAAP) ($ millions) | | | | | | |
|---|---|---|---|---|---|---|
| | **Q1 FY 15** | **Q2 FY 15** | **Q3 FY 15** | **Q4 FY 15** | **Q1 FY 16** | **Q2 FY 16** |
| | 9/30/2014 | 12/31/2014 | 3/31/2015 | 6/30/2015 | 9/30/2015 | 12/31/2015 |
| Consensus Estimate* | 639 E | 717 E | 659 E | 695 E | 703 E | 750 E |
| | | | | | | |
| As Reported | 631 | 696 | 663 | 698 | 687 | 753 |
| As Restated | 597 | 680 | 652 | 681 | 668 | 743 |
| | | | | | | |
| As Reported | Miss | Miss | Beat | Beat | Miss | Beat |
| As Restated | Miss | Miss | Miss | Miss | Miss | Miss |

* Source: S&P Capital IQ

(*Id.* ¶ 130).

When Hain issued its Q1 FY 2017 forecast, it fell far short of Wall Street expectations. Hain estimated that it would earn between $1.19 and $1.22 per share, while the consensus estimate had been $1.94 per share. Hain projected that its revenue would be between $2.84 billion and

$2.86 billion, which was approximately a hundred million dollars short of the consensus estimate

of the $2.906 billion.

In its June 22, 2017 financial filings, Hain admitted that its financial reporting had suffered

from material weaknesses.  In its Form 10-K, Hain identified at least two material weaknesses:

> *Ineffective Control Environment* - The Company's control environment did not
> sufficiently promote effective internal control over financial reporting, which
> contributed to the other material weakness described below.  Principle contributing
> factors included: (i) an insufficient number of personnel appropriately qualified to
> perform control design, execution and monitoring activities; (ii) an insufficient
> number of personnel with an appropriate level of U.S. GAAP knowledge and
> experience and ongoing training in the application of U.S. GAAP commensurate
> with our financial reporting requirements; and (iii) in certain instances, insufficient
> documentation or basis to support accounting estimates.
> *Revenue Recognition* - The Company's internal controls to identify, accumulate
> and assess the accounting impact of certain concessions or side agreements on
> whether the Company's revenue recognition criteria had been met were not
> adequately designed or operating effectively. The Company's controls were not
> effective to ensure (i) consistent standards in the level of documentation of
> agreements required to support accurate recording of revenue transactions, and (ii)
> that such documentation is retained, complete, and independently reviewed to
> ensure certain terms impacting revenue recognition were accurately reflected in the
> Company's books and records.  In addition, the Company did not design and
> maintain effective controls over the timing and classification of trade promotion
> spending.

(*Id.* ¶ 133).  In order to remedy the material weaknesses that it identified, Hain employed several

"remediation efforts."  Hain also announced that Conte was leaving Hain to pursue other

opportunities as of June 23, 2017.

### 5. Additional Alleged Material Misstatements and Omissions

The Lead Plaintiffs further detail a number of alleged misstatements and omissions made

in the company's financial forms during the Class Period relating to revenue and demand, (*id.* ¶¶

139–224); misstatements and omissions made during analyst conferences and earnings conference

calls relating to revenue, inventory, and demand, (*id.* ¶¶ 225–49); and misstatements and omissions

regarding the company's accounting policies, revenue recognition practices, sales and promotion incentives, trade promotions, Sarbanes-Oxley certifications, and internal controls, (*id.* ¶¶ 251–73).

As to the accounting policies, the complaint alleges that the Defendants' misstatements violated GAAP (Generally Accepted Accounting Principles). While Hain represented throughout the Class Period that it complied with GAAP, its actions purportedly violated those principles. Relevant here, Hain said that:

> Sales are recognized when the earnings process is complete, which occurs when products are shipped in accordance with terms of agreements, title and risk of loss transfer to customers, collection is probable and pricing is fixed or determinable. Sales are reported net of sales and promotion incentives, which include trade discounts and promotions and certain coupon costs. Shipping and handling costs billed to customers are included in reported sales. Allowances for cash discounts are recorded in the period in which the related sale is recognized.
> . . .
> Sales incentives and promotions include price discounts, slotting fees and coupons and are used to support sales of the Company's products. These incentives are deducted from our gross sales to determine reported net sales.
> . . .
> Accruals for trade promotions are recorded primarily at the time a product is sold to the customer based on expected levels of performance. Settlement of these liabilities typically occurs in subsequent periods primarily through an authorization process for deductions taken by a customer from amounts otherwise due to the Company.

(*Id.* ¶¶ 254, 257, 260 (internal emphasis omitted)). However, the Lead Plaintiffs allege that the Defendants violated GAAP by, *inter alia*, recognizing revenue when inventory left the warehouse but distributors had a right to return; recognizing revenue before title and risk of loss had transferred to the distributors; and failing to properly recognize costs associated with sales promotions and incentives offered to customers.

### 6. Additional Evidence Relating to Scienter

During the Class Period, Simon and Carroll sold a large number of their share of Hain stock. According to the Lead Plaintiffs, the number of shares sold by Simon and Carroll during

the Class Period was substantially larger than the number of shares sold by those two during the

39 months preceding the Class Period (the "control period).

| | Control Period | | Class Period | |
|---|---|---|---|---|
| Person | Number of Shares Sold | Net Proceeds | Number of Shares Sold | Net Proceeds |
| Carroll | 100,000 | $3,816,328 | 308,916 | $24,388,112 |
| Simon | 915,000 | $42,052,050 | 983,798 | $80,227,263 |

(*Id.* ¶ 309)

Simon and Carroll's bonuses were tied to Hain's financial performance, including its net

sales. The company's October 9, 2015 proxy statement stated that "executive compensation was

tied to the Company hitting target net sales, diluted earnings per share, and [earnings before

interest, taxes, depreciation, and amortization] adjusted." (*Id.* ¶ 316). In FY 2015, Simon's salary

was $1.85 million, and his bonus was $5,656,725 in cash and $8,787,355 in stock awards.

Carroll's salary was $693,000 with a bonus of $711,711 in cash and $1,119,854 in stock awards.

Finally, throughout the Class Period, Hain purchased several natural and organic food

companies in exchange for Hain stock. On January 13, 2014, Hain acquired Tilda Limited in

exchange for, *inter alia*, 1,646,173 shares of Hain stock valued at $148,400,000. On April 28,

2014, Hain acquired Charter Baking Company in exchange for, *inter alia*, 133,744 shares of Hain

stock valued at $11,168,000. On July 17, 2014, Hain acquired the remaining 51.3% of Hain Pure

Protein Corporation that it did not already own in exchange for, *inter alia*, 231,428 shares of Hain

stock valued at $19,690,000. On July 24, 2015, Hain acquired Formatio Beratungs und

Beteiligungs GmbH and its subsidiaries in exchange for, *inter alia*, 240,207 shares of Hain stock

valued at $16,308,000.

## B.  The Relevant Procedural History

On June 5, 2017, the Court ordered that all cases relating to Hain Celestial Group Securities Litigation be consolidated into a single action under master docket number 16-4581.  The Court Lead Plaintiffs and Lead Counsel at that time, and ordered that a consolidated amended complaint be filed within sixty days.

On August 4, 2017, the Lead Plaintiffs filed a consolidated amended complaint, bringing claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act.  While not explicitly clear from the complaint, the Lead Plaintiffs allege violations of subsections (a), (b), and (c) of Rule 10b-5.  The Lead Plaintiffs seek class certification, compensatory damages, and other costs.

On September 7, 2017, pursuant to a stipulation and order, the Lead Plaintiffs filed a corrected consolidated amended complaint.

On October 3, 2017, the Defendants filed the instant motion to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(6).

On April 4, 2018, the Court ordered the parties to file supplemental briefs on the motion.

## II.  DISCUSSION

## A.  The Legal Standard

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff.  *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Bold Elec., Inc. v. City of N.Y.*, 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free School Dist.*, 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009)).

Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679.

## B. As to the Relevant Law on a § 10(b) Claim

The Lead Plaintiffs' federal securities fraud claims implicate a statutory and regulatory framework involving Section 10(b) Rule 10b–5, Federal Rule of Civil Procedure 9(b), and the pleading standards required by the Private Securities Litigation Reform Act (the "PSLRA").

Under Section 10(b) of the Securities Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b-5, which was promulgated pursuant to this Section by the SEC, states that it is unlawful

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 CFR § 240.10b–5. Rule 10b-5 only prohibits conduct that is already prohibited by § 10(b). *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157, 128 S. Ct. 761, 768, 169 L. Ed. 2d 627 (2008) (internal citation omitted). The Supreme Court has read a right to a private cause of action implied in the statute and its implementing regulation. *Id.* (internal citation omitted).

In order to succeed on a § 10(b) claim, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (citing *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341–342, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)).

Pursuant to the heightened pleading standards of the PSLRA, as to the first two elements listed above, a plaintiff must "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321, 127 S. Ct. 2499, 2508, 168 L. Ed. 2d 179 (2007) (quoting 15 U.S.C. §§ 78u–4(b)(1), 78u–4(b)(2)).

A strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014) (citing *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290–91 (2d Cir. 2006)). "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal citations and quotation marks omitted). "Recklessness is defined as at the least, an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (internal citations, quotation marks, and ellipses omitted).

A plaintiff adequately alleges scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 127 S. Ct. at 168 (emphasis added). The Court must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.*

The Lead Plaintiffs bring claims under subsections (a), (b), and (c) of Rule 10(b)(5). While subsection (b) prohibits "the making of a material fact and the omission to state a material fact," subsections (a) and (c) allow suit against defendants who, with scienter, employ a "device, scheme or artifice to defraud," or engage in an "act, practice, or course of business which operates or would operate a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5.

"To state a claim based on conduct violating Rule 10b–5(a) and (c), plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Alstom SA*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005) (internal citation omitted)). A plaintiff bringing a claim pursuant to those subsections must "plead with particularity the manipulative scheme itself . . . ." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 297 (S.D.N.Y. 2003).

## C. As to the Parties' Arguments

The Defendants contend that the CWs' allegations should be disregarded by the Court because the CWs did not occupy positions where they would possess the alleged information. As to the elements of a § 10-b claim, the Defendants argue that the Lead Plaintiffs have failed to allege sufficient facts to support a strong inference of scienter or a material misrepresentation.

For their part, the Lead Plaintiffs state that scienter can be implied from the direct and circumstantial evidence of conscious misbehavior and recklessness. Namely, the fraudulent channel stuffing scheme in which the individual Defendants were directly involved; the material weaknesses in Hain's internal controls and their subsequent remedial measures; the suspicious circumstances regarding the demotions, resignations, and terminations of senior management; the importance of Hain's core United States operations and the Individual Defendants' access to reports. Alternatively, the Lead Plaintiffs contend that that their allegations regarding the Individual Defendants' motives support a strong inference of scienter. Furthermore, they state that the CWs are reliable and should be credited, and that they have sufficiently alleged material misstatements.

### D. Application to the Lead Plaintiffs' Claims

As noted above, the Lead Plaintiffs allege numerous material misrepresentations made by the Defendants. These include their stated financial results; statements regarding the inventory levels of Hain's distributors; Hain's accounting policies; statements regarding the company's sales incentives and trade promotions; and certifications and disclosures revolving around Hain's internal controls. All of these alleged misstatements flow from the Lead Plaintiffs' overarching allegation that the Defendants engaged in fraudulent channel stuffing. That is, the Lead Plaintiffs allege that the Defendants misled the market by: inflating Hain's reported sales and revenue through various improper accounting techniques; failing to disclose that Hain's channel stuffing and revenue recognition practices were causing distributors to build up too much inventory and would, in the long run, force the company to forego significant sales; and by using optimistic public statements to hide the retailer inventory problem.

The Lead Plaintiffs' channel stuffing allegations are the basis of their Rule 10b-5(a) and (c) claims, and also form much of their argument in support of a strong inference of scienter. (*See* ECF No. 87 at 10–12). The Court will first determine whether the channel stuffing allegations are sufficiently particularized, and whether they support a finding of scienter.

### 1. As to the Defendants' Alleged Channel Stuffing Scheme

The Lead Plaintiffs allege that the Defendants sent excess product to its distributors and improperly recognized revenue in violation of its own accounting standards and GAAP, and misled investors as the company's true revenue. In their brief, the Lead Plaintiffs claim that the distributors did not pay for the excess product, and in any event, had an absolute right of return. In opposition, the Defendants contend that "real products were shipped to real customers who paid real money," (Defs.' Reply Mem. in Supp. of Mot. to Dismiss at 3 (quoting *In re Bristol-Myers*

*Squibb Sec. Lit.*, 312 F. Supp. 2d 549, 568 (S.D.N.Y. 2004))), that granting a right of return does not necessarily mean that revenue cannot be recognized, and that the allegations regarding the purported right of return are conclusory in any event. The Court finds that the Lead Plaintiffs have not alleged sufficient facts in support of their contention that Hain engaged in a fraudulent channel stuffing scheme.

As the Defendants point out, "there may be any number of legitimate reasons for attempting to achieve sales earlier." *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008) (citation omitted). Indeed, as the Supreme Court stated when it summarized the defendant's arguments in *Tellabs*, there can be both illegitimate channel stuffing, such as "writing orders for products customers had not requested," and legitimate channel stuffing, such as "offering customers discounts as an incentive to buy." *Tellabs*, 551 U.S. at 325, 127 U.S. at 2511.

The Seventh Circuit, on remand from the Supreme Court's decision in *Tellabs*, clarified when channel stuffing becomes illegitimate:

> Channel stuffing becomes a form of fraud only when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them. They are in effect sales on consignment, and such sales cannot be booked as revenue. Neither condition of revenue recognition has been fulfilled—ownership and its attendant risks have not been transferred, and since the goods might not even be sold, there can be no certainty of getting paid.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (internal citation and quotation marks omitted); *see also Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 566 (finding that the defendants did not engage in channel stuffing because "Plaintiffs' counsel conceded . . . there was no right of return"); *Gavish v. Revlon, Inc.*, No. 00 CIV. 7291 (SHS), 2004 WL 2210269, at *14 (S.D.N.Y. Sept. 30, 2004) ("[G]ranting a right of return . . . is fraudulent [if] the seller fails to disclose the practice, or if it is disclosed, fails to maintain adequate reserves for

expected returns in accordance with GAAP or the company's stated revenue recognition policy." (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999))).

While the Lead Plaintiffs allege that the Defendants engaged in illegitimate channel stuffing because distributors had an absolute right of return, a review of their allegations reveals that they have not alleged sufficient facts in support of that claim.

In support of their contention that distributors had a right of return and did not have to pay for excess product, the Lead Plaintiffs rely on the confidential witnesses. CW 6 claims that "off-invoice concessions ranged from 10–25% discount on total sales for the quarter and the distributor was 'free to return' any of that inventory after the quarter ended." (Compl. ¶ 61). CW 6 further claims that he processed returns of between $500,000 and $700,000 per quarter. (*Id.* ¶ 62).

CW 5 "said it was his understanding that UNFI never purchased products from Hain but just warehoused them." (*Id.* ¶ 64). The complaint does not explain how CW 5 knew, or how he was even lead to merely "understand," that UNFI did not pay for product. CW 5 was a warehouse manager for UNFI. He does not state that he reviewed invoices, or saw any proof that UNFI did not pay for the product.

CW 3 "constantly saw products being returned . . . ." (*Id.* ¶ 69). Again, the complaint does not detail the amount of returns CW 3 saw, or what percent of sales these returns accounted for.

Generally, confidential witnesses may be probative of scienter only where each of their accounts is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

While the Court notes here that it generally credits the CWs' allegations because their positions have been sufficiently detailed, and the Court finds it likely that they were able to discern

much of what they said, the accounts of the CWs relating to rights of return are not sufficiently detailed. They rely on generalizations, and do not point to specific reports or evidence.

However, even assuming that the Court could credit these allegations, they are insufficiently detailed to sustain a claim for a scheme under 10b–5(a) and (c). The allegations stand in stark contrast to two cases where courts in this Circuit found that the plaintiffs sufficiently alleged scienter against the Defendants. In *Levy v. Maggiore*, 48 F. Supp. 3d 428 (E.D.N.Y. 2014), the plaintiff included specific statements from a broker who sold him stock in the Defendants' company who said that the company "booked consignment shipments and other fictitious sales as 'sales' in order to inflate its sales numbers." *Id.* at 442 (internal citations and quotation marks omitted). Furthermore, the plaintiff included affidavits from two brokers, one of whom had purchased a specific brand from the company, and had found during the due diligence process that many of the company's sales "were consignment sales and 'chargebacks' (shipments to retailers that had to be bought back by IBG if the product didn't sell)." *Id.* (internal citations and quotation marks omitted). The *Levy* plaintiff submitted documents from IBG's bankruptcy proceedings which listed two creditors who claimed a quarter of a million dollars each for returned merchandise. Finally, the plaintiff supplied a term sheet between IBG and one of its retailers in which IBG "agree[d] to a guaranteed sales on all products sold to [the retailer]. . . . [I]f the item d[id] not meet [the retailer]'s sales expectations, [the retailer] [would] send all remaining store and [] inventory back to IBG." *Id.* (internal citations, quotation marks, and alterations omitted). The court found that all of this "provide[d] a sufficient basis for Plaintiff to 'state with particularity all facts on which' Plaintiff relies to support his belief that IBG's 2008 gross sales were in fact comprised largely of consignment shipments." *Id.* at 443.

Similarly, in *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602 (S.D.N.Y. 2015), the plaintiff included allegations from three different confidential sources who identified specific deals defendants made with distributors at the end of certain quarters where the distributors agreed to buy large bulks of inventory to inflate revenue. "[E]ach bulk sale involved multiple contracts in order to separate the terms of the sale, which would be recognized immediately, from the sale's substantial rebates, which would not be recognized in that quarter." *Id.* at 609. The three confidential witnesses detailed the terms of the agreements with the distributors. The confidential witnesses included one of the defendants' distributors, the president of one of the companies who was a party to one of the deals, and one of the defendant's director of sales who was involved in the deals.

Therefore, even if the Court were to consider the conclusory statements of CWs 3, 5, and 6, the two cases above demonstrate that the Lead Plaintiffs have failed to "to 'state with particularity all facts on which" [they] rel[y] to support [their] belief that [the Defendants'] gross sales were in fact comprised largely of consignment shipments." *Levy*, 48 F. Supp. 3d at 443. A California court, faced with a similar set of facts, held that:

> Even if an inference of illegitimacy could be drawn from the Defendants' behavior, Plaintiffs have not provided corroborating details to meet the heightened pleading standard of the PSLRA. Although Plaintiffs list the name of two distributors, the CAC generally fails to allege specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts. Plaintiffs also fail to provide any corroborating details about orders reportedly received by [distributors] to "load" at the end of each quarter . . . .

*In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) (internal citation and quotation marks omitted). The same holds true here. The Lead Plaintiffs have not set forth the alleged scheme with any particularity, and therefore have failed to raise a strong inference of scienter regarding the channel stuffing scheme. "Where sham transactions are alleged, specific

facts about each one of these transactions are required." *Janbay v. Canadian Solar, Inc.*, No. 10 CIV. 4430 RWS, 2012 WL 1080306, at *4 (S.D.N.Y. Mar. 30, 2012) (citing *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 116 (2d Cir. 1982) (rejecting fraud theory based on inadequate write downs of obsolete facilities where the plaintiff failed to identify the facilities, their recorded value, or the values that should have been recorded)); *see also Davidoff v. Farina*, No. 04 CIV. 7617 (NRB), 2005 WL 2030501, at *13 (S.D.N.Y. Aug. 22, 2005) (stating that "plaintiffs' allegations regarding improper revenue recognition are exceedingly general and do not explain with any specificity what effect the alleged conduct had on the company's statements regarding its financial health" because, *inter alia*, "plaintiffs did] not indicate when, by whom or what size 'fictitious' orders were generated"); *Gavish*, 2004 WL 2210269, at *13 ("[T]he accounting abuses, and the manner in which they contributed to the sales drop-off, are not alleged with a degree of detail sufficient to support a reasonable belief that Revlon actually engaged in them during the Class Period.").

Furthermore, even if the Court were to credit those statements from the confidential witnesses, the returns noted by CW 6 are quite insignificant. In that way, the Lead Plaintiffs have failed to show that the Defendants failed to properly account for any returns. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 68 (2d Cir. 2001) ("Scholastic could, under generally accepted accounting principles, record revenues upon shipment to the retailer so long as an adequate reserve provision existed for books that might be returned."). CW 6 claims that he processed returns of between $500,000 and $700,000 per quarter. Hain's revised financials showed that it netted $2.61 billion in sales in FY 2015, and $2.15 billion in sales in the first nine months of FY 2016. (Compl. ¶ 129). Returns of $500,000 per quarter would represent .08% of net sales in 2015, and .09% of

sales in 2016. Returns of $700,000 per quarter would represent and .1% of sales in 2015 or 2016. It is unclear from the complaint whether other individuals processed returns similar to CW 6.

As the Defendants point out, Hain's 2016 10-K states that any returns for which the company not been accounted were immaterial, and the company concluded that "its historical accounting policy for these distributors [who received side agreements, rights of return, and concessions] is appropriate as the sales price is fixed or determinable at the time ownership transfers to these distributors, based on the Company's ability to make a reasonable estimate of future returns and certain concessions at the time of shipment." (Defs.' Ex. B at 52). Additionally, according to the complaint, investors were aware that distributors seemingly had too much inventory. (*See* Compl. ¶¶ 228, 232, 235, 238, 243, 245, 248). Therefore, "Plaintiffs' allegations . . . do not raise a sufficient inference that [Hain's] overall reserves for returns were recklessly inadequate." *Gavish*, 2004 WL 2210269, at *14.

Without adequately demonstrating that the Defendants gave distributors an absolute right of return, the Lead Plaintiffs' allegations amount to a claim that the Defendants offered incentives to distributors to take extra product, and improperly recognized revenue early. As multiple courts in this Circuit have found:

> where it is alleged that (i) management set aggressive targets, (ii) incentives were given to wholesalers to buy product before they actually needed it, (iii) in order to meet earnings estimates, (iv) it was known that wholesaler inventories were higher than usual, and (v) real products were shipped to real customers who paid real money, there is no strong inference that Defendants knew or should have known that the sales should have been accounted for in some way other than the Company's historical revenue recognition upon shipment model, and, therefore, conscious misbehavior or recklessness cannot be inferred.

*Id.* at *19 (quoting *Bristol–Myers Squibb Sec. Lit.,* 312 F. Supp. 2d at 568); *see also Bristol–Myers Squibb Sec. Lit.*, 312 F. Supp. 2d at 566 ("Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation that the sales

at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness.").

Therefore, the Defendants' alleged GAAP violations and identification and remediation of internal controls also fail to support a strong inference of scienter. As the Second Circuit has said:

> In the accounting context, failure "to identify problems with the defendant-company's internal controls and accounting practices *does not* constitute reckless conduct sufficient for Section 10(b) liability." [*Novak,* 216 F.3d at 309] (emphasis added). Similarly, failure to comply with Generally Accepted Accounting Practices or other such irregularities are insufficient to establish recklessness. *Id.* To rise to the state of mind required, these allegations must be coupled with evidence of "corresponding fraudulent intent." *Id.* (citations omitted).

*W. Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717, 720 (2d Cir. 2009) (internal alterations omitted); *see also In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 207 (E.D.N.Y. 2000) (Spatt, J.) ("[A]llegations of accounting violations, without more, are insufficient to state a claim." ); *Bausch & Lomb*, 592 F. Supp. 2d at 345 ("[V]iolations of GAAP, even ones that lead to restatement of financials, do not suffice to raise a strong inference of scienter without particularized allegations of fraudulent intent."). As the Lead Plaintiffs have failed to demonstrate that the Defendants acted with fraudulent intent, the alleged GAAP violations, and the identification and remediation of internal controls fail to support a strong inference of scienter.

Therefore, the Court finds that the Lead Plaintiffs fail to adequately allege that the Defendants engaged in a fraudulent channel stuffing scheme. For the same reasons, the allegations relating to the scheme do not give rise to a strong inference of scienter.

Accordingly, the Lead Plaintiffs' claims brought pursuant to Rule 10b-5 subsections (a) and (c) are dismissed without prejudice. The Court therefore turns to the remaining allegations contained within the Section 10(b) claim and the Rule 10b-5(b) claim.

### 2. As to Whether the Lead Plaintiffs Establish Scienter Without the Allegations Relating to the Scheme

### a. As to the Remaining Circumstantial Evidence of Misbehavior or Recklessness

Beyond the purported channel stuffing scheme, alleged GAAP violations, and remediation of internal controls, the Lead Plaintiffs contend that the departure of senior management, the presence of the scheme in Hain's core U.S. segment, and the individual Defendants' access to reports are all circumstantial evidence of misbehavior or recklessness supporting a strong inference of scienter. The Court finds that the Lead Plaintiffs have not met their burden at this juncture.

### i. "Suspicious" Circumstances Regarding the Demotions, Resignations, and Terminations of Hain's Senior Management

The Lead Plaintiffs point to the terminations and resignations of several senior employees at Hain: Conte, Smith, Ng, Powhida, Weiner, Hyndman, Guerrero. Additionally, they point to Carroll's and Meiers' demotions. The Court finds that these allegations do not support a finding of scienter.

Conte resigned on the same day that Hain announced it was taking remedial measures to correct material weaknesses in Hain's internal controls. Smith resigned to allegedly pursue other opportunities, but was still unemployed as of the filing of the complaint. Hyndman, the controller, and Guerrero, the Senior Director of Supply Chain Finance both resigned two months after the restatement of financials. Meiers was demoted two months before Hain disclosed the SEC inquiry, and Carroll was demoted a month after the announcement.

Much like the allegations regarding the scheme in general, the allegations from the CWs regarding several of these individuals' connections to the purported scheme are vague and often based on multiple layers of belief or hearsay. (*See* Compl. ¶ 91 (CW 1 "believed" that Smith was forced out because he was "not willing to be one of Simon's puppets."); *id.* ¶ 92 (CW 1 states, without examples, that the Heard of Human Resources was replaced for "not agreeing" with

Simon); *id.* ¶ 95 (CW 1 "believed" Powhida was fired "to take the hit for the credits scheme.")). The Court finds these statements unreliable. "No amount of investigation can transform information and belief-hearsay, essentially-into personal knowledge." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 330 n.50 (S.D.N.Y. 2009) (internal citation and quotation marks omitted), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).

Departures do not raise a strong inference of scienter "without some indicia of highly unusual or suspicious circumstances." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011). This question is admittedly a close one, but it seemingly stands alone as a close question among the factors weighing in favor of scienter. Without more, it is insufficient. The Court must consider competing inferences, and it is just as plausible that these individuals resigned, were demoted, or were fired because of negligence and mismanagement.

Therefore, the departures do not support a strong inference of scienter as they are currently pled.

### ii. Hain's Core U.S. Segment

While the Lead Plaintiffs argue that the fact that the purported fraud took place in Hain's core U.S. segment, the Second Circuit "the Second Circuit has expressed doubt as to whether the core operation doctrine has survived." *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 474 (S.D.N.Y. 2017); *see also Shemian v. Research In Motion Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779, at *19 n.10 (S.D.N.Y. Mar. 29, 2013) (stating that the plaintiff could not rely upon "the 'core operations' inference that courts in this district have rejected as insufficient to meet the PSLRA's heightened pleading bar"), *aff'd,* 570 F. App'x 32 (2d Cir. 2014). In any case, core business allegations are not evidence of scienter unless the "magnitude" of fraud is "startling" in relation to core products. *See In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *16 (S.D.N.Y. Apr.

22, 2016).  The Court does not find that the magnitude of the fraud is startling in this instance, and therefore, the fact that the alleged actions occurred within Hain's core U.S. segment does not contribute to a strong inference of scienter.

### iii.  Individual Defendants' Access to Reports

The Lead Plaintiffs' claim that the individual defendants' access to reports supports a strong inference of scienter cannot stand because the Lead Plaintiffs do not identify any specific reports.  As with the allegations regarding the channel stuffing scheme, the Lead Plaintiffs point to generalities and conclusions that are insufficient here.  *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 249 (S.D.N.Y. 2012) ("Our Circuit has held that where plaintiffs contend defendants had access to contrary facts, [plaintiffs] must specifically identify the reports or statements containing this information.").

Therefore, the individual defendants' access to reports does not support a strong inference of scienter.

### iv.  Allegations of Recklessness Considered as a Whole

Considering the circumstantial evidence of misbehavior or recklessness as a whole, as the Court must, *Tellabs*, 551 U.S. at 326, the Court finds that the Lead Plaintiffs come quite close but fall just short of meeting their burden, s*ee, e.g., Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 165 (D. Conn. 2007) ("Plaintiffs' allegations are insufficient to establish conscious misbehavior or recklessness. Specifically, Plaintiffs have failed to show that Defendants engaged in conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." (internal quotation marks omitted)), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).  Accordingly, the Lead Plaintiffs have failed, at this juncture, to sufficiently

plead scienter based on circumstantial evidence. As discussed below, the Lead Plaintiffs will be granted another attempt to do so.

### b. As to the Allegations Regarding Motive and Opportunity

Alternatively, the Lead Plaintiffs argue that they have demonstrated that they are able to show scienter because of the ways in which the Defendants benefitted from the fraud. Specifically, they point to insider stock sales, the Individual Defendants' bonuses, and Hain's acquisitions during the Class Period. The Court finds that these allegations also fail to establish a strong inference of scienter.

### i. As to the Insider Stock Sales

As to the insider stock sales, the Lead Plaintiffs only identify sales by two individuals. Carroll sold three times as many shares during the Class Period as during the same length of time preceding the Class Period, and made eight times as much. Simon sold about 10% more than during the time preceding the Class Period, and made almost twice as much. However, these facts are insufficient to create a strong inference of scienter because sheer volume and dollar numbers from two corporate officers do not necessarily indicate improper motive.

"The mere fact that insider stock sales occurred does not suffice to establish scienter." *Ressler v. Liz Claiborne, Inc.,* 75 F. Supp. 2d 43, 58 (E.D.N.Y. 1999) (quoting *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1224 (1st Cir. 1996)). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp.,* 252 F.3d at 74–75. Here, the Lead Plaintiffs only addressed the sales of two of the Defendants, and did not address the percentage of stock sold by those two Defendants. *See, e.g., Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (large volume of sales by

defendant were not suspicious because the shares that he sold represented only 11% of his total holdings); *Ressler,* 75 F. Supp. 2d at 59 ("[L]arge proceeds alone are not suspicious per se, ... and other relevant facts may undermine any inference of fraud arising from them.") (internal citation omitted); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 296 (S.D.N.Y. 1999) ("[P]laintiffs do not adequately plead that defendants, individually or collectively, sold a large percentage of their total shares; large dollar amounts, standing alone, typically do not suffice to establish motive."); *Duncan v. Pencer,* No. 94 Civ. 0321(LAP), 1996 WL 19043, at *12 (S.D.N.Y. Jan.16, 1996) ("[B]are allegations of their trading [sales by nine defendants totaling $29 million] fail to indicate, for example, how many shares the Individual Defendants retained after the sales.").

Although it is true, as the Lead Plaintiffs point out, that the Court in *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999) said that "the $78 million profit from sales by the Individual Defendants during the Class Period is . . . massive by any measure," *id.* at 140, the Court also relied on the fact that all of the individual defendants had sold for large profits, and that the plaintiffs demonstrated what percent of their total holdings the individual defendants sold. The Lead Plaintiffs only point to sales by two individual Defendants, and leave the Court to wonder what percent of stocks were sold by those two individuals.

Therefore, Carroll and Simon's stock sales are insufficient to establish motive.

### ii.  As to Carroll and Simon's Bonuses

The Lead Plaintiffs contend that Carroll and Simon's bonuses based on stock value illustrate their motive and opportunity to artificially inflate stock prices through the supposed scheme. The Court finds that they do not illustrate the individual Defendants' motive or opportunity.

As the Second Circuit has said,

Plaintiffs' allegation that defendants were motivated to defraud the public because
an inflated stock price would increase their compensation is without merit. If
scienter could be pleaded on that basis alone, virtually every company in the United
States that experiences a downturn in stock price could be forced to defend
securities fraud actions. "[I]ncentive compensation can hardly be the basis on which
an allegation of fraud is predicated." *Ferber v. Travelers Corp.,* 785 F.Supp. 1101,
1107 (D.Conn.1991); *accord Tuchman v. DSC Communications Corp.,* 14 F.3d
1061, 1068–69 (5th Cir.1994). Therefore, we hold that the existence, without more,
of executive compensation dependent upon stock value does not give rise to a
strong inference of scienter.

*Acito*, 47 F.3d at 54.

Therefore, Carroll and Simon's bonuses do not support a finding of motive and opportunity
at this time.

### iii. As to the Use of Stock to Make Acquisitions

In a similar way, the Lead Plaintiffs argue that the Defendants use of stock to make
acquisitions during the Class Period exhibits their motive and opportunity. The Court finds that
the Lead Plaintiffs have failed to connect the acquisitions to the artificial inflation, and that the
allegations do not currently establish motive or opportunity.

On January 13, 2014, Hain acquired Tilda Limited in exchange for, *inter alia*, 1,646,173
shares of Hain stock valued at $148,400,000. On April 28, 2014, Hain acquired Charter Baking
Company in exchange for, *inter alia*, 133,744 shares of Hain stock valued at $11,168,000. On
July 17, 2014, Hain acquired the remaining 51.3% of Hain Pure Protein Corporation that it did not
already own in exchange for, *inter alia*, 231,428 shares of Hain stock valued at $19,690,000. On
July 24, 2015, Hain acquired Formatio Beratungs und Beteiligungs GmbH and its subsidiaries in
exchange for, *inter alia*, 240,207 shares of Hain stock valued at $16,308,000.

The Second Circuit has concluded that "in some circumstances, the artificial inflation of
stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v.
Gregor,* 220 F.3d 81, 93 (2d Cir.2000). This rule, however, is interpreted narrowly. Before

grounding scienter on this manifestation of motive, courts ordinarily require evidence that the allegedly fraudulent inflation of stock prices was aimed at the specific acquisitions identified in the pleadings. *See, e.g., ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 201 (2d Cir. 2009) ("In this case, the link between the acquisition and the alleged misconduct simply is not close enough to strengthen the inference of an intent to defraud." (footnote omitted)); *In re Vivendi Universal, S.A.,* 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) ("Scienter may be imputed, as is the case here, to defendants when defendants' were motivated to inflate company stock prices as a means to effectuate a *specific* acquisition that would not otherwise be possible without fraudulently inflating stock prices" (emphasis added)); *see also Ross v. Lloyds Banking Grp., PLC*, 546 F. App'x 5, 9 (2d Cir. 2013) ("Such generalized desires fail to establish the requisite scienter because the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired." (internal citation, quotation marks, and ellipsis omitted)).

Hain had been acquiring companies for quite some time. (*See* Compl. ¶ 43). There is no indication that the acquisitions during this period were unique. Nor do the Lead Plaintiffs attempt to show that but for the alleged manipulation, Hain would not have been able to make these acquisitions. In addition, courts have recognized that the inflation of stock value to compete more effectively in the acquisition market "can redound to shareholders' benefit and thus figure within a general, non-fraudulent scheme of corporate growth." *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11 CIV. 7968 JPO, 2013 WL 144041, at *12 (S.D.N.Y. Jan. 14, 2013) (collecting cases), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013).

Therefore, the Court finds that Hain's use of stock to make acquisitions is not indicative of motive or opportunity.

### iv. Considering the Motive and Opportunity Allegations Holistically

Considering as the allegations of motive and opportunity as a whole, *Tellabs*, 551 U.S. at 326, the Court finds that the Lead Plaintiffs fall short of raising a strong inference of scienter. *In re Carter–Wallace, Inc. Sec. Litig.,* No. 94 Civ. 5704, 1999 WL 1029713, at *5, 1999 U.S. Dist. LEXIS 17526, at *18 (S.D.N.Y. Nov. 9, 1999) ("Four cubic zirconias will never add up to one real diamond and neither will four generic motives add up to one or more specific motives."), *aff'd,* 220 F.3d 36 (2d Cir.2000). Again, the Lead Plaintiffs will have another opportunity to do so in their amended complaint.

### 2. As to the Other Elements of the Lead Plaintiffs' Section 10(b) Claim

As the Court finds that the Lead Plaintiffs have failed to plead a strong inference of scienter, the Court does not assess the remaining elements of their Section 10(b) claim. *See Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO,* 475 F. App'x 353 (2d Cir. 2012).

### E. As to the Lead Plaintiffs' Claims Brought Under Section 20(a) of the Exchange Act

Plaintiffs also bring claims against the Individual Defendants pursuant to Section 20(a) of the Exchange Act. Section 20(a) imposes liability on individuals who control Section 10 violators. *See* 15 U.S.C. § 78t(a). To assert a *prima facie* case under Section 20(a), a plaintiff "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996) (internal citations and quotation marks omitted). Because the Complaint has not stated a primary violation under Section 10(b) and Rule 10b–5, the Section

20(a) claims must likewise be dismissed. *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

### III. CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) is granted, and the complaint is dismissed without prejudice.

The Lead Plaintiffs represent that they have acquired information from additional former employees that were uncovered during the Lead Plaintiffs' investigation, and requested leave to amend in the event that the Court found that they did not adequately plead any of their claims. (*See* ECF No. 99 at 10).  The Court finds that this is sufficient reason to grant leave to amend the complaint.

The Lead Plaintiffs are directed to file a second amended complaint within thirty days of entry of this order.

**SO ORDERED**.

Dated:  Central Islip, New York

March 29, 2019

_/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge