**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------X
                                                       :
In Re The Hain Celestial Group Inc.        :    Case No. 16-cv-04581 (ADS) (SIL)
                                                       :
Securities Litigation                              :    <u>JURY TRIAL DEMANDED</u>
                                                       :
                                                       :
                                                       :
-------------------------------------------------------X


**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF FEDERAL SECURITIES LAWS</u>**

## <u>TABLE OF CONTENTS</u>

I.    NATURE OF THE ACTION ..................................................................... 1

II.   JURISDICTION AND VENUE .............................................................. 10

III.  PARTIES ................................................................................................. 11

      A.    Lead Plaintiffs.............................................................................. 11

      B.    Defendants ................................................................................... 11

IV.   CONFIDENTIAL WITNESSES ............................................................ 14

V.    CONTROL PERSON ALLEGATIONS.................................................. 16

VI.   SUBSTANTIVE ALLEGATIONS ......................................................... 17

      A.    Overview of Hain's Business and Growth through Acquisitions......................... 17

      B.    Hain Suffers as the Natural Food Market Tightens ............................................. 19

      C.    Defendants Resort to Unsustainable and Undisclosed Sales Tactics
            to Mask Declining Sales and Make It Appear to Investors as if
            Hain Were Able to Meet Market Expectations Through Organic
            Means ........................................................................................... 20

            1.    Defendants Fail To Disclose Hain's Reliance on
                  Unsustainable Sales Practices To Generate Sales and Meet
                  Expectations............................................................................ 20

            2.    Hain Engages in a Fraudulent Scheme to Mislead Investors................... 23

            3.    Hain's December 2018 Settlement With The SEC Confirms
                  Its Reliance on Unsustainable Sales Practices and Details
                  Defendants' Scheme ............................................................... 24

            4.    Confidential Witnesses Detail Hain's Reliance on
                  Unsustainable Business Practices to Generate Sales ............... 26

            5.    Confidential Witnesses Detail Hain's Accounting
                  Manipulations ........................................................................ 30

            6.    Confidential Witnesses Describe the Involvement of Hain's
                  Executives and Senior Management in the Fraud..................... 32

7.      Hain's Lack of Internal Controls Allowed Information at
        Hain to be Kept Within Senior Management's Inner Circle
        and Outsiders Were Terminated ....................................... 35

D.      Hain's Top Distributors Refuse to Take So Much Excess Inventory
        at the End of Fiscal 2016 and Hain Is Forced to Disclose, and then
        Investigate, the Extent of its Myriad Concessions and the Revenue
        Recognition Impact of Those Concessions............................................ 40

E.      Hain Reveals the Widespread Nature of the Fraud................................. 44

F.      Post-Class Period Developments ........................................................... 45

        1.      Hain Delays Filing While Making Further Executive
                Changes....................................................................... 45

        2.      June 22, 2017: Hain Announces Financial Results for
                Fiscal Year 2016 and the First Three Quarters of Fiscal
                2017 and Restates Results for Fiscal Years 2014 and 2015
                and the First Three Quarters of Fiscal 2016.............................. 46

        3.      Hain Reaches Settlement With SEC Regarding Its Internal
                Controls Failures............................................................. 51

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS IN HAIN'S FINANCIAL RESULTS.................... 53

A.      First Quarter Fiscal Year 2014 Results – November 2013 ................... 53

        1.      Form 8-K for the First Quarter Fiscal Year 2014 ..................... 53

        2.      First Quarter Fiscal Year 2014 Financial Results on Form
                10-Q ............................................................................. 55

B.      Second Quarter Fiscal Year 2014 Results – February 2014 ............... 55

        1.      Form 8-K for the Second Quarter Fiscal Year 2014................. 55

        2.      Second Quarter Fiscal Year 2014 Financial Results on
                Form 10-Q...................................................................... 56

C.      Third Quarter Fiscal Year 2014 Results – May 2014 .......................... 57

        1.      Form 8-K for the Third Quarter Fiscal Year 2014................... 57

        2.      Third Quarter Fiscal Year 2014 Financial Results on Form
                10-Q ............................................................................. 58

D.      Fourth Quarter and Full Fiscal Year 2014 Results – August 2014...................... 58

| | 1. | Form 8-K for the Fourth Quarter and Full Fiscal Year 2014 | 58 |
|---|---|---|---|
| | 2. | Fourth Quarter and Full Fiscal Year 2014 Financial Results on Form 10-Q | 60 |
| E. | | First Quarter Fiscal Year 2015 Results – November 2014 | 60 |
| | 1. | Form 8-K for the First Quarter Fiscal Year 2015 | 61 |
| | 2. | First Quarter Fiscal Year 2015 Financial Results on Form 10-Q | 61 |
| F. | | Second Quarter Fiscal Year 2015 Results – February 2015 | 62 |
| | 1. | Form 8-K for the Second Quarter Fiscal Year 2015 | 62 |
| | 2. | Second Quarter Fiscal Year 2015 Financial Results on Form 10-Q | 63 |
| G. | | Third Quarter Fiscal Year 2015 Results – May 2015 | 63 |
| | 1. | Form 8-K for the Third Quarter Fiscal Year 2015 | 63 |
| | 2. | Third Quarter Fiscal Year 2015 Financial Results on Form 10-Q | 64 |
| H. | | Fourth Quarter and Full Fiscal Year 2015 Results – August 2015 | 64 |
| | 1. | Form 8-K for the Fourth Quarter and Full Fiscal Year 2015 | 65 |
| | 2. | Fourth Quarter and Full Fiscal Year 2015 Financial Results on Form 10-K | 66 |
| I. | | First Quarter Fiscal Year 2016 Results – November 2015 | 66 |
| | 1. | Form 8-K for the First Quarter Fiscal Year 2016 | 67 |
| | 2. | First Quarter Fiscal Year 2016 Financial Results on Form 10-Q | 67 |
| J. | | Second Quarter Fiscal Year 2016 Results – February 2016 | 68 |
| | 1. | Form 8-K for the Second Quarter Fiscal Year 2016 | 68 |
| | 2. | Second Quarter Fiscal Year 2016 Financial Results on Form 10-Q | 69 |
| K. | | Third Quarter Fiscal Year 2016 Results – May 2016 | 69 |

1.     Form 8-K for the Third Quarter Fiscal Year 2016 ....................................... 69

2.     Third Quarter Fiscal Year 2016 Financial Results on Form 10-Q .......................................................................................................... 71

VIII.   ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................. 73

A.    Analyst Conferences and Earnings Conference Calls ........................................... 73

1.     2014 ICR Conference – January 14, 2014 ................................................... 73

2.     Earnings Conference Call for Second Quarter Fiscal Year 2014 – February 4, 2014 ........................................................................... 73

3.     Earnings Conference Call for Third Quarter Fiscal Year 2014 –  May 8, 2014 ................................................................................. 75

4.     Earnings Conference Call for Fourth Quarter and Full Fiscal Year 2014 – August 20, 2014 ...................................................... 76

5.     Earnings Conference Call for First Quarter Fiscal Year 2015 – November 6, 2014 ......................................................................... 77

6.     Earnings Conference Call for Second Quarter Fiscal Year 2015 – February 4, 2015 ........................................................................... 78

7.     Earnings Conference Call for Third Quarter Fiscal Year 2015 – May 6, 2015 ................................................................................... 79

8.     Earnings Conference Call for Fourth Quarter and Full Year Fiscal 2015 – August 18, 2015 ................................................................. 80

9.     Earnings Conference Call for First Quarter Fiscal Year 2016 – November 5, 2015 ......................................................................... 81

10.    2016 ICR Conference – January 12, 2016 ................................................. 81

11.    Simon Responds to Resignation of Hain's Chief Accounting Officer – January 22, 2016 .................................................... 82

12.    Earnings Conference Call for Second Quarter Fiscal Year 2016 – February 1, 2016 ........................................................................... 83

13.    Consumer Analyst Group of New York Conference – February 17, 2016 ................................................................................... 84

14.    Earnings Conference Call for Third Quarter Fiscal Year 2016 – May 4, 2016 ................................................................................... 84

B. Materially False and Misleading Statement Repeated Throughout the Class Period ....................................................................... 85

  1. Hain's Critical Accounting Policies ..................................... 86

  2. Hain's Revenue Recognition Practices .................................. 87

  3. Hain's Sales and Promotion Incentives ................................. 88

  4. Hain's Trade Promotions ...................................................... 88

  5. Sarbanes-Oxley Certifications .............................................. 89

  6. Statements Regarding Internal Controls ................................ 92

IX. THE TRUTH EMERGES ..................................................................... 96

A. Hain's January 21, 2016 Announcement – First Partial Disclosure .................... 96

B. Hain's August 15, 2016 Announcement – Second Partial Disclosure ........................................................................... 96

C. Hain's November 16, 2016 Audit Committee Review Announcement ...................................................................... 99

D. The Truth is Further Revealed on February 10, 2017 – Final Corrective Disclosure ............................................................. 100

X. DEFENDANTS' VIOLATIONS GAAP ................................................ 100

XI. ADDITIONAL EVIDENCE OF SCIENTER ........................................ 103

A. The Senior Management Terminations Contribute to a Strong Inference of Scienter ............................................................... 103

B. Hain's Core U.S. Segment Was Extremely Important to the Company's Success ................................................................. 105

C. Suspicious Stock Sales by Carroll and Simon During the Class Period ............................................................................ 106

D. Hain's Significant Remedial Measures Contribute to a Strong Inference of Scienter ............................................................... 108

E. Simon and Carroll's Enormous Bonuses Contribute to a Strong Inference of Scienter ............................................................... 110

F. Hain's Acquisitions Using Artificially Inflated Stock Contribute to a Strong Inference of Scienter ............................................... 111

G.    The Magnitude of the End Of Quarter Sales Detailed in the SEC Order Contribute to a Strong Inference of Scienter ............................................ 112

XII.    CLASS ACTION ALLEGATIONS ..................................................................... 113

XIII.    LOSS CAUSATION/ECONOMIC LOSS ............................................................ 115

A.    January 21, 2016 – First Partial Disclosure ....................................... 117

B.    August 15, 2016 – Second Partial Disclosure .................................... 117

C.    February 10, 2017 – Final Corrective Disclosure ............................... 119

XIV.    PRESUMPTION OF RELIANCE ...................................................................... 120

XV.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ......................................... 122

XVI.    CLAIMS FOR RELIEF ................................................................................... 122

COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants ............................................ 122

COUNT II For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants .............................. 125

COUNT III For Violations of Section 20(a) of the Exchange Act Against Defendants Simon, Carroll, Smith, and Conte ................................................................ 127

PRAYER FOR RELIEF ............................................................................................... 128

JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS .................................................. 129

Lead Plaintiffs Rosewood Funeral Home ("Rosewood") and Salamon Gimpel ("Gimpel")

(together, "Lead Plaintiffs"), by their undersigned attorneys, hereby bring this Second Amended

Consolidated Class Action Complaint ("Complaint") against Hain Celestial Group, Inc. ("Hain"

or the "Company"), Irwin D. Simon ("Simon"), Pasquale Conte ("Conte"), John Carroll

("Carroll"), and Stephen J. Smith ("Smith") (together, "Defendants"). Defendants Simon, Conte,

Smith, and Carroll are collectively referred to as the "Individual Defendants."  The allegations

herein are based on Lead Plaintiffs' personal knowledge and on information and belief as to all

other matters, such information and belief having been informed by the investigation conducted

by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and

Exchange Commission ("SEC") filings by Hain; securities analysts' reports and advisories about

the Company; press releases and other public statements issued by the Company; media reports

about the Company; consultations with an accounting expert; and interviews of former

employees of Hain and other persons with knowledge of the matters alleged herein.  Lead

Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are

known only to, or are exclusively within the custody or control of, the Defendants.  Lead

Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.  On behalf of themselves and the class

they seek to represent, Lead Plaintiffs allege as follows:

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action brought pursuant to Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5

promulgated thereunder (17 C.F.R. § 240.10b-5) on behalf of all persons and entities that

purchased or otherwise acquired the publicly traded common stock of Hain, and call and put

options on such publicly traded common stock, (collectively, "Hain Securities"), during the period from November 5, 2013 through February 10, 2017, inclusive (the "Class Period").

2.      Hain is a leading marketer, manufacturer, and seller of organic and natural food and personal care products. Hain's customer base consists principally of specialty and natural food distributors, supermarkets, natural food stores, retailers and convenience stores. During the Class Period, approximately 30% of Hain's net sales for its U.S. Business Segment were derived from two distributors: (1) United Natural Foods, Inc. ("UNFI"), accounting for approximately $325-350 million in annual net sales for fiscal years 2014-2016 (over 20% of Hain's net sales for its U.S. Business Segment), and (2) Walmart Stores, Inc., accounting for over $115 million in net sales annually (approximately 8% of Hain's net sales for its U.S. Business Segment).

3.      In an effort to conceal that demand for Hain's products had been steadily deteriorating, starting in November 2013, Defendants engaged in a fraudulent scheme designed to load Hain's customers and distributors with excess product at the end of fiscal quarters. That scheme included offering customers and distributors generous "sales concessions" including substantial discounts, rights of return, and rights of reimbursement for perishable product that spoiled before being sold, in exchange for those customers agreeing to warehouse large amounts of Hain's products.

4.      These purported "sales concessions" were unsustainable for Hain's business because they stole sales from future quarters and relied on distributors' continued willingness to accept increasingly more product than they needed and could sell in any given quarter. Moreover, in order to get customers to continue to take product long after their inventories were overstocked, Defendants had to offer increasingly larger concessions.  Yet, even with multi-million dollar concessions offered to Hain's top two distributors at the end of fiscal 2016, those

- 2 -

distributors informed Hain they needed to curtail their Hain purchases.  Further, these sales

concessions had accounting implications for the Company given the rights of return, extended

payment obligations, and inadequate documentation supporting the off-invoice concessions.

5.      Most importantly, Defendants failed to truthfully advise investors of this scheme

so that investors could analyze the sustainability of the Company's business.  Defendants'

undisclosed end-of-the-quarter sales pull-ins artificially inflated Hain's financial results during

fiscal years 2014, 2015, and 2016, disguising the serious decline in demand for Hain's products

until the fourth fiscal quarter of 2016 (ended June 30, 2016), when Hain's largest distributors

became unwilling to accept such high levels of excess inventory as end-user demand moderated

for Hain's products. (Hain operates with its fiscal year ending on June 30.)

6.      Throughout the Class Period, Defendants falsely assured investors that Hain's

sales were the result of organic factors, such as "strong demand," rather than revealing that the

Company had been relying on sales gimmickry to meet Hain's financial projections and Wall

Street estimates for the Company's earnings.  Defendants' false statements and omissions

materially misled investors about the true nature of Hain's sales revenue, the Company's ability

to meet its projections and analysts' expectations through organic business activity, and demand

for Hain's products which was known or recklessly disregarded by Defendants at the time the

statements and omissions were made.  Defendants' failure to disclose Hain's reliance on these

sales practices and their contribution to the Company's reported financial results and future

prospects was a material omission making Defendants' statements during the Class Period about

these metrics and the Company's future prospects materially false and misleading.

7.      Defendants also improperly recognized revenue in violation of Generally

Accepted Accounting Principles ("GAAP"), in connection with these practices, which in turn

artificially inflated Hain's publicly reported financial results for fiscal years 2014, 2015, and 2016. **Indeed, Hain's restated numbers show that, but for these practices, Hain would have missed consensus Wall Street estimates by huge margins for six straight quarters**. Had Hain had six-straight fiscal quarters below consensus estimates, it certainly would have been material to investors at the time those results were reported. Instead, investors were led to mistakenly believe that Hain was able to naturally and organically generate sufficient revenue to meet analysts' expectations. As a result, investors were unable to analyze the true risk to the Company's future prospects.

8.     The scheme detailed herein was orchestrated by and directly involved executives at the highest levels of the Company, including CEO Simon, former CFO Smith, former CFO Conte, former CEO of Hain North America Carroll, and COO James Meiers. During the Class Period, these executives repeatedly touted the sales and income growth of the Company while knowing – or having unfettered access to the truth but recklessly disregarding – that product inventory was parked with distributors who had agreed to warehouse that inventory only with the added incentives detailed herein, just so that the Company could falsely tout its ability to organically grow its business. First-hand accounts from seven former Hain employees working for different Hain product brands confirm that senior management at Hain instructed certain employees to offer increasingly creative end-of-quarter sales incentives to facilitate meeting Wall Street's consensus estimates and the Company's own guidance.

9.     Eventually, distributors reached their inventory capacity and would no longer serve as Hain's inventory warehouse—i.e., Hain could no longer persuade customers with off-invoice concessions to accept more inventory than necessary despite the ever-increasing value of the sales incentives offered. On August 15, 2016, after the market closed, Hain announced that it

was unable to timely report its financial results for the fourth quarter and full Fiscal Year 2016 due to its investigation of sales concessions granted to certain U.S. distributors. The Company's press release stated: "The Company is currently evaluating whether revenue associated with those concessions was accounted for in the correct period and is also currently evaluating its internal control over financial reporting." The Company also announced that it did not expect to achieve its previously announced guidance for Fiscal Year 2016 (ended June 30, 2016). This disclosure, however, was materially misleading in that Defendants failed to disclose the extent of the Company's sales concessions known then to the Individual Defendants, the effect of the sales concessions on the Company's previously reported financial results, and Hain's lack of internal controls, including the lack of documentation supporting the sales concessions and off-invoice transactions. **This shocking news caused Hain's share price to fall precipitously on August 16, 2016, from $53.40 per share to $39.35 per share, a 26.3% drop and a loss in market capitalization of $1.6 billion**. Analysts at J.P. Morgan questioned the Company's "vague" disclosure, asking "what the revenue recognition issue actually entails" and "what happens if [] Hain's evaluation of its financial reporting controls turns up additional problems."

10.     On February 10, 2017, the last day of the Class Period, Hain revealed that the Company's "previously-issued financial information" could no longer be relied upon because of "potential errors." In addition, the Company disclosed that the "SEC has issued a formal order of investigation and, pursuant to such order, the SEC issued a subpoena to the Company seeking relevant documents." **In response to this news, on February 13, 2017 (the next trading day), the price of Hain stock declined more than 8%, to close at $35.10 per share on unusually heavy trading volume.**

11.     On June 22, 2017, **after failing to file any financial reports for almost a year**, Hain finally issued revised financial statements for Fiscal Years 2014, 2015, and 2016, as well as issuing its Quarterly Reports on Form 10-Q for the first three quarters of Fiscal Year 2017. According to the Company, the restatement was required because Hain: (i) improperly recognized revenue related to the timing of trade and promotional accruals, (ii) prematurely recognized revenue on certain sales; and (iii) improperly classified promotion expenses.  The Company also announced that James M. Langrock was replacing Pat Conte as CFO effective immediately. Without the aid of its undisclosed, unsustainable pull-in sales practices and improper revenue recognition, Hain's business plummeted.  For the first nine months of Fiscal Year 2017, Hain reported a 14% year-over-year decrease in U.S. net sales, a 51.1% year-over-year decrease in net income, and a 51.1% year-over-year decrease in earnings per share. During the Company's earning conference call on June 22, 2017, Hain acknowledged that net sales for the first three quarters of its fiscal year 2017 were negatively impacted by $55 million due to "an inventory realignment at certain customers and a SKU rationalization" – i.e. Hain's customers were refusing to accept as much additional inventory on a quarterly basis despite the increasingly generous end-of-quarter sales concessions. The CEO of  Hain North America described the sales hit from the inventory realignment and SKU rationalization as "obviously a significant hit for us to take." (During the earnings call, "SKU rationalization" was described generally as a focus on Hain's top performing 500 SKUs. (6/22/17 Earnings Call Trans. at 23).).  Knowing that it could not continue its reliance on unsustainable sales tactics to generate revenue, Hain was forced to release a dismal forecast for its fiscal fourth quarter and Fiscal Year 2017 - well short of consensus estimates.

12.     On June 22, 2017, Hain also disclosed in its Annual Report for Fiscal Year 2016 (ended June 30, 2016), that it had material weaknesses in its internal controls over financial reporting, identifying the following deficiencies:

> *Ineffective Control Environment* - The Company's control environment did not sufficiently promote effective internal control over financial reporting, which contributed to the other material weakness described below. Principle contributing factors included: (i) an insufficient number of personnel appropriately qualified to perform control design, execution and monitoring activities; (ii) an insufficient number of personnel with an appropriate level of U.S. GAAP knowledge and experience and ongoing training in the application of U.S. GAAP commensurate with our financial reporting requirements; and (iii) in certain instances, insufficient documentation or basis to support accounting estimates.

> *Revenue Recognition* - The Company's internal controls to identify, accumulate and assess the accounting impact of certain concessions or side agreements on whether the Company's revenue recognition criteria had been met were not adequately designed or operating effectively.  The Company's controls were not effective to ensure (i) consistent standards in the level of documentation of agreements required to support accurate recording of revenue transactions, and (ii) that such documentation is retained, complete, and independently reviewed to ensure certain terms impacting revenue recognition were accurately reflected in the Company's books and records.  In addition, the Company did not design and maintain effective controls over the timing and classification of trade promotion spending.

13.     Almost 18 months later, on December 11, 2018, the SEC announced that it had reached a settlement with Hain concluding the SEC's investigation of the Company.  In the "Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order" (the "SEC Order"), Hain admitted to relying on sales concessions from at least 2014 until May 2016 which, while perhaps not illegal if properly accounted for and properly disclosed to investors, were unsustainable and definitely not publicly disclosed. These undisclosed sales practices were designed to load Hain's customers/distributors with more product than they could possibly sell-

through in any given quarter by offering huge incentives.  *See In the Matter of The Hain Celestial Group, Inc.*, Exchange Act Release No. 84781 (Dec. 11, 2018).  These incentives included:

> (1) cash incentives which distributors demanded increase quarter over quarter in order to continue to take Hain product overstock. The cash incentives reached up to $500,000 per distributor per quarter;
>
> (2) extended payment terms (up to 90 days);
>
> (3) substantial discounts off list price or invoice price (up to 20% off, with one of Hain's distributors receiving a $1.5 million discount in a single fiscal quarter in 2016 right before Defendants' scheme was exposed); and
>
> (4) "spoils coverage," whereby Hain agreed to reimburse the distributors for excess product that spoiled or expired before the distributor could sell through to retailers (i.e., spoils reimbursement for one of Hain's distributors reached $1.6 million in a single quarter in fiscal 2016, also right before Defendants' scheme was exposed. (SEC Order at 3).

Hain engaged in these undisclosed sales practices in order to make it appear to investors that it was able to meet expectations through normal organic sales growth.

14.     According to SEC Order, "[t]hese incentives had potential accounting implications," but were often inadequately documented, or not documented at all.  (SEC Order at 2).  Indeed, it took the Company approximately 10 months to conclude its internal investigation, in part, because of "Hain's inadequate documentation of the incentives and lack of sufficient internal accounting controls to provide reasonable assurances that the incentives were accounted for correctly." (SEC Order, at 2).

15.     The SEC Order also confirms the "beginning of the end" of Defendants' scheme as the end of fiscal 2016 when certain distributors told Hain they would no longer accept so much excess inventory: "[N]ear the end of Hain's fiscal year 2016, Distributors 1 and 2

independently communicated to Hain that going forward, they planned to reduce their inventory levels. Over fiscal year 2017, Distributor 1 went from holding approximately $74 million in Hain inventory (June 2016), to $47 million (June 2017). Similarly, Distributor 2 went from holding approximately $24 million in Hain inventory (June 2016), to $14 million (June 2017)." SEC Order at 6.  Based on disclosures in Hain's Class Period SEC filings about its top customers, Plaintiffs believe that reference in the SEC Order to "Distributor 1" is UNFI and "Distributor 2" is Walmart.

16.     Hain conceded that it had violated: (i) Section 13(b)(2)(A) of the Exchange Act which requires Hain to make and keep records which accurately and fairly reflect Hain's transactions; and (ii) Section 13(b)(2)(B) of the Exchange Act which requires Hain to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions are executed in accordance with management's authorization and in conformity with GAAP.  (SEC Order at 8.)  In connection with the Settlement with the SEC, Hain was forced to establish an internal audit function, implement changes to its revenue recognition practices, and develop a revenue recognition and contract review training program. (SEC Order at 7).

17.     Moreover, unbeknownst to investors, during the Class Period, Defendants Simon and Carroll engaged in a highly suspicious pattern of insider trading for proceeds of approximately $104.3 million. Specifically, Carroll sold 308,916 shares of Hain stock during the Class Period for proceeds of more than $24.3 million. Including shares withheld by Hain in connection with option exercises or personal taxes, ***Carroll disposed of approximately 74% of the total shares, including shares converted from options, he had available for sale during the Class Period***. Underscoring the suspicious nature of his trading, Carroll's Class Period sales of Hain stock represented a dramatic increase over the amount of Hain stock he sold during an

equal period of time prior to the Class Period, amounting to a more than 600% increase in proceeds over the prior time period. Simon sold 983,798 shares of Hain stock during the Class Period for proceeds of $80 million. Including shares withheld by Hain in connection with option exercises or personal taxes, and shares gifted, ***Simon disposed of more than 66% of the total shares, including options, he had available for sale during the Class Period.***

18.     As a direct and proximate result of Defendants' scheme to defraud and unlawful course of conduct, Defendants' misstatements and omissions, and the precipitous decline in the market price of the Company's common stock, Lead Plaintiffs and the Class have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a).

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Hain is headquartered in this District and many of the violations of law complained of herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

22.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.     **PARTIES**

   A.     **Lead Plaintiffs**

   23.     Co-Lead Plaintiff Rosewood is a funeral home serving families in the Houston, Texas area since the 1800s.  Rosewood purchased Hain call options transactions during the Class Period and suffered a loss of approximately $1,548,333 from its purchases of Hain call options during the Class Period.

   24.     Co-Lead Plaintiff Gimpel purchased Hain common stock during the Class Period. Gimpel suffered a loss of approximately $822,519 from his purchases of Hain common stock during the Class Period.

   B.     **Defendants**

   25.     Hain is incorporated in Delaware with its principal executive offices located at 1111 Marcus Avenue, Lake Success, NY 11042.  Hain manufactures, markets, distributes, and sells organic and natural products in the United States, the United Kingdom, Canada, and Europe under brand names which are sold as "better-for-you" products.  Hain's product brands include Almond Dream, Arrowhead Mills, Bearitos, BluePrint, Celestial Seasonings, Coconut Dream, Cully & Sully, Danival, DeBoles, Earth's Best, Ella's Kitchen, Empire, Europe's Best, Farmhouse Fare, Frank Cooper's, FreeBird, Gale's, Garden of Eatin', GG UniqueFiber, Hain Pure Foods, Hartley's, Health Valley, Imagine, Johnson's Juice Co., Joya, Kosher Valley, Lima, Linda McCartney's (under license), MaraNatha, Natumi, New Covent Garden Soup Co., Plainville Farms, Rice Dream, Robertson's, Rudi's Gluten-Free Bakery, Rudi's Organic Bakery, Sensible Portions, Spectrum Organics, Soy Dream, Sun-Pat, SunSpire, Terra, The Greek Gods, Tilda, WestSoy, and Yves Veggie Cuisine.  The Company's personal care products are marketed under the Alba Botanica, Avalon Organics, Earth's Best, JASON, Live Clean and Queen Helene brands.  Hain's Securities are traded on the NASDAQ Global Select Market (the "NASDAQ")

under the ticker symbol "HAIN."  The Company's operations are managed in five operating segments that are integrated under one management team and employ uniform marketing, sales, and distribution programs.  During the Class Period, between 56-60% of Hain's consolidated net sales were generated within the U.S.  Hain's largest customer was UNFI, a distributor that accounted for more than 20% of Hain's net sales for its U.S. business segment.

26.     Simon is the founder of Hain and was the Company's President, CEO and Chairman of the Board until his departure in June 2018. During the Class Period, Simon signed Hain's annual reports and quarterly and annual certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Hain's internal controls over financial reporting.  During the Class Period, Simon participated in the Company's quarterly earnings conference calls described herein.  Simon was a direct and substantial participant in the fraud.

27.     Conte was Hain's CFO and Executive Vice President, Finance, from September 8, 2015 until he resigned on June 22, 2017.  Conte previously served as Hain's Senior Vice President, Finance, from October 2014 to September 2015, and Treasurer and Vice President from July 2009 to October 2014.  Prior to joining Hain, Conte worked at Motorola, Inc. (formerly Symbol Technologies, Inc.) in a series of financial roles of increasing responsibility. From November 2015 until the end of the Class Period, Conte signed Hain's annual reports and quarterly and annual certifications pursuant to SOX, stating that the financial information contained in the Company's financial reports was accurate, and disclosed any material changes to Hain's internal controls over financial reporting.  During the Class Period, Conte reported

directly to Simon and was listed as either an executive officer or senior management in Hain's annual reports.  Conte was a direct and substantial participant in the fraud.

28.     Smith was Hain's CFO and Executive Vice President from September 3, 2013 until his "resignation" on September 30, 2015.  From the beginning of the Class Period until his "resignation," Smith signed Hain's annual reports and quarterly and annual certifications pursuant to SOX stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Hain's internal controls over financial reporting.  During that same time frame, Smith participated in the Company's quarterly earnings conference calls described herein.  During the Class Period, Smith reported directly to Simon and was listed as an executive officer in Hain's annual reports.  Smith was a direct and substantial participant in the fraud.

29.     Carroll has been Hain's Executive Vice President, Global Brands, Categories and New Business Ventures since March 6, 2017.  Carroll previously served as Hain's Executive Vice President and CEO for Hain Celestial North America from February 2015 to March 6, 2017.  Before that, Carroll served as CEO of Hain Celestial United States, President of Grocery and Snacks Division and President of Personal Care since May 2008, since September 12, 2005, and since August 22, 2006, respectively. Carroll served as Hain's Executive Vice President of Melville Businesses since February 10, 2004 and also served as Hain's President of Grocery and Frozen since July 1, 2004.  During the Class Period, Carroll participated in the Company's quarterly earnings conference calls described herein.  During the Class Period, Carroll reported directly to Simon and was listed as an executive officer in Hain's annual reports.  Carroll was a direct and substantial participant in the fraud.

30.     Defendants Simon, Conte, Smith, and Carroll are collectively referred to as the "Individual Defendants."  Hain and the Individual Defendants are collectively referred to as "Defendants."

## IV.   CONFIDENTIAL WITNESSES

31.     As part of its investigation into the facts underlying this action, counsel for Lead Plaintiffs interviewed former employees of Hain and other persons with knowledge of the matters alleged herein. Confidential witnesses ("CWs") will be identified herein by number (CW 1, CW 2, etc.).  All CWs will be described in the masculine to protect their identities.

32.     Confidential Witness ("CW") 1 is a former Hain employee who worked for the Company from September 2012 through June 2016 as a Senior Finance Manager.  CW 1 was responsible for finances related to Hain's manufacturing costs associated with creating products in the United States (excluding operations in India and the United Kingdom), including posting accruals quarterly to Hain's accounting department so Hain's Senior Vice President and Controller, Marla Hyndman, could justify the quarterly numbers to Hain's auditor, EY (formerly known as Ernst & Young). *See* ¶303 (describing Company's treatment of accruals).  CW 1 reported to Hain's Senior Director of Supply Chain Finance who reported to James Meiers, Hain's former COO.

33.     CW 2 is a former Hain employee who worked for the Company from January 2016 through February 2017 as a Senior Sales Analyst.  CW 2 was responsible for forecasting, trade planning and profit and loss analysis at the BluePrint brand business at Hain.  BluePrint products consist of raw, organic cold-pressed fruit and vegetable juice beverages, including a raw juice cleanse program designed to detoxify the body.  BluePrint's products are delivered nationwide.  CW 2 reported directly to the General Manager for BluePrint, who reported directly to Simon.

34.     CW 3 is a former Hain employee who worked for the Company from June 2014 to July 2016 as an Executive Assistant to Meiers.  In addition to general administrative duties for Meiers, CW 3's responsibilities included reviewing and formatting Hain's financial results each quarter prior to public release.

35.     CW 4 is a former Hain employee who worked for the Company from January 2012 through June 2014 as a Brand Manager and from June 2014 to June 2017 as a Senior Brand Manager.  CW 4 reported to Hain's former Director of Marketing, who reported to Hain's Vice President of Marketing.  CW 4's responsibilities included product development and strategy, profit and loss analysis, and budgeting for non-dairy products such as Spectrum.  Spectrum products consist of a premium line of culinary oils and vinegars in addition to Omega 3 supplements.

36.     CW 5 is a former employee of NFI Industries, a company that provided warehousing services for Hain, from August 2011 to 2013 as a Senior General Manager in a warehouse in Ontario, CA that was leased by Hain.

37.     CW 6 is a former Hain employee who worked for the Company from 2000 until October 2016.  During the Class Period, CW 6 served as the Senior Manager of Customer Support at Hain and reported directly to Hain's Director of Customer Satisfaction, who reported directly to Meiers.  CW 6's responsibilities included all customer service tasks including processing the Company's quarterly numbers and product returns with its financial operations and accounting departments.

38.     CW 7 is a former Hain employee who worked for the Company from January 2005 until August 1, 2017, most recently as the Senior Director of Supply Chain Finance. CW 7,

who reported directly to Meiers was responsible for managing the supply chain financials, such as profit and loss analysis, cost accounting, and sales reporting.

39.     CW 8 was the former Manager of Sales Planning for Hain during the entirety of the Class Period. CW 8 was responsible for supporting Hain's Field Sales Team and driving retail sales.

## V.     CONTROL PERSON ALLEGATIONS

40.     Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and had access to the adverse undisclosed information about the Company's business, operations, financial statements and present and future business prospects via access to internal corporate documents.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Hain's net sales within the U.S. comprised the majority of Hain's total sales during the Class Period and sales through distributors were fundamental aspects of Hain's business that the Individual Defendants followed, tracked, and were aware of, or should have followed, tracked, and been aware of, at all times.

41.     The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants had access to and were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual

Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

42.     As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

43.     In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Hain, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## VI.     SUBSTANTIVE ALLEGATIONS

### A.     Overview of Hain's Business and Growth through Acquisitions

44.     Hain manufactures, markets, distributes, and sells organic and natural products under brand names which are sold as "better-for-you" products.  Hain's products are sold throughout the United States with a customer base consisting principally of specialty and natural food distributors, supermarkets, natural food stores, and e-commerce retailers.  A significant portion of Hain's products are sold through independent food distributors.  According to CW 1, Hain relied on only two or three distributors.

- 17 -

45.     Hain consists of a collection of what were once small, successful, independent natural and organic brands.  Since Hain became a publicly traded company in 1993, it has rapidly acquired small natural food companies, making its biggest purchase in 2000 with Celestial Seasonings.

46.     These acquisitions fueled Hain's business growth for a long time.  Hain was one of the first companies to embrace the natural and organic movement.  Simon's goal was to spend a minimum of $100 million every year acquiring natural and organic food companies.  By aggressively acquiring the best-selling small, independent organic food companies and integrating them under Hain's umbrella, the Company was able to consistently generate double-digit growth in sales.

47.     Hain's growth translated into higher share prices as its stock price responded in kind to this momentum, increasing over 800% between 2010 and Hain's last annual report filed prior to the public disclosure of the fraud.



48.     Hain's acquisition strategy involved integrating the Company's brands under one management team and employing uniform marketing, sales, and distribution programs.  Meiers

described this process for the BluePrint brand at the Bank of America Merrill Lynch Conference on March 12, 2014: "as we acquire these businesses, it's about getting the efficiencies aligned, taking costs out of the business and then we will optimize the manufacturing."  In reality, Meiers' use of the word "efficiencies" referred to how Hain achieved economies of scale by cutting the acquired brand's operations down to the bare bones, to eke out greater profitability. This practice immediately had a positive impact on revenue, but Hain's strategy of underinvesting in its brands was doomed over the long run.

49.     Hain's failure to invest in the branding of its acquired companies made it vulnerable to private label competitors moving into the organic market under the brands of Kroger, Walmart, Target, and Costco.  Outside the power of the label itself, there was little competitive advantage to Hain's acquired companies.  What consumers really cared about was that a product was labeled "organic."  After that, customers purchased the cheapest option available – which often meant private label brands.

**B.     Hain Suffers as the Natural Food Market Tightens**

50.     By the beginning of the Class Period, Hain began to suffer as the largest domestic organic grocery, Whole Foods Market, struggled.  After years of profiting from its role as the dominant and virtually exclusive provider in the organic foods market, Whole Foods' growth wilted under pressure from both smaller players such as Sprouts and established players such as Costco that began offering the same fare at competitive prices.  With more chains moving to sell natural and organic foods, it became harder for Hain to command a price premium.

51.     The challenges in the organic and natural food market also had a direct impact on UNFI – one of the largest distributors of organic foods and Hain's largest customer.

52.     During the Class Period, better prices and increased competition allowed Costco, Walmart, and Target, key retailers for organic products, to cut back on the number of Hain items

they stocked and to reduce the prices on the Hain items they did stock.  According to an analysis by Piper Jaffray, the average number of Hain products on the shelves of these stores dropped 11% from 202 products in the fourth quarter of fiscal year 2014 to 180 products in fourth quarter of 2015.  *See* Piper Jaffray, *Hain Celestial Group, Inc. (HAIN), Negative Pre-Announcement Not a Huge Surprise, Multiple Expansion Delayed*, Jan. 12, 2016.  According to the analysis, the remaining Hain products on the shelves were subject to clearance pricing with a 5.1% discount on prices of like items.  Piper Jaffray, *Hain Celestial Group, Inc. (HAIN), Items Increase Sequentially at Mass Merchants, But Pricing Pressure Remains*, Apr. 12, 2016.

  **C.**  **Defendants Resort to Unsustainable and Undisclosed Sales Tactics to Mask Declining Sales and Make It Appear to Investors as if Hain Were Able to Meet Market Expectations Through Organic Means**

    **1.**  **Defendants Fail To Disclose Hain's Reliance on Unsustainable Sales Practices To Generate Sales and Meet Expectations**

  53.  As corroborated by several of the CWs, Defendants resorted to undisclosed, unsustainable pull-in sales practices in order to mask declining sales and diminishing growth prospects. Defendants' failure to disclose this to investors—and to instead attribute Hain's sales to organic factors—constituted the making of false and misleading statements and/or material omissions within the scope of Rule 10b-5(b).

  54.  Each quarter, Hain reported on its performance and provided guidance to Wall Street analysts and investors with respect to its projected net sales and earnings per share for the year. Wall Street, in turn, provided its own analysis establishing consensus quarterly estimates – figures that analysts believed the Company should be able to achieve in view of the information provided by the Company.  Not surprisingly, these figures predicted continued growth consistent with Hain's guidance.

55.     As a result, Defendants needed to find a way to increase sales and earnings or else be forced to disclose the declining prospects for Hain. To do so, Hain resorted to inherently unsustainable sales practices aimed at persuading its customers to accept more inventory than those customers actually needed—a practice known as "pulling in" sales and referred to internally at Hain as "loading."

56.     Hain admitted in its settlement with the SEC that it relied on these short-term pull-in sales practices including offering customers: (1) cash incentives up to $500,000 per quarter per distributor; (2) extended payment terms (up to 90 days); (3) substantial discounts off list price or off-invoice price (up to 20% off, with one of Hain's distributors receiving a $1.5 million discount in a single quarter during fiscal year 2016); and (4) "spoils coverage," whereby Hain agreed to reimburse the distributors for excess product that spoiled or expired before the distributor could sell through to retailers (i.e., spoils reimbursement for just one of Hain's distributors amount to $1.6 million in fiscal 2016) (SEC Order at 4).  The purposes of these sales concessions was to encourage customers to purchase more product than they actually needed so that Hain could meet its quarterly numbers.

57.     Relying on these off-contract incentives could not be maintained long-term because it requires pulling forward sales from future quarters into current ones and depends on customers' continued willingness to accept more product than necessary—which cannot be guaranteed. While it might work to shore up sales for a short period of time, reliance on pull-in sales practices eventually stops working once customers become unwilling to purchase beyond their needs.

58.      Rather than inform investors that the Company's sales figures depended on these short-term unsustainable business practices, Hain continued to represent that the Company was

achieving its sales as a result of sustainable organic factors, such as strong demand. Hain's failure to disclose reliance on its unsustainable sales tactics therefore misleadingly created the impression that Hain was able to meet its projections and analysts' expectations based on organic factors, when, in reality, Hain only achieved its reported sales figures because it relied on sales practices that inherently did not reflect normal and maintainable demand.

59.     Moreover, as corroborated by former employees, Hain granted its distributors an unconditional right to return the goods if the distributors could not sell the products and the distributors were not obligated to pay for the goods until and unless they sold them.  Despite the distributors having no payment obligation unless the product was sold and having the absolute right to return the product, Hain nevertheless claimed that it "sold" the products. Hain also engaged in accounting manipulations that included shipping millions of dollars in products to distributors with the absolute right to return the product the following fiscal quarter with no obligation to pay for those returns.  Hain then provided the distributors with free "credits" to track the amount of inventory being shipped.  Hain booked these "credits" in its internal accounting system and later altered the accounting numbers to make them appear legitimate.

60.     These facts made Defendants' statements about "sales" and "distribution" false because this practice misleadingly created the impression of a strong and ongoing natural demand for Hain's products that did not exist.  Because Hain failed to disclose that it offered its customers an absolute right of return—and instead falsely assured investors that sales were generated as a result of organic factors—investors were materially mislead about the true nature of Hain's sales revenue, the Company's ability to meet its projections and analysts' expectations through natural business activity, and demand for its products. In other words, investors were

unable to assess the risks that Hain's future cash flows would be negatively affected by the Company's undisclosed, short-term unsustainable business practices.

### 2.    Hain Engages in a Fraudulent Scheme to Mislead Investors

61.    Because Defendants assured investors that Hain generated its sales figures as a result of organic factors—and concealed that Hain was instead relying on "pull in" sales practices—Defendants' conduct constituted a scheme to defraud investors within the scope of Rules 10b-5(a) and (c). Indeed, Defendants knowingly disseminated false information to investors when Hain publicly attributed its sales figures to sustainable, organic factors and concealed the concessions it had to grant in order to generate those sales. Because Defendants participated in the dissemination of this false information (regardless of which individual "made" the false statements to investors), Defendants engaged in inherently deceptive conduct (i.e., a fraudulent "scheme").

62.    Defendants' scheme involved three different segments of Hain's finance team: (1) financial planning and analysis led by Carroll; (2) supply chain/operations finance led by Meiers (who reported to Carroll); and (3) revenue recognition and SEC filings led by Smith and, later, Conte.

63.    The scheme began with Carroll obtaining the Hain mid-quarter financial sales so he would know the sales shortfall before negotiating with distributors to take more inventory. After Carroll negotiated the credits and "off-invoice" concessions in exchange for distributors taking the amount of inventory necessary for Hain to meet its quarterly sales numbers, Carroll and Simon communicated to the managers of Hain's brands the amount to be loaded onto the distributors' trucks.  At the end of each quarter, Hain sent inventory to the distributors – primarily UNFI – with the understanding that the distributor was free to return the products the following fiscal quarter.

64.     Next, Meiers' group accounted for the credits and off-invoice concessions as revenue as soon as the shipments left the warehouse.  This involved posting millions of dollars in credits and off-invoice concessions onto Hain's internal system for financial reporting that was linked to an enterprise-wide JD Edwards reporting system.  Meiers and his inner circle then smoothed out the sales and revenue numbers to avoid discovery of the fraud. Meiers then sent the modified sales and revenue numbers to Hain's CFO for inclusion in the Company's SEC filings where Smith and, later, Conte prepared Hain's financial reports for the public.

65.     Finally, in the following fiscal quarter, the distributors returned the excess inventory that was shipped in the prior quarter and the process would begin again, although with an increasingly larger deficit due to the prior quarter's credits and off-invoice concessions.

### 3.      Hain's December 2018 Settlement With The SEC Confirms Hain's Reliance on Unsustainable Sales Practices and Details Defendants' Scheme

66.     Hain's December 2018 settlement with the SEC provides additional details about Hain's reliance on unsustainable and undisclosed sales practices to generate end-of-quarter sales and the nature of the scheme.

67.     According to the SEC Order, between at least 2014 and May 2016, Hain executed annual sales contracts with its largest distributor—UNFI—stipulating to quarterly inventory sales growth targets. UNFI earned financial incentives based on meeting those growth targets. In practice, this meant that Hain and UNFI agreed, on a quarterly basis, to inventory purchasing targets, which ranged up to $90 million per quarter. (SEC Order at 3).

68.      During many quarters, UNFI communicated to Hain's sales personnel that it might not purchase sufficient inventory to meet its quarterly target, informing Hain that UNFI would miss the target by as little as $10 million and as much as $30 million. (SEC Order at 3). As a way to incentivize UNFI to purchase more inventory to meet its targets, Hain and UNFI

would renegotiate their quarterly terms so that UNFI would obtain extra-contractual incentives, such as (1) cash financial incentives (ranging from $75,000 to $500,000 per quarter), (2) spoils coverage, and/or (3) occasionally extending payment terms up to 60 days—in exchange for meeting a renegotiated inventory purchasing target. (SEC Order at 4).  Reliance on these sales practices meant that Hain was "pulling in" sales from future quarters to meet its quarterly projections by incentivizing its distributors to purchase more inventory that necessary. The settlement indicates that Hain relied on similar tactics with Walmart, its second largest distributor, except that, according to the SEC Order, Walmart's payment terms were extended up to 90 days.  None of these sales practices were disclosed by Defendants to investors at the time.

69.     The magnitude of sales that Hain achieved at the end of each quarter in reliance on these unsustainable pull-in sales business practices was significant. Indeed, UNFI purchased 52-64% of its inventory in the last month of the quarter on the basis of these off-contract incentives, which (considering that its inventory purchasing targets were $90 million) amounted to approximately $46.8-$57.6 million of inventory. (SEC Order at 4).  Because Hain's overall net sales for its U.S. Business Segment was approximately $300 million per quarter, these undisclosed sales practices enabled Hain to achieve more than 15% of its total quarterly sales in the final month of the quarter to just one distributor. (SEC Order at 3).

70.     In addition, Hain failed to appropriately document its off-contract agreements with distributors and lacked sufficient polices and procedure to provide reasonable assurances that end-of-quarter sales were accounted for properly. (SEC Order at 4). Moreover, Hain's sales personnel were not appropriately trained or knowledgeable about the accounting implications of their sales practices, and there were insufficient policies and procedures to monitor incentives

made in sales transactions, which had potential revenue recognition implications. (SEC Order at 4).

### 4. Confidential Witnesses Detail Hain's Reliance on Unsustainable Business Practices to Generate Sales

71.      Former employees further confirm the practices detailed above and in Hain's settlement with the SEC.  According to CW 6, who worked in both Hain's sales and operations teams during his tenure, both before and throughout the Class Period, Hain coordinated with UNFI and other distributors to make up for earnings shortfalls by giving distributors "off-invoice" concessions.  CW 6 recalled how Defendants would realize about halfway into a quarter that the Company would not meet its expectations and would negotiate concessions with distributors based on the mid-quarter sales numbers.  CW 6 explained that these off-invoice concessions ranged from 10-25% discount on total sales for the quarter and the distributor was "free to return" any of that inventory after the quarter ended.  After the concessions were negotiated, Hain would load the distributors' trucks for delivery.

72.      CW 6 processed returns at Hain and recalled that generally 6-8 weeks after the quarter ended, Hain would start to receive the products that were loaded the previous quarter. CW 6 detailed how product returns normally were heavily scrutinized, but no one asked any questions about UNFI's product returns.  According to CW 6, $500,000 returns were on the "low-end" of the quarterly returns he processed, and he recalled a $700,000 product return in 2015.  CW 6 remembered the employees in Hain's office would joke about they would love to be UNFI because you can return whatever you want.  CW 6 recalled frequently spending entire days processing returns of inventory that was sold to distributors the previous quarter.

73.      CW 4 referred to Hain's undisclosed, unsustainable pull-in sales practices as "loading" and "de-loading" that took place throughout CW 4's five-year tenure at Hain and

involved Hain offering concessions to the distributor, saying "here's a discount to load." According to CW 4, at the end of each quarter, Hain would ship inventory to distributors – primarily UNFI and KeHE Distributors LLC – to increase reported revenue and then "de-load" (i.e., return the product) in the following quarter.

74. CW 7 also detailed Hain's "loading" practices—i.e., pushing out inventory at the end of the quarter. CW 7 explained that Hain was consistently forced to offer material concessions or make other deals with customers in order to achieve Hain's quarterly revenue projections. Indeed, CW 7 explained that when Hain began to feel "pressure" in sales, it resorted to pushing out inventory, referred to as "customer loading," as well as using credits/accruals to offset Hain's sales deficits on its balance sheet. Accruals are credit (offsets) to sales.

75. CW 7 also confirmed the right of return offered to customers. According to CW 7, Hain had an agreement with its customers that if the customers could not sell the excess inventory, they could return the unsold inventory. CW 7 explained further that Hain's customers did not want to get stuck with the inventory, so they would not take on the excess inventory without a right of return.  CW 3 prepared budget materials for Meiers and constantly saw products being returned and credits being issued, especially with UNFI.  CW 3 recalled a significant increase in returns and credits at the end of 2015 and early 2016 when Hain began to lay-off employees.

76. According to CW 7, the problem with loading inventory at the end of quarters was that it would produce a "drop off" in sales for the first month of the subsequent quarter—a practice CW 7 explained was "like a Ponzi [scheme]," CW 7 explained that Hain was able to sustain these practices for some time because it was consistently acquiring companies to make up for the shortfall. What started to happen in 2015, CW 7 explained, was that consumer spending

started to drop, so Hain had to "become more creative" with the way it made its numbers because Hain did not change its forecasts. This started to become apparent to CW 7 by the end of the calendar year 2015. Indeed, CW 7 explained that the constant push to make numbers forced Hain to take unconventional measures, and that it resembled a Ponzi scheme because when you are always borrowing from the future quarters you eventually run out of money.

77.      According to CW 2, who worked in Hain's BluePrint brand, Hain's "core business practice" during the Class Period was to load distributors with inventory at the end of the quarter to increase "financial reporting."  CW 2 understood that Hain would send "actual inventory" to distributors so the Company could recognize the inventory as additional sales revenue for that quarter.

78.      CW 2 recalled that all of Hain's brands were struggling the end of Q4 Fiscal 2016, and the Company was struggling to meet its Wall Street consensus estimates and the Company's guidance numbers.  CW 2 reported that the BluePrint brand decided to miss its numbers for the quarter because of a concern that if BluePrint ran too many promotions to get inventory out the door, it would negatively impact subsequent quarters.  According to CW 2, the following day, BluePrint's General Manager received a call from Simon with a directive that BluePrint "needs to make this quarter"—referring to Hain's forecasted sales for BluePrint. Based on Simon's directive, CW 2 "pushed inventory" to BluePrint's distributor, DSD Distributors, so Hain could recognize the revenue for that quarter.  CW 2 added that every brand at Hain was doing this (not just BluePrint) to recognize additional revenue before the end of the quarter and fiscal year.

79.      CW 4 performed profit and loss analysis and budgeting for Hain's Spectrum brand (oils and vinegars) and observed that the majority of loading was done with brand products

that had a longer shelf life such as Spectrum, Westbrae (beans), and MaraNatha (nut butters) products. Both CW 6 and CW 1 also confirmed that Spectrum and MaraNatha were among the most frequent brands where accruals were being posted. Other Hain brands carrying goods with longer perishable lives such as JASON (natural cosmetics), ALBA (beauty products) and Earth's Best (baby food) were also used for loading. CW 6 added that Hain also chose to load using these brands because they were more expensive so Hain could make larger sales using "less inventory."

80.　　Hain's reliance on undisclosed, unsustainable pull-in sales practices was not limited only to longer lasting perishable goods. CW 2 stated that while most of the products involved in the loading practices were longer lasting non-perishable goods such as snacks, teas, and beauty products, Hain was forced to use all of its brands to load to the distributors as part of the scheme. Indeed, CW 2, who worked at the BluePrint brand selling raw perishable juices, observed the use of pull-in sales practices with BluePrint's products.

81.　　According to CW 4, the practice became more apparent internally in 2015 as Hain faced increased competition and lower sales – thus, making the reliance on undisclosed, unsustainable pull-in sales practices even more egregious. CW 4 recounted how at the end of each quarter during his tenure, he would see $5-6 million in transactions for the last week of the quarter. CW 4 would see these transactions, knowing they could not be real, on Spectrum's shipment reports. CW 4 explained that because his brand (Spectrum) was the "heaviest loaded brand" he knew the numbers could not be real. CW 4 added that UNFI and other distributors would historically stock on average seven to nine weeks of Spectrum inventory but leading up to Hain's August 15, 2016 announcement, CW 4 saw on UNFI's weekly inventory reports

circulated within Hain that UNFI was stocking eighteen (18) to nineteen (19) weeks of Spectrum inventory.

### 5. Confidential Witnesses Detail Hain's Accounting Manipulations

82. Despite granting distributors an absolute right to return the loaded inventory, Hain would book the revenue from the sales of its products at the same time the products were shipped to the distributors. CW 6, who was responsible for Hain's end of quarter numbers and processing Hain's sales, explained that Hain recognized revenue as soon as the pushed inventory was "off the dock." CW 4 corroborated that Hain recognized revenue as soon as the shipments left the warehouse, as he saw the recognized revenue on Spectrum's shipment reports generated by an internal system called Business Objects.

83. CW 1 was responsible for reporting Hain's financial results (led by Meiers), and explained that he was instructed to post the distributor credits onto Hain's internal financial overview for unofficial reporting. CW 1 explained that the credits were booked into Hain's financial system as money that distributors owed Hain and the credits directly affected Hain's overall gross profit. CW 1 also observed that the credits were spread out and broken down by brand. CW 3 separately corroborated that CW 1 was responsible for handling the paperwork related to the returns and credits during the Class Period.

84. CW 1 posted and tracked the credits for the operations team using Hain's Hyperion software system which would feed into the Company's enterprise-wide JD Edwards system. According to CW 6, the sales team used internal software called Prism to track concessions and returns that was also linked to the JD Edwards system.

85. CW 7 also detailed Hain's use of credits and accruals. CW 7 became weary of the legitimacy of the accruals as the accruals began to increase in size relative to the Company's historic levels. According to CW 7, Stephen Powhida was responsible for everything related to

Hain's accruals. CW 7 explained that the accruals started at around $200,000. Although $200,000 seemed reasonable, when the accruals started to multiply and became $1-2 million, CW 7 questioned how it was possible. Initially, CW 7 thought that the accruals were coming from supplier rebates, but he began to think otherwise as they grew in dollar amount. CW 7 added that there was a "correlation" between how Hain was doing in a particular quarter and the size of the accruals.

86.     CW 7 described the accruals as Powhida's "creativity" and explained that Powhida was being directed by Meiers.  CW 7 explained that Meiers relied on Powhida to create those accruals, but Meiers would protest if they got too big. According to CW 7, reliance on accruals meant that Hain was "borrowing from [the] future" to make its numbers.  Indeed, CW 7 explained that when Hain's projections showed shortfalls due to the impact of the accruals, Powhida was expected to come up with a number and that number always magically made it so Hain was no longer short.

87.     CW 7 described how the accruals were communicated internally at Hain. According to CW 7, an email would be sent to Marla Hyndman's group (Hain's Controller) with an attachment, usually an Excel spreadsheet prepared by Powhida. The accruals would have an explanation related to Hain's suppliers or contract manufacturers. CW 7 explained that Powhida would be the last person to give CW 7 the numbers each month, and CW 7 would then post the accruals. CW 7 explained that Powhida would "make the numbers just right" before the soft close of the quarter.

88.     CW 5, a former employee at a warehouse leased by Hain, described how Hain used an enterprise resource planning system to ensure that the Company "would always have

visibility" into its inventory at the warehouse.  These systems synced on a monthly basis according to CW 5.

89.     CW 1, who was responsible for booking the credits, corroborated that by June 2015, the credit numbers became suspicious, as sales were declining but the credits continued to grow.  CW 1 personally observed that the credits were going up every quarter and eventually the credits reached millions of dollars each quarter. CW 1 began to believe that "someone's trying to fill in [the] gap" in the hope that sales would increase the following quarter to offset returns. CW 1 explained that the credits were a running concern at Hain.  Indeed, CW 1 left Hain in June 2016 because he believed "something screwy" was going on with Hain's financial numbers.

90.     CW 6 also stated that in the years leading up to the revelation of the fraud, Hain was using concessions more aggressively as Hain's sales continued to decline.

### 6.     Confidential Witnesses Describe the Involvement of Hain's Executives and Senior Management in the Fraud

91.     Hain's executives and senior management knew about and directly participated in Hain's efforts to "load" product on customers at the end of a quarter, in reliance on undisclosed, unsustainable pull-in sales practices to generate revenue.  CW 4 stated that employees and executives at Hain referred to this practice as "loading."  CW 7 also confirmed that the term "loading" was used freely among senior executives, including by Carroll and Meiers.

92.     As CW 4 was responsible for profit and loss analysis and budgeting he presented state of the business, forecasts, revenue, and shipment information directly to Carroll regarding problems with the "loading" practice.  CW 4 recalled numerous brand strategy meetings where loading was openly discussed with Carroll, such as shipments being down a certain amount because Hain had loaded inventory to distributors at the end of the previous quarter.  As an example, CW 4 explained that her presentation to Carroll included that Spectrum was down in

Q1 because Spectrum had "loaded" in Q4.  Indeed, after the Company's August 15, 2016

announcement, CW 4 recalled that Hain's management met with Carroll and that Carroll

demanded that employees refrain from using the term "loading" and rephrase it as "inventory

reduction."

93.     CW 6 recalled that Carroll would request CW 6 to provide certain numbers,

usually by mid-quarter, so Carroll would know of the sales shortfall before negotiating the

concessions with UNFI.  According to CW 6, Carroll then provided an incentive for UNFI to

take the amount of Hain's inventory necessary for Hain to meet its quarterly sales revenue

numbers.  CW 6 attended internal Hain sales calls where Carroll would inform the other

attendees that he had negotiated the concessions with UNFI that would make up the sales deficit

for that quarter, which was referred to as "OIs" or "off-invoice."

94.     According to CW 7, UNFI's owner (as it is a privately held company) dealt

directly with Defendant Simon when it came to anything related to revenue. CW 7 explained that

Defendant Simon could "always make them [UNFI] buy more if needed." CW 7 explained that

Simon would approach Hain's customers and encourage them to buy more product at the end of

the quarter by offering material concessions. CW 7 recalled that in one instance the material

concessions offered to customers in exchange for buying more product amounted to millions of

dollars. CW 7 also explained that the concessions Simon negotiated with UNFI included a right

of return.

95.     CW 7 explained that he would hear Defendants Carroll and Simon discuss Hain's

financial arrangements with UNFI, and that when they realized that CW 7 heard these

conversations, they would say that they were "not supposed" to be discussing those arrangements

in front of others.  CW 7 recalled that Carroll and Simon tried to be secretive about the loading

practices and attempted to keep it to themselves, but that CW 7 nevertheless heard that they were discussing it. According to CW 7, Simon had "special powers" when it came to interfacing with Hain's customers and that only the higher-ups had the power to make "special deals" with distributors.

96.     CW 2 similarly believed that the directives to rely on these undisclosed, unsustainable pull-in sales practices came from Hain's upper management based on discussions with Hain's General Manager for the BluePrint brand who reported directly to Simon.

97.     Hain's executives and senior management also knew about and directly participated in Hain's fraudulent accounting practices to make the fabricated sales appear legitimate.  CW 4 explained how Hain tracked sales, inventory, and Company guidance targets using weekly business reviews and executive transaction reports sent by email to Hain's upper management, including Simon and Carroll.

98.     CW 1, who worked under Meiers, described how Meiers directly participated in the fraud by telling Hain's Senior Vice President of Manufacturing, Steve Powhida, to book the credits with accounting.  CW 1 recalled Powhida describing a $3 million credit that Powhida submitted to accounting and CW 1 observed the $3 million credit in Hain's financial reports.

99.     CW 6, who worked in Hain's financial operations with Meiers, added that Meiers was definitely aware of the loading because he was responsible for all of Hain's warehousing, transportation, and carriers.  CW 6 explained that anything that was sent from Hain or returned was done under Meiers' supervision.

100.     As Meiers' executive assistant, CW 3 had first-hand knowledge of Meiers' actions.  CW 3 confirmed that Powhida, who previously worked at Heinz with Meiers, was Meiers' right hand man and that Meiers was "well known for changing numbers left and right."

CW 3 added that Meiers worked long days during the last two weeks of the quarter as the financial numbers were constantly changing.

       7.    **Hain's Lack of Internal Controls Allowed Information at Hain to be Kept Within Senior Management's Inner Circle and Outsiders Were Terminated**

101.    As Carroll stated at a Bank of America Merrill Lynch Conference on March 12, 2014, he "run[s] the US, along with Jim Meiers."  CW 1 confirmed this, stating that Hain's finance team was run by Meiers' operations group and Carroll's financial planning and analysis group which worked together.

102.    CW 1 described Hain's internal controls as "not good."  CW 1 explained that if Meiers did not like the financial numbers, Meiers would go to accounting and say "this number has to change" and it would change.  CW 1 recalled that Hain's then-current Senior Vice President and Controller, Marla Hyndman, and Hain's Senior Vice President of Finance/Business Planning, Rose Ng, would tell Meiers to provide justification for the sales numbers based on discussions with auditors, but ultimately Meiers could get what he wanted done.

103.    Moreover, CW 1, who worked under Meiers, stated that Meiers "openly controlled" the credits with limited involvement from others.  CW 1's direct supervisor, Hain's Senior Director of Supply Chain Finance who reported to James Meiers, Hain's former COO. informed CW 1 that Meiers controlled the credits.  When CW 1 asked Powhida or Meiers about the credits, they would respond "don't worry about it."

104.    CW 3 was responsible for preparing materials for quarterly budget meetings led by Meiers and similarly recounted that Meiers would attend "closed door" quarterly meetings with three other accounting employees "changing numbers" for the sales results for the quarter. CW 3 stated Meiers was always changing the numbers but he found it hard to believe because

they were sales results for the quarter, not forecasts. According to CW 3, Meier would sit in a room for a week to make the numbers "look pretty."  CW 3 was responsible for printing reports for the budget meetings, and in some instances, he was asked to print the same report multiple times. When asked to print the same report, CW 3 questioned why and was told by one of Meiers' direct reports, "just don't ask…we've made some changes." CW 3 would also print those same reports for John Carroll's assistant Mary Hicks. According to CW 3, he noticed on more than one occasion that there were changes in the numbers on the reports that she was asked to print multiple times for the same meeting. He reiterated that he "knew the numbers were changing" because he saw the changes in the same document that he was responsible for circulating.

105.    In addition, the Individual Defendants were hands on and obsessively controlling. CW 1 recalled that Simon "wanted to know everything that was happening" at Hain and that Simon "treated [Hain] as if it was still privately held by him."  CW 1 added that Simon was "very much in control" of everything at Hain. Likewise, CW 7 explained that Simon treated each Hain brand is if it were one of his children and did not like oversight.  For example, CW 6 recalled that Simon knew specifics regarding the concessions negotiated with the distributors, adding that Simon "is in everything" that happens at Hain.

106.    CW 3 recalled that Simon, Meiers, and Carroll would drink together frequently on Fridays in Simon's office.  CW 1 added that Simon and Carroll were "very friendly" with one another.  CW 2 described Meiers as Simon's "right-hand man."  CW 7, who reported directly to Meiers and said that Meiers was known to be "powerful" and had a tight-knit relationship with Simon. CW 7 also referred to Meiers and Carroll as a "boy's club."

107.     Simon also had unfettered power at the Company.  Simon served as Chairman of the Board, President, and CEO, allowing him to control both the Board and Company management as well as statements made to investors.  Indeed, according to Hain's proxy statement filed with the SEC on October 9, 2015, Simon's employment agreement assured that he would always serve as Chairman of the Board as long as he was with the Company.  Simon's employment agreement also specified that "[i]f [Simon] is not re-appointed as Chairman of the Board, he will be entitled to terminate his employment with the rights and entitlements available to him under his employment agreement as if his employment was terminated by him for good reason as defined therein."  The October 9, 2015 proxy statement further detailed that if Simon unilaterally decided he had been terminated for good reason, he "would be entitled to receive approximately $89,259,325."

108.     Employees that questioned the loading practices were fired.  On September 8, 2015, after only two years as Hain's CFO, the Company announced that Smith was departing the Company and would be replaced by Conte.

109.     CW 1 believed that Smith lasted only two years at Hain because he was not willing to be one of Simon's puppets unlike Smith's successor, Conte, who CW 1 described as one of Simon's guys.

110.     CW 1 explained that throughout his tenure at Hain, he witnessed various people that "did not agree" with Simon and they did not last long at Hain and eventually Simon would replace them with one of his people.  As another example, CW 1 added that Simon replaced Hain's Head of Human Resources for not agreeing with Simon.

111.     Indeed, while Simon explained that Smith departed Hain to "pursue other opportunities," as of December 2016, Smith's LinkedIn page shows that Smith was still "seeking new opportunities."

112.     CW 3 recalled that Meiers did not like to have anyone looking over his shoulder, that everyone was afraid of Meiers, and "if you fight back [with Meiers] . . . goodbye." According to CW 1, Rose Ng attempted to operate as a check and balance within Hain's finance team but Ms. Ng was fired the same month as Smith for being a "bottleneck" to Meiers.  CW 3 confirmed that Ms. Ng was always chasing Meiers and told CW 3 that Meiers "owes [Ms. Ng] numbers" and that Hain fired Ms. Ng after she was constantly butting heads with Meiers because she was unwilling to manipulate the Company's financial numbers.

113.     According to CW 7, who worked at Hain from January 2005 through August 1, 2017, Hain never had an internal audit department or compliance department during his tenure. CW 7 confirmed that Ms. Ng was considered internally to be the "police" and that she would ask a lot of questions about the Company's supply chain organization. CW 7 explained that Ms. Ng "wanted to dig into" Meiers's numbers, which made Meiers uncomfortable. CW 7 added that Meiers was very secretive with his numbers because providing numbers prematurely elicited questions that he did not want asked of him at the time. CW 7 explained that Ms. Ng was kept away from the details related to loading to distributors at the end of the quarter, and that when she asked any questions, she was told by the executives to stop asking. According to CW 7, once Ms. Ng she was let go in September 2015 there was no one at Hain performing that function, given that Hyndman would go along with whatever Meiers wanted.

114.     The same month that Smith departed Hain, the Company fired Powhida because, CW 1 believed, Meiers wanted Powhida to take the hit for the credits scheme. CW 7 also

confirmed that Powhida was used as a "scapegoat," because Meiers relied on and pushed Powhida to make the numbers and it was "getting out of control."

115.    According to CW 7, no time or effort was put into implementing the proper internal controls, including Hain's failure to properly documents sales contracts. CW 7 added that Hain lacked a revenue recognition policy and a proper internal audit function. CW 7 explained that the hiring of James Langrock and Michael McGuiness, in late 2015 and early 2016, respectively, led to Hain being unable to file its financials on time and the identification of the need for the restatement. According to CW 7, when they arrived, they were surprised to find what was going on at Hain.

116.    CW 8 confirmed that Hain did not properly account for customer bill-backs and contract-related issues during his tenure. CW 8 stated that the accounting problems were compounded by the fact that the people at Hain "doing the books" did not understand the customer contracts. CW 8 recounted how he was working with Hain's production team and learned about contract-related deals that he was not previously aware of because the accounting department had not informed him about the deals.

117.    According to CW 8, the accounting problems were uncovered when James Langrock joined Hain and started looking at Hain's books. CW 8 stated that it became clear to Langrock that at the end of quarters, Hain was making big deals with customers like UNFI and KeHE. CW 8 heard that Langrock questioned "if we are doing that, how are we accounting for that?" According to CW 8, Langrock continued to dig and ultimately brought in outside auditors. In connection with the Company's filing of corrected financials, CW 8 learned that some of Hain's customers had no contracts, some customers had "vague" contracts, and certain customers

had off-invoice deals and issues with "bill backs." CW 8 added that there were so many variations of contracts that the problem for Hain was that the documentation was "lacking."

**D.      Hain's Top Distributors Refuse to Take So Much Excess Inventory at the End of Fiscal 2016 and Hain Is Forced to Disclose, and then Investigate, the Extent of its Myriad Concessions and the Revenue Recognition Impact of Those Concessions**

118.    Eventually, distributors reached their inventory capacity and would no longer serve as Hain's inventory warehouse—i.e., Hain could no longer persuade customers with off-invoice concessions to accept more inventory than necessary despite the ever-increasing incentives offered.  Moreover, faced with the mounting pressure of increasingly larger credits to distributors, Hain's credit scheme became "too big to hide" and the Company could not "cover" its numbers anymore, according to CW 1.

119.    CW 3 described how in December 2015, Hain was being audited.  CW 4 heard that Hain's external auditor, EY, identified the accounting issue and Hain's "whole right wing" of its corporate headquarters was filled with auditors.  CW 6 corroborated that around December 2015, Hain was caught by its auditors and that during that audit "UNFI kept popping up."  CW 2 also recalled the auditors remaining at Hain for a long time.

120.    CW 3 also recalled that D&B Consultants ("D&B") conducted an internal audit at Hain in early 2016.  CW 3 recalled that D&B asked Meiers directly for all of their information and inferred that Meiers was concerned with what the internal audit would uncover.  CW 3 also sensed distrust at the Company during this time and knew that Hain would need to restate their numbers.

121.    On January 11, 2016, after EY began to question Hain's accounting and only months after Smith's resignation, Hain cut its quarterly and annual guidance, stating that it anticipated full-year sales of $2.9-$3.04 billion and earnings per share in the range of $1.95-

$2.10, below its previous issued guidance of $2.97 billion to $3.11 billion in sales revenue and earnings per share of $2.11-$2.26.

122.    On January 21, 2016, after the market closed, Hain revealed in a Report on Form 8-K that Ross Weiner resigned from his position of Vice President – Finance, Chief Accounting Officer.  CW 6 recalled that Weiner – like Smith before him – left Hain because he did not like what he was seeing regarding the off-invoice concessions offered to distributors.

123.    Analysts at J.P. Morgan noted that Weiner's resignation was "weighing on the shares" as concerns regarding the Company's accounting grew.  Analysts at Wells Fargo stated that "the news adds to the broader adjustments around the Hain story."  Meanwhile, Simon continued to mislead investors by telling the J.P. Morgan analysts on January 22, 2016 that there is "***nothing wrong with Hain's accounting at all***."

124.    Following this news, the price of Hain shares declined $2.64 per share, or over 7%, from a close of $36.10 per share on January 21, 2016 to close at $33.46 per share on January 25, 2016.  However, Simon's January 22, 2016 misstatement artificially propped up Hain's stock price and kept it from falling even further.

125.    On August 15, 2016, after the market closed, Hain disclosed a delay in the release of the Company's 2016 financial results.  However, Defendants continued to downplay any issues with Hain's accounting:

> [Hain] announced today that it will delay the release of its fourth quarter and fiscal year 2016 financial results. During the fourth quarter, the Company identified concessions that were granted to certain distributors in the United States. The Company is currently evaluating whether revenue associated with those concessions was accounted for in the correct period and is also currently evaluating its internal control over financial reporting.
>
> Previously, the Company has recognized revenue pertaining to the sale of its products to certain distributors at the time the products are shipped to such distributors. The Company is evaluating

> whether the revenue associated with the concessions granted to
> certain distributors should instead have been recognized at the time
> the products sell through its distributors to the end customers. . . .
> There can be no assurance that the Company will complete the
> preparation and filing of the Form 10-K within the extension
> period. . . . Separately, the Company does not expect to achieve its
> previously announced guidance for fiscal year 2016.

126.     Although Defendants represented that any potential errors would not "impact the

total amount of revenue ultimately recognized by the Company," the public reacted quickly,

causing the price of Hain's shares to fall by $14.05 per share, or over 26%, from a close of

$53.40 per share on August 15, 2016, to a close of $39.35 per share on August 16, 2016, a loss of

$1.6 billion in market capitalization.

127.     Upon this news, analysts at Atlantic Securities, Bank of America Merrill Lynch,

UBS, Oppenheimer, Barclays, BMO Capital Markets, Piper Jaffray, Jefferies, Maxim Group,

Wedbush, and J.P. Morgan all lowered their price targets for Hain stock.  The analysts at Piper

Jaffray acknowledged the "internal financial control risk makes the stock difficult to own" while

noting "the departure of the CFO and resignation of the chief accounting officer in a short period

of time left us concerned on the state of the finance management."  J.P. Morgan analysts further

questioned the Company's "vague" disclosure asking "what the revenue recognition issue

actually entails" and "what happens if [] Hain's evaluation of its financial reporting controls

turns up additional problems."

128.     According to CW 2, Hain made the August 15, 2016 announcement because of

the loading activity and that there was "a lot of bad stuff going on" that the Company was now

trying to "clean up."

129.     On August 30, 2016, Hain filed a Notification of Late Filing on Form 12b-25

informing the SEC that the Company would not be able to file its annual report on Form 10-K

for Fiscal Year 2016 by the filing deadline.  Hain repeated its claim that the filing was late

because "[t]he Company is currently evaluating whether the revenue associated with those concessions was accounted for in the correct period and is also currently evaluating its internal control over financial reporting."

130.    Due to Hain's inability to file its annual report, the Company received a letter from NASDAQ dated August 31, 2016, stating that the Company was non-compliant with NASDAQ rules.  The Company revealed on November 3, 2016 that it submitted its plan to regain compliance with NASDAQ on October 31, 2016, and on November 2, 2016, NASDAQ granted the Company an extension, through February 27, 2017, to file its reports with the SEC.

131.    On September 26, 2016, Hain announced that it obtained a limited waiver from its credit facility lenders covering an extension of certain financial reporting obligations until December 27, 2016.

132.    On November 16, 2016, Hain issued a press release entitled "Hain Celestial Announces Completion of Independent Audit Committee Review."  This press release contained the purported results of Hain's internal Audit Committee's investigation into the Company's financial statements and claimed that the Audit Committee found no evidence of "intentional" wrongdoing in connection with the Company's financial statements.  The Audit Committee came to this conclusion while at the same time disclosing, "Hain Celestial has begun to implement a remediation plan to strengthen its internal controls and organization."

133.    Commenting on the results of the Audit Committee investigation, Simon admitted the Company's need to remediate its financial reports and to strengthen Hain's internal controls, stating:

> Hain Celestial is committed to transparency of our financial
> reporting, and we are taking concrete measures to remediate as
> well as strengthen our internal controls.  We are extremely pleased

that the Company can now move forward with its reporting process
as we put these challenges behind us.

134.    The results of the Audit Committee investigation were a farce.  Despite the Audit

Committee somehow completing its investigation, the Company announced it "will not be in a

position to release financial results until the completion of the Company's internal accounting

review and the audit process."  The internal accounting review and audit process would continue

for another seven months.

135.    On December 7, 2016, Hain began to clean house by moving Meiers to a new

position as Chief Executive Officer for Hain Pure Protein Corp. and appointed a new Chief

Operations Officer, Gary W. Tickle.  Hain also appointed a new Chief Supply Chain Officer, a

new Chief Customer Officer, and a new Vice President of Marketing.

136.    On December 20, 2016, Hain announced that it obtained a second limited waiver

from its credit facility lenders covering an extension of certain financial reporting obligations

until February 27, 2017.

**E.    Hain Reveals the Widespread Nature of the Fraud**

137.    On February 10, 2017, after the market closed, Hain filed a Notification of Late

Filing on Form 12b-25 that revealed the wide-ranging scope of the Company's wrongdoing.

While the Company had initially focused on the recognition of revenue associated with

concessions granted to certain distributors during the fourth quarter of Fiscal Year 2016, Hain

now revealed in a regulatory filing that the Company had expanded the scope of its internal

accounting review "to perform an analysis of previously-issued financial information in order to

identify and assess any potential errors."  Further, Hain announced that the SEC had launched a

formal investigation into the Company: "The SEC has issued a formal order of investigation and,

pursuant to such order, the SEC issued a subpoena to the Company seeking relevant documents."

138.     In reaction to this news, the price of Hain's stock fell $3.43 per share, or more than 8%, from a close of $38.53 per share on February 10, 2017, to close at $35.10 per share on February 13, 2017, the next trading day, on unusually heavy trading volume.

139.     On this news, analysts at The Buckingham Research Group lowered their price target for Hain stock, stating, "we are lowering our estimates to reflect our 'best guess' that HAIN is likely to undergo an earnings revision or meaningful earnings rebase as a result of this process."

### F.     Post-Class Period Developments

#### 1.     Hain Delays Filing While Making Further Executive Changes

140.     The Company did not file its corrected financial results by February 27, 2017, as required by the SEC.  Instead, Hain announced that it had obtained a third limited waiver from its credit facility lenders covering an extension of certain financial reporting obligations until May 30, 2017.

141.     On February 28, 2017, NASDAQ informed Hain that it was not in compliance with listing requirements and therefore its stock was subject to delisting unless the Company timely requested a hearing before a NASDAQ Hearings Panel.

142.     On March 6, 2017, Hain announced that the Company was removing Carroll from his role with U.S. sales and that he would no longer serve as the CEO for Hain North America. Hain appointed Gary W. Tickle to take over Carroll's position.

143.     On May 11, 2017, Hain filed a Notification of Late Filing on Form 12b-25, informing the SEC that the Company would be unable to file its third quarter report on Form 10-Q for the quarter ended March 31, 2017, by the filing deadline.  Hain also revealed that it anticipated that it would be in a position to file its financial results by the end of May 2017.

144.     On May 30, 2017, Hain announced that it had obtained a fourth limited waiver from its credit facility lenders covering an extension of certain financial reporting obligations until June 15, 2017.

145.     On June 15, 2017, Hain announced that it had obtained a fifth limited waiver from its credit facility lenders covering an extension of certain financial reporting obligations until June 22, 2017.

      **2.**     **June 22, 2017: Hain Announces Financial Results for Fiscal Year 2016 and the First Three Quarters of Fiscal 2017 and Restates Results for Fiscal Years 2014 and 2015 and the First Three Quarters of Fiscal 2016**

146.     On June 22, 2017, after obtaining two extensions from NASDAQ and five waivers from its credit facility lenders, Hain finally filed its Report on Form 10-K for Fiscal Year 2016, as well as the Company's Reports on Form 10-Q for the first, second, and third quarters of Fiscal Year 2017.  Hain admitted in the Fiscal Year 2016 Form 10-K that "both fiscal 2016 and fiscal 2015 net sales benefited from certain concessions provided to our largest distributors, including payment terms beyond the customer's standard terms, rights of return of product and post-sale concessions, most of which were associated with sales that occurred at the end of each respective quarter."  In addition to the restated financial statements, the Company announced that CFO Pat Conte was being replaced by James Langrock, effective immediately.

147.     **In each of the revised filings, the Company also admitted that it suffered from material weaknesses in financial reporting**.  For example, Hain's Form 10-K for Fiscal Year 2016 reported:

> Under the supervision and with the participation of our management, including the CEO and CFO, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of June 30, 2016. In making this assessment, management used the criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of

Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, management, including our CEO and CFO, has concluded that our internal control over financial reporting was not effective as of June 30, 2016 due to material weaknesses in our internal control over financial reporting, which are disclosed below.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. **In connection with the assessment of our internal control over financial reporting described above, management identified the following deficiencies that constituted individually, or in the aggregate, material weaknesses in our internal control over financial reporting as of June 30, 2016**:

- *Ineffective Control Environment* - The Company's control environment did not sufficiently promote effective internal control over financial reporting, which contributed to the other material weakness described below. Principle contributing factors included: (i) an insufficient number of personnel appropriately qualified to perform control design, execution and monitoring activities; (ii) an insufficient number of personnel with an appropriate level of U.S. GAAP knowledge and experience and ongoing training in the application of U.S. GAAP commensurate with our financial reporting requirements; and (iii) in certain instances, insufficient documentation or basis to support accounting estimates.

- *Revenue Recognition* - The Company's internal controls to identify, accumulate and assess the accounting impact of certain concessions or side agreements on whether the Company's revenue recognition criteria had been met were not adequately designed or operating effectively. The Company's controls were not effective to ensure (i) consistent standards in the level of documentation of agreements required to support accurate recording of revenue transactions, and (ii) that such documentation is retained, complete, and independently reviewed to ensure certain terms impacting revenue recognition were accurately reflected in the Company's books and records. In addition, the Company did not design and maintain effective controls over the timing and classification of trade promotion spending.

- 47 -

148.     Hain also corrected certain errors in its prior financial statements for fiscal years 2014, 2015, and the first nine months of fiscal year 2016.  As set forth in the Company's June 22, 2017 investor presentation and restated financials, Hain overstated its net sales by $167 million and its GAAP earnings per share by $0.13 for Fiscal Years 2014, 2015 and the first three quarters of Fiscal 2016:

### Summary Financial Impact

|  |  | FY 2014A | FY 2015A | 9 Months FY 16A |
|---|---|---|---|---|
| **Net Sales** | Original | $2,154 | $2,689 | $2,190 |
| | % YoY Growth | | 24.8% | |
| | Revised | $2,108 | $2,610 | $2,148 |
| | % YoY Growth | | 23.8% | |
| | $ - difference | ($46) | ($79) | ($42) |
| | % - difference | (2.1%) | (2.9%) | (1.9%) |
| **GAAP EPS** | Original | $1.42[1] | $1.62 | $1.32 |
| | Revised | $1.32[1] | $1.60 | $1.31 |
| | $ - difference | ($0.10) | ($0.02) | ($0.01) |
| | % - difference | (7.0%) | (1.2%) | (0.8%) |
| **Non-GAAP EPS** | Original | $1.59 | $1.88 | $1.42 |
| | Revised | $1.51 | $1.83 | $1.42 |
| | $ - difference | ($0.08) | ($0.05) | $ - |
| | % - difference | (5.0%) | (2.7%) | 0.0% |

149.     According to the above chart, net sales were overstated by 2.1%, 2.9% and 1.9% in fiscal 2014, fiscal 2015 and for the 9 months ended March 31, 2016, respectively. GAAP earnings per share was overstated by 7% and 1.2% in fiscal 2014 and fiscal 2015.

150.     However, Hain's adjusted financials did not tell the full story.  A closer analysis corroborates what the CWs reported that: (i) Hain relied on undisclosed, unsustainable pull-in sales practices to meet Wall Street's consensus quarterly sales expectations during the Class Period; and (ii) Defendants improperly recognized revenue related to the timing of trade and promotional accrual, prematurely recognized revenue on certain sales, and improperly classified promotion expenses.

151.    As the chart below shows, as the demand for Hain's products fell and Hain's sales fell below Wall Street's consensus estimates, Hain increasingly relied on these undisclosed, unsustainable pull-in sales practices to "beat" or minimize the miss of those estimates all the while telling the market that Hain's sales were all organic and natural.

| NET SALES (GAAP) ($ millions) | | | | | | |
|---|---|---|---|---|---|---|
| | **Q1 FY 15** | **Q2 FY 15** | **Q3 FY 15** | **Q4 FY 15** | **Q1 FY 16** | **Q2 FY 16** |
| | 9/30/2014 | 12/31/2014 | 3/31/2015 | 6/30/2015 | 9/30/2015 | 12/31/2015 |
| Consensus Estimate* | 639 E | 717 E | 659 E | 695 E | 703 E | 750 E |
| | | | | | | |
| As Reported | 631 | 696 | 663 | 698 | 687 | 753 |
| As Restated | 597 | 680 | 652 | 681 | 668 | 743 |
| | | | | | | |
| As Reported | Miss | Miss | Beat | Beat | Miss | Beat |
| As Restated | Miss | Miss | Miss | Miss | Miss | Miss |

*Source: S&P Capital IQ

152.    After narrowing the sales misses for the first and second quarters in Fiscal Year 2015, Hain's revised numbers show that the Company relied on undisclosed, unsustainable pull-in sales practices to beat consensus estimates for the third and fourth quarter of Fiscal Year 2015 and the second quarter of Fiscal Year 2016.  Indeed, Hain's restated numbers show that, but for these practices, Hain would have missed consensus Wall Street estimates by huge margins for six straight quarters.  **While the Company classified its revisions as "immaterial errors," the fact that Hain had six-straight fiscal quarters below consensus estimates would certainly have been material to investors at the time those results were reported**. Instead, investors were led to mistakenly believe that Hain was able to naturally and organically generate sufficient revenue to meet analysts' expectations.  As a result, investors were unable to analyze the true risk to the Company's future prospects.

153.    Without the aid of its undisclosed, unsustainable pull-in sales practices and improper revenue recognition, Hain's business plummeted.  For the first nine months of Fiscal

Year 2017, Hain reported a 14% year-over-year decrease in U.S. net sales, a 51.1% year-over-year decrease in net income, and a 51.1% year-over-year decrease in earnings per share:

| Metric (in thousands except per share amount) | Fiscal 2016, First 9 Months* | Fiscal 2017, First 9 Months | Change (YoY) |
|---|---|---|---|
| U.S. net sales | 1,025,398 | 882,273 | (14.0%) |
| Net income (loss) | $137,234 | $67,117 | (51.1%) |
| Earnings (loss) per share | $1.33 | $0.65 | (51.1%) |

*As reported in Hain's Form 10-Q filed May 10, 2016

154.    During the earnings call on June 22, 2017, Hain acknowledged that the U.S. sales decline was due, in part, to distributors taking less inventory than in prior years. The Company's new CFO revealed that net sales for the first three quarters of fiscal year 2017 were negatively impacted by $55 million due to "an inventory realignment at certain customers and a SKU rationalization" –i.e., Hain's customers were refusing to accept as much additional inventory on a quarterly basis despite the increasingly generous end-of-quarter sales concessions. The CEO of Hain North America described the sales hit from the inventory realignment and SKU rationalization as "obviously a significant hit for us to take." Knowing that it could not continue its reliance on unsustainable sales tactics to generate revenue, Hain also was forced to release a dismal forecast for its fiscal fourth quarter and Fiscal Year 2017. Based on the forecast, Hain expected to earn between $1.19 to $1.22 a share, on an adjusted basis, for the fiscal year. This was well short of consensus estimate of $1.94 a share. Hain's revenue was projected at $2.84 billion to $2.86 billion, shy of the $2.906 billion expected.

155.    New CFO, James Langrock, recognizing the utter lack of internal controls at place at Hain, discussed the massive remediation efforts that were necessary to fix the internal control problems at Hain:

> We have made tremendous improvements in our financial controls,
> improving processes and upgrading and adding key personnel. We
> have expanded our team with new hires including a new controller
> for the U.S. segment, a global revenue controller ahead of internal
> audit, and a Chief Compliance Officer. We have also improved our
> financial controls globally through enhanced standardized contract
> accounting policies; expanded review processes and monitoring
> controls over contracts with customers, customer payments in
> incentives, and the implementation of an extensive revenue
> recognition and contract review training program as well as new
> policies and procedures around revenue recognition and other
> significant accounting matters.

156.    CW 3 reported that other senior members of Hain's financial team including

Marla Hyndman, Hain's Controller during the Class Period, were terminated in the wake of the

disclosure of the fraud.

### 3.    Hain Reaches Settlement With SEC Regarding Its Internal Controls Failures

157.    On December 11, 2018, Hain settled charges with the SEC for violations of: (i)

Section 13(b)(2)(A) of the Exchange Act which requires Hain to make and keep records which

accurately and fairly reflect Hain's transactions; and (ii) Section 13(b)(2)(B) of the Exchange

Act which requires Hain to devise and maintain a system of internal accounting controls

sufficient to provide reasonable assurance that transactions are executed in accordance with

management's authorization and in conformity with GAAP.  (SEC Order at 7) .

158.    In admitting to violations of Section 13(b)(2)(B) for its internal controls failures,

Hain accepted the SEC's findings that "[f]rom at least 2014 until May 2016, Hain U.S. sales

personnel gave sales incentives to certain distributors to promote sales at the end of quarters."

(SEC Order at 2). Specifically, Hain engaged in improper end of quarter undisclosed,

unsustainable pull-in sales practices with its top two distributors, who together accounted for

approximately 30% of Hain's net sales during fiscal years 2014 through 2016, offering these

distributors off-invoice concessions as a way to incentivize them to purchase sufficient inventory to meet Hain's sales growth targets. (SEC Order at 3).

159.    The sales incentives Hain admitted to in the SEC Order further confirm the facts alleged herein, including the statements of former employees. For example, CW 6 and CW 4 also explain that Hain offered distributors off-invoice concessions, including discounts, in order to incentivize them to accept more product than needed.  Hain admitted to this practice in the SEC Order:

> "As a way to incentivize Distributor 1 [UNFI] to purchase sufficient inventory to meet or exceed its agreed-upon sales growth targets, a practice developed whereby Distributor 1 and Hain would renegotiate their quarterly terms. These renegotiations varied by quarter, but **Distributor 1 would obtain extra-contractual incentives**—such as (1) **cash financial incentives** (ranging from $75,000 to $500,000 per quarter, in those quarters in which cash incentives were provided) . . . .
>
> *             *             *
>
> In addition to a volume target, Hain's [end of quarter] sales with Distributor 2 consisted of incentives including: (1) **a discount off invoice**; (2) extended payment terms (typically 90 days); and (3) spoils coverage. **Regarding the discounts off invoice, the dollar value of these quarterly discounts increased upward over the Relevant Time Period [fiscal year 2014-2016], from around $200,000 to nearly $1.5 million in the final quarter of fiscal year 2016**.

160.    The increase over the course of the Class Period in the amount of "discounts off invoice" further demonstrates the inherently unsustainable nature of Defendants' scheme. Eventually, the size of the discount would become too large to continue.

161.    The nature of the internal control failures reflect that Hain's senior management, including the Defendants, failed to set an adequate "tone at the top" to establish an effective control environment. As detailed in the SEC Order, Hain's end-of-quarter sales (and related incentives) to its largest distributors were not appropriately documented. Contracts with

distributors were not formally amended, certain agreements were memorialized only in email correspondences, and incentives offered to encourage end-of-quarter sales were often agreed to orally. This ineffective control environment enabled Defendants' scheme and ensured that end-of-quarter sales were not properly documented or accounted for.

162.     Indeed, "Hain lacked sufficient policies and procedures to provide reasonable assurances that [end-of-quarter] sales were accounted for properly. Hain's sales personnel were not appropriately trained or knowledgeable about the accounting implications of their pull-in sales practices. Further, there were insufficient policies and procedures to monitor incentives made in sales transactions, which could have potential revenue recognition implications." (SEC Order at 4).

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN HAIN'S FINANCIAL RESULTS

### A.     First Quarter Fiscal Year 2014 Results – November 2013

163.     The Class Period begins on November 5, 2013.  On that date, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the first fiscal quarter ended September 30, 2013 (the "Q1 FY 2014 8-K").  Additionally, on November 12, 2013, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the first quarter ended September 30, 2013 (the "Q1 FY 2014 10-Q").

### 1.     Form 8-K for the First Quarter Fiscal Year 2014

164.     The Q1 FY 2014 8-K touted "net sales of $477.5 million, a 33% increase, compared to net sales of $359.8 million in the first quarter of fiscal year 2013."  Additionally, "Hain Celestial US reported record first quarter sales of $312.0 million, a 23% increase,

including strong sales from Ella's Kitchen® and BluePrint® brands acquired after the first quarter of fiscal year 2013."

165.    The Company attributed the growth in net sales to "***strong brand contribution***" with "***double-digit growth***" by, amongst other brands, Spectrum.

166.    The Q1 FY 2014 8-K also boasted "earned income from continuing operations of $27.7 million compared to $19.8 million in the prior year first quarter, a 40% increase, and reported earnings per diluted share from continuing operations of $0.57 compared to $0.42 in the prior year first quarter."  "Adjusted net income was $25.3 million compared to $19.2 million in the prior year first quarter, a 32% increase and adjusted earnings per diluted share was $0.52 compared to $0.41, a 27% increase."

167.    The Q1 FY 2014 8-K also reconfirmed the Company's annual guidance for Fiscal Year 2014 and updated its first half of Fiscal Year 2014 earnings guidance:

- Total net sales range of $2.025 billion to $2.050 billion for fiscal year 2014; an increase of approximately 17% as compared to fiscal year 2013.

- Earnings range of $2.95 to $3.05 per diluted share for fiscal year 2014; an increase of 16% to 20% as compared to fiscal year 2013.

- Earnings range of $1.37 to $1.42 per diluted share for the first half of fiscal year 2014.

168.    Analysts were quick to praise the Company's results.  For example, on the same day Hain filed the Q1 FY 2014 8-K, analysts at Jeffries noted in a report that Hain's earnings per share for the quarter was 1 cent ahead of the Company's guidance and increased their price target for Hain.  The analysts were well aware that the natural and organic food market was "suffering from overcapacity and poor demand," but unaware that Hain had been relying on undisclosed,

- 54 -

unsustainable pull-in sales practices, the analysts referred to Hain as "one of the few bright spots" in the natural and organic food market.

169.     Also on November 5, 2013, analysts at BMO Capital Markets reported on Hain's "strong growth" in MaraNatha and Spectrum brands while stating that Hain's EPS growth guidance "appears to be conservative."

### 2.     First Quarter Fiscal Year 2014 Financial Results on Form 10-Q

170.     The Q1 FY 2014 10-Q contained information concerning the Company's current financial condition for the first quarter ended September 30, 2013, including the figures provided above in the Q1 FY 2014 8-K.

### B.     Second Quarter Fiscal Year 2014 Results – February 2014

171.     On February 4, 2014, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the second fiscal quarter ended December 31, 2013 (the "Q2 FY 2014 8-K").  Additionally, on February 10, 2014, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the second quarter ended December 31, 2013 (the "Q2 FY 2014 10-Q").

### 1.     Form 8-K for the Second Quarter Fiscal Year 2014

172.     The Q2 FY 2014 8-K touted "record net sales of $535 million in the second quarter, an 18% increase, compared to net sales of $455 million in the second quarter of fiscal year 2013."  Additionally, "Hain Celestial US reported record second quarter net sales of $328 million, a 17% increase."

173.     The Q2 FY 2014 8-K also touted "earned net income of $41 million compared to $32 million in the prior year second quarter, a 30% increase, and reported earnings per diluted share of $0.84, which includes $0.03 earnings per diluted share from discontinued operations, compared to $0.67, a 25% increase compared to last year."  "Adjusted net income was $43

million compared to $35 million in the prior year second quarter, a 23% increase, and adjusted earnings per diluted share was $0.87 compared to $0.74, an 18% increase compared to last year."

174.   Simon attributed the Company's "*record second quarter results, the highest in the Company's history and our twelfth consecutive quarter of year-over-year double digit sales*" to "*strong sales driven by expanded distribution and brand contribution as well as robust operating margin expansion as we leveraged our selling, general and administrative expenses with a higher sales base.*"

175.   The Q2 FY 2014 8-K also raised the Company's annual guidance for Fiscal Year 2014:

- Total net sales range of $2.115 billion to $2.145 billion for fiscal year 2014; an increase of approximately 22% to 24% as compared to fiscal year 2013.

- Earnings range of $3.07 to $3.15 per diluted share for fiscal year 2014; an increase of 21% to 25% as compared to fiscal year 2013."

176.   Defendants' reliance on undisclosed, unsustainable pull-in sales practices had its desired effect.  In response to the Q2 FY 2014 8-K, Piper Jaffray issued an analyst report titled "Distribution Gains Remain Compelling; Reiterate Overweight" noting that "HAIN reported FQ2 adjusted EPS of $0.87 which came in line with our estimate and consensus" and stating the "U.S. business remains strong."

**2.      Second Quarter Fiscal Year 2014 Financial Results on Form 10-Q**

177.   The Q2 FY 2014 10-Q contained information concerning the Company's current financial condition for the three and six months ended December 31, 2013, including the figures provided above in the Q2 FY 2014 8-K.

C.      **Third Quarter Fiscal Year 2014 Results – May 2014**

178.    On May 8, 2014, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the third fiscal quarter ended March 31, 2014 (the "Q3 FY 2014 8-K"). Additionally, on May 12, 2014, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the third quarter ended March 31, 2014 (the "Q3 FY 2014 10-Q").

### 1.      Form 8-K for the Third Quarter Fiscal Year 2014

179.    The Q3 FY 2014 8-K boasted record "net sales of $557.4 million, a 22% increase, compared to net sales of $456.1 million in the third quarter of fiscal year 2013.  Hain Celestial US reported record third quarter net sales of $319.5 million, a 15% increase."

180.    The Q3 FY 2014 8-K also published "earned adjusted net income from continuing operations of $44.5 million compared to $34.4 million in the prior year third quarter, a 29% increase and reported adjusted earnings per diluted share from continuing operations of $0.88 compared to $0.72, a 22% increase."  "Net income was $35.2 million compared to $40.7 million in the prior year third quarter."

181.    Simon attributed the "***record third quarter results, the highest net sales in the Company's history and our 13th consecutive quarter of year-over-year double digit net sales and adjusted earnings growth***" to "***strong demand for our organic and natural brands as demonstrated by the increasing consumption of our products***."

182.    The Q3 FY 2014 8-K also raised the Company's guidance for Fiscal Year 2014:

- Total net sales range of $2.145 billion to $2.150 billion for fiscal year 2014; an increase of approximately 24% as compared to fiscal year 2013.

- Earnings range of $3.14 to $3.17 per diluted share for fiscal year 2014; an increase of 24% to 25% as compared to fiscal year 2013."

183.     Analysts at Piper Jaffray in a May 8, 2014 report referred to the results reported in the Q3 FY 2014 8-K as "Impressive" and noted that Hain again beat Wall Street expectations: "HAIN's FQ3 adjusted EPS of $0.88 came in above our estimate and consensus while net sales of $557M was in-line with consensus expectations but beat our model."

184.     In a May 8, 2014 report, analysts at SunTrust Robinson Humphrey reiterated their buy recommendation because of Hain's "solid 3Q14 results" with revenue of $557M and EPS of $0.88 just ahead of consensus estimates of $556M and $0.86.  The analysts remarked that the U.S. business was "hitting on all cylinders."

### 2.     Third Quarter Fiscal Year 2014 Financial Results on Form 10-Q

185.     The Q3 FY 2014 10-Q contained information concerning the Company's current financial condition for the three and nine months ended March 31, 2014, including the figures provided above in the Q3 FY 2014 8-K.

### D.     Fourth Quarter and Full Fiscal Year 2014 Results – August 2014

186.     On August 20, 2014, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the fourth fiscal quarter and fiscal year ending June 30, 2014 (the "FY 2014 8-K").  Additionally, on August 27, 2014, Hain filed with the SEC a Report on Form 10-K, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the Fiscal Year ending June 30, 2014 and the interim quarters (the "FY 2014 10-K").

### 1.     Form 8-K for the Fourth Quarter and Full Fiscal Year 2014

187.     The FY 2014 8-K contained information concerning the Company's fourth quarter and full fiscal year 2014 financial condition boasting record sales.  Indicated as performance highlights were "net sales for the fourth quarter of fiscal year 2014 were a record $583.8 million, an increase of 26.0% compared to net sales of $463.5 million in the prior year

fourth quarter." Additionally, "Hain Celestial US reported record net sales of $323.0 million, a 13.2% increase."

188.    The FY 2014 8-K included the following financial results for the fourth quarter of fiscal year 2014:

> The Company earned income from continuing operations of $35.7 million compared to $25.9 million in the prior year fourth quarter and reported earnings per diluted share from continuing operations of $0.70 compared to $0.53 in the prior year fourth quarter, a 32.1% increase. Adjusted income from continuing operations was $46.0 million compared to $31.7 million, a 45.3% increase, and adjusted earnings per diluted share from continuing operations was $0.90 compared to $0.65, a 38.5% increase, from the prior year fourth quarter. Adjusted EBITDA reached a record $79.4 million during the fourth quarter.

189.    The FY 2014 8-K also included the following financial results for the full fiscal year 2014:

> Worldwide net sales for fiscal year 2014 were a record $2.154 billion, an increase of 24.2% compared to net sales of $1.735 billion in the prior year. Hain Celestial US reported record net sales of $1.282 billion, a 17.0% increase.
>
> * * *
>
> The Company earned income from continuing operations of $141.5 million compared to $119.8 million in the prior year and reported earnings per diluted share from continuing operations of $2.83 compared to $2.52 in the prior year, a 12.3% increase. Adjusted income from continuing operations was $158.6 million compared to $120.2 million, a 32.0% increase, and adjusted earnings per diluted share from continuing operations was $3.17 compared to $2.53 in the prior year, a 25.3% increase. Adjusted EBITDA reached a new high of $300.0 million for the fiscal year ended June 30, 2014.

190.    Simon attributed the record net sales for the fiscal year to the "***US business continu[ing] to generate strong results as momentum for organic and natural products builds across various channels of distribution.***"

191.    The FY 2014 8-K provided annual guidance for fiscal year 2015 including "[t]otal net sales range of $2.725 billion to $2.80 billion; an increase of approximately 27% to 30% as compared to fiscal year 2014" and "[e]arnings range of $3.72 to $3.90 per diluted share; an increase of 17% to 23% as compared to fiscal year 2014."

192.    After Hain filed the FY 2014 8-K, analysts became increasingly bullish on Hain stock.  For example, analysts at Piper Jaffray issued a report on August 20, 2014 increasing its price target stating "Hain Celestial reported better than expected top and bottom line results reflecting solid productivity gains, high single digit organic growth, and guidance better than we expected."  BB&T Capital Markets issued a report the same day noting that "the beat was driven by strong sales which grew 26% to $583.8M, above our 24.9% forecast and consensus at 24.6%."

193.    Analysts at SunTrust Robinson Humphrey were "most impressed with" the "8.5% organic growth in the US" considering the "lingering concern from investors of how choppy trends in the natural/organic channel would impact HAIN's results."

### 2.    Fourth Quarter and Full Fiscal Year 2014 Financial Results on Form 10-Q

194.    The FY 2014 10-K contained information concerning the Company's current financial condition for the fourth quarter and full fiscal year ended June 30, 2014, including the figures provided above in the FY 2014 8-K.

### E.    First Quarter Fiscal Year 2015 Results – November 2014

195.    On November 6, 2014, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the first fiscal quarter ended September 30, 2014 (the "Q1 FY 2015 8-K").  Additionally, on November 7, 2014, Hain filed with the SEC a Report on Form

10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the first quarter ended September 30, 2014 (the "Q1 FY 2015 10-Q").

### 1. Form 8-K for the First Quarter Fiscal Year 2015

196.    The Q1 FY 2015 8-K boasted record "net sales of $631.3 million; adjusted net sales of $642.6 million, a 35% increase over the prior year period net sales."  Additionally, "Hain Celestial US reported record first quarter net sales of $336.9 million."

197.    The Q1 FY 2015 8-K also publicized "earned net income of $18.9 million and adjusted net income of $34.7 million for the first quarter."  "Earnings per diluted share was $0.37 and on an adjusted basis was $0.68, a 31% increase from the prior year first quarter."

198.    Simon attributed "*the highest quarterly net sales in the Company's history*" to Hain's "*diverse portfolio of brands and products across multiple categories and our customer base across various channels of distribution.*"

199.    The Q1 FY 2015 8-K also reiterated the Company's annual guidance for Fiscal Year 2015:

- Total net sales range of $2.725 billion to $2.80 billion; an increase of approximately 27% to 30% as compared to fiscal year 2014.

- Earnings range of $3.72 to $3.90 per diluted share; an increase of 17% to 23% as compared to fiscal year 2014.

### 2. First Quarter Fiscal Year 2015 Financial Results on Form 10-Q

200.    The Q1 FY 2015 10-Q contained information concerning the Company's current financial condition for the first quarter ended September 30, 2014, including the figures provided above in the Q1 FY 2015 8-K.

F.      **Second Quarter Fiscal Year 2015 Results – February 2015**

201.    On February 4, 2015, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the second fiscal quarter ended December 31, 2014 (the "Q2 FY 2015 8-K").  Additionally, on February 9, 2015, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the second quarter ended December 31, 2014 (the "Q2 FY 2015 10-Q").

1.      **Form 8-K for the Second Quarter Fiscal Year 2015**

202.    The Q2 FY 2015 8-K touted "net sales of $696.4 million; record adjusted net sales of $701.7 million, a 31% increase over the prior year period adjusted net sales." Additionally, "Hain Celestial US reported record second quarter net sales of $354.0 million and record second quarter adjusted net sales of $359.3 million, an increase of 10% over the prior year second quarter."

203.    The Q2 FY 2015 8-K also disclosed "earned net income of $44.6 million and adjusted net income of $55.5 million for the second quarter" and "[e]arnings per diluted share was $0.43 and on an adjusted basis was $0.54, a 26% increase from the prior year second quarter."

204.    Simon attributed the "***record results***" to Hain's "***diverse portfolio of worldwide brands, overcoming foreign currency impacts to deliver our 17th consecutive quarter of year-over-year double digit sales and adjusted earnings growth.***"

205.    The Q2 FY 2015 8-K also updated the Company's annual guidance for Fiscal Year 2015:

- Total net sales range of $2.650 billion to $2.675 billion; an increase of approximately 23% to 24% as compared to fiscal year 2014.

- Earnings range of $1.85 to $1.89 per diluted share; an increase of 17% to 19% as compared to fiscal year 2014.

### 2. Second Quarter Fiscal Year 2015 Financial Results on Form 10-Q

206. The Q2 FY 2015 10-Q contained information concerning the Company's current financial condition for the three and six months ended December 31, 2014, including the figures provided above in the Q2 FY 2015 8-K.

### G. Third Quarter Fiscal Year 2015 Results – May 2015

207. On May 6, 2015, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the third fiscal quarter ended March 31, 2015 (the "Q3 FY 2015 8-K"). Additionally, on May 11, 2015, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the third quarter ended March 31, 2015 (the "Q3 FY 2015 10-Q").

### 1. Form 8-K for the Third Quarter Fiscal Year 2015

208. The Q3 FY 2015 8-K touted record "net sales of $662.7 million, a 19% increase over the prior year period."  Additionally, "Hain Celestial US reported record third quarter net sales of $343.7 million, an increase of 8%, over the prior year third quarter."

209. The Q3 FY 2015 8-K also disclosed "earned net income of $33.4 million and adjusted net income of $46.5 million for the third quarter" and "[e]arnings per diluted share of $0.32; adjusted earnings per diluted share of $0.45."

210. Simon attributed the Company's "*18th consecutive year-over-year double digit net sales growth*" to "*the strength of our core brands and contributions from acquisitions.*"

211. The Q3 FY 2015 8-K also updated the Company's annual guidance for Fiscal Year 2015:

- Total net sales range of $2.692 billion to $2.700 billion; an increase of approximately 25% as compared to fiscal year 2014.

- Earnings range of $1.86 to $1.90 per diluted share; an increase of 17% to 20% as compared to fiscal year 2014.

212.    Defendants' statements gave assurances to analysts.  Analysts at Imperial Capital stated in a report the same day as the Q3 FY 2015 8-K titled "Growth Rates Appear Stable" and "Consistent with Consensus."  J.P. Morgan analysts remained "Overweight" on the stock, stating in a report the following day, May 7, 2015, that "[w]e are constructive on the HAIN story, which we think has legs over the long term. We expect continued high organic sales growth."  Wells Fargo Securities noted in a May 7, 2015 analyst report that "Hain's U.S. distribution story continues to show solid momentum."

213.    As the Company later reported in its annual report for Fiscal Year 2016 filed on June 22, 2017, Hain's original statements regarding sales and overall health and trajectory were false.  In fact, the revised statements for the third quarter of Fiscal Year 2015 reveal that, but for Hain's reliance on undisclosed, unsustainable pull-in sales practices, the Company would have missed Wall Street consensus net sales estimates for the quarter.

### 2.    Third Quarter Fiscal Year 2015 Financial Results on Form 10-Q

214.    The Q3 FY 2015 10-Q contained information concerning the Company's current financial condition for the three and nine months ended March 31, 2015, including the figures provided above in the Q3 FY 2015 8-K.

### H.    Fourth Quarter and Full Fiscal Year 2015 Results – August 2015

215.    On August 18, 2015, Hain filed with the SEC a Report on Form 8-K signed by Smith providing financial results for the fourth fiscal quarter and fiscal year ended June 30, 2015 (the "FY 2015 8-K").  Additionally, on August 21, 2015, Hain filed with the SEC a Report on

Form 10-K, signed and certified as accurate by Simon and Smith, containing Hain's financial results for the Fiscal Year ended June 30, 2015 and the interim quarters (the "FY 2015 10-K").

### 1.    Form 8-K for the Fourth Quarter and Full Fiscal Year 2015

216.    The FY 2015 8-K contained information concerning the Company's fourth quarter of fiscal year 2015 financial condition boasting "[r]ecord fourth quarter net sales of $698.1 million, a 20% increase over the prior year period" and full year "[r]ecord net sales of $2.69 billion, a 25% increase; adjusted net sales of $2.71 billion."  Additionally, "Hain Celestial US reported record fourth quarter net sales of $332.8 million" and for the full fiscal year, "record net sales of $1.367 billion."

217.    The FY 2015 8-K included the following financial results for the fourth quarter of fiscal year 2015:

> The Company earned net income from continuing operations of $71.1 million, a 99% increase, and adjusted net income of $57.2 million, a 24% increase, compared to the prior year fourth quarter. Earnings per diluted share for the fourth quarter were $0.68, a 94% increase versus the prior year period, which includes a $20.7 million tax benefit resulting from an election made during the quarter to change the tax status of one of the Company's international subsidiaries. On an adjusted basis earnings per diluted share for the fourth quarter were $0.55, a 22% increase.

218.    The FY 2015 8-K included the following financial results for the full fiscal year 2015:

> The Company earned net income from continuing operations of $167.9 million, a 19% increase, and adjusted net income of $193.9 million, a 22% increase, for the fiscal year. Earnings per diluted share for the fiscal year were $1.62, a 16% increase, and on an adjusted basis were $1.88, an 18% increase.

219.    Simon attributed the "*record net sales and earnings growth*" to "*strong worldwide demand for our diverse portfolio of leading organic and natural brands across many product categories, sales channels and geographies.*"

220.    The FY 2015 8-K also provided annual guidance for fiscal year 2016:

- Total net sales range of $2.97 billion to $3.11 billion, an increase of approximately 10% to 15% as compared to fiscal year 2015;

- Earnings range of $2.11 to $2.26 per diluted share, an increase of 12% to 20% as compared to fiscal year 2015.

221.    Analysts and investors responded positively to Hain's sales numbers meeting Wall Street's expectations.  Analysts at Maxim Group stated in a report published the same day as the FY 2015 8-K that Hain's sales were "in line with our estimate and $6M above the consensus" adding that "[c]oncerns over a slowdown in the natural channel are overblown."

222.    Similarly, analysts at BMO Capital Markets stated in a report the following day that "investor concerns of a sales growth slowdown are misplaced; HAIN's U.S. organic sales growth is poised to accelerate in F2016."

223.    As the Company later reported in its annual report for Fiscal Year 2016 filed on June 22, 2017, Hain's original statements regarding sales and overall health and trajectory were false.  In fact, the revised statements for the fourth quarter of Fiscal Year 2015 reveal that, but for Hain's undisclosed, unsustainable pull-in sales practices, the Company would have missed Wall Street consensus net sales estimates for the quarter.

## 2.    Fourth Quarter and Full Fiscal Year 2015 Financial Results on Form 10-K

224.    The FY 2015 10-K contained information concerning the Company's current financial condition for the fourth quarter and full year ended June 30, 2015, including the figures provided above in the FY 2015 8-K.

## I.    First Quarter Fiscal Year 2016 Results – November 2015

225.    On November 5, 2015, Hain filed with the SEC a Report on Form 8-K signed by Conte, providing financial results for the first fiscal quarter ended September 30, 2015 (the "Q1

FY 2016 8-K").  Additionally, on November 9, 2015, Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Conte, containing Hain's financial results for the first quarter ended September 30, 2015 (the "Q1 FY 2016 10-Q").

### 1.      Form 8-K for the First Quarter Fiscal Year 2016

226.     The Q1 FY 2016 8-K disclosed "[r]ecord first quarter net sales of $687.2 million, a 9% increase over the prior year period or, on a constant currency basis, an 11% increase over prior year adjusted net sales of $642.6 million." Additionally, "[t]he United States segment reported first quarter net sales of $331 million."

227.     Simon attributed this success to "***the diversification of our business across our branded organic and natural product categories, sales channels and geographies, which fueled solid worldwide results in our typically lowest sales and profitability quarter.***"

228.     The Q1 FY 2016 8-K announced "earned net income of $31.3 million, a 67% increase, and adjusted net income of $38.2 million, a 10% increase, compared to the prior year first quarter. Earnings per diluted share for the first quarter were $0.30, a 67% increase versus the prior year period. On an adjusted basis earnings per diluted share for the first quarter were $0.37, a 9% increase."

229.     The Q1 FY 2016 8-K also announced the Company's annual guidance for fiscal year 2016, which proposed an increase of 10% to 15% in total net sales from fiscal year 2015 at a predicted range of $2.97 billion to $3.11 billion.  The report indicated an earnings range of $2.11 to $2.26 per diluted share which is an increase of 12% to 20% over fiscal year 2015.

### 2.      First Quarter Fiscal Year 2016 Financial Results on Form 10-Q

230.     The Q1 FY 2016 10-Q contained information concerning the Company's current financial condition for the three months ended September 30, 2015, including the figures provided above in the Q1 FY 2016 8-K.

**J.      Second Quarter Fiscal Year 2016 Results – February 2016**

231.    On February 1, 2016, Hain filed with the SEC a Report on Form 8-K signed by

Conte providing financial results for the second fiscal quarter ended December 31, 2015 (the

"Q2 FY 2016 8-K").  Additionally, on February 9, 2016, Hain filed with the SEC a Report on

Form 10-Q, signed and certified as accurate by Simon and Conte, containing Hain's financial

results for the second quarter ended December 31, 2015 (the "Q2 FY 2016 10-Q").

**1.      Form 8-K for the Second Quarter Fiscal Year 2016**

232.    The Q2 FY 2016 8-K contained information concerning the Company's financial

condition again announcing record results.  The Q2 FY 2016 8-K touted "Record net sales of

$752.6 million, an 8% increase, or 11% on a constant currency basis, over prior year net sales of

$696.4 million" and called for a 28% increase in earnings per diluted share of $0.55 as compared

to the same period in the prior year.  Additionally, "[t]he United States segment reported second

quarter net sales of $342.3 million," nearly half of the Company's net sales.

233.    Simon commented that: "***Our strong sales growth was impacted in the quarter***

***primarily by reductions in inventories at certain customers in the United States segment.***"

234.    "The Company earned net income of $56.9 million, a 28% increase, and adjusted

net income of $59.2 million, a 7% increase, compared to the prior year period. Earnings per

diluted share for the second quarter were $0.55, a 28% increase compared to the prior year

period. On an adjusted basis earnings per diluted share for the second quarter were $0.57, a 6%

increase compared to the prior year period."

235.    The Q2 FY 2016 8-K also reiterated the Company's Fiscal Year 2016 guidance

expectations of "[t]otal net sales range of $2.90 billion to $3.04 billion, an increase of

approximately 7% to 12% as compared to fiscal year 2015, and [e]arnings per diluted share

range of $1.95 to $2.10, an increase of approximately 4% to 12% as compared to fiscal year 2015."

236.    As the Company later reported in its annual report for Fiscal Year 2016 filed on June 22, 2017, Hain's original statements regarding sales and overall health and trajectory were false.  In fact, the revised statements for the second quarter of Fiscal Year 2016 reveal that, but for Hain's reliance on undisclosed, unsustainable pull-in sales practices, the Company would have missed Wall Street consensus net sales estimates for the quarter.

**2.    Second Quarter Fiscal Year 2016 Financial Results on Form 10-Q**

237.    The Q2 FY 2016 10-Q contained information concerning the Company's current financial condition for the three and six months ended December 31, 2015, including the figures provided above in the Q2 FY 2016 8-K.

**K.    Third Quarter Fiscal Year 2016 Results – May 2016**

238.    On May 4, 2016, Hain filed with the SEC a Report on Form 8-K signed by Conte providing financial results for the third fiscal quarter ended March 31, 2016 (the "Q3 FY 2016 8-K").  Additionally, on May 10, 2016 Hain filed with the SEC a Report on Form 10-Q, signed and certified as accurate by Simon and Conte, containing Hain's financial results for the third quarter ended March 31, 2016 (the "Q3 FY 2016 10-Q").

**1.    Form 8-K for the Third Quarter Fiscal Year 2016**

239.    The Q3 FY 2016 8-K contained information concerning the Company's financial condition, once again boasting of record sales.  Indicated as performance highlights, were "Net sales of $750.0 million, a 13% increase, or 15% on a constant currency basis, over prior year period net sales of $662.7 million."  Net income for the three months ended March 31, 2016, accordingly increased from $96.8 million in 2015 to $137.2 million in 2016.  Additionally, earnings per diluted share increased 47% reaching $0.47 over the prior year period.

240.    The Q3 FY 2016 8-K also announced "earned net income of $49.0 million, a 47% increase, and adjusted net income of $50.6 million, a 9% increase, compared to the prior year period. Earnings per diluted share for the third quarter were $0.47, a 47% increase compared to the prior year period."

241.    The Company also increased financial projections for fiscal year 2016.  In particular, the Company stated that total net sales would increase 9% to 10% over the prior year period indicating a predicted range of $2.946 billion to $2.966 billion and earnings per diluted share increase of 6% to 9% at a range of $2.00 to $2.04.

242.    Simon ascribed these strong financial results to "*[t]he diversification of our product portfolio with leading organic, natural and better-for-you brands around the world, combined with our team's solid execution of our operational initiatives [which] fueled our financial performance.*"

243.    Simon also applauded the performance of the Company's United States segment which reported net sales of $351.9 million for the third quarter, a growth of 2.4% over the prior year period, stating, "*We are extremely pleased with our US results where we returned to growth in the third quarter and expect these trends to continue.*"

244.    Hain's positive quarter due to reliance on undisclosed, unsustainable pull-in sales practices had its intended effect as analysts at Morningstar noted in a May 4, 2016 report that the "result aligns with our view that much of Hain's recent challenges are transitory" and that "Hain's [r]eturn to U.S. [g]rowth [s]upports [o]ur [l]ong-[t]erm [o]utlook."

245.    Also, in response to Hain's announcement of the Company's financial results, analysts at Maxim Group in a May 4, 2016 report noted "we would continue to be buyers of HAIN after the better-than-expected FY3Q16 (Mar) results."

246.    Analysts at SunTrust Robinson Humphrey also reiterated a buy rating for Hain stock in a May 4, 2016 report noting that the financial results were "above our estimate . . . and the consensus estimate."  The SunTrust analysts added, "HAIN expects the growth to accelerate in the coming quarter, aided by favorable comparisons and new distribution wins, and the company now expects a return to their historical target of mid-single-digit growth for the US business in FY17."

### 2.    Third Quarter Fiscal Year 2016 Financial Results on Form 10-Q

247.    The Q3 FY 2016 10-Q contained information concerning the Company's current financial condition for the three and nine months ended March 31, 2016, including the figures provided above in the Q3 FY 2016 8-K.

248.    Hain, Simon, and Conte knew, or reckless disregarded, that the statements set forth in ¶¶164-247 were materially false and misleading when made and omitted material information because they attributed Hain's financial results to organic factors, such as "strong brand contribution" (¶165), "expanded distribution" (¶174), "strong demand" and "momentum for organic and natural products" (¶¶181, 190), Hain's "diverse portfolio" of brands (¶219), and "solid execution of [Hain's] operational initiatives (¶242), but failed to disclose that Hain had actually generated its financial results in reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—tactics that are unsustainable because they depend on customers' willingness to accept more product than necessary, which cannot be guaranteed. Defendants' failure to disclose its reliance on these unsustainable sales practices—and Hain's deficient internal control environment, which enabled Defendants to effectuate their scheme—materially misled investors about the true nature of Hain's sales revenue, the Company's ability to meet its projections and analysts' estimates

through natural, organic business activity, and demand for Hain's products. As a result, investors were unable to fairly assess the risk that Defendants' scheme would negatively affect the Company's future cash flows and financial results.

249.    Hain's undisclosed, unsustainable pull-in sales practices also artificially increased estimates of future sales, future net income and earnings estimates and misrepresented the underlying customer demand represented by these financial reports.  Hain's estimates of future sales, future net income and earnings estimates also omitted to disclose that Hain would need to overcome enormous product returns in the following quarter as a result of Hain's sales practices during the reported fiscal quarter.  Further, Simon and Conte did not expect the growth of U.S. sales to continue because distributors' inventory levels had reached capacity and they could no longer accept more product than necessary—which is what Hain's unsustainable sales practices depended on. These false statements and/or omissions were material because they altered the total mix of information available to Hain investors.

250.    In addition, Hain, Simon, and Conte knew, or recklessly disregarded, that the statements set forth above were materially false and misleading when made and omitted that Hain was improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  Correspondingly, all of the announced net sales relating to the corresponding fiscal quarter and fiscal year were artificially overstated by $167 million (and GAAP earnings per share were overstated by $0.13) during the Class Period as admitted by the Company in its June 22, 2017 restatement (as detailed in ¶¶146-56).

## VIII.   ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.      Analyst Conferences and Earnings Conference Calls

#### 1.       2014 ICR Conference – January 14, 2014

251.    In a speech given at the 2014 ICR Conference on January 14, 2014, Simon discussed how sales in the BluePrint brand had doubled because "***We expanded distribution, and we will continue to expand the product line and new offerings into other categories.***"

252.    Simon knew, or recklessly disregarded, that the statement set forth in ¶251 was materially false and misleading when made and omitted material information because Simon attributed sales in the BluePrint brand to "expanded distribution," but failed to disclose that Hain had actually generated its sales in reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—tactics that are unsustainable because they depend on customers' willingness to accept more product than necessary, which cannot be guaranteed. Defendants' failure to disclose its reliance on these unsustainable sales practices materially misled investors about the true nature of Hain's sales revenue, the Company's ability to meet its projections and analysts' expectations through natural, organic business activity, and demand for Hain's products.

#### 2.       Earnings Conference Call for Second Quarter Fiscal Year 2014 – February 4, 2014

253.    On February 4, 2014, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Smith participated, with various securities analysts to discuss Hain's second quarter fiscal year 2014 results.

254.    During the question and answer portion of the conference call, Carroll was asked "if consumption is 9% and you are saying core sales growth is mid- to high-single digit, are we

- 73 -

having some inventory issues [with] some of the larger customers that is causing the wheels to slow down?"  Carroll, responded, "***No, no, actually -- no, I think whatever slowdown we are seeing here is a function of the inventory build, the pipeline builds for some major distribution gains that we got in the beginning of the fiscal.***"

255.    Another analyst followed up on this response noting, "So just to paraphrase you, John, things going out the door, retailers are a little higher right now than what you are shipping to them, but you think that will square itself in the second half?"  Carroll responded, "***Yes, they will catch up***."

256.    Carroll knew, or recklessly disregarded, that the statements set forth in ¶¶254-55 were materially false and misleading when made and omitted material information because the inventory build and major distribution gains were the result of reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—all of which Defendants failed to disclose. Further, Simon and Smith were present during the conference call and did not correct Carroll's statement.  These false statements and/or omissions were material because they altered the total mix of information available to Hain investors.

257.    On that same call, Simon stated:  "Now, I'll focus on ***the key drivers that led to our strong sales performance***. Our organic growth was up 5 single digits excluding currency. Similar to growth in prior quarters, ***key drivers were -- new distribution, deeper penetration in key accounts, new and existing products, strong consistent consumer demand, and new private authorizations across many classes of trade***."

258.     Simon knew, or recklessly disregarded, that the statement set forth in ¶257 was materially false and misleading when made and omitted material information because Simon attributed sales to "deeper penetration in key accounts" and "strong consistent consumer demand," among other things, but failed to disclose that Hain had actually generated its sales in reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—tactics that are unsustainable because they depend on customers' willingness to accept more product than necessary, which cannot be guaranteed. Defendants' failure to disclose its reliance on these unsustainable sales practices materially misled investors about the true nature of Hain's sales revenue, the Company's ability to meet its projections and analysts' expectations through natural, organic business activity, and demand for Hain's products. Further, Carroll and Conte were present during the conference call and did not correct Simon's statement.  This false statement and/or omission was material because they altered the total mix of information available to Hain investors.

### 3.     Earnings Conference Call for Third Quarter Fiscal Year 2014 – May 8, 2014

259.     On May 8, 2014, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Smith participated with various securities analysts to discuss Hain's third quarter fiscal 2014 results.

260.     During the call, Simon stated: "Now I will focus on some other key drivers that led our strong sales performance. Our organic growth was up high single digits, excluding currency. *We continued to experience growth from our new distribution, deeper penetration in key accounts, and new existing products and strong, consistent consumer demand*."

261.    Simon knew, or recklessly disregarded, that the statement set forth in ¶260 was materially false and misleading when made and omitted material information because Simon attributed sales to "deeper penetration in key accounts" and "strong, consistent consumer demand," among other things, but failed to disclose that Hain had actually generated its sales in reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—tactics that are unsustainable because they depend on customers' willingness to accept more product than necessary, which cannot be guaranteed. Defendants' failure to disclose its reliance on these unsustainable sales practices materially misled investors about the true nature of Hain's sales revenue, the Company's ability to meet its projections and analysts' expectations through natural, organic business activity, and demand for Hain's products. Further, Carroll and Conte were present during the conference call and did not correct Simon's statement.  This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

### 4.    Earnings Conference Call for Fourth Quarter and Full Fiscal Year 2014 – August 20, 2014

262.    On August 20, 2014, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Smith participated, with various securities analysts to discuss Hain's fourth quarter and full fiscal year 2014 results.

263.    During the question and answer portion of the conference call, an analyst asked Carroll to "touch on UNFI inventory reduction."  Carroll responded, "***UNFI has been implementing their IO system, which is obviously their inventory optimization system . . . and it has been reflected in our guidance***."  Carroll added that UNFI's inventory reduction was "***between one to two weeks of inventory.***"  Simon said the UNFI's inventory reduction was

"*somewhere between $16 million to $20 million that came out in the second half of this year and that was built into our guidance and built into our guidance going into fiscal 2015.*"

264.   Carroll and Simon knew, or recklessly disregarded, that the statements set forth in ¶263 were materially false and misleading when made and omitted material information because UNFI's inventory reduction was the result of reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—all of which Defendants failed to disclose.  Further, Smith was present during the conference call and did not correct Carroll's and Simon's statements.  These false statements and/or omissions were material because they altered the total mix of information available to Hain investors.

### 5.   Earnings Conference Call for First Quarter Fiscal Year 2015 – November 6, 2014

265.   On November 6, 2014, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Conte participated, with various securities analysts to discuss Hain's first quarter fiscal year 2015 results.

266.   On the call, Simon stated: "Now, let me focus on key drivers that led to our strong sales performance, as I mentioned, organic growth was up in the high-single digits. . . . Importantly, *we're growing deeper in key accounts, based on strong, consistent consumer demand*."

267.   Simon knew, or recklessly disregarded, that the statement set forth in ¶266 was materially false and misleading when made and omitted material information because Simon attributed sales to "strong, consistent consumer demand," among other things, but failed to disclose that Hain had actually generated its sales in reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives,

extended payment terms, spoilage coverage, and the absolute right of return—tactics that are unsustainable because they depend on customers' willingness to accept more product than necessary, which cannot be guaranteed. Defendants' failure to disclose its reliance on these unsustainable sales practices materially misled investors about the true nature of Hain's sales revenue, the Company's ability to meet its projections and analysts' expectations through natural, organic business activity, and demand for Hain's products. Further, Carroll and Conte were present during the conference call and did not correct Simon's statement.  This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

### 6. Earnings Conference Call for Second Quarter Fiscal Year 2015 – February 4, 2015

268.    On February 4, 2015, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Conte participated with various securities analysts to discuss Hain's second quarter fiscal year 2015 results.

269.    During the call, Simon stated: "***The demand for healthy better-for-you products help us generate record net sales***."

270.    Simon knew, or recklessly disregarded, that the statement set forth in ¶269 was materially false and misleading when made and omitted material information because Simon attributed sales to strong demand but failed to disclose that Hain had actually generated its sales in reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—tactics that are unsustainable because they depend on customers' willingness to accept more product than necessary, which cannot be guaranteed. Defendants' failure to disclose its reliance on these unsustainable sales practices materially

misled investors about the true nature of Hain's sales revenue, the Company's ability to meet its projections and analysts' expectations through natural, organic business activity, and demand for Hain's products. Further, Carroll and Conte were present during the conference call and did not correct Simon's statement.  This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

### 7. Earnings Conference Call for Third Quarter Fiscal Year 2015 – May 6, 2015

271. On May 6, 2015,  the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Conte participated with various securities analysts to discuss Hain's third quarter fiscal year 2015 results.

272. On the call, Simon stated: "***Global demand for healthy, better-for-you products help us deliver a record third-quarter net sales, up over 19%***."

273. Simon knew, or recklessly disregarded, that the statement set forth in ¶272 was materially false and misleading when made and omitted material information because Simon attributed sales to strong demand, but failed to disclose that Hain had actually generated its sales in reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—tactics that are unsustainable because they depend on customers' willingness to accept more product than necessary, which cannot be guaranteed. Defendants' failure to disclose its reliance on these unsustainable sales practices materially misled investors about the true nature of Hain's sales revenue, the Company's ability to meet its projections and analysts' expectations through natural, organic business activity, and demand for Hain's products. Further, Carroll and Conte were present during the conference call and did not

correct Simon's statement.  This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

### 8. Earnings Conference Call for Fourth Quarter and Full Year Fiscal 2015 – August 18, 2015

274.    On August 18, 2015, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Conte participated with various securities analysts to discuss Hain's fourth quarter and full year 2015 results.

275.    On the call, Simon stated: "***Strong demand for our portfolio of leading organic and natural products helped fuel our growth across 15 or 20 core product categories, sales channels, and geographies***."

276.    Simon knew, or recklessly disregarded, that the statement set forth in ¶275 was materially false and misleading when made and omitted material information because Simon attributed sales to strong demand, but failed to disclose that Hain had actually generated its sales in reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—tactics that are unsustainable because they depend on customers' willingness to accept more product than necessary, which cannot be guaranteed. Defendants' failure to disclose its reliance on these unsustainable sales practices materially misled investors about the true nature of Hain's sales revenue, the Company's ability to meet its projections and analysts' expectations through natural, organic business activity, and demand for Hain's products. Further, Carroll and Conte were present during the conference call and did not correct Simon's statement.  This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

9. **Earnings Conference Call for First Quarter Fiscal Year 2016 – November 5, 2015**

277.    On November 5, 2015, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Conte participated, with various securities analysts to discuss Hain's first quarter fiscal year 2016 results.

278.    During Carroll's prepared remarks he attributed Hain Celestial US's "Q1 net sales shortfall" to "*lost sales and inventory from distributor and account shifts.*"

279.    Carroll knew, or recklessly disregarded, that the statement set forth in ¶278 was materially false and misleading when made and omitted material information because the lost sales and inventory from distributor and account shifts was the result of reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—all of which Defendants failed to disclose. As distributors' inventory levels reached capacity, they could no longer be persuaded to accept more inventory than necessary, which is what Hain's undisclosed, unsustainable sales practices depended on. Further, Simon and Conte were present during the conference call and did not correct Carroll's statement.  This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

10. **2016 ICR Conference – January 12, 2016**

280.    On January 11, 2016, after the market closed, Hain cut its quarterly and annual guidance, stating that it anticipated full-year sales of $2.9-$3.04 billion and earnings per share in the range of $1.95-$2.10, below its previous-issued guidance of $2.97 billion to $3.11 billion in sales revenue and earnings per share of $2.11-$2.26.

- 81 -

281.    The next afternoon on January 12, 2016 at the 2016 ICR Conference, Carroll acknowledged the guidance cut was "***in the area of inventory***" but attributed Hain's problems as "***one-offs***" and would alleviate the pressure on profits with a major cost reduction plan totaling about $100 million.

282.    Carroll knew, or recklessly disregarded, that the statement set forth in ¶281 was materially false and misleading when made and omitted material information because the inventory one-offs were the result of reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—all of which Defendants failed to disclose. As distributors' inventory levels reached capacity, they could no longer be persuaded into accepting more inventory than necessary, which is what Hain's undisclosed, unsustainable sales practices depended on. Further, Simon and Conte were present during the conference call and did not correct Carroll's statement. This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

### 11.    Simon Responds to Resignation of Hain's Chief Accounting Officer – January 22, 2016

283.    On January 22, 2016, J.P. Morgan published a report entitled "Hain Celestial Group, Inc. (HAIN US) Comments from CEO on CAO" discussing Hain's recent revelation that Hain's Chief Accounting Officer, Ross Weiner, resigned from his position.  The report quoted Simon as stating there is "***nothing wrong with Hain's accounting at all***" and the Chief Accounting Officer is merely leaving to pursue another opportunity where he may ultimately have the chance to be CFO.

284.    Simon knew, or recklessly disregarded, that the statement set forth in ¶283 was materially false and misleading when made and omitted material information because Hain's

accounting and financial statements failed to reveal that the Company was improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  As a result of the improper accounting, Hain's financial results would have to be restated as detailed in ¶¶146-56.   This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

### 12. Earnings Conference Call for Second Quarter Fiscal Year 2016 – February 1, 2016

285.   On February 1, 2016, the Company hosted an earnings conference call, in which Defendants Simon, Carroll, and Conte participated, with various securities analysts to discuss Hain's second quarter fiscal year 2016 results.

286.   During the question and answer portion of the conference call an analyst asked Simon about "inventory de-stock" in the most recent quarter.  Simon responded, "from a sales decline right now, it was not because we have too many SKUs and we've got all these dying SKUs out there; *the biggest part of it was inventory reduction.*"

287.   Simon knew, or recklessly disregarded, that the statement set forth in ¶286 was materially false and misleading when made and omitted material information because the inventory reduction was the result of reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—all of which Defendants failed to disclose. As distributors' inventory levels reached capacity, they could no longer be persuaded to accept more inventory than necessary, which is what Hain's undisclosed, unsustainable sales practices depended on. Further, Carol and Conte were present during the

conference call and did not correct Simon's statement. This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

### 13. Consumer Analyst Group of New York Conference – February 17, 2016

288.     On February 17, 2016, in a speech given at the Consumer Analyst Group of New York Conference, Conte stated "As John [Carroll] has previously discussed on our earnings call, the US segment declined due to Walmart's clean floor policy, losing Sensible Portion displays, discontinuing unprofitable club baby and nut butter SKUs; ***loss of sales and inventory from a distributor and account shifts***; and loss of private-label sales, primarily in nut butters."

289.     Conte knew, or recklessly disregarded, that the statement set forth in ¶288 was materially false and misleading when made and omitted material information because the "loss of sales and inventory from distributor and account shifts" was the result of reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—all of which Defendants failed to disclose. As distributors' inventory levels reached capacity, they could no longer be persuaded to accept more inventory than necessary, which is what Hain's undisclosed, unsustainable sales practices depended on. This false statement and/or omission was material because it altered the total mix of information available to Hain investors.

### 14. Earnings Conference Call for Third Quarter Fiscal Year 2016 – May 4, 2016

290.     On May 4, 2016, the Company hosted an earnings conference call, in which Simon, Carroll, Meiers, and Conte participated, with various securities analysts to discuss Hain's third quarter fiscal year 2016 results.

291.    During the question and answer portion of the conference call, Simon and Carroll

were asked about the U.S. segment "What gives you confidence to be able to get back up to that

mid- single-digit rate next fiscal year?"  Carroll responded, in part:

> We're starting to see more distribution wins, particularly against
> our top 500 to 800 SKUs. We're resolving some of the issues that
> we had with retailers, for example, with the clean floor policy or
> ***with distributors as we had accounts shift. . . . So we're pretty
> optimistic that we can drive the sort of growth that we are
> targeting here.***

292.    Carroll knew, or recklessly disregarded, that the statement set forth in ¶291 was

materially false and misleading when made and omitted material information because the

distributor accounts shift was the result of reliance on undisclosed, unsustainable pull-in sales

practices (referred to internally as "loading"), such as offering discounts, cash incentives,

extended payment terms, spoilage coverage, and the absolute right of return—all of which

Defendants failed to disclose. As distributors' inventory levels reached capacity, they could no

longer be persuaded to accept more inventory than necessary, which is what Hain's undisclosed,

unsustainable sales practices depended on. Further, this purported excuse for the Company's

sales decline was the same Carroll used in the prior fiscal quarter.  Further, Simon and Conte

were present during the conference call and did not correct Carroll's statement.  These false

statements and/or omissions were material because they altered the total mix of information

available to Hain investors.

**B.    Materially False and Misleading Statement Repeated Throughout the Class
        Period**

293.    During the Class Period, Hain, Smith, and Conte issued a series of statements that

were repeated in the Company's various filings with the SEC.  These statements and the times

when they were issued to the investing public are detailed below.

1.    **Hain's Critical Accounting Policies**

294.    Throughout the Class Period, Hain, Simon, Smith, and Conte stated that Hain's accounting policies with respect to revenue recognition, sales, promotional incentives, and inventory were critical to accurately portray the financial condition of the Company and that Hain complied with GAAP:

> Critical Accounting Estimates
>
> ***Our financial statements are prepared in accordance with accounting principles generally accepted in the United States****. The accounting principles we use require us to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and amounts of income and expenses during the reporting periods presented. We believe in the quality and reasonableness of our critical accounting policies; however, materially different amounts may be reported under different conditions or using assumptions different from those that we have applied. **The accounting policies that have been identified as critical to our business operations and understanding the results of our operations pertain to revenue recognition, sales and promotional incentives, valuation of accounts and chargebacks receivable, inventory***, property, plant and equipment, accounting for acquisitions, stock based compensation, goodwill and intangible assets and valuation allowances for deferred tax assets.

295.    Hain, Simon, and Smith signed the filings in which this statement appeared in connection with Hain's Q1 FY 2014 10-Q; Q2 FY 2014 10-Q; Q3 FY 2014 10-Q; Q1 FY 2015 10-Q; Q2 FY 2015 10-Q; and Q3 FY 2015 10-Q.  Hain, Simon, and Conte signed the filings in which this statement appeared in connection with Hain's Q1 FY 2016 10-Q; Q2 FY 2016 10-Q; and Q3 FY 2016 10-Q.

296.    Hain, Simon, Smith, and Conte knew, or recklessly disregarded, that the statements set forth in ¶294 were materially false and misleading when made and omitted material information because the Company's financial statements were not prepared in accordance with accounting principles generally accepted in the United States because the

Company was improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter. Moreover, Defendants failed to disclose Hain's reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return, to generate sales. Further, the Company had no regard for treating generally accepted accounting policies regarding revenue recognition, sales, promotional incentives and inventory as critical to Hain's business operations.

### 2. Hain's Revenue Recognition Practices

297.    Throughout the Class Period, Hain disclosed the Company's purported practices for revenue recognition as follows:

> Sales are recognized when the earnings process is complete, which occurs when products are shipped in accordance with terms of agreements, *title and risk of loss transfer to customers, collection is probable* and pricing is fixed or determinable. *Sales are reported net of sales and promotion incentives, which include trade discounts and promotions and certain coupon costs.* Shipping and handling costs billed to customers are included in reported sales. Allowances for cash discounts are recorded in the period in which the related sale is recognized.

298.    Hain, Simon, and Smith signed the filings in which this statement appeared in connection with Hain's FY 2014 10-K and the FY 2015 10-K.

299.    Hain, Simon, and Smith knew, or recklessly disregarded, that the statements set forth in ¶297 were materially false and misleading when made and omitted material information because, contrary to what Defendants disclosed regarding the Company's revenue recognition practices, the Company was improperly turning inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.  Thus, no title or risk of

loss transferred to the distributors. Moreover, Defendants failed to disclose Hain's reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return, to generate sales. These false statements and/or omissions were material because they altered the total mix of information available to Hain investors.

### 3. Hain's Sales and Promotion Incentives

300.    Throughout the Class Period, Hain made statements regarding the Company's purported practices for sales and promotion incentives: "Sales incentives and promotions include price discounts, slotting fees and coupons and are used to support sales of the Company's products. *These incentives are deducted from our gross sales to determine reported net sales.*"

301.    Hain, Simon, and Smith signed the filings in which this statement appeared in connection with Hain's FY 2014 10-K and the FY 2015 10-K.

302.    Hain, Simon, and Smith knew, or recklessly disregarded, that the statements set forth in ¶300 were materially false and misleading when made and omitted material information because the Company did not deduct promotion incentives from gross sales to determine reported net sales.  Instead, the Company improperly turned inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter. Moreover, Defendants failed to disclose Hain's reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return, to generate sales.

### 4. Hain's Trade Promotions

303.    Throughout the Class Period, Hain made statements regarding the Company's purported practices regarding trade promotions: "*Accruals for trade promotions are recorded*

*primarily at the time a product is sold to the customer based on expected levels of performance. Settlement of these liabilities typically occurs in subsequent periods primarily through an authorization process for deductions taken by a customer from amounts otherwise due to the Company*."

304. Hain, Simon, and Smith signed the filings in which this statement appeared in connection with Hain's FY 2014 10-K and the FY 2015 10-K.

305. Hain, Simon, and Smith knew, or recklessly disregarded, that the statements set forth in ¶303 were materially false and misleading when made and omitted material information because the Company improperly turned inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter. Thus, there was no expected level of performance for these improper sales. Moreover, Defendants failed to disclose Hain's reliance on undisclosed, unsustainable pull-in sales practices (referred to internally as "loading"), such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return, to generate sales. These false statements and/or omissions were material because they altered the total mix of information available to Hain investors.

### 5. Sarbanes-Oxley Certifications

306. SOX requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually and that the principal officers certify their responsibilities for financial reports in each quarterly and annual filing.

307. Simon, Smith, and Conte completed certifications pursuant to Section 302 of SOX certifying that:

1.      I have reviewed this quarterly report on Form 10-Q of The Hain Celestial Group, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

308.  Pursuant to Section 906 of SOX, Simon, Smith, and Conte further certified that:

The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

309.  Simon and Smith issued these certifications in connection with the Q1 FY 2014 10-Q; Q2 FY 2014 10-Q; Q3 FY 2014 10-Q; FY 2014 10-K; Q1 FY 2015 10-Q; Q2 FY 2015 10-Q; Q3 FY 2015 10-Q; and FY 2015 10-K.  Simon and Conte issued these certifications in connection with the Q1 FY 2016 10-Q; Q2 FY 2016 10-Q; and Q3 FY 2016 10-Q.

310.  Simon, Smith, and Conte knew, or recklessly disregarded, that the statements set forth in ¶¶307-08 were materially false and misleading when made and omitted material

- 91 -

information because the financial statements did not fairly present the financial condition of the Company and the Company did not have adequate internal controls in place for the purpose of accounting. Instead, the Company improperly turned inventory into sales by booking shipments to distributors as sales and revenue even though those distributors had no obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.

311. Moreover, as Hain admitted in the SEC Order, Hain violated Section 13(b)(2)(B) of the Exchange Act and failed to maintain effective internal controls, as demonstrated by the undisclosed, unsustainable pull-in sales practices detailed in the SEC Order and herein. Indeed, the SEC Order found (and Hain accepted) that "Hain lacked sufficient policies and procedures to provide reasonable assurances that [end-of-quarter] sales were accounted for properly. Hain's sales personnel were not appropriately trained or knowledgeable about the accounting implications of their sales practices. Further, there were insufficient policies and procedures to monitor incentives made in sales transactions, which could have potential revenue recognition implications."

312. These false statements and/or omissions were material because they altered the total mix of information available to Hain investors.

### 6. Statements Regarding Internal Controls

313. In each filing with the SEC, Simon, Smith, and Conte made statements regarding the effectiveness of Hain's internal controls over financial reporting, stating that the Company's internal controls were effective.

314. The statements were made on November 12, 2013 (Q1 FY 2014 10-Q); February 10, 2014 (Q2 FY 2014 10-Q); May 12, 2014 (Q3 FY 2014 10-Q); November 7, 2014 (Q1 FY 2015 10-Q); February 9, 2015 (Q2 FY 2015 10-Q); May 11, 2015 (Q3 FY 2015 10-Q); and May 10, 2016 (Q3 FY 2016 10-Q):

**Item 4.      Controls and Procedures**
**Evaluation of Disclosure Controls and Procedures**

Our Chief Executive Officer and Chief Financial Officer have reviewed our disclosure controls and procedures as of the end of the period covered by this report. Based upon this review, these officers concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is (1) recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

315.   On November 9, 2015 (Q1 FY 2016 10-Q) and February 9, 2016 (Q2 FY 2016

10-Q), Simon and Conte represented:

**Item 4.      Controls and Procedures**
**Evaluation of Disclosure Controls and Procedures**

Our Chief Executive Officer and Chief Financial Officer have reviewed our disclosure controls and procedures as of the end of the period covered by this report. Based upon this review, these officers concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is (1) recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

During the first quarter of fiscal 2016, the Company implemented the Hyperion Financial Management system for consolidation and financial reporting resulting in changes to our processes and related internal controls over financial reporting. We expect this new reporting tool will enhance our internal control over financial reporting. Pre-implementation testing and post-implementation reviews were conducted by management to ensure that controls surrounding the system implementation process, the reporting tool, and the closing process were effective to prevent material financial

statement errors. Other than changes related to this new reporting tool, no other changes in our internal control over financial reporting occurred during the period covered by this quarterly report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

316.    On August 27, 2014 (FY 2014 10-K) and August 21, 2015 (FY 2015 10-K),

Simon and Smith represented:

**Item 9A.        Controls and Procedures**
**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15(b) of the Exchange Act, our management has carried out an evaluation, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the Exchange Act, as of the end of the period covered by this report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

**Management's Report on Internal Control over Financial Reporting**

Management, including our Chief Executive Officer and our Chief Financial Officer, is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control system was designed to provide reasonable assurance to the Company's management and Board of Directors regarding the preparation and fair presentation of the published financial statements in accordance with generally accepted accounting principles.

* * *

Management assessed the effectiveness of our internal control over financial reporting as of June 30, 2015. Management's assessment was based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria).

Based on this assessment, the Company's management concluded that as of June 30, 2015, our internal control over financial reporting is effective.

The Company's internal control over financial reporting as of June 30, 2015 has been audited by Ernst & Young LLP, the independent registered public accounting firm who also audited the Company's consolidated financial statements. Ernst & Young's attestation report on management's assessment of the Company's internal control over financial reporting follows.

317.    As stated above, Simon, Smith, and Conte completed the required certifications stating that Hain had established and maintained both disclosure controls and procedures as well as internal controls over financial reporting.

318.    Despite the wording in the certifications, Hain's disclosure controls and procedures as well as its internal controls over financial reporting were not effective.  Moreover, despite publicly acknowledging its responsibility to maintain adequate disclosure controls and procedures as well as internal controls over financial reporting and certifying that the controls were effective, in reality Hain's controls were deficient, rendering its financial statements false and misleading.

319.    Defendants' statements in ¶¶314-16 were materially false and misleading when made and omitted material information because, as Hain admitted in the SEC Order, Hain violated Section 13(b)(2)(B) of the Exchange Act and failed to maintain effective internal controls, as demonstrated by the undisclosed, unsustainable pull-in sales practices detailed in the SEC Order and herein. Indeed, the SEC Order found (and Hain accepted) that "Hain lacked sufficient policies and procedures to provide reasonable assurances that [end-of-quarter] sales were accounted for properly. Hain's sales personnel were not appropriately trained or knowledgeable about the accounting implications of their sales practices. Further, there were

insufficient policies and procedures to monitor incentives made in sales transactions, which could have potential revenue recognition implications."

## IX.   THE TRUTH EMERGES

### A.   Hain's January 21, 2016 Announcement – First Partial Disclosure

320.   On January 21, 2016, after the market closed, Hain disclosed, in a Report on Form 8-K, that Ross Weiner resigned from his position of Vice President – Finance, Chief Accounting Officer.

321.   Following this disclosure, the price of Hain shares declined $2.64 per share, or over 7%, from a close of $36.10 per share on January 21, 2016 to close at $33.46 per share on January 25, 2016.

322.   Analysts at J.P. Morgan noted that Weiner's resignation was "weighing on the shares" as concerns regarding the Company's accounting grew.  Analysts at Wells Fargo stated that "the news adds to the broader adjustments around the Hain story."

### B.   Hain's August 15, 2016 Announcement – Second Partial Disclosure

323.   On August 15, 2016, after the market closed, Hain announced that the filing of its Annual Report for Fiscal 2016 would be delayed as it had identified concessions that were granted to certain U.S. distributors and was investigating whether revenue associated with those concessions was properly and timely accounted for.  The Company filed with the SEC a Form 8-K, signed by Conte, which stated:

> **The Hain Celestial Group, Inc. Announces Delay in the Release of its Fourth Quarter and Fiscal Year 2016 Financial Results**
> **Lake Success, NY, August 15, 2016** - The Hain Celestial Group, Inc. (NASDAQ: HAIN), a leading organic and natural products company with operations in North America, Europe and India providing consumers with A Healthier Way of Life™, announced today that it will delay the release of its fourth quarter and fiscal year 2016 financial results. During the fourth quarter, the Company identified concessions that were granted to certain

distributors in the United States. The Company is currently evaluating whether the revenue associated with those concessions was accounted for in the correct period and is also currently evaluating its internal control over financial reporting. The Audit Committee of the Company's Board of Directors is conducting an independent review of these matters and has retained independent counsel to assist in that review.

Previously, the Company has recognized revenue pertaining to the sale of its products to certain distributors at the time the products are shipped to such distributors. The Company is evaluating whether the revenue associated with the concessions granted to certain distributors should instead have been recognized at the time the products sell through its distributors to the end customers. *The Company expects that any potential changes in the timing of the recognition of revenue with respect to these transactions should not impact the total amount of revenue ultimately recognized by the Company with respect to such distributors and does not reflect on the validity of the underlying transactions with respect to such distributors.*

The Company will experience a delay in the timely filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016 (the "Form 10-K") and expects to file a notification of late filing on Form 12b-25 with the Securities and Exchange Commission to obtain an automatic 15-day extension of the filing deadline for the Form 10-K. There can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period.

The Company will not be in a position to release financial results until the completion of the independent review of the Audit Committee and of the audit process relating to the 2016 fiscal year. The Company is working diligently on this matter and will, as soon as practicable, make a further announcement regarding the updated timing of the release of financial results and a conference call on its financial results. Separately, the Company does not expect to achieve its previously announced guidance for fiscal year 2016.

324. In reaction to these disclosures, the price of Hain common stock declined $14.05 per share, or over 26%, from a close of $53.40 per share on August 15, 2016, to close at $39.35 per share on August 16, 2016. However, this disclosure was materially misleading in that Hain and Conte knew, or recklessly disregarded, that the statements set forth in ¶323 were materially

false and misleading when made and omitted material information because Hain and Conte

failed to disclose that the Company's practice was to improperly turn inventory into sales by

booking shipments to distributors as sales and revenue even though those distributors had no

obligation to pay for the shipments and were free to return the inventory the next fiscal quarter.

Hain and Conte knew, or recklessly disregarded, that the total amount of revenue ultimately

recognized by the Company would be impacted as a result of the improper accounting.

Moreover, Defendants failed to disclose Hain's reliance on undisclosed, unsustainable pull-in

sales practices (referred to internally as "loading"), such as offering discounts, cash incentives,

extended payment terms, spoilage coverage, and the absolute right of return, to generate sales.

These false statements and/or omissions were material because they altered the total mix of

information available to Hain investors.

325.    The next day, August 16, 2016, analysts at J.P. Morgan spoke with Simon and

reiterated the "key takeaways" from what Simon said:

> We took it as a given after reading the press release that Hain
> would have to restate prior revenue and/or earnings; however, we
> no longer are sure this is the case. Clearly, there remains a
> reasonably high probability that historicals will need to change, but
> Mr. Simon emphasized that the company is still only "reviewing"
> the issue and that no conclusions have been drawn yet. It is
> possible, in other words, that nothing needs to be restated.
>
> The company seems confident – though it is too early to be sure –
> that this accounting issue will prove to be isolated. One of the lines
> of the press release that spooked us was that Hain is "also currently
> evaluating its internal control over financial reporting." This
> suggests that other problems potentially could be discovered.
> Though Mr. Simon emphasized that the review is still going on, he
> seemed hopeful – almost confident, to our ears – that this particular
> issue would be isolated and not indicative of additional problems.
> We will see; for now, we remain guarded on the subject.

### C.      Hain's November 16, 2016 Audit Committee Review Announcement

326.      On November 16, 2016, Hain Celestial issued a press release entitled "Hain Celestial Announces Completion of Independent Audit Committee Review."  This press release contained the supposed results of the Audit Committee's investigation into the Company's financial statements.  In particular, the press release claimed, "[t]he [Audit Committee] review, which was extensive, found no evidence of intentional wrongdoing in connection with the Company's financial statements."

327.      Of the results of the Audit Committee investigation, Simon stated:

> Hain Celestial is committed to transparency of our financial reporting, and we are taking concrete measures to remediate as well as strengthen our internal controls.  We are extremely pleased that the Company can now move forward with its reporting process as we put these challenges behind us.

328.      However, these disclosures were materially misleading in that Simon knew, or recklessly disregarded, that the statements set forth in ¶¶326-27 were materially false and misleading when made and omitted material information because, as Hain admitted in the SEC Order, Hain violated Section 13(b)(2)(B) of the Exchange Act and failed to maintain effective internal controls, as demonstrated by the undisclosed, unsustainable pull-in sales practices detailed in the SEC Order and herein. Indeed, the SEC Order found (and Hain accepted) that "Hain lacked sufficient policies and procedures to provide reasonable assurances that [end-of-quarter] sales were accounted for properly. Hain's sales personnel were not appropriately trained or knowledgeable about the accounting implications of their sales practices. Further, there were insufficient policies and procedures to monitor incentives made in sales transactions, which could have potential revenue recognition implications."  These false statements and/or omissions were material because they altered the total mix of information available to Hain investors.

**D.    The Truth is Further Revealed on February 10, 2017 – Final Corrective Disclosure**

329.    On February 10, 2017, after the market closed, Hain filed a Notification of Late Filing on Form 12b-25 that revealed the wide ranging scope of the Company's wrongdoing. While the Company had initially focused on the recognition of revenue associated with concessions granted to certain distributors during the fourth quarter of Fiscal Year 2016, Hain now revealed in a regulatory filing that the Company had expanded the scope of its internal accounting review "to perform an analysis of *previously-issued financial information* in order to identify and assess any potential errors."  Further, Hain announced that the SEC had launched a formal investigation into the Company: "The SEC has issued a formal order of investigation and, pursuant to such order, the SEC issued a subpoena to the Company seeking relevant documents."

330.    In reaction to these disclosures, the price of Hain's stock fell $3.43 per share, or more than 8%, from a close of $38.53 per share on February 10, 2017, to close at $35.10 per share on February 13, 2017, the next trading day, on unusually heavy trading volume.

331.    On this news, analysts at The Buckingham Research Group lowered their price target for Hain stating, "we are lowering our estimates to reflect our 'best guess' that HAIN is likely to undergo an earnings revision or a meaningful earnings rebase as a result of this process."

**X.    DEFENDANTS' VIOLATIONS OF GAAP**

332.    As detailed herein, Hain improperly recognized revenue in violation of GAAP, which in turn artificially inflated Hain's publicly reported financial condition.  Consequently, Hain's publicly issued financial statements during the Class Period reported materially overstated net sales, which in turn inflated Hain's net income, and earnings per share. Specifically, Hain's concessions set forth in its multi-year revised financial statements evidence

that the previously filed Class Period financial results were materially false, misleading, and could no longer be relied upon and violated GAAP and SEC guidance throughout the Class Period.

333.    Defendants represented to investors during the Class Period that Hain's financial statements were prepared in accordance with GAAP—representations highly material to the total mix of information available for investors' evaluation of whether or not to purchase Hain Securities.

334.    In fact, the Company's financial statements violated GAAP by improperly recording revenue when the distributors had the right to return Hain's inventory.  According to Accounting Standards Codification ("ASC") 605-15-25, *Revenue recognition when right of return exists*, if a customer has a right of return, Hain was not permitted to recognize revenue on its sales to distributors until the right of return expired.  Thus, when Hain recognized the entire revenue on its sales immediately after the inventory left the warehouse, Hain's SEC filings violated GAAP when that revenue was reported.  Hain also violated GAAP by failing to estimate the amounts of future returns it expected in the following fiscal quarter and accruing such estimates in the period the products were sold.

335.    The Company's financial statements further violated GAAP by recognizing revenue prior to the transfer of title and risk of loss to the distributors.  Pursuant to ASC 605-10-S99, *Revenue Recognition – Overall – SEC Materials*, Hain was not permitted to recognize revenue until delivery has occurred.  Delivery is not considered to have occurred unless the customer has taken title and assumed the risks and reward of ownership of the products.  Here, Hain ignored this criteria and recognized revenue at the time of shipment, when in fact, Hain still owned that inventory.  As detailed herein, Hain merely parked its inventory with the distributors

until the following fiscal quarter.  Hain maintained substantially all of the risks of ownership—even after shipment.  Thus, Hain was not permitted to recognize revenue for the pushed inventory.  Indeed, Hain was later forced to restate this practice of premature revenue recognition.  Therefore, the Company violated GAAP when it reported revenue in the current fiscal period for the pushed inventory.

336.    Hain's financial statements also failed to properly recognize costs associated with sales promotions and incentives offered to customers.  ASC 605-50-25-3, *Revenue Recognition – Customer Payments and Incentives – Recognition*, addresses incentives that will not result in a loss on the sale of the product, and states that if offered voluntarily by a vendor and without charge to customers as a result of a single exchange transaction, a vendor shall recognize the cost of such a sales incentive at the later of the following: (i) the date at which the related revenue is recognized by the vendor, or (ii) the date at which the sales incentive is offered.  Hain admitted to violating ASC 605-50-25-3 when the Company restated its annual report for Fiscal Year 2016 on June 22, 2017 and corrected "errors related to the appropriate timing of customer payments and incentives associated with trade promotions."  Further, the Company concealed the impact of these promotions and incentives by failing to offset these costs from reported revenue.  In this way, the Company's financial statements also violated ASC 650-50-45, *Revenue Recognition – Customer Payments and Incentives – Other Presentation Matters*.

337.    Consequently, Defendants' statements during the Class Period that Hain's financial statements were prepared in accordance with GAAP were also materially false and misleading.  By failing to file financial statements with the SEC which conformed to the requirements of GAAP, such statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 CFR § 210.1.

## XI.   ADDITIONAL EVIDENCE OF SCIENTER

338.   As alleged herein, Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated throughout the Class Period were materially false and misleading and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements.  Indeed, Defendants, by virtue of their receipt and knowledge of information reflecting the true facts regarding Hain's reliance on undisclosed, unsustainable pull-in sales practices to generate revenue and improper accounting practices, their control over, and/or receipt and/or modification of Hain's materially incomplete, false and misleading misstatements and/or their access to inside information concerning Hain and its reliance on unsustainable sales practices to generate revenue and improper accounting practices, knowingly or recklessly participated in the fraudulent course of conduct alleged herein. Indeed, the fraudulent scheme described in this Complaint could not have been perpetuated over such a substantial period of time without the knowledge and complicity, or at a minimum reckless disregard, of the personnel at the highest level of the Company, including the Individual Defendants.

### A.   The Senior Management Terminations Contribute to a Strong Inference of Scienter

339.   During the Class Period, and in the months after Hain first announced it was improperly recognizing revenue based on concessions and other incentives offered to distributors, Hain replaced most of the senior executives involved and created entirely new positions.  The temporal proximity between Hain's restatement and these departures and new hires strongly support an inference of scienter on the part of Defendants.

340.   On September 3, 2013, Smith joined Hain as the Company's new CFO.  On September 8, 2015, after only two years as Hain's CFO, the Company announced that Smith was

departing the Company to "pursue [] other opportunities" and would be replaced by Conte. Simon described the reason for Smith's departure was to "pursue [] other opportunities," however, as written on Smith's LinkedIn page as of December 2016, Smith was still "seeking new opportunities."

341.    Also in September 2015, the Company fired Senior Vice President of Manufacturing, Powhida, who worked under Meiers and Senior Vice President of Finance/Business Planning, Rose Ng, who worked under Carroll.

342.    On January 21, 2016, only four months after Smith's resignation, Hain revealed in a Form 8-K that "Ross Weiner resigned from his position of Vice President – Finance, Chief Accounting Officer."

343.    Despite the major shakeups and movements among the executives responsible for reporting Hain's financial earnings, Simon sought to allay analysts' concerns regarding Hain's accounting by stating on January 22, 2016, that there is "nothing wrong with Hain's accounting at all."

344.    On December 7, 2016, Hain announced that Gary Tickle would become Chief Operating Officer for Hain Celestial U.S. and Meiers would move to Hain's Pure Protein Corporation in addition to being Chief Operations Officer for Hain's Project Terra.  CW 1 stated that he has heard that this new position was a demotion for Meiers, but Hain wanted the market to think it was a promotion.  Hain also appointed a new Chief Supply Chain Officer, a new Chief Customer Officer, and a new Vice President of Marketing.

345.    On March 6, 2017, Hain announced that the Company was removing Carroll from his role with U.S. sales as he would no longer serve as the CEO for Hain North America and changed Carroll's position to Executive Vice President, Global Brands, Categories and New

Business Ventures of Hain Celestial.  Hain appointed Gary W. Tickle to take over Carroll's prior position as CEO for Hain North America.

346.    On June 22, 2017, Hain announced that Conte would be "resigning" from his CFO position effective immediately.

347.    The same day, the Company announced an expanded "team with new hires including a new controller for the U.S. segment, a global revenue Controller, a Head of Internal Audit, and a Chief Compliance Officer."

348.    Following the Class Period, in 2018, Hain terminated Marla Hyndman, its Senior Vice President and Controller.

349.    Following the Class Period, in June 2018, Hain announced that Simon was leaving Hain.

350.    The employee turnover at Hain's executive level indicates that certain individuals at the Company (*e.g.*, the Board of Directors) had determined that Defendants were aware of the deficiencies in their accounting staff and intentional and/or reckless conduct with respect to its financial reporting, and that the deficiencies and conduct were significant and severe enough to warrant the replacement of the Company's CFO and the CEO of Hain North America.

**B.      Hain's Core U.S. Segment Was Extremely Important to the Company's Success**

351.    As the Company's highest executives, the Individual Defendants were deeply involved in Hain's U.S. sales, accounting, and revenue recognition and had access to all material information regarding the Company's core operations, including the U.S. sales of Hain's products.  As such, they had knowledge of all material facts regarding Hain's core U.S. business – or at the very least had full and unfettered access to this same information.  The Individual Defendants therefore knew or were reckless in disregarding the fact that the adverse facts

specified herein that the amount of U.S. sales, net income, and earned income per share were being falsely reported to (in order to mislead) the investing public.

352.    As noted in a May 3, 2016 report by analysts at RBC Capital Markets, "[i]nternal sales trends of Hain Celestial's US division (51% of revenue and 75% of profit) have historically been the key driver of its valuation."  Further, during the Class Period, between 56-60% of the Company's consolidated net sales were generated within the United States.  Given the crucial importance of U.S. sales to Hain's operations and financial success, the sales figures and the improper methods employed to achieve those sales were among Hain's most important internal metrics, a subject of intense market scrutiny and concern, and a topic on which Defendants made numerous public statements throughout the Class Period.  As such, the Individual Defendants were plainly aware of the means by which the Company's core products were sold – namely, in reliance on undisclosed, unsustainable pull-in sales practices to persuade customers to accept more product than necessary. Indeed, as CEO of Hain, North America, Carroll was specifically responsible for monitoring and understanding Hain's relationship with its distributors in the United States and therefore knew or was reckless as to the fact that Hain had relied on undisclosed, unsustainable sales practices to generate sales.  As CFOs, Defendants Smith and Conte were specifically responsible for monitoring and understanding how Hain generated revenues from its core U.S. products and therefore knew or were reckless as to the fact that Hain engaged in these unsustainable sales practices.

### C.    Suspicious Stock Sales by Carroll and Simon During the Class Period

353.    During the Class Period, Carroll and Simon reaped the rewards of their fraud while Hain's stock price was artificially inflated.  To evaluate Carroll and Simon's selling activity, Plaintiffs used the publicly-available trading data that Carroll and Simon were required to report to the SEC on Form 4.  Plaintiffs analyzed the trading by Carroll and Simon during the

Class Period and then compared that to an equal length period immediately preceding the Class Period. The period from July 30, 2010 – November 4, 2013 is defined at the "Control Period." The Form 4s filed during the Class Period and Control Period are hereby incorporated by reference.

354.    Plaintiffs calculated the total sales by each individual together with the cash proceeds from such sales, during the Control and Class Periods.  Those totals were then compared.

355.    The number of shares sold and the net proceeds from sales during the Class Period by Carroll and Simon were extraordinarily large compared to the Control Period.

| Person | Control Period | | Class Period | |
|--------|----------------|---|--------------|---|
| | Number of Shares Sold | Net Proceeds | Number of Shares Sold | Net Proceeds |
| Carroll | 100,000 | $3,816,328 | 308,916 | $24,388,112 |
| Simon | 915,000 | $42,052,050 | 983,798 | $80,227,263 |

A comprehensive list of each sale of Hain stock by Simon and Carroll is provided in Exhibit A attached herein.

356.    Carroll's Class Period stock sales were not only large in absolute terms, but also inconsistent with Carroll's own prior selling activity during the Control Period.

357.    Carroll increased his stock sales from 100,000 shares during the Control Period to 308,916 shares during the Class Period – a startling increase of more than 300%.

358.    The contrast between Carroll's sales during the Control Period and Class Period is even more striking when measured in dollars and as a percentage of his holdings. Carroll sold 308,916 shares of Hain stock during the Class Period for proceeds of $24,388,112.23. This represented a more than 600% increase from the $3,816,328 million of shares Carroll sold during

the Control Period.  In addition, during the Class Period, 203,608 shares of Carroll's stock were withheld by the Company for Carroll's benefit (either in connection with payments associated with Carroll's option exercises or to pay for Carroll's personal taxes). ***Through these transactions, Carroll disposed of approximately 74% of the total shares, including shares converted from options, he had available for sale during the Class Period.***  Percentage of total shares available for sale that were disposed during the Class Period was calculated by dividing (A) the sum of Class Period open market sales and Class Period shares used for payment of stock option exercise price by (B) the sum of pre-class period shares, Class Period open market purchases, Class Period stock awards, and Class Period shares acquired through stock option conversion.

359.    Simon similarly reaped the rewards of the fraud as net proceeds from his stock sales. Simon sold 983,798 shares of Hain stock during the Class Period for proceeds of $80,227,263, representing an increase of almost 200% from $42,052,050 during the Control Period.  In addition, during the Class Period, 973,779 shares of Simon's stock were withheld by the Company for Simon's benefit (either in connection with payments associated with Simon's option exercises or to pay for Simon's personal taxes), and Simon also disposed of 27,172 shares as gift dispositions. ***Through these transactions, Simon disposed of more than 66% of the total shares, including options, he had available for sale during the Class Period.***

**D.    Hain's Significant Remedial Measures Contribute to a Strong Inference of Scienter**

360.    Following Hain's disclosure of financial reporting errors and breakdown in internal controls, Hain enacted several significant, wide-sweeping "remediation efforts."  Hain described these "remediation efforts" within its Fiscal Year 2016 Form 10-K, under the section

titled "Remediation of the Material Weaknesses in Internal Control Over Financial Reporting,"

in pertinent part as follows:

> *Organizational Enhancements* - The Company has identified and begun to implement several organizational enhancements as follows: (i) the creation of a new position, Global Revenue Controller, which has been filled and will be responsible for all aspects of the Company's revenue recognition policies, procedures and the proper application of accounting to the Company's sales arrangements; (ii) the identification and hiring of a new Controller for the Company's United States segment, which has been filled, who is responsible for all accounting functions in the United States segment; (iii) the establishment of an internal audit function that reports directly to the Audit Committee; (iv) the bifurcation of the General Counsel and Chief Compliance Officer roles in order to have a more dedicated focus on establishing standards and implementing procedures to ensure that the compliance programs throughout the Company are effective and efficient in identifying, preventing, detecting and correcting noncompliance with applicable rules and regulations; and (v) the enhancement of the Company's organizational structure over all finance functions and an increase of the Company's accounting personnel with people that have the knowledge, experience, and training in U.S. GAAP to ensure that a formalized process for determining, documenting, communicating, implementing and monitoring controls over the period-end financial close and reporting processes is maintained.

> *Revenue Practices* - The Company has evaluated its revenue practices and has begun implementing improvements in those practices, including: (i) the development of more comprehensive revenue recognition policies and improved procedures to ensure that such policies are understood and consistently applied; (ii) better communication among all functions involved in the sales process (e.g., sales, business unit, legal, accounting, finance); (iii) increased standardization of contract documentation and revenue analyses for individual transactions; and (iv)  the development of a more comprehensive review process and monitoring controls over contracts with customers, customer payments and incentives, including corporate review of related accruals and presentation of trade promotions and incentives.

> *Training Practices* - The Company has developed a comprehensive revenue recognition and contract review training program. This training is focused on senior-level management, customer-facing employees as well as finance, sales and marketing personnel.

361.    Hain further detailed its remedial efforts in its settlement with the SEC.

Specifically, the SEC Order states:

> "Hain made a number of organizational changes, such as hiring staff in compliance positions and establishing an internal audit function.
>
> Hain also implemented changes to its revenue recognition practices, including (1) revisions to its revenue recognition policies and procedures; (2) standardization of its contract documentation and revenue analyses; (3) revisions to its review process and monitoring controls over contracts with customers, customer payments, and incentives; and (4) changes in its communication function related to contractual modifications, between those involved in the sales process and those in Corporate Finance. Hain also developed a revenue recognition and contract review training program.

362.    The extent and breath of these actions reveal the severity of the accounting errors and material weaknesses within the Company's financial reporting.  That such actions were taken demonstrate the utter lack of oversight and control that needed correction.  Given that Hain responded proportionately to Defendants' intentional and/or reckless conduct, the Company's remediation efforts strongly support an inference of scienter.

### E.    Simon and Carroll's Enormous Bonuses Contribute to a Strong Inference of Scienter

363.    Simon and Carroll were motivated to misrepresent Hain's financial results because of the large cash bonuses and stock option grants that were closely tied to the Company's financial performance, including Hain's net sales.  According to the Company's proxy statement filed with the SEC on October 9, 2015, executive compensation was tied to the Company hitting target net sales, diluted earnings per share, and EBITDA adjusted.  The target net sales measure was to achieve the middle range of the Company's net sales guidance.

364.    Due to the fraud detailed herein, the Company's net sales, net income, diluted earnings per share, and EBITDA adjusted, among other things, were materially overstated during

the Class Period, allowing Simon and Carroll to receive undeserved and exorbitant compensation.  Specifically, in Fiscal Year 2015, Simon's annual salary was $1,850,000, his bonus tied to the above corporate financial objectives was $5,565,725, and $8,787,355 in stock awards, with his total compensation coming to $16,310,640.  As further shown in the Company's proxy statement, Simon met his bonus target for net sales by only 0.1%.  Likewise, Carroll received an annual salary of $693,000, a bonus of $711,711, and $1,119,854 in stock awards, with his total compensation coming to $2,553,575.

365.    Had Simon and Carroll reported Hain's true financial results, they would not have received this level of compensation. Because Simon and Carroll's compensation was tied to the Company's financial performance, they were motivated to falsify key financial figures to obtain additional incentive compensation.

**F.    Hain's Acquisitions Using Artificially Inflated Stock Contribute to a Strong Inference of Scienter**

366.    Defendants were further motivated to artificially inflate Hain's share price because during the Class Period, Defendants were negotiating the purchase price to acquire additional natural and organic food companies using Hain shares.  On January 13, 2014, Hain acquired Tilda Limited in exchange for, *inter alia*, 1,646,173 shares of Hain stock valued at $148,400,000.  On April 28, 2014, Hain acquired Charter Baking Company in exchange for, *inter alia*, 133,744 shares of Hain stock valued at $11,168,000.  On July 17, 2014, Hain acquired the remaining 51.3% of Hain Pure Protein Corporation that it did not already own in exchange for, *inter alia*, 231,428 shares of Hain stock valued at $19,690,000.  On July 24, 2015, Hain acquired Formatio Beratungs und Beteiligungs GmbH and its subsidiaries in exchange for, *inter alia*, 240,207 shares of Hain stock valued at $16,308,000.

Case 2:16-cv-04581-ADS-SIL   Document 110   Filed 05/06/19   Page 119 of 141 PageID #: 1949

367.    By artificially inflating Hain's share price, Defendants caused Hain to acquire the above companies using fewer shares than if Defendants had fully revealed the Company's reliance on undisclosed, unsustainable pull-in sales practices to generate sales.

**G.    The Magnitude of the End Of Quarter Sales Detailed in the SEC Order Contribute to a Strong Inference of Scienter**

368.    The magnitude of the end-of-quarter sales during the Class Period to UNFI—Hain's largest distributor—support a strong inference of scienter.

369.    As detailed in the SEC Order, *more than 15% of Hain's quarterly sales were made in the final month of each quarter from UNFI—its largest distributor*. Indeed, the SEC Order explains that "Hain's quarterly inventory purchasing targets for Distributor 1 [i.e., UNFI] ranged up to $90 million," and that "Distributor 1 purchased 52-64% of its inventory in or around the last month of the quarter"—that is, Distributor 1 (i.e., UNFI) purchased approximately between $46.8-57.6 million of inventory in the last month of a quarter. Because Hain's overall net sales for its U.S. Business Segment were approximately $300 million per quarter, *Hain was selling more than 15% of its total quarterly sales in the final month of the quarter to just one distributor.*

370.    The sheer magnitude of these end-of-quarter sales figures provide strong evidence that Defendants knew, or were reckless in disregarding, that Hain generated the majority of its sales from its largest distributor—and more than 15% of its total quarterly sales—in the final month of each quarter during the Class Period, and therefore relied on incentives to generate a significant percentage of its overall sales.

371.    This is further confirmed by the fact that, according to former employees, Hain's senior management, including the Individual Defendants, negotiated directly with UNFI in order to incentivize UNFI to take excess inventory.

- 112 -

372.     For example, CW 6 recalled that Carroll would request CW 6 to provide certain numbers, usually by mid-quarter, so Carroll would know of the sales shortfall before negotiating the concessions with UNFI.  According to CW 6, Carroll then provided an incentive for UNFI to take the amount of Hain's inventory necessary for Hain to meet its quarterly sales revenue numbers.  CW 6 attended internal Hain sales calls where Carroll would inform the other attendees that he had negotiated the concessions with UNFI that would make up the sales deficit for that quarter, which was referred to as "OIs" or "off-invoice."

373.     Likewise, CW 7 explained that Simon negotiated directly with UNFI's owner and could "always make them [UNFI] buy more if needed." CW 7 added that Simon and Carroll acknowledged that they were "not supposed" to discuss its arrangements with UNFI in front of others.

374.     Defendants therefore knew, or were reckless in disregarding, that Hain relied on sales incentives with its distributors—including its largest distributor—to generate sales, which were achieved predominately in the final month of each quarter during the Class Period.

## XII.    CLASS ACTION ALLEGATIONS

375.     Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise acquired Hain Securities during the Class Period and that were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Hain during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Hain's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the

legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

376.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Hain stock actively traded on the NASDAQ under the ticker symbol "HAIN."  According to the Company's Report on Form 10-Q for the quarter ended March 31, 2017, as of June 16, 2017, Hain had 103,697,237 shares outstanding.

377.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether the Exchange Act was violated by Defendants;

(b)     whether Defendants misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading, and/or omitted material facts;

(e)     whether the price of Hain Securities was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

378.     Lead Plaintiffs' claims are typical of the claims of members of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

379.     Lead Plaintiffs will adequately protect the interests of the Class and have retained

counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that

conflict with those of the Class.

380.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.  Furthermore, as the damages suffered by individual Class

members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.  There will

be no difficulty in the management of this action as a class action.

## XIII.   LOSS CAUSATION/ECONOMIC LOSS

381.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused

Lead Plaintiffs' and class members' economic loss.  Lead Plaintiffs' claims for securities fraud

are asserted under the fraud on the market theory of reliance.  The market price of Hain

Securities, actively traded on the NASDAQ, were artificially inflated by the false and misleading

statements and material omissions complained of herein, including misleading statements and

omissions concerning consumer demand for Hain's products, Hain's accounting practices,

recognition of revenue, inventory, and internal controls over financial reporting.  Instead of

truthfully disclosing during the Class Period that Hain was improperly turning inventory into

sales by booking shipments to distributors as revenue even though those distributors had no

obligation to pay for the shipments and were free to return the inventory, Hain did not have the

underlying customer demand to meet the Company's projected targets, and that Hain lacked

internal controls on financial reporting, Defendants falsely reassured investors concerning the

Company's business and internal controls.  Further, once the Company disclosed its fraudulent

accounting practices and investors learned Hain was improperly recognizing revenue through

concessions with distributors, the Company continued to misrepresent the nature of this practice and its impact on the Company's business.

382.     These false and misleading statements had the intended effect and caused Hain Securities to trade at artificially inflated levels throughout the Class Period.

383.     The Class Period inflation in Hain Securities was removed when the Company's lack of sales concealed by Defendants' false and misleading statements and omissions, or the financial, regulatory, and operational impacts thereof, were revealed to the market.  The information was disseminated through several partial disclosures that slowly revealed the nature and extent of Hain's deliberate disregard for proper accounting, manipulation of inventory, and internal controls.  These disclosures, more particularly described below, removed artificial inflation from Hain Securities and caused economic injury to Lead Plaintiffs and other members of the Class.

384.     The corrective impact of the individual disclosures alleged herein was, however, tempered by Defendants' continued false and misleading statements about the Company's reliance on undisclosed, unsustainable pull-in sales practices to generate sales, accounting, and regulatory compliance.  These continued misrepresentations maintained the price of Hain Securities at a level that was inflated by fraud, inducing members of the Class to continue purchasing Hain Securities even after the Company disclosed it had improperly provided concessions to distributors and leading to further price declines that caused additional injury to the Class upon the disclosure of additional information about the true condition of Hain's operations.

385.     The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.

A.      **January 21, 2016 – First Partial Disclosure**

386.    On January 21, 2016, after the market closed, Hain revealed in a Form 8-K that "Ross Weiner resigned from his position of Vice President – Finance, Chief Accounting Officer."   CW 6 recalled that Weiner – like Smith  before him – left Hain because he did not like what he was seeing regarding off-invoice concessions offered to distributors.

387.    Analysts at J.P. Morgan noted that Weiner's resignation was "weighing on the shares" as concerns regarding the Company's accounting grew.  Analysts at Wells Fargo stated that "the news adds to the broader adjustments around the Hain story."  Meanwhile, Simon continued to mislead investors by telling the J.P. Morgan analysts on January 22, 2016 that there is "***nothing wrong with Hain's accounting at all.***"

388.    Following this disclosure, the price of Hain shares declined $2.64 per share, or over 7%, from a close of $36.10 per share on January 21, 2016 to close at $33.46 per share on January 25, 2016.

B.      **August 15, 2016 – Second Partial Disclosure**

389.    On August 15, 2016, after the market closed, Defendants revealed that the Company would miss its filing deadline in a press release which stated:

> **The Hain Celestial Group, Inc. Announces Delay in the Release of its Fourth Quarter and Fiscal Year 2016 Financial Results**
>
> **Lake Success, NY, August 15, 2016 -** The Hain Celestial Group, Inc. (NASDAQ: HAIN), a leading organic and natural products company with operations in North America, Europe and India providing consumers with A Healthier Way of Life™, announced today that it will delay the release of its fourth quarter and fiscal year 2016 financial results. During the fourth quarter, the Company identified concessions that were granted to certain distributors in the United States. The Company is currently evaluating whether the revenue associated with those concessions was accounted for in the correct period and is also currently evaluating its internal control over financial reporting. The Audit Committee of the Company's Board of Directors is conducting an

independent review of these matters and has retained independent counsel to assist in that review.

Previously, the Company has recognized revenue pertaining to the sale of its products to certain distributors at the time the products are shipped to such distributors. The Company is evaluating whether the revenue associated with the concessions granted to certain distributors should instead have been recognized at the time the products sell through its distributors to the end customers. The Company expects that any potential changes in the timing of the recognition of revenue with respect to these transactions should not impact the total amount of revenue ultimately recognized by the Company with respect to such distributors and does not reflect on the validity of the underlying transactions with respect to such distributors.

The Company will experience a delay in the timely filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016 (the "Form 10-K") and expects to file a notification of late filing on Form 12b-25 with the Securities and Exchange Commission to obtain an automatic 15-day extension of the filing deadline for the Form 10-K. There can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period.

The Company will not be in a position to release financial results until the completion of the independent review of the Audit Committee and of the audit process relating to the 2016 fiscal year. The Company is working diligently on this matter and will, as soon as practicable, make a further announcement regarding the updated timing of the release of financial results and a conference call on its financial results. Separately, the Company does not expect to achieve its previously announced guidance for fiscal year 2016.

390.     In response, analysts at Atlantic Securities, Bank of America Merrill Lynch, UBS, Oppenheimer, Barclays, BMO Capital Markets, Piper Jaffray, Jeffries, Maxim Group, Wedbush, and J.P. Morgan lowered their price targets for Hain stock.  The analysts at Piper Jaffray acknowledged the "internal financial control risk make[s] the stock difficult to own" while noting "the departure of the CFO and resignation of the chief accounting officer in a short period of time left us concerned on the state of finance management."  The J.P. Morgan analysts further questioned the Company's "vague" disclosure asking "what the revenue recognition issue

actually entails" and "what happens if . . . Hain's evaluation of its financial reporting controls turns up additional problems."

391.    In reaction to these disclosures, the price of Hain common stock declined $14.05 per share, or over 26%, from a close of $53.40 per share on August 15, 2016, to close at $39.35 per share on August 16, 2016.

392.    As *The New York Times* remarked in an article on August 19, 2016, titled "Bloated Pay Came Before Hain's Celestial's Error," Hain's announcement was "[n]ot the most transparent disclosure in history, that's for sure."

393.    Because of Defendants' vague statements and their continued misrepresentations and omissions, the price of Hain Securities remained artificially inflated.  Indeed, analysts at Morningstar left their price target for Hain stock unchanged, noting that "[i]f the accounting discrepancies are pervasive, we may downgrade our Standard stewardship rating, particularly if the results of the investigation indicate that management has not sufficiently invested in essential internal controls."  Analysts at Jeffries maintained a "buy" rating but asked "[i]s there another shoe to drop" such as "if it is revealed that the SEC is involved."

### C.    February 10, 2017 – Final Corrective Disclosure

394.    On February 10, 2017, after the market closed, the scope of wrongdoing significantly expanded.  While the Company initially focused on the timing of the recognition of the revenue associated with concessions granted to certain distributors, Hain now revealed in a regulatory filing that the Company had expanded the scope of its internal accounting review "to perform an analysis of previously-issued financial information in order to identify and assess any potential errors."  Further, Hain announced that the SEC had launched a formal investigation: "The SEC has issued a formal order of investigation and, pursuant to such order, the SEC issued a subpoena to the Company seeking relevant documents."

395. On this news, analysts at The Buckingham Research Group lowered their price target for Hain stock, stating: "we are lowering our estimates to reflect our 'best guess' that Hain is likely to undergo an earnings revision or a meaningful earnings rebase as a result of this process."

396. In reaction to these disclosures, the prices of Hain common stock declined $3.43 per share, or over 8%, from a close of $38.53 per share on February 10, 2017, to close at $35.10 per share on February 13, 2017, the next trading day.

## XIV. PRESUMPTION OF RELIANCE

397. Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's common stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Lead Plaintiffs and other members of the Class purchased or acquired Hain Securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

398. At all relevant times, the market for Hain Securities was efficient for the following reasons, among others:

(a) As a regulated issuer, Hain filed periodic public reports with the SEC;

(b)      Hain regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)      Hain was followed by numerous securities analysts employed by major brokerage firm(s) including, but not limited to:  (1) JPMorgan Chase & Co.; (2) Jefferies LLC; (3) Barclays Capital; (4) Wells Fargo Securities; (5) BB&T Capital Markets; (6) Wright Investors' Service; (7) SunTrust Robinson Humphrey Capital Markets; (8) BMO Capital Markets; (9) Piper Jaffray; (10) Janney Montgomery Scott; (11) S&P Capital IQ; (12) Buckingham Research Group; (13) Canaccord Genuity; (14) RBC Capital Markets; (14) Sadif Investment Analytics; (15) UBS Research; (16) Maxim Group LLC; (17) Oppenheimer & Co.; (18) Wedbush Securities; (19) Morningstar Inc.; (20) Atlantic Securities; and (21) Bank of America Merrill Lynch, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

(d)      Hain Securities were actively traded on an efficient market, the NASDAQ, where the Company's common stock trades under the ticker symbol "HAIN."

399.      As a result of the foregoing, the market for Hain Securities promptly digested current information regarding Hain from all publicly available sources and reflected such information in Hain Securities.  Under these circumstances, all purchasers and acquirers of Hain Securities during the Class Period suffered similar injury through their purchases or acquisitions of Hain Securities at artificially inflated prices, and the presumption of reliance applies.

400.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XV.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

401.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Hain and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Hain who knew that those statements were false and misleading when made.

## XVI.   CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5(b) Promulgated Thereunder Against All Defendants

402.    Lead Plaintiffs repeat, incorporate, and reallege every allegations set forth above as if fully set herein.

403.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

404.     During the Class Period, the Defendants disseminated or approved the false statements specified herein, among others, which they knew, or recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

405.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which: (i) deceived the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflated and maintained the market price of Hain Securities; and (iii) caused Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Hain Securities at artificially inflated prices.  In furtherance of this unlawful course of conduct, Defendants, each one of them, took the actions set forth herein.

406.     Pursuant to the above course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, the Defendants made statements in quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Hain Securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Hain's finances and business prospects. Specifically, the Defendants misleadingly assured investors throughout the Class Period that

Hain had achieved its sales figures as a result of organic factors, such as strong demand, and failed to disclose that the Company had instead been relying on unsustainable sales tactics to meet Hain's financial projections and Wall Street estimates.

407.    As described above, the Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

408.    The Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Hain.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Hain's businesses, operations, future financial condition, and future prospects.

409.    As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Hain's Securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Hain's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased Hain Securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Defendants, and were damaged thereby.

410.    During the Class Period, Hain Securities were traded on an active and efficient market.  Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Hain Securities at prices artificially inflated by Defendants' wrongful conduct.

411.    Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Hain Securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.  The market price of Hain Securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

412.    By reason of the conduct alleged herein, the Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

413.    As a direct and proximate result of the wrongful conduct of the Defendants, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

414.    Lead Plaintiffs repeat, incorporate, and reallege every allegations set forth above as if fully set herein.

415.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiffs need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

416.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially inflate the market price of Hain Securities; and (iii) cause Plaintiff to purchase Hain's Securities at artificially inflated prices.

417.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with their purchases of Hain Securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

418.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the employment of unsustainable business practices, including offering discounts and concessions to customers, to pull in sales at the end of Hain's fiscal quarters in order to meet Hain's projections and Wall Street estimates, while simultaneously disseminating information to the market that attributed Hain sales to sustainable organic factors, such as strong demand.

419.    Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which Hain Securities traded.

420.    During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Hain Securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

421.     As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Hain Securities during the Class Period.

422.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Lead Plaintiffs and the Class for damages suffered in connection with their purchases of Hain Securities during the Class Period.

**COUNT III**
**For Violations of Section 20(a) of the Exchange Act**
**Against Defendants Simon, Carroll, Smith, and Conte**

423.     Lead Plaintiffs repeat, incorporate, and reallege every allegation set forth above as if fully set herein.

424.     During the Class Period, the Individual Defendants participated in the operation and management of Hain, and conducted and participated, directly and indirectly, in the conduct of Hain's business affairs.  Because of their senior positions, they knew the adverse non-public information about Hain's business prospects, including that Hain's sales were generated in reliance on unsustainable pull-in sales practices that were not disclosed, rather than on the organic factors Defendants disclosed to investors.

425.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Hain's financial condition and results of operations, and to correct promptly any public statements issued by Hain which had become materially false or misleading.

426.     Because of their positions of control and authority as senior officers of Hain, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public filings, and other statements which Hain made and disseminated in the

marketplace during the Class Period concerning Hain's results of operations.  In their capacities as senior officers of Hain, the Individual Defendants had direct involvement in the day-to-day operations of the Company and reviewing and approving the Company's public statements. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Hain to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Hain within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Hain's Securities.

427.    Each of the Individual Defendants, therefore, acted as a controlling person of Hain.  By reason of their senior management positions and/or being directors of Hain, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Hain to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Hain and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

428.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Hain.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

      C.    Awarding Lead Plaintiffs reasonable costs, and expenses incurred in this action, including counsel fees and expert fees; and

      D.    Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**
**<u>APPLICABLE TO ALL CLAIMS</u>**

Plaintiffs hereby demand a trial by jury.

DATED:  May 6, 2019               Respectfully submitted,

                                */s/*    Jonathan Gardner
                                  Jonathan Gardner
                                  Christine M. Fox
                                  **LABATON SUCHAROW LLP**
                                  140 Broadway
                                  New York, NY 10005
                                  Tel: (212) 907-0700
                                  Fax:  (212) 818-0477
                                  Email: jgardner@labaton.com
                                          cfox@labaton.com

                                  *Counsel for Rosewood Funeral Home and*
                                  *Co-Lead Counsel for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh
122 East 42nd Street
Suite 2920
New York, NY 10168
Tel: (212) 682-5340
Fax: (212) 884-0988
Email: glinkh@glancylaw.com

Robert Prongay
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160
Email: rprongay@glancylaw.com

*Counsel for Salamon Gimpel and*
*Co-Lead Counsel for the Class*

# EXHIBIT A

## CLASS PERIOD TRADING BY DEFENDANTS

### (11/5/13 – 2/10/17)

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Carroll (John B.) | 15,000 | $95.23 | $1,428,450.00 | 22-Aug-14 |
| Carroll (John B.) | 10,000 | $95.30 | $953,000.00 | 25-Aug-14 |
| Carroll (John B.) | 2,624 | $98.05 | $257,283.20 | 27-Aug-14 |
| Carroll (John B.) | 1,376 | $98.00 | $134,848.00 | 28-Aug-14 |
| Carroll (John B.) | 11,441 | $112.83 | $1,290,888.03 | 4-Dec-14 |
| Carroll (John B.) | 15,000 | $114.91 | $1,723,650.00 | 5-Dec-14 |
| Carroll (John B.) | 15,000 | $115.79 | $1,736,850.00 | 8-Dec-14 |
| Carroll (John B.) | 38,475 | $113.48 | $4,366,143.00 | 10-Dec-14 |
| Carroll (John B.) | 100,000 | $62.17 | $6,217,000.00 | 25-Feb-15 |
| Carroll (John B.) | 100,000 | $62.80 | $6,280,000.00 | 5-Mar-15 |
| **Total** | **308,916** | | **$24,388,112.23** | |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Simon (Irwin D.) | 117,516 | $84.02 | $9,873,694.32 | 8-Nov-13 |
| Simon (Irwin D.) | 7,484 | $84.72 | $634,044.48 | 8-Nov-13 |
| Simon (Irwin D.) | 45,000 | $84.07 | $3,783,150.00 | 11-Nov-13 |
| Simon (Irwin D.) | 50,000 | $83.21 | $4,160,500.00 | 12-Nov-13 |
| Simon (Irwin D.) | 30,000 | $84.77 | $2,543,100.00 | 13-Nov-13 |
| Simon (Irwin D.) | 25,000 | $83.00 | $2,075,000.00 | 20-Nov-13 |
| Simon (Irwin D.) | 25,000 | $83.17 | $2,079,250.00 | 21-Nov-13 |
| Simon (Irwin D.) | 25,000 | $88.22 | $2,205,500.00 | 24-Feb-14 |
| Simon (Irwin D.) | 25,000 | $91.23 | $2,280,750.00 | 4-Mar-14 |
| Simon (Irwin D.) | 430 | $93.19 | $40,071.70 | 14-May-14 |
| Simon (Irwin D.) | 10,184 | $98.19 | $999,966.96 | 15-Oct-14 |
| Simon (Irwin D.) | 10,184 | $98.19 | $999,966.96 | 15-Oct-14 |
| Simon (Irwin D.) | 20,000 | $107.89 | $2,157,800.00 | 18-Nov-14 |
| Simon (Irwin D.) | 95,000 | $107.82 | $10,242,900.00 | 18-Nov-14 |
| Simon (Irwin D.) | 100,000 | $107.27 | $10,727,000.00 | 19-Nov-14 |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Simon (Irwin D.) | 30,000 | $106.75 | $3,202,500.00 | 20-Nov-14 |
| Simon (Irwin D.) | 5,850 | $110.26 | $645,021.00 | 15-Dec-14 |
| Simon (Irwin D.) | 5,850 | $110.26 | $645,021.00 | 15-Dec-14 |
| Simon (Irwin D.) | 70,000 | $58.37 | $4,085,900.00 | 9-Feb-15 |
| Simon (Irwin D.) | 30,000 | $57.71 | $1,731,300.00 | 10-Feb-15 |
| Simon (Irwin D.) | 150,000 | $58.74 | $8,811,000.00 | 12-Feb-15 |
| Simon (Irwin D.) | 100,000 | $59.24 | $5,924,000.00 | 13-Feb-15 |
| Simon (Irwin D.) | 3,150 | $60.29 | $189,913.50 | 30-Apr-15 |
| Simon (Irwin D.) | 3,150 | $60.29 | $189,913.50 | 30-Apr-15 |
| **Total** | **983,798** | | **$80,227,263.42** | |

**CONTROL PERIOD TRADING BY DEFENDANTS**

**(7/30/10 – 11/4/13)**

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Carroll (John B) | 15,000 | $29.69 | $445,350.00 | 9-Feb-11 |
| Carroll (John B) | 20,000 | $30.21 | $604,200.00 | 10-Feb-11 |
| Carroll (John B) | 15,000 | $30.20 | $453,000.00 | 11-Feb-11 |
| Carroll (John B) | 10,000 | $40.02 | $400,200.00 | 14-Feb-12 |
| Carroll (John B) | 1,100 | $40.07 | $44,077.00 | 15-Feb-12 |
| Carroll (John B) | 13,900 | $40.09 | $557,251.00 | 16-Feb-12 |
| Carroll (John B) | 25,000 | $52.49 | $1,312,250.00 | 10-May-12 |
| **Total** | **100,000** | | **$3,816,328.00** | |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Simon (Irwin D) | 60,000 | $34.94 | $2,096,400.00 | 10-May-11 |
| Simon (Irwin D) | 60,000 | $34.31 | $2,058,600.00 | 11-May-11 |
| Simon (Irwin D) | 65,000 | $34.33 | $2,231,450.00 | 12-May-11 |
| Simon (Irwin D) | 40,000 | $33.99 | $1,359,600.00 | 13-May-11 |
| Simon (Irwin D) | 4,000 | $33.56 | $134,240.00 | 16-May-11 |
| Simon (Irwin D) | 16,000 | $33.21 | $531,360.00 | 17-May-11 |
| Simon (Irwin D) | 40,000 | $33.63 | $1,345,200.00 | 18-May-11 |
| Simon (Irwin D) | 15,000 | $33.75 | $506,250.00 | 19-May-11 |
| Simon (Irwin D) | 5,000 | $31.71 | $158,550.00 | 29-Aug-11 |
| Simon (Irwin D) | 5,000 | $31.97 | $159,850.00 | 30-Aug-11 |
| Simon (Irwin D) | 60,000 | $36.83 | $2,209,800.00 | 1-Dec-11 |
| Simon (Irwin D) | 40,000 | $36.77 | $1,470,800.00 | 2-Dec-11 |
| Simon (Irwin D) | 30,000 | $40.26 | $1,207,800.00 | 21-Feb-12 |
| Simon (Irwin D) | 30,000 | $40.10 | $1,203,000.00 | 22-Feb-12 |
| Simon (Irwin D) | 65,000 | $40.71 | $2,646,150.00 | 23-Feb-12 |
| Simon (Irwin D) | 15,000 | $52.26 | $783,900.00 | 9-May-12 |
| Simon (Irwin D) | 60,000 | $52.11 | $3,126,600.00 | 10-May-12 |

| Name | Number of Shares Sold | Price Per Share | Proceeds | Date |
|---|---|---|---|---|
| Simon (Irwin D) | 5,000 | $60.38 | $301,900.00 | 5-Dec-12 |
| Simon (Irwin D) | 60,000 | $59.90 | $3,594,000.00 | 15-Feb-13 |
| Simon (Irwin D) | 10,000 | $59.48 | $594,800.00 | 19-Feb-13 |
| Simon (Irwin D) | 30,000 | $58.43 | $1,752,900.00 | 20-Feb-13 |
| Simon (Irwin D) | 100,000 | $63.19 | $6,319,000.00 | 7-May-13 |
| Simon (Irwin D) | 70,000 | $62.74 | $4,391,800.00 | 8-May-13 |
| Simon (Irwin D) | 30,000 | $62.27 | $1,868,100.00 | 9-May-13 |
| **Total** | **915,000** | | **$42,052,050.00** | |