# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re The Hain Celestial Group Inc. Securities Litigation | Case No. 16-cv-04581 (ADS) (SIL) |
| | Hon. Arthur D. Spatt |

# LEAD PLAINTIFFS' OPPOSITION TO
# DEFENDANT THE HAIN CELESTIAL GROUP INC.'S MOTION TO DISMISS
# <u>THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

I.     INTRODUCTION ........................................................................................ 1

II.    FACTUAL BACKGROUND ...................................................................... 3

    A.    Company Background ....................................................................... 3

    B.    Hain's Unsustainable Pull-In Sales Practices and Failure to Disclose Them ......... 3

    C.    Hain Restates its Financials, Announces that it Suffered a Material Weakness, and Admits to Employing Undisclosed Sales Concessions .................. 5

III.   ARGUMENT ............................................................................................. 6

    A.    Defendants Purposefully Misconstrue Plaintiffs' Allegations ............................. 6

    B.    The SAC Adequately States a Rule 10b-5(b) Claim ........................................... 10

        1.    The SAC Adequately Alleges That Defendants' Statements Concerning Hain's Financial Results Are Actionable ............................. 11

        2.    Additional Materially False and Misleading Statements .......................... 16

        3.    The SAC Adequately Pleads A Strong Inference of Scienter .................. 17

            (a)   The SAC Alleges Strong Direct and Circumstantial Evidence of Conscious Misbehavior or Recklessness ..................................... 17

            (b)   Plaintiffs' Motive Allegations Support a Strong Inference of Scienter ......................................................................................... 21

        4.    The SAC Adequately Pleads Loss Causation ........................................... 23

    C.    The SAC Adequately States a Rule 10b-5(a) and (c) Claim ............................... 24

IV.   CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)........................................................................24

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    506 F. App'x 32 (2d Cir. 2012) ...............................................................................15

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) .....................................................................13-14

*CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*,
    735 F.3d 114 (2d Cir. 2013).....................................................................................18

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012).....................................................................17

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
    928 F. Supp. 2d 705 (S.D.N.Y. 2013).....................................................................24

*Cunha v. Hansen Nat. Corp.*,
    No. 08-cv-1249, 2012 WL 12886194 (C.D. Cal. Oct. 22, 2012) ...........................14

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................23

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017).....................................................................10

*Fisher v. Kanas*,
    487 F. Supp. 2d 270 (E.D.N.Y. 2007) ....................................................................16

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*
    268 F. Supp. 3d 526 (S.D.N.Y. 2017).....................................................................23

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................8, 14, 24, 25

*Gauquie v. Albany Molecular Research, Inc.*,
    No. 14-cv-6637, 2016 WL 4007591 (E.D.N.Y. July 26, 2016)...............................20

*Hall v. Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008).....................................................................20

*In re Health Mgmt. Inc. Sec. Litig.*,
    184 F.R.D. 40 (E.D.N.Y. 1999) ...................................................................15

*In re ICN Pharm., Inc. Sec. Litig.*,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ................................................... 6-7

*In re JPMorgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................21

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006)...............................................17

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976).......................................................................9

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)......................................................10

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)...............................................................10, 14

*Mild v. PPG Indus., Inc.*,
    No. 18-cv-4231, 2018 WL 6787351 (C.D. Cal. Dec. 21, 2018).......... 20-21

*Murphy v. Precision Castparts Corporation*,
    No. 16-cv-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017) ...... 12-13

*In re Mylan N.V. Sec. Litig.*,
    No. 16-cv-7926, 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)............14

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).................................................................8, 22

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014).......................................................20

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015)........................................................21

*In re Regeneron Pharm., Inc. Sec. Litig.*,
    No. 03-cv-3111, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) .................15

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
    239 F. Supp. 2d 1351 (N.D. Ga. 2002).....................................................13

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010).......................................................23

*In re St. Jude Med. Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011) ...........................................................................7, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..............................................................................17, 21, 22, 23

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ....................................................................10, 14

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
    No. 13-cv-6057, 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) .................................9

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ...................................................................................9

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .....................................................................................10

**Rules**

Fed. R. Evid. 408(a)(1) ...............................................................................................9

Fed. R. Civ. P. 8 ........................................................................................................23

Lead Plaintiffs Salamon Gimpel and Rosewood Funeral Home ("Plaintiffs") hereby submit this opposition to Defendants' Motion to Dismiss (ECF No. 113) ("Mot. at __") the Second Amended Consolidated Class Action Complaint (ECF No. 110) (the "SAC" or "¶__").

## I. INTRODUCTION

Defendants attempt to convince the Court that all it must do to resolve this Motion is rubber stamp its prior order dismissing the Consolidated Class Action Complaint (the "CAC"). *See* ECF No. 106 (the "Order"). But Defendants ignore that new facts and allegations require additional analysis—analysis that Defendants' motion largely fails to address.

*First*, since Plaintiffs filed the CAC, Defendants admitted, in a settlement with the SEC, that Hain relied on a variety of unsustainable sales practices to generate end-of-quarter sales, including offering distributors cash incentives, extended payment terms, discounts, and other concessions so that distributors would purchase more inventory than necessary—tactics that are unsustainable because they require pulling sales forward from future quarters into current ones and depend on customers' continued willingness to accept more product than necessary. Defendants turned to these sales tactics in order to mask declining demand for Hain's products, and continued attributing Hain's sales results to organic factors such as strong demand. While the sales tactics Hain admitted to might not be inherently improper, Defendants' failure to disclose to investors Hain's reliance on them ***was*** improper, because it materially misled investors about the true nature of Hain's sales revenue, the Company's ability to meet its projections through normal business activity, and demand for its products.

*Second*, Defendants ignore that Generally Accepted Accounting Principles ("GAAP") provide clear guidance on the timing of revenue recognition. Defendants' restatement admits that the Company recognized revenue during the Class Period before such revenue was due. The fact that the revenue was ultimately recognizable, Mot. at 6, does not cure clear violations of GAAP.

**Third**, Plaintiffs included additional allegations from two more former Hain employees (CWs 7 and 8)—including one (CW 7) who was responsible for managing profit and loss analysis, cost accounting, and sales reporting, ¶38—who further corroborate that Hain relied on a variety of unsustainable sales practices (including those Hain has admitted to and others), and who also provide additional support for other elements of Plaintiffs' claims. Indeed, these allegations, when viewed collectively with Plaintiffs' other CW allegations, reveal that Defendants made false and misleading statements in numerous areas, did so with the requisite scienter, and also engaged in a fraudulent scheme.

Defendants narrowly interpret the allegations in the SAC in a misguided attempt to distract the Court from Plaintiffs' actual allegations. Indeed, Defendants largely ignore the distinction between (i) Plaintiffs' Rule 10b-5(b) claim, which alleges that Defendants made materially false and misleading statements throughout the Class Period, and (ii) Plaintiffs' Rule 10b-5(a) and (c) claim, which alleges that Defendants also engaged in a fraudulent scheme. In doing so, Defendants largely fail to address Plaintiffs' Rule 10b-5(b) claim, and instead devote most of their attention to Plaintiffs' scheme allegations—specifically whether Plaintiffs have adequately alleged an "absolute right of return."

But Plaintiffs' Rule 10b-5(b) claim is not dependent on whether Plaintiffs' adequately allege an absolute right of return. What Plaintiffs allege is that Defendants failed to disclose to investors Hain's reliance on a ***variety of unsustainable sales practices***—including offering an absolute right of return, as well as others incentives that Hain admitted to relying on—rendering Defendants' Class Period statements materially false and misleading. For this same reason, Defendants mistakenly claim that Hain's settlement with the SEC exculpates them in this Action in light of the fact that the SEC Order (defined herein) does not mention the "absolute right of

return." However, the SEC Order reveals that Defendants engaged in precisely the conduct that Plaintiffs are alleging Defendants failed to disclose to the market—thus, the SEC Order supports Plaintiffs' allegations.

## II.  FACTUAL BACKGROUND

### A.  Company Background

Hain—a leading seller of organic and natural and personal care products—sells most of its products to specialty and natural food distributers, supermarkets, natural food stores, and select e-commerce retailers. ¶¶2, 44. During the Class Period, approximately 30% of Hain's net sales for its U.S. Business Segment were derived from two distributors: (1) United Natural Foods, Inc. ("UNFI"), accounting for approximately $325-350 million in annual net sales for fiscal years 2014-2016 (more than 20% of Hain's net sales for its U.S. Business Segment), and (2) Walmart Stores, Inc. ("Walmart"), accounting for more than $155 million in net sales annually (approximately 8% of Hain's net sales for its U.S. Business Segment). ¶2.

### B.  Hain's Unsustainable Pull-In Sales Practices and Failure to Disclose Them

By the start of the Class Period, demand for Hain's products began to deteriorate, in part because of increased competition and a tightening of the organic foods market. ¶¶49-52. To mask declining sales and diminishing growth prospects, Defendants began to offer distributors various types of sales concessions aimed at persuading them to accept more inventory than necessary—a practice known as "pulling in" sales and referred to internally as "loading." ¶54-55.

Details of these sales practices were revealed in a settlement Hain reached with the Securities and Exchange Commission (the "SEC") on December 11, 2018. ¶13. In the accompanying order (the "SEC Order"), Hain admitted to providing distributors off-contract sales concessions—including to its top 2 distributors, which accounted for nearly 30% of Hain's net sales for the U.S. Business Segment—in order to incentivize them to purchase excess

inventory, including: (1) cash financial incentives (ranging from $75,000 to $500,00 per quarter per distributor); (2) extended payment terms (up to 90 days); (3) substantial discounts off list price or off-invoice price (up to 20% off, with one of Hain's distributors receiving a $1.5 million discount in a single quarter during fiscal year 2016); and (4) "spoils coverage," whereby Hain agreed to reimburse the distributors for excess product that spoiled or expired before the distributor could sell through to retailers. ¶¶56, 68.

Former Hain employees provide additional details about the sales concessions Hain relied on to incentivize distributors to purchase excess inventory:

- CW 4 referred to these undisclosed, unsustainable sales practices as "loading" and explained that Hain offered concessions to the distributor, saying "here's a discount to load." ¶73
- CW 4 further explained that, at the end of each quarter, Hain would ship inventory to distributors to increase reported revenue and then "de-load" (i.e., return the product) in the following quarter. *Id.*
- CW 6 explained that Hain coordinated with UNFI and other distributors to make up for earnings shortfalls by giving distributors "off-invoice" concessions, which ranged from 10-25% discount on total sales for the quarter, and that the distributor was "free to return" any of that inventory after the quarter ended. ¶71.
- CW 7 detailed Hain's loading practices and explained that Hain was consistently forced to offer material concessions or make other deals with customers to achieve Hain's quarterly revenue. ¶74
- CW 7 confirmed that Hain had an agreement with its customers that if the customers could not sell the excess inventory, they could return it. ¶75.
- CW 2 stated that Hain's "core business practice" during the Class Period was to load distributors with inventory at the end of the quarter to increase "financial reporting." ¶77.
- CW 3 prepared budget materials for Meiers and constantly saw products being returned and credits being issued. ¶75.
- CW 1, who was responsible for booking credits, explained that by June 2015, the credit numbers became suspicious, as sales were declining but the credits continued to grow. ¶89.

Although not necessarily illegal if properly accounted for and properly disclosed to investors, reliance on these sales practices is unsustainable because it requires pulling forward sales from future quarters into current ones and depends on customers' continued willingness to

accept more product than necessary—which cannot be guaranteed. ¶57. Crucially, Defendants

did not disclose to investors that Hain relied on these unsustainable sales practices.

### C. Hain Restates its Financials, Announces that it Suffered a Material Weakness, and Admits to Employing Undisclosed Sales Concessions

Over a series of corrective disclosures, Hain revealed the full extent of the fraud ending

on February 10, 2017, when the Company announced that its "previously-issued financial

information" could no longer be relied upon because of "potential errors." ¶121-39. Hain also

announced that the SEC had launched a formal investigation of the Company. ¶137.

Then, on June 22, 2017, Hain restated its historical financial results for the fiscal years

2014 and 2015, and the first three quarters of 2016. ¶¶146-53. Hain revealed that net sales were

overstated by 2.1%, 2.9%, and 1.9% in fiscal 2014, fiscal 2015, and for the nine months ended

March 31, 2016, respectively. ¶¶148-49. These overstatements of net sales enabled Hain to meet

consensus sales estimates for six consecutive quarters—Hain would have missed these estimates

had it reported the restated figures. ¶151. Further, Hain admitted that it had a material weakness

in its internal controls relating directly to its reliance on "concessions or side agreements" with

its customers and the related accounting impact of those agreements. ¶147.

Then, on December 11, 2018, Hain settled charges with the SEC for, and admitting to,

violations of: (i) Section 13(b)(2)(A) of the Exchange Act, which requires companies to make

and keep records that accurately and fairly reflect sales transactions; and (ii) Section 13(b)(2)(B)

of the Exchange Act, which requires companies to devise and maintain a system of internal

accounting controls sufficient to provide reasonable assurance that sales transactions are

executed in accordance with management's authorization and in conformity with GAAP. ¶157.

In admitting to violations of Section 13(b)(2)(B) for its internal controls failures, Hain accepted

the SEC's findings that "[f]rom at least 2014 until May 2016, Hain U.S. sales personnel gave sales incentives to certain distributors to promote sales at the end of quarters." ¶158.

## III. ARGUMENT

### A. Defendants Purposefully Misconstrue Plaintiffs' Allegations

The SAC alleges, with respect to Plaintiffs' Section 10(b) claims, that Defendants violated: (a) Rule 10b-5(b) by making false and misleading statements throughout the Class Period, *see infra* at 10-24; ¶¶402-13, and (b) Rule 10b-5(a) and (c) by employing a deceptive scheme (i.e., the "scheme liability claim"), *see infra* at 24-25; ¶¶414-22.

Defendants conflate these separate claims and misconstrue the allegations of the SAC. Specifically, Defendants devote nearly their entire Motion to arguing that Plaintiffs have failed to allege scienter based on unsustainable business practices with respect to their scheme liability claim. Mot. at 8-23. But this ignores that Plaintiffs' allegations about Hain's reliance on unsustainable business practices are not pled as ***support*** for scienter, nor are they exclusively pled to establish that Defendants engaged in a fraudulent scheme; rather, these allegations form the basis of Plaintiffs' Rule 10b-5(b) claim, which alleges that Defendants' Class Period statements were false and misleading because they failed to disclose how Hain actually generated its sales. For this reason, many of Defendants' arguments are largely beside the point.

***First***, as detailed below, Defendants' argument that offering discounts, sales incentives, and promotions is not inherently fraudulent (Mot. at 9) ignores that Plaintiffs allege that it is Defendants' ***failure to disclose*** these practices to the market—not the legality of the practices themselves—that creates Rule 10b-5(b) liability. Thus, Defendants' argument that "providing discounts or promotions to customers" is not improper, and that attempting to achieve sales earlier can be perfectly legitimate (Mot. at 9), gets them nowhere, because it misrepresents what the SAC alleges. Defendants rely on *In re ICN Pharmacueticals, Inc. Securities Litigation*, 299

F. Supp. 2d 1055 (C.D. Cal. 2004) to argue that Plaintiffs' allegations are implausible because for channel stuffing to be improper, it must be a "short-lived scheme." Mot. at 9-10. But, again, Plaintiffs are not alleging that Hain's sales practices are improper, but rather that Defendants' failure to disclose reliance on them—while attributing sales to organic factors—is the improper conduct. *See In re St. Jude Med. Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 891 (D. Minn. 2011) (rejecting this same argument).

*Second*, Defendants argue that Plaintiffs' claims rise and fall entirely on whether Plaintiffs have adequately alleged that Hain offered its distributors an absolute right of return. Mot. at 10-16. This, too, ignores that Plaintiffs' Rule 10b-5(b) claim is premised on Defendants' failure to disclose reliance on *a number of unsustainable sales practices*, including, but not limited to, offering distributors the absolute right of return. Defendants have already admitted in the SEC Order to relying on a variety of undisclosed sales practices, including offering incentives, extended payment terms, and other sales concessions. ¶¶56, 68. While Plaintiffs include allegations of former employees indicating that Hain also offered distributors an absolute right of return, this is just one of the alleged undisclosed sales practices. Whether Plaintiffs have adequately alleged an absolute right of return is therefore not dispositive of Plaintiffs' claims.

*Third*, Defendants challenge the statements of Plaintiffs' confidential witnesses by focusing exclusively on whether they have provided sufficiently detailed information about the absolute right of return. Mot. at 11-14. But Plaintiffs' CW-based allegations are not so limited. Instead, in addition to confirming that Defendants offered distributors the absolute right of return, ¶¶71-73, 75, the confidential witnesses also provide detailed information about the numerous undisclosed sales practices that Hain relied on, ¶¶71-81, as well as about other issues, including the involvement of senior management in negotiating undisclosed sales concessions

with Hain's largest distributors, ¶¶91-100, Hain's accounting manipulations, ¶¶82-90, and Hain's lack of internal controls. ¶¶101-17. Defendants take too narrow a view of the CW allegations, ignoring that they are about more than just the absolute right of return. When viewed together— and not by focusing only on those relating to the absolute right of return—the CW allegations support Plaintiffs' claims. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010) ("CWs' information must be viewed together.").

Indeed, the SAC sufficiently alleges facts regarding the CWs that confirm their reliability, which is all it must do. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (a source need only be "described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). Here, the SAC details the nature of the CWs' position and responsibilities, ¶¶31-39, as well as their personal experiences observing the undisclosed sales practices, Defendants' involvement in negotiating sales concessions, and the alleged accounting manipulations. ¶¶71-117. The CWs also provide specific details about Hain's sales practices with respect to Hain's largest distributor that are independently corroborated by the SEC Order. *Compare* ¶71, *with* ¶¶66-70.

***Fourth***, for many of these same reasons, Defendants' argument that the SEC Order undermines Plaintiffs' theory of fraud is mistaken. Defendants argue that because the SEC purportedly found that the sales practices Hain admitted to were not improper, Mot. at 17, and because the "SEC Order says nothing about an 'absolute' or 'unconditional' right of return", *id.*, the SEC Order "exculpates the Defendants in this matter." *Id.* at 16. But the SEC Order, the result of a negotiated compromise between the Company and the SEC, is not proof of any findings by the SEC, as the issues were not adjudicated in that matter, nor does it exculpate Defendants in any way. Indeed, the SEC Order simply represents a consent agreement with

limited preclusive value. *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir.

1976) ("[A]consent judgment between a federal agency and a private corporation which is not

the result of an actual adjudication of any of the issues . . . [cannot] be used as evidence in

subsequent litigation between that corporation and another party."); *Vanleeuwen v. Keyuan*

*Petrochemicals, Inc.*, No. 13-cv-6057, 2014 WL 3891351, at *4 n.5 (S.D.N.Y. Aug. 8, 2014)

("The SEC's decision to not prosecute its claims is irrelevant as to whether Plaintiffs have

plausibly alleged claims in this case."); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694,

707 n.5 (9th Cir. 2012) ("We draw no inference from the SEC's decision not to . . . charge

defendants with fraud."). For the same reason that Plaintiffs would not be entitled to ***prove***

Defendants' reliance on unsustainable sales practices by pointing solely to the SEC Order,

Defendants cannot rely on it here to ***disprove*** that they engaged in the alleged conduct. *See* Fed.

R. Evid. 408(a)(1) (excluding evidence against either party of a compromise offer or negotiation

that is offered to prove or disprove the validity of a disputed claim).

Defendants also take liberties with the language in the SEC Order: although the SEC

Order states that the "vast majority" of products purchased in connection with end-of-quarter

sales were ultimately sold through to retailers, Defendants claim repeatedly in the Motion that

"vast majority" means 99% of those sales. Mot. at 6, 15, 18. But the SEC Order does not

quantify what "vast majority" means and Defendants cannot introduce this fact on its Motion.

***Finally***, Defendants mischaracterize the SAC when they argue that Plaintiffs have simply

swapped the term "channel stuffing" with "pull-in sales" and "unsustainable sales practices"

labels, without otherwise enhancing their allegations. Mot. at 2-3. In reality, Plaintiffs opted to

characterize Defendants' sales tactics differently in the SAC to better capture their allegations:

Plaintiffs are not alleging that Hain merely stuffed the channel with too much inventory, but

rather that Hain relied on tactics aimed at incentivizing distributors to accept significantly more inventory than could be sold within the upcoming quarters, without disclosing this to investors. The terms "pull-in sales" and "unsustainable sales practices" more closely address the types of tactics Hain used to generate *sales*, as Hain admitted in the SEC Order. ¶¶66-70.

### B. The SAC Adequately States a Rule 10b-5(b) Claim

"To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that the defendants, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 462 (S.D.N.Y. 2017).

When a corporation or its representatives speak to the market, there is a duty to make such disclosure complete and accurate. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[T]here is a duty to tell the whole truth."); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("When a corporation does make a disclosure . . . there is a duty to make it complete and accurate."); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("It is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic."). Moreover, when a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005).

### 1. The SAC Adequately Alleges That Defendants' Statements Concerning Hain's Financial Results Are Actionable

Defendants' statements made throughout the Class Period regarding Hain's financial results and the drivers of those results were materially false and misleading because Defendants failed to disclose that those results were generated only through reliance on unsustainable sales practices and did not reflect normal and sustainable demand. *See* ¶¶164-247, 251, 254-55, 257, 260, 263, 266, 269, 272, 275.

When issuing those statements, Defendants simultaneously attributed Hain's sales results to a variety of organic factors, explaining, for instance, that sales growth was driven by "strong brand contribution" (¶165), "expanded distribution" (¶251), "strong demand" and "momentum for organic and natural products" (¶¶181, 190), Hain's "diverse portfolio" of brands (¶219), "solid execution of [Hain's] operational initiatives (¶242), "deeper penetration in key accounts" and "strong consistent consumer demand" (¶¶257, 260, 266), and "demand for healthy [ ] products," ¶¶269, 272. Defendants did not disclose, however, that Hain had actually generated those sales by offering a variety of sales concessions aimed at incentivizing distributors to accept unneeded inventory so that Hain could meet its sales targets.

Defendants largely ignore these allegations, focusing most of their argument on challenging whether Plaintiffs adequately pled that Hain actually offered its customers an absolute right of return, *see* Mot. at 10-16—just one of the unsustainable sales practices that Plaintiffs actually alleged Defendants relied on. This is not surprising, considering that Defendants ***admitted*** in the SEC Order that Hain relied on a number of other short-term, pull-in sales practices, ***none of which Hain disclosed***. *See supra* at 3-4.

Former Hain employees further confirm Defendants' reliance on these unsustainable, pull-in sales practices, *see supra* at 4, including CWs 7 and 8. Indeed, CW 7 provides additional

details about Hain's loading practices—which he described as a Ponzi scheme, ¶¶74, 76, 91, 94, 95, as well as about Hain's use of credits and accruals, ¶85-86, including detailing how accruals were communicated internally at Hain, ¶87. CW 7 described Hain's reliance on accruals as "borrowing from [the] future" to make its numbers. ¶86. CW8 further details that Hain's accounting department did not properly account for contract-related issues during his tenure and that Hain entered into off-invoice deals with customers. ¶¶117-18.

Sales tactics such as these are inherently unsustainable because they create an illusion of real demand, when in reality distributors are actually purchasing product not because they need it (or want it), but because they are monetarily incentivized to do so. These tactics are also unsustainable because they depend on the continued participation and willingness of customers to accept excess, unneeded inventory, which cannot be guaranteed.

Plaintiffs do not allege that these sales tactics are inherently improper or fraudulent. Instead, Plaintiffs allege that Defendants' failure to disclose reliance on these sales practices to generate revenue—and to instead attribute sales to organic factors, like strong demand—is what forms the basis of Rule 10b-5(b) liability. Indeed, if Defendants had simply told the market at the time they disclosed Hain's financial results that Hain had engaged in these business practices in order to make its numbers, there would have been no deception and no fraud. Defendants, however, chose to hide these material facts from investors—facts that would alter the total mix of available information.

Courts regularly find statements actionable (*i.e.*, materially misleading) when a company attributes sales to factors such as strong demand, but fails to disclose reliance on unsustainable sales practices, such as persuading customers to accept advance inventories, even if there is nothing inherently improper about the practice. For instance, in *Murphy v. Precision Castparts*

*Corporation*, the court found that plaintiffs had adequately stated a claim for failure to disclose reliance on pull-in sales practices to generate revenue, explaining that "[a]lthough there is nothing inherently wrong with the practice of 'aggressively pursuing quarterly results' by pulling in sales . . . such a practice may be misleading to the extent it creates the impression of a sustainable demand for [the company's] products." No. 16-cv-00521-SB, 2017 WL 3084274, at *9 (D. Or. June 27, 2017). The court further explained that "[d]efendants' representations about organic growth did not include disclosures of the additional facts that [the company] was aggressively pulling in sales, offering discounts, and extending payment options to encourage larger sales," and therefore found that "a fact-finder could determine that [the company']s failure to disclose to investors that [its] sales were resulting in large part from aggressive pulling in strategies was material information." *Id.*

Similarly, in *In re Scientific-Atlanta, Inc. Securities Litigation*, 239 F. Supp. 2d 1351, 1362-63 (N.D. Ga. 2002), the court found that "a plaintiff may state a claim for securities fraud by alleging that a company materially misrepresented its financial condition by failing to disclose sales practices that encouraged customers to purchase substantial advance inventories of product because such practices could reduce the company's future revenues," despite that defendants had argued (as Defendants do here) that "there is nothing inherently wrongful about pressing for sales to be made earlier than in normal course." Likewise, in *St. Jude Med.*, the court found that Defendants' failure to disclose reliance on heavy discounts and end-of-quarter bulk sales to meet sales forecasts was actionable not because the practice was inherently improper, but because "[defendant] misled investors by stating that its earnings and growth rate would be maintained even though [defendant] was engaging in an unsustainable pattern of channel stuffing and not properly accounting for its sales." 836 F. Supp. 2d at 890-91. *See also In re Campbell*

13

*Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 588-89 (D.N.J. 2001) (finding that once defendants disclosed the company's sales figures and growth projections, they "had the concomitant obligation to divulge their loading"—*i.e.*, offering customers discounts at the end of a quarter to meet sales targets—because such information is material to investors); *Cunha v. Hansen Nat. Corp.*, No. 08-cv-1249, 2012 WL 12886194, at *3 (C.D. Cal. Oct. 22, 2012) (explaining that "actions which are not inherently fraudulent can be actionable," and finding defendants' financial statements actionable because "channel-stuffing [even if not fraudulent] could at the very least cause those results to be misleading where it resulted in an overloaded supply chain that could not sustain impressive early results" and made "investors think there was sustainably higher demand for [the company's] products").

Moreover, because Defendants put the source of Hain's revenue at issue (*i.e.*, attributing it to factors such as strong demand and strong brand contribution), the failure to disclose the true source of such revenue gives rise to liability under Section 10(b) and Rule 10b-5(b). *See Freudenberg*, 712 F. Supp. 2d at 180 (once a company puts the topic of the cause of its financial success at issue, it is obligated to disclose information concerning the source of its success); *see also Van der Moolen*, 405 F. Supp. 2d at 401 (same). Once Defendants made statements attributing sales to certain factors, they had an obligation to "tell the whole truth." *Jinkosolar*, 761 F.3d at 250. That duty persisted even if Defendants' statements were literally correct (they were not) because the omitted information made the statements materially misleading. *In re Mylan N.V. Sec. Litig.*, No. 16-cv-7926, 2018 WL 1595985, at *4 (S.D.N.Y. Mar. 28, 2018) ("[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading.").

Defendants rely on *Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) to argue that "there is no duty to disclose 'unsustainable sales practices' in the context of otherwise accurate statements about earnings." Mot. at 23. But *Boca Raton* is distinguishable for the reasons Plaintiffs explained in their Reply Brief in Support of their Additional Briefing on Defendants' Motion to Dismiss the CAC. ECF No. 101 at 3-4.

Defendants also argue that "Plaintiffs fail to plead that disclosures from August 2016 onward contained a single misleading omission." Mot. at 23-24. This argument also fails as Defendants' fraud still remained undisclosed to the market as of this date. Defendants cannot and do not argue on this Motion that the alleged Class Period should end in August 2016—a question that is inherently fact-based and therefore not appropriate for resolution on a motion to dismiss. *In re Health Mgmt. Inc. Sec. Litig.*, 184 F.R.D. 40, 44-45 (E.D.N.Y. 1999) (Spatt, J.) (determining class period length is a question of fact).

Finally, Defendants challenge the materiality of their restatement in a misguided argument that the corrections Hain made to its financial statements after the close of the Class Period "accounted for just 2.4% of Hain's overall net sales and were insignificant in relation to the company's operations." Mot. at 24. But this misrepresents (or miscomprehends) Plaintiffs' allegations, which are that Defendants' reliance on pull-in sales tactics to generate sales is information that would alter the total mix of available information. The size of the corrections is not dispositive as to materiality. Moreover, issues of materiality are not appropriate for resolution on a motion to dismiss. *See In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03-cv-3111, 2005 WL 225288, at *20 (S.D.N.Y. Feb. 1, 2005) ("materiality issues are rarely appropriate for resolution on a motion to dismiss").

## 2. Additional Materially False and Misleading Statements

Plaintiffs' Rule 10b-5(b) claim is also premised on allegations that Defendants made additional categories of materially false and misleading statements during the Class Period concerning: (1) Hain's accounting policies, ¶¶283, 294-99; (2) inventory levels at distributors, ¶¶278, 281, 286, 288, 291; (3) internal controls and certifications pursuant to Section 302 of the Sarbanes-Oxley Act ("SOX Certifications"), ¶¶307-09, 314-16 ; and (4) Hain's sales and trade promotions, ¶¶300-01, 303-04.

Defendants do not challenge the falsity of these alleged misstatements, and have therefore waived this argument. *See Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (arguments raised for the first time in a reply brief are waived). This Court's Order dismissing the CAC did not specifically analyze whether these additional categories of misstatements were adequately pled. Plaintiffs hereby incorporate their arguments concerning the actionability of these statements from their Opposition to Defendants' Motion to Dismiss the CAC (ECF No. 87) and their additional briefing relating to Defendants' motion (ECF No. 99 at 8-10; ECF No. 101).

In addition, Hain's admissions in the SEC Order provide further support for the falsity of these statements. For example, Defendants' statements throughout the Class Period regarding Hain's accounting policies, including that there was "nothing wrong" with Hain's accounting, ¶¶283, 294-99, were materially false and misleading because Hain admitted in the SEC Order that it violated Section 13(b)(2)(B) of the Exchange Act, which requires Hain to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's authorization and in conformity with GAAP. ¶¶157-58. As part of the settlement with the SEC, Hain was forced to establish an internal audit function, implement changes to its revenue recognition practices, and develop a

revenue recognition and contract review training program. ¶16. Hain's admission in the SEC Order is an acknowledgment that these statements were false when made.

These admissions—including that Hain "lacked sufficient policies and procedures to provide reasonable assurances that [end-of-quarter] sales were accounted for properly," ¶162—also render false and misleading Defendants' certifications pursuant to Section 302 of the Sarbanes-Oxley Act ("SOX Certifications") and statements regarding the effectiveness of Hain's internal controls. ¶¶307-09, 314-16; *see Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1159-60 (W.D. Wash. 2006) (finding that plaintiffs adequately alleged that SOX certifications were false and misleading based on the company's disclosure that there was a material weakness in its internal controls).

### 3.    The SAC Adequately Pleads A Strong Inference of Scienter

In evaluating scienter, the key question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference . . . ." *Id.* at 324; *cf. City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("a tie . . . goes to the plaintiff").

### (a)    The SAC Alleges Strong Direct and Circumstantial Evidence of Conscious Misbehavior or Recklessness

Here, the SAC adequately alleges that Defendants recklessly, if not consciously, issued false and misleading statements and omissions during the Class Period. Recklessness is "conduct that [i]s highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the

defendant must have been aware of it." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 127 n.11 (2d Cir. 2013). Conscious misbehavior, by contrast, is "deliberate[ly] illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *Id.*

The SAC gives rise to a strong inference that Defendants knew, or were reckless in not knowing, that Hain relied on unsustainable sales practices and failed to disclose this to investors.

***First***, former employees confirm that the Individual Defendants and senior management were personally involved in negotiating sales concessions—such as discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return—with distributors, confirming that they were aware of the very facts Plaintiffs allege they failed to disclose. *See, e.g.*, ¶¶78, 92. CW 7, who confirmed that the term "loading" was used freely among senior executives, including Carroll and Meiers, stated that Defendant Simon dealt directly with UNFI's owner when it came to anything related to revenue, and that Defendant Simon could "always make [UNFI] buy more if needed." ¶94. CW 7 further stated that Defendant Simon had "special powers" when it came to interfacing with Hain's customers and that only the higher-ups had the power to make "special deals" with distributors. ¶95. Defendants point out that CW 7 was "featured prominently" in the CAC "not as a CW but as one of the alleged wrongdoers." Mot. at 12. Not so. Rather, the allegation they point to—that CW 7 "would smooth out the [accounting] numbers for [COO] Meiers" (Mot. at 12 (citing CAC ¶86))—reveals that CW 7 was ***directed*** to engage in the alleged misconducted by Hain's senior management, not that he was an "alleged wrongdoer" himself. In reality, CW 7's allegations confirm that he is well-positioned to provide credible information about the alleged misconduct and the involvement of senior management.

**Second**, Defendants took steps to conceal their reliance on the undisclosed sales practices. Indeed, the sales concessions that Hain provided distributors as an incentive to accept unneeded inventory were made "off-invoice" pursuant to secret side agreements that obscured the nature of the transactions from auditors. ¶¶71, 93, 125. Hain admitted to this, stating in its revised SEC filings that Hain failed to "identify, accumulate, and assess the accounting impact of certain concessions or side agreements." ¶147. Moreover, in the SEC Order, Hain again admitted that it failed to appropriately document its off-contract agreements with distributors. ¶70. Relatedly, former employees confirm that Hain's senior management was secretive about the off-invoice concessions that they negotiated with UNFI—Hain's largest distributor. For example, CW 7 confirmed that when Defendants Carroll and Simon would realize that CW 7 overheard them discussing Hain's financial arrangements with UNFI, they would say that they were "not supposed" to be discussing the topic in front of others. ¶95. The SAC further alleges that senior management attempted to conceal their reliance on its unsustainable sales practices until it was no longer possible—when outside auditors identified the issue, forcing Hain to take corrective action. ¶117 ("According to CW 8, the accounting problems were uncovered when James Langrock joined Hain and started looking at Hain's books. . . . Langrock continued to dig and ultimately brought in outside auditors"); *see also* ¶¶119-20.

**Third**, the size of the end-of-quarter sales to UNFI demonstrates that Defendants had to have been aware of how those sales were achieved, which, as Hain admitted in the SEC Order, included offering cash financial incentives, spoils coverage, and extended payment aimed at incentivizing UNFI to purchase excess inventory. ¶68. According to the SEC Order, Hain was selling more than 15% of its total quarterly sales in the final month of the quarter to UNFI. ¶¶69, 368-69. The sheer magnitude of the sales to UNFI during the final month of the quarter provides

strong evidence that Defendants knew, or were reckless in disregarding, the methods Hain relied upon to generate those end-of-quarter sales, especially considering, as former employees substantiate, that the Individual Defendants were responsible for negotiating directly with UNFI. ¶¶94, 369-74; *see Gauquie v. Albany Molecular Research, Inc.*, No. 14-cv-6637, 2016 WL 4007591, at *3 (E.D.N.Y. July 26, 2016) ("[T]he magnitude of the alleged falsity contributes to the inference of scienter.").

 *Fourth*, Hain's admission that it had inadequate internal controls during the relevant time period contributes to a strong inference of scienter. *See Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (holding that internal control material weaknesses are "probative of scienter"). Indeed, Hain settled charges with the SEC for violations of Section 13(b)(2)(B) of the Exchange Act, which requires Hain to devise and maintain a system of internal accounting controls, and accepted the SEC's findings that "[f]rom at least 2014 until May 2016, Hain U.S. sales personnel gave sales incentives to certain distributors to promote sales at the end of quarters" ¶158. Hain had previously admitted that it suffered a material weakness in its financial reporting relating to "the accounting impact of certain concessions or side agreements." ¶147. These admissions of a material weakness in Hain's internal controls—which relate directly to Defendants' failure to properly document its reliance on undisclosed sales practices—supports an inference of scienter.

 *Fifth*, the termination of employees who questioned Hain's sales practices and, separately, Hain's significant remedial measures post-Class Period contributes to a strong inference of scienter. ¶¶360-62; *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (sustaining complaint and finding that employee terminations supported an inference of scienter); *Mild v. PPG Indus., Inc.*, No. 18-cv-4231, 2018 WL 6787351, at *7 (C.D. Cal. Dec.

21, 2018) (finding remedial measures coupled with resignations supported inference of scienter). This Court found this question to be "a close one" when it assessed the allegations in the CAC, Order at 35, and Plaintiffs have now bolstered these allegations. Indeed, CW 7 confirms that Ms. Ng was considered internally to be the "police" and "wanted to dig into" Meiers's purported sales numbers, which made Meiers uncomfortable. CW 7 also stated that Ms. Ng was kept away from the details relating to Hain's loading practices and was told by executives to stop asking questions. ¶113. Moreover, CW 7 confirmed that Mr. Powhida was used as a "scapegoat," after Meiers relied on and pushed Powhida to make the numbers, which were "getting out of control." ¶114. Allegations in the SAC that Hain terminated employees who questioned Hain's undisclosed sales practices, when considered collectively with Plaintiffs' other scienter allegations, support an inference of scienter.

*Finally*, the remaining allegations of conscious misbehavior or recklessness—when assessed "holistically" and not "in isolation," *Tellabs*, 551 U.S. at 326—support a strong inference of scienter. Indeed, the suspicious circumstances and timing of high-level employee departures contributes to a strong inference of scienter. ¶¶339-50; *see Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015). Likewise, the false and misleading statements at issue here relate to the core operations of Hain's business—its U.S. Segment—which further supports an inference of scienter. *In re JPMorgan Chase Sec. Litig.,* 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005) ("When information is at the core of a company's business, it may be properly ascribable to senior officers.").

### (b)     Plaintiffs' Motive Allegations Support a Strong Inference of Scienter

In this Circuit, scienter can be established by *either* (a) motive and opportunity allegations *or* (b) facts "constitute[ing] strong circumstantial evidence of conscious misbehavior

or recklessness." *Novak*, 216 F.3d at 308. Thus, allegations of "motive" are not necessary to show scienter. *Tellabs*, 551 U.S. at 325.

Plaintiffs have alleged that Carroll's and Simon's suspicious stock sales during the Class Period support an inference of scienter (¶¶353-59; SAC Exhibit A), demonstrating that Defendants "benefitted in a concrete and personal away from the purported fraud." *Novak*, 216 F.3d at 311. This Court found that the stock sales, as alleged in the CAC, did not establish motive because they had "le[ft] the Court to wonder what percent of stocks were sold by" Carroll and Simon. The SAC now alleges the percentages sold—which were significant.

The SAC alleges that Defendant Carroll sold 308,916 shares of Hain stock during the Class Period for proceeds of more than $24.3 million. ¶335. Including shares withheld by Hain in connection with option exercises or personal taxes, ***Carroll disposed of approximately 74% of total shares***, including shares converted from options, he had available for sale during the Class Period. ¶358. Defendant Simon sold 983,798 shares of Hain stock during the Class Period, for proceeds of $80 million. ¶335. Including shares withheld by Hain in connection with option exercises or personal taxes, and shares gifted, ***Simon disposed of more than 66% of the total shares***, including options, he had available for sale during the Class Period. ¶359.

Defendants claim that Plaintiffs' percentage calculations are wrong, and they come up with lower percentage calculations through highly misleading double counting. Mot. at 21-22. For example, Defendants rely on data from the Company's pre-Class Period Form 14A to establish Carroll and Simon's pre-Class Period common stock positions. *Id.* For example, Defendants use 400,348 shares from Hain's Form 14A for Carroll's pre-Class Period stock holdings position. Mot. at 22. However, Defendants failed to deduct 352,488 from that number, which represents options that had yet to be exercised by Carroll (as clearly indicated on the Form

14A), meaning Defendants have doubled those options as "stock," counting them before exercise and then again after exercise. Defendants also failed to deduct 22,083, which represents "shares of unvested restricted common stock" (also clearly indicated on the Form 14A)—shares that were not available for sale and should not be included in Carroll's pre-Class Period stock position. Defendants' computations for Simon also have the same double-counting problems.

Defendants also argue that shares withheld in connection with option exercises and personal taxes should not be considered when assessing motive. But courts say differently. *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) ("[T]here is little principled reason to exclude in-kind sales [i.e., sales to cover tax liabilities] as a categorical matter. Money is fungible; in-kind and take-home cash sales affect the seller's bottom line equally."); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 n.6 (S.D.N.Y. 2010) (explanation that sales "were necessary to pay the exercise price of expiring options and associated taxes [for stock sales]" could not be resolved on a motion to dismiss).

Plaintiffs' remaining motive and opportunity allegations—including Simon's and Carroll's substantial bonus compensation, ¶¶363-65, and Hain's acquisition activity using artificially inflated stock, ¶¶366-67—further support an inference of scienter when assessed "holistically" (with the insider sales allegations) and not "in isolation." *Tellabs*, 551 U.S. at 326.

### 4. The SAC Adequately Pleads Loss Causation

In order to plead loss causation, plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," as set forth in Rule 8. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Thus, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347.

Plaintiffs have satisfied this standard with respect to the February 2017 disclosure—the only disclosure Defendants challenge. Mot. at 25. Indeed, on February 10, 2017, Hain announced

that it had expanded the scope of its internal accounting review "to perform an analysis of previously issued financial information" and also announced that the SEC had issued a formal order of investigation, as well as a document subpoena. ¶394. On this news, Hain common stock declined $3.43 per share, or more than 8%. ¶396. While Defendants feebly challenge whether this disclosure related to the prior misstatements, the issue of loss causation is a "fact specific question appropriate for trial." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013), and there is no requirement that Defendants' misstatements and the corresponding disclosure be "mirror image." *See Freudenberg*, 712 F. Supp. 2d at 202.

### C. The SAC Adequately States a Rule 10b-5(a) and (c) Claim

To state a claim based on conduct violating Rule 10b-5(a) and (c), plaintiffs must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance. *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005).

The SAC alleges—based on statements from CWs—that Defendants' scheme began with Carroll obtaining Hain's mid-quarter financial sales so he would know the sales shortfall before negotiating with distributors to take more inventory. ¶93. After Carroll negotiated the credits and "off-invoice" concessions in exchange for distributors taking the amount of inventory necessary for Hain to meet its quarterly sales numbers, Carroll and Simon communicated to the managers of Hain's brands the amount to be loaded onto the distributors' trucks. ¶¶78, 93. At the end of each quarter, Hain sent inventory to the distributors, primarily UNFI, with the understanding that the distributor was free to return the products the following fiscal quarter. ¶¶71-73, 75.

Next, Meiers's group accounted for the credits and off-invoice concessions as revenue as soon as the shipments left the warehouse. ¶82. This involved posting millions of dollars in credits and off-invoice concessions onto Hain's internal system for financial reporting that was

linked to an enterprise-wide JD Edwards reporting system. ¶84. Meiers and his inner circle then smoothed out the sales and revenue numbers to avoid discovery of the fraud. ¶¶99, 100, 102, 104. Meiers then sent the modified sales and revenue numbers to Hain's CFO for inclusion in the Company's SEC filings where Smith and, later, Conte prepared Hain's financial reports for the public. Finally, in the following fiscal quarter, the distributors returned the excess inventory that was shipped in the prior quarter and the process would begin again, although with an increasingly larger deficit due to the prior quarter's credits and off-invoice concessions. ¶65.

The SAC supports Plaintiffs' scheme allegations with additional facts not included in the CAC. ***First***, Hain has since admitted in the SEC Order that it had relied on offering off-invoice concessions to its largest distributors—including UNFI—to meet Hain's quarterly targets. ¶¶66-70. ***Second***, CW 7—who reported directly to Meiers—provides additional facts in support of the fact that Hain had an agreement with customers that if they could not sell the excess inventory they were incentivized to purchase, they could return it. ¶¶38, 75. Indeed, CW 7 explains that Hain's customers would not take on the excess inventory without this right of return. ¶75. Moreover, CW 7 provides details about Hain's loading practices and reliance on accruals. *See supra* at 4, 11-12. CW 7's statements—when considered collectively with the other CW allegations, *Freudenberg*, 712 F. Supp. 2d at 197 ("CWs' information must be viewed together.")—support a finding that Defendants engaged in a fraudulent scheme.

The SAC also adequately pleads scienter with respect to Plaintiffs' scheme liability claims for the same reasons it pleads scienter with respect to the Rule 10b-5(b) claim.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.

DATED: August 5, 2019                    Respectfully submitted,

                                         By: /s/ *Jonathan Gardner*
                                         Jonathan Gardner
                                         Christine M. Fox
                                         **LABATON SUCHAROW LLP**
                                         140 Broadway
                                         New York, New York 10005
                                         Tel: (212) 907-0700
                                         Fax: (212) 818-0477
                                         jgardner@labaton.com
                                         cfox@labaton.com

                                         *Counsel for Rosewood Funeral Home and*
                                         *Co-Lead Counsel for the Class*

                                         Lionel Z. Glancy
                                         Robert V. Prongay
                                         Joshua L. Crowell
                                         Leanne H. Solish
                                         **GLANCY PRONGAY & MURRAY LLP**
                                         1925 Century Park East, Suite 2100
                                         Los Angeles, California 90067
                                         Tel.: (310) 201-9150
                                         *Fax:* (310) 201-9160
                                         lglancy@glancylaw.com
                                         rprongay@glancylaw.com
                                         jcrowell@glancylaw.com
                                         lsolish@glancylaw.com

                                         *Counsel for Salamon Gimpel and Co-Lead*
                                         *Counsel for the Class*