UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

In Re The Hain Celestial Group Inc.

Securities Litigation

---------------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER**
2:16-cv-04581 (ADS)(SIL)

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 0 6 2020 ★

LONG ISLAND OFFICE

<u>**APPEARANCES:**</u>

**Labaton Sucharow LLP**
*Co-Lead Counsel for the Plaintiffs*
140 Broadway
New York, NY 10005
    By:   Christopher Joseph Keller, Esq.,
           Eric J. Belfi, Esq.,
           Francis P. McConville, Esq.,
           Jonathan Gardner, Esq.,
           Seth Morgan Jessee, Esq.,
           Christopher Lawrence Mooney, Esq.,
           Howard G. Smith, Esq.,
           Joshua Lon Crowell, Esq.,
           Leanne H. Solish, Esq.,
           Michael P. Canty, Esq., Of Counsel

**Goldberg Law PC**
*Co-Lead Counsel for the Plaintiffs*
1999 Avenue of the Stars Suite 1100
Los Angeles, CA 90067
    By:   Michael Goldberg, Esq.,
           Brian J. Schall, Esq., Of Counsel

**Glancy Prongay & Murray LLP**
*Co-Lead Counsel for the Plaintiffs*
122 East 42nd
Street, Suite 2920
New York, New York 10168
    By:   Lionel Z. Glancy, Esq.,
           Rovert V. Prongay, Esq.,
           Joshua L. Crowell, Esq.,
           Leanna H. Solish, Esq.,
           Lesley F. Portnoy, Esq., Of Counsel

1

**The Law Offices of Howard G. Smith**
*Co-Lead Counsel for the Plaintiffs*
3070 Bristol Pike Suite 112
Bensalem, PA 19020
     By:    Howard G. Smith, Esq., Of Counsel

**DLA Piper LLP**
*Counsel for the Defendants The Hain Celestial Group, Inc., Irwin D. Simon, Pasquale Conte, John Carroll and Stephen J. Smith*
1251 Avenue of the Americas
New York, NY 10020-1104
     By:    Timothy E. Hoeffner, Esq.,
              Jason Daniel Gerstein, Esq., Of Counsel

**SPATT, District Judge:**

This case involves allegations that defendant Hain Celestial Corp. ("Hain" or the "Company") and certain of its current and former officers and directors (collectively, the "Defendants") made materially false and misleading statements concerning Hain's inventory and revenues by allegedly engaging in the practice of "channel stuffing" in violation of sections 10(b), Rule 10(b)-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

On March 29, 2019, the Court granted a motion to dismiss the amended consolidated class action complaint (the "CAC") pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 12(b)(6). ECF 106 [hereinafter the "Order"]. The Order dismissed the CAC without prejudice and with leave to replead.

On May 6, 2019, Lead Plaintiffs Rosewood Funeral Home ("Rosewood") and Salamon Gimpel ("Gimpel," collectively, the "Lead Plaintiffs") filed the Second Amended Complaint (the "SAC").

Presently before the Court is a motion by the Defendants to dismiss the SAC pursuant to Rule 12(b)(6) for failure to state a claim. For the following reasons, the Defendants' motion is granted in its entirety and the SAC is dismissed with prejudice.

## I. BACKGROUND

Hain manufactures, markets, distributes, and sells organic and natural products in the United States and several other countries. During the period from November 5, 2013 through February 10, 2017 (the "Class Period"), 55–60% of Hain's net sales were generated within the United States. Hain's products are marketed as "better for you" foods, and its product line includes brands such as Almond Dream, Arrowhead Mills, BluePrint, Celestial Seasonings, Coconut Dream, Earth's Best, Garden of Eatin', Hain Pure Foods, Joya, MaraNatha, Rice Dream, Soy Dream, Terra Chips, The Greek Gods, and WestSoy. Hain's largest customer during the Class Period was United Natural Foods, Inc. ("UNFI"), a distributor that accounted for 12% of Hain's net sales during the Class Period.

Defendant Irwin Simon ("Simon") founded Hain in May 1993. He has been the President and Chief Executive Officer ("CEO") ever since, and was appointed Chairman of the Board in April 2000. Defendant Pasquale Conte ("Conte") was Chief Financial Officer ("CFO") from October 2014 to September 2015; and had previously served as Treasurer and Vice President from July 2009 to October 2014. Defendant Stephen J. Smith ("Smith") was CFO and Executive Vice President from September 3, 2013 to September 30, 2015. Defendant John Carroll ("Carroll," together with Simon, Conte, and Smith, the "Individual Defendants") was Hain's Executive Vice President and CEO for Hain Celestial North America from February 2015 to March 6, 2017. Carroll has been the Executive Vice President for Global Brands, Categories, and New Business Ventures since March 6, 2017.

3

The Lead Plaintiffs, along with the members of the proposed class, purchased or otherwise acquired the publicly traded common stock of Hain, and call and put options on the publicly traded common stock (collectively, "Hain Securities"), during the Class Period.

By the early 2010s, Hain allegedly began suffering from stiff competition as generic brands and chain stores began to offer natural and organic foods. As a result, Hain could no longer meet its revenue targets or Wall Street's projections. In order to meet those targets and projections, the Defendants allegedly engaged in a "channel stuffing" scheme. Channel stuffing is the practice of intentionally oversupplying distributors with products in order to artificially inflate sales and revenue. In so doing, a company that stuffs its distribution channels essentially "robs Peter to pay Paul"—that is, the company inflates revenue for one financial quarter by stealing revenue from a future financial quarter or quarters; and it misrepresents the company's financial status.

The Lead Plaintiffs allege that the Defendants engaged in channel stuffing by shipping extra inventory to its distributors with financial incentives; offering discounts to distributors for accepting extra product beyond the distributors' needs; and offering distributors an absolute right to return the products. For the purposes of this motion, the Court will only discuss new allegations pertaining to the scheme raised in the SAC, rather than provide a complete recitation of the facts. The Court refers the parties to the Order for a recitation of the facts originally alleged in the CAC.

The SAC adds allegations based on two new confidential witnesses, the findings made by the Securities Exchange Commission ("SEC") in its settlement with Hain concerning its investigation of the Company, and a number of statements made by Simon during earnings conference calls omitted from the CAC. The Court will discuss each additional set of allegations in turn.

4

## A. The Confidential Witness Statements.

The CAC referenced the statements of six confidential witnesses ("CWs"), such that the new CWs cited in the SAC shall be referred to as CW 7 and CW 8.

### 1. CW 7.

CW 7 is a former Hain employee who worked for the Company from January 2005 until August 1, 2017, most recently as the Senior Director of Supply Chain Finance. CW 7, who reported directly to Hain's Chief Operating Officer, James Meiers ("Meiers"), was responsible for managing the supply chain financials, such as profit and loss analysis, cost accounting, and sales reporting. SAC ¶ 38.

CW 7 explained Hain's "loading" practices—*i.e.*, pushing out inventory at the end of the quarter. According to CW 7, Hain was consistently forced to offer material concessions or make other deals with customers in order to achieve Hain's quarterly revenue projections. When Hain began to feel "pressure" in sales, it resorted to pushing out inventory, referred to as "customer loading," as well as using credits/accruals to offset Hain's sales deficits on its balance sheet. *Id.* ¶ 74. CW 7 confirmed the testimony of other CWs that the term "loading" was used freely among senior executives, including by Carroll and Meiers. *Id.* ¶ 91.

CW 7 also alleged that Hain provided an absolute right of return to customers. According to CW 7, Hain had an agreement with its customers that if the customers could not sell the excess inventory, they could return the unsold inventory. CW 7 explained further that Hain's customers did not want to get stuck with the inventory, so they would not take on the excess inventory without a right of return. *Id.* ¶ 75.

CW 7 stated that these practices created problems in that they produced a "drop off" in sales for the first month of the subsequent quarter—a practice CW 7 explained was "like a Ponzi

[scheme]," CW 7 explained that Hain was able to sustain these practices for some time because it was consistently acquiring companies to make up for the shortfall. *Id.* ¶ 76. However, in 2015, consumer spending started to drop, so Hain had to "become more creative" with the way it made its numbers because Hain did not change its forecasts. *Id.*

CW 7 became weary of the legitimacy of the credits and accruals written as they started to increase in size relative to the Company's historic levels. According to CW 7, the accruals started at around $200,000, which seemed reasonable at the time, but started to multiply and became $1–2 million, creating suspicion. Initially, CW 7 thought that the accruals were coming from supplier rebates, but he began to think otherwise as they grew in dollar amount. CW 7 added that there was a "correlation" between how Hain was doing in a particular quarter and the size of the accruals. *Id.* ¶ 85.

According to CW 7, the Senior Vice President of Manufacturing, Stephen Powhida ("Powhida") was responsible for everything related to accruals. *Id.* CW 7 described the accruals as Powhida's "creativity" and explained that Powhida was being directed by Meiers. Meiers relied on Powhida to create those accruals, but would protest if they got too big. When Hain's projections showed shortfalls due to the impact of the accruals, Powhida was expected to come up with a number and that number always magically made it so Hain was no longer short. *Id.* ¶ 86.

CW 7 described how the accruals were communicated internally at Hain. According to CW 7, an email would be sent to the controller group with an attachment, usually an Excel spreadsheet prepared by Powhida. The accruals would have an explanation related to Hain's suppliers or contract manufacturers. CW 7 explained that Powhida would be the last person to give CW 7 the numbers each month, and CW 7 would then post the accruals. CW 7 explained that Powhida would "make the numbers just right" before the soft close of the quarter. *Id.* ¶ 87.

CW 7 provided further background regarding Hain's distributors. According to CW 7, Simon would approach Hain's customers and encourage them to buy more product at the end of the quarter by offering material concessions. CW 7 recalled that in one instance the material concessions offered to customers in exchange for buying more product amounted to millions of dollars. CW 7 also explained the concessions Simon negotiated with one of Hain's largest distributors, United Natural Foods, Inc. ("UNFI"). One of those concessions included a right of return. Allegedly, UNFI's owner dealt directly with Simon when it came to anything related to revenue, and Simon could "always make them [UNFI] buy more if needed." *Id.* ¶ 94.

CW 7 alleged that he would hear Carroll and Simon discuss Hain's financial arrangements with UNFI, and that when they realized that CW 7 heard these conversations, they would say that they were "not supposed" to be discussing those arrangements in front of others. *Id.* ¶ 95. CW 7 recalled that Carroll and Simon tried to be secretive about the loading practices and attempted to keep it to themselves, but that CW 7 nevertheless heard them discuss it. According to CW 7, Simon had "special powers" when it came to interfacing with Hain's customers and that only the higher-ups had the power to make "special deals" with distributors. *Id.*

CW 7 also alleged that Hain never had an internal audit department or compliance department during his tenure. *Id.* ¶ 113. According to CW 7, no time or effort was put into implementing the proper internal controls, including Hain's failure to properly documents sales contracts. CW 7 added that Hain lacked a revenue recognition policy and a proper internal audit function. *Id.* ¶ 115.

CW 7 confirmed the testimony of other CWs that Hain's Senior Vice President and Controller, Rose Ng ("Ng"), was considered internally to be the "police" and that she would ask a lot of questions about the Company's supply chain organization. CW 7 explained that Ms. Ng

7

"wanted to dig into" Meiers's numbers, which made Meiers uncomfortable. *Id.* ¶ 113. CW 7 added that Meiers was very secretive with his numbers because providing numbers prematurely elicited questions that he did not want asked of him at the time. CW 7 explained that Ng was kept away from the details related to loading to distributors at the end of the quarter, and that when she asked any questions, she was told by the executives to stop asking. *Id.*

According to CW 7, once Ng was let go in September 2015 there was no one at Hain performing that function, given that Hain's Controller, Marla Hyndman ("Hyndman"), would go along with whatever Meiers wanted. *Id.* CW 7 also confirmed the testimony of CW 1 that Hain fired Powhida as a "scapegoat," because Meiers relied on and pushed Powhida to make the numbers and it was "getting out of control." *Id.* ¶ 114. In late 2015 and early 2016, respectively, Hain hired James Langrock and Michael McGuiness, who were allegedly surprised to find out what was going on at Hain. *Id.* ¶ 115.

### 2. CW 8.

CW 8 was the former Manager of Sales Planning for Hain during the entirety of the Class Period. In that role, CW 8 was responsible for supporting Hain's Field Sales Team and driving retail sales. *Id.* ¶ 39.

CW 8 alleges that that Hain did not properly account for customer billbacks and contract-related issues during his tenure. CW 8 stated that the accounting problems were compounded by the fact that the people at Hain "doing the books" did not understand the customer contracts. *Id.* ¶ 116. CW 8 recounted how he was working with Hain's production team and learned about contract-related deals that he was not previously aware of because the accounting department had not informed him about the deals. *Id.*

According to CW 8, the accounting problems were uncovered when James Langrock joined Hain and started looking at Hain's books. CW 8 stated that it became clear to Langrock that at the end of quarters, Hain was making big deals with customers like UNFI and KeHE Distributors LLC. CW 8 heard that Langrock questioned "if we are doing that, how are we accounting for that?" *Id.* ¶ 117. According to CW 8, Langrock continued to dig and ultimately brought in outside auditors. In connection with the Company's filing of corrected financials, CW 8 learned that some of Hain's customers had no contracts; some customers had "vague" contracts; and certain customers had off-invoice deals and issues with "bill backs." *Id.* CW 8 added that there were so many variations of contracts that the problem for Hain was that the documentation was "lacking." *Id.*

### 3. The SEC Order.

On December 11, 2018, the SEC announced that it had reached a settlement with Hain concluding the SEC's investigation of the Company, and agreed to a consent "Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order" (the "SEC Order").

In the SEC Order, Hain admitted to asking distributors to purchase specific dollar values of inventory by quarter-end, in exchange for additional incentives. In particular, the SEC investigated four types of sales practices: "(1) cash incentives (up to $500,000), (2) extended payment terms (up to 90 days), (3) discounts off list price (up to 20% off), and (4) spoils coverage, whereby Hain agreed to reimburse the distributor for products that spoiled or expired before the distributor could sell through to retailers." SEC Order ¶ 5. The SEC concluded that "[n]one of these types of incentives are improper; however, they could have financial reporting implications." *Id.*

a. UNFI.

The SEC specifically investigated Hain's practices with a Distributor 1, which the Lead Plaintiffs identified as UNFI. During the Class Period, Hain executed annual sales contracts with UNFI stipulating to quarterly inventory sales growth targets. UNFI earned financial incentives based on meeting those growth targets. In practice, this meant that Hain and UNFI agreed, on a quarterly basis, to inventory purchasing targets, which ranged up to $90 million per quarter. *Id.* ¶ 6.

During many quarters, UNFI communicated to Hain's sales personnel that it might not purchase sufficient inventory to meet its quarterly target, informing Hain that UNFI would miss the target by as little as $10 million and as much as $30 million. *Id.* As a way to incentivize UNI to purchase sufficient inventory to meet or exceed its agreed-upon sales growth targets, a practice developed whereby UNFI and Hain would renegotiate their quarterly terms. These renegotiations varied by quarter, but Distributor 1 would obtain extra-contractual incentives—such as (1) cash financial incentives (ranging from $75,000 to $500,000 per quarter, in those quarters in which cash incentives were provided), (2) spoils coverage, and/or (3) occasionally extended payment terms up to 60 days—in exchange for meeting a renegotiated inventory purchasing target. *Id.* ¶ 7.

Regarding the spoils coverage, UNFI received a 1% off-invoice discount intended as compensation for products that expired or spoiled in its warehouses before it sold the products to retailers pursuant to its annual sales contract. However, the SEC found that UNFI also requested and received additional reimbursement for any products purchased in an end-of-quarter sale that expired or spoiled before selling to retailers. ("EOQ spoils"). *Id.* ¶ 8.

During the Class Period, Hain paid out increasing amounts to UNFI in EOQ spoils, from $0.5 million in FY 2013; to $0.8 million in FY 2014; $1.1 million in FY 2015; and $1.6 million in FY 2016. *Id.* Hain's annual net sales to UNFI during that window varied from $325 to $350 million. Thus, "[t]he vast majority of the products purchased in connection with EOQ sales to [UNFI] ultimately sold through to retailers." *Id.*

However, the SEC found that these EOQ sales were not appropriately documented. While Hain and UNFI signed an annual contract, in no instance was the contract amended to incorporate these EOQ agreements. Rather, these agreements were typically memorialized only in email correspondence with the distributor. In some quarters, particular incentives, such as spoils coverage, were agreed to orally. *Id.* ¶ 9. In addition, the EOQ sales with UNFI were not fully communicated outside of the sales department, to the appropriate personnel in Hain's accounting and finance departments, to take into consideration any relevant accounting implications. Moreover, Hain lacked clear policies and procedures regarding when distributor incentives required approval and/or notification beyond the sales team (whether based on the concession's size or character). *Id.* ¶ 12.

Based on these findings, the SEC concluded as to Hain's relationship with UNFI that:

> Hain lacked sufficient policies and procedures to provide reasonable assurances that EOQ sales were accounted for properly. Hain's sales personnel were not appropriately trained or knowledgeable about the accounting implications of their sales practices. Further, there were insufficient policies and procedures to monitor incentives made in sales transactions, which could have potential revenue recognition implications.

*Id.* ¶ 11.

b. Distributor 2.

The SEC also investigated Hain's practices with Hain's second-largest distributor, Distributor 2. Unlike UNFI, Distributor 2 was never subject to any contractual provisions related to quarterly sales growth targets. However, the SEC found that a similar practice developed whereby Hain would request Distributor 2 to purchase a specific amount of inventory by quarter-end, in exchange for additional incentives. In a number of quarters, Distributor 2 countered Hain's requested volume target with a lower figure, noting its pre-existing inventory levels and communicating concerns that inventory would expire. *Id.* ¶ 13.

In addition to a volume target, Hain's end-of-quarter sales with Distributor 2 consisted of incentives including: (1) a discount off invoice; (2) extended payment terms (typically 90 days); and (3) spoils coverage. *Id.* ¶ 14. Regarding the discounts off invoice, the dollar value of these quarterly discounts increased upward over the Class Period, from about $200,000 to about $1.5 million in the final quarter of fiscal year 2016. *Id.* Hain's spoils coverage amounts to Distributor 2 increased over the Class Period as well, reaching as high as $430,000 in the final quarter of fiscal year 2016. As with UNFI, these spoils were in addition to a 1% off invoice discount that Distributor 2 was already receiving. However, the SEC similarly found that "vast majority of the products purchased in connection with EOQ sales to Distributor 2 ultimately sold through to retailers." *Id.*

Ultimately, the SEC found Hain utilized the same deficient accounting practices regarding its end-of-quarter sales with Distributor 2 that the SEC found with UNFI. *Id.* ¶¶ 15–17.

c. The Ultimate Conclusions.

As a result of the foregoing investigation, the SEC concluded, and Hain conceded, that Hain violated: (i) Section 13(b)(2)(A) of the Exchange Act, which requires Hain to make and keep records which accurately and fairly reflect Hain's transactions; and (ii) Section 13(b)(2)(B) of the

Exchange Act, which requires Hain to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions are executed in accordance with management's authorization and in conformity with GAAP. *Id.* ¶¶ 23–24. Hain also agreed to a number of remedial efforts, consisting of establishing an internal audit function; implementing changes to its revenue recognition practices; and developing a revenue recognition and contract review training program. *Id.* ¶¶ 25–27.

### 4. The Additional Earnings Call Statements.

On February 4, 2014, the Company hosted an earnings conference call, in which Simon, Carroll, and Smith participated, with various securities analysts to discuss Hain's second quarter fiscal year 2014 results. SAC ¶ 253. The CAC originally referenced the call. The SAC added the following statement made by Simon on the call:

> "Now, I'll focus on the key drivers that led to our strong sales performance. Our organic growth was up 5 single digits excluding currency. Similar to growth in prior quarters, key drivers were -- new distribution, deeper penetration in key accounts, new and existing products, strong consistent consumer demand, and new private authorizations across many classes of trade."

*Id.* ¶ 257.

On November 6, 2014, the Company hosted an earnings conference call, in which Simon, Carroll, and Conte participated, with various securities analysts to discuss Hain's first quarter fiscal year 2015 results. *Id.* ¶ 265. On the call, Simon stated: "Now, let me focus on key drivers that led to our strong sales performance, as I mentioned, organic growth was up in the high-single digits. . . . Importantly, we're growing deeper in key accounts, based on strong, consistent consumer demand." *Id.* ¶ 266.

On February 4, 2015, the Company hosted an earnings conference call, in which Simon, Carroll, and Conte participated with various securities analysts to discuss Hain's second quarter

fiscal year 2015 results. *Id.* ¶ 268. During the call, Simon stated: "The demand for healthy better-for-you products help us generate record net sales." *Id.* ¶ 269.

On May 6, 2015, the Company hosted an earnings conference call, in which Simon, Carroll, and Conte participated with various securities analysts to discuss Hain's third quarter fiscal year 2015 results. *Id.* ¶ 271. On the call, Simon stated: "Global demand for healthy, better-for-you products help us deliver a record third-quarter net sales, up over 19%." *Id.* ¶ 272.

On August 18, 2015, the Company hosted an earnings conference call, in which Simon, Carroll, and Conte participated with various securities analysts to discuss Hain's fourth quarter and full year 2015 results. *Id.* ¶ 274. On the call, Simon stated: "Strong demand for our portfolio of leading organic and natural products helped fuel our growth across 15 or 20 core product categories, sales channels, and geographies." *Id.* ¶ 275.

According to the Lead Plaintiffs, these statements were materially false and misleading because Simon attributed sales to strong demand, among other things, but failed to disclose that Hain had actually generated its sales in reliance on the allegedly undisclosed, unsustainable pull-in sales practices discussed above. *Id.* ¶¶ 258, 261, 267, 270, 273, 276.

## II. DISCUSSION

### A. THE LEGAL STANDARD.

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir. 2006); *Bold Elec., Inc. v. City of N.Y.,* 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free Sch. Dist.,* 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

14

Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly*, the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009)).

Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679.

**B. The Relevant Law on a § 10(b) Claim.**

The Lead Plaintiffs' federal securities fraud claims implicate a statutory and regulatory framework involving Section 10(b) Rule 10b–5, Federal Rule of Civil Procedure 9(b), and the pleading standards required by the Private Securities Litigation Reform Act (the "PSLRA").

Under Section 10(b) of the Securities Exchange Act, it is:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5, which was promulgated pursuant to this Section by the SEC, states that it is unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b–5. Rule 10b-5 only prohibits conduct that is already prohibited by § 10(b). *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157, 128 S. Ct. 761, 768, 169 L. Ed. 2d 627 (2008) (internal citation omitted). The Supreme Court has read a right to a private cause of action implied in the statute and its implementing regulation. *Id.* (internal citation omitted).

In order to succeed on a § 10(b) claim, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337 (2d Cir. 2011).

Pursuant to the heightened pleading standards of the PSLRA, as to the first two elements listed above, a plaintiff must "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 127 S. Ct. 2499, 2508, 168 L. Ed. 2d 179 (2007) (quoting 15 U.S.C. §§ 78u–4(b)(1), 78u–4(b)(2)).

A strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27–28 (2d Cir. 2014) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)). "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal citations and quotation marks omitted). "Recklessness is defined as at the least, an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (internal citations, quotation marks, and ellipses omitted).

A plaintiff adequately alleges scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 127 S. Ct. at 168 (emphasis added). The Court must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.*

The Lead Plaintiffs bring claims under subsections (a), (b), and (c) of Rule 10(b)(5). While subsection (b) prohibits the making of "any untrue statement of material fact or to omit to state a [necessary] material fact," subsections (a) and (c) allow suit against defendants who, with scienter,

employ a "device, scheme or artifice to defraud," or engage in an "act, practice, or course of business which operates or would operate a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5.

"To state a claim based on conduct violating Rule 10b–5(a) and (c), plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Alstom SA*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005) (internal citation omitted)). A plaintiff bringing a claim pursuant to those subsections must "plead with particularity the manipulative scheme itself . . . ." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 297 (S.D.N.Y. 2003).

## C. APPLICATION TO THE FACTS.

In the Order, the Court found that the Lead Plaintiffs failed to adequately allege that the Defendants engaged in a fraudulent channel stuffing scheme. Pursuant to that finding, the Court found that the allegations related to channel stuffing in the CAC neither stated a claim under Rule 10b-5 subsections (a) and (c) nor gave rise to a strong inference of scienter so as to state a claim for violations of Section 10(b) and Rule 10b-5(b). ECF 106 at 33. Then, the Court looked to the remaining allegations in the CAC and assessed whether they could establish scienter without the channel-stuffing related allegations. *Id.* at 34–40. Considering the allegations of recklessness, motive and opportunity as a whole, the Court found that those allegations also fell short of raising a strong inference of scienter. *Id.* at 36, 41.

The Court will apply a similar, but somewhat varied approach to its assessment of the allegations in the SAC. The Lead Plaintiffs changed their primary theory of liability from alleging a fraudulent channel stuffing scheme under Rule 10b-5 subsections (a) and (c) to alleging that the Defendants failed to disclose purportedly unsustainable business practices in violation of Section

18

10(b) and Rule 10b-5(b). ECF 118 at 9 ("Plaintiffs opted to characterize Defendants' sales tactics differently in the SAC to better capture their allegations."). Under this theory, the Lead Plaintiffs allege that the Defendants had an obligation to disclose that they were offering distributors cash incentives, extended payment terms, discounts, and other concessions so that distributors would purchase more inventory than necessary. According to the Lead Plaintiffs, the Defendants continued attributing Hain's sales results to organic factors such as strong demand while turning to these sales tactics in order to mask declining demand for Hain's products, thereby making their statements false and misleading.

Therefore, the Court will first address whether the SAC contains sufficient facts to allege a fraudulent channel stuffing scheme under Rule 10b-5 subsections (a) and (c). Then, the Court will assess the Lead Plaintiffs' newfound allegations that Section 10(b) and Rule 10b-5(b) imposed an obligation on the Defendants to disclose that scheme, after which the Court will address the remainder of the allegations premised on behavior unrelated to channel stuffing.

1. As to the Rule 10b-5 Subsections (a) and (c) Claims.

The Lead Plaintiffs allege that the Defendants engaged in the practice of "channel stuffing" by sending excess product to Hain's distributors; improperly recognized revenue in violation of its own accounting standards and GAAP; and misled investors as to the Company's true revenue. According to the Lead Plaintiffs, the distributors did not pay for the excess product, and in any event, had an absolute right of return. The Court found the CAC lacked sufficiently particularized facts in support of the Lead Plaintiffs' claim that this scheme was fraudulent. ECF 106 at 30.

In doing so, the Court endorsed the standard articulated by the Seventh Circuit on remand in *Tellabs* regarding the threshold past which channel stuffing becomes illegitimate:

> Channel stuffing becomes a form of fraud only when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them. They are in effect sales on consignment, and such sales cannot be booked as revenue. Neither condition of revenue recognition has been fulfilled—ownership and its attendant risks have not been transferred, and since the goods might not even be sold, there can be no certainty of getting paid.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008).

Applying this standard, the Court found that the CAC failed to allege sufficient facts to support the claim that the Defendants' distributors had an absolute right of return. As to the confidential witness statements upon which the CAC based its channel stuffing claims—CW 3, CW 5, and CW 6—the Court explained:

> While the Court notes here that it generally credits the CWs' allegations because their positions have been sufficiently detailed, and the Court finds it likely that they were able to discern much of what they said, the accounts of the CWs relating to rights of return are not sufficiently detailed. They rely on generalizations, and do not point to specific reports or evidence.

ECF 106 at 28–29. Moreover, the Court found that even if it did credit those allegations, they were "insufficiently detailed to sustain a claim for a scheme under 10b–5(a) and (c)," *id.* at 29, because "the conclusory statements of CWs 3, 5, and 6 . . . failed to 'state with particularity all facts on which" [they] rel[y] to support [their] belief that [the Defendants'] gross sales were in fact comprised largely of consignment shipments.'" *Id.* at 30 (quoting *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 443 (S.D.N.Y. 2015)). Lastly, the Court found that the Lead Plaintiffs' allegations did not raise "'a sufficient inference that [Hain's] overall reserves for returns were recklessly inadequate'" because the returns from distributors were "quite insignificant." *Id.* at 31–32 (quoting *Gavish v. Revlon, Inc.*, No. 00-cv-7291, 2004 WL 2210269, at *14 (S.D.N.Y. Sept. 30, 2004)).

Once the Court determined that the CAC failed to adequately allege that the Defendants

gave distributors an absolute right of return, that ruling was fatal to the remainder of the Lead

Plaintiffs' claims premised on channel stuffing. As the Court explained, "[w]ithout adequately

demonstrating that the Defendants gave distributors an absolute right of return, the Lead Plaintiffs'

allegations amount to a claim that the Defendants offered incentives to distributors to take extra

product, and improperly recognized revenue early." *Id.* at 32. Such allegations failed to create a

"'strong inference that Defendants knew or should have known that the sales should have been

accounted for in some way other than the Company's historical revenue recognition upon shipment

model, and, therefore, conscious misbehavior or recklessness cannot be inferred.'" *Id.* (quoting

*Gavish*, 2004 WL 2210269, at \*19). Nor could "the Defendants' alleged GAAP violations and

identification and remediation of internal controls . . . support a strong inference of scienter," as

those "'allegations must be coupled with evidence of 'corresponding fraudulent intent'" "'to rise

to the state of mind required.'" *Id.* at 33 (quoting *W. Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp.*,

344 F. App'x 717, 720 (2d Cir. 2009).

Thus, the question presently before the Court is whether the new facts in the SAC suffice

to allege that the Defendants offered Hain's distributors an absolute right of return. The Court finds

that they do not.

The primary evidence relied on by the Lead Plaintiffs is the confidential witness CW 7.

CW 7's statements regarding a supposed right of return consist of the same conclusory assertions

that the Court previously rejected:

> According to CW 7, Hain had an agreement with its customers that if the customers
> could not sell the excess inventory, they could return the unsold inventory. CW 7
> explained further that Hain's customers did not want to get stuck with the inventory,
> so they would not take on the excess inventory without a right of return.

SAC ¶ 75. CW 7 provides no specific details regarding an absolute right of return, such as "specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts." *In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004). The closest CW 7 comes is a broad averment that "the concessions Simon negotiated with UNFI included a right of return." SAC ¶ 94. However, merely identifying a distributor is insufficient. *ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d at 1062. "'Where sham transactions are alleged, specific facts about each one of these transactions are required.'" ECF 106 at 30–31 (quoting *Janbay v. Canadian Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306, at *4 (S.D.N.Y. Mar. 30, 2012)) (collecting cases).

The Lead Plaintiffs also allege that the SEC Order establishes that Hain "admitted . . . it had relied on offering off-invoice concessions to its largest distributors—including UNFI—to meet Hain's quarterly targets." ECF 118 at 25. But the SEC Order falls far short of inculpating the Defendants in an illegitimate channel stuffing scheme. In reality, it exonerates them. The SEC investigated the end-of-quarter incentives challenged by the Lead Plaintiffs. Based on its investigation, the SEC concluded that "[n]one of these types of incentives are improper," SEC Order ¶ 5, and that "[t]he vast majority of the products purchased in connection with EOQ sales to [the two distributors investigated] ultimately sold through to retailers," *id.* ¶¶ 8, 14. Tellingly, the SEC Order also makes no mention of an alleged absolute right of return to either distributor.

In their opposition, the Lead Plaintiffs argue that the Court cannot rely on the SEC Order because it "simply represents a consent agreement with limited preclusive value." ECF 118 at 8–9. The Lead Plaintiffs are incorrect. They cannot rely on the SEC Order as their basis for alleging that the channel stuffing scheme here was fraudulent on one hand, while simultaneously arguing

22

that the Court cannot look at findings in the SEC Order that are favorable to the Defendants on the other hand.

"If the allegations of a pleading 'are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading].'" *In re Trusteeships Created by Tropic CDO I Ltd.*, 92 F.Supp.3d 163, 171 (S.D.N.Y. 2015) (quoting *Sazerac Co. v. Falk*, 861 F.Supp. 253, 257 (S.D.N.Y. 1994)). Thus, reference to the SEC Order is entirely proper. *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 510 (S.D.N.Y. 2017) ("[T]he Court considers the SEC's exculpatory finding as if it were in the complaint itself, and accepts it as true."); *Price v. Strianese*, No. 17-cv-652, 2017 WL 4466614, at *3 n.3 (S.D.N.Y. Oct. 4, 2017) ("Because Plaintiff incorporates the SEC order by reference into his Complaint, the Court may rely on it in deciding Defendants' motion to dismiss"); *Presbyterian Healthcare Servs. v. Goldman Sachs & Co.*, No. 15-cv-6579, 2017 WL 1048088, at *5 (S.D.N.Y. Mar. 17, 2017) ("Reliance on the . . . SEC Order. . . is warranted because the plaintiffs rely upon [this] documents in their complaint.").

Consequently, the new allegations in the SAC describe little more than the same aggressive sales tactics which the Court previously ruled do not support a strong inference of scienter, because "'real products were shipped to real customers who paid real money.'" ECF 106 at 32 (quoting *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 568 (S.D.N.Y. 2004) (emphasis added))). Therefore, the Court finds that the SAC lacks facts sufficiently particularized to allege fraudulent channel stuffing in violation of Rule 10b-5 subsections (a) and (c).

**2. As to the Section 10(b) and Rule 10b-5(b) Claims for Failure to Disclose the Alleged Channel Stuffing Scheme.**

The Lead Plaintiffs allege that the Defendants made statements throughout the Class Period regarding Hain's financial results and the causes of those results which were materially false and misleading because the Defendants failed to disclose that those results were generated only through reliance on allegedly unsustainable sales practices and did not reflect normal and sustainable demand. *See* SAC ¶¶ 164–247, 251, 254–55, 257, 260, 263, 266, 269, 272, 275.

This theory fails because its predicate is the illegitimacy of the channel stuffing practices the Court already found to be legitimate. The Court already explained that none of the sales incentives challenged here are improper because the Lead Plaintiffs failed to allege that an absolute right of return existed that would make end-of-quarter sales in effect sales on consignment.

Therefore, the Lead Plaintiffs' theory boils down to "to a claim that the Defendants offered incentives to distributors to take extra product." ECF 106 at 32. Subsections (a) and (c) do not prohibit offering such incentives, so that the Lead Plaintiffs cannot assert that subsection (b) required their disclosure. *See Cortina v. Anavex Life Scis. Corp.*, No. 15-cv-10162, 2016 WL 7480415, at *5 (S.D.N.Y. Dec. 29, 2016) (("[T]he theory of Plaintiffs' claim is . . . that Defendants failed to disclose the alleged paid-promotional scheme in the risk disclosure sections of their SEC filings. But that theory assumes that there was a paid-promotional scheme to disclose. Yet . . . the Amended Complaint fails to adequately allege that Defendants orchestrated such a scheme.").

In response, the Lead Plaintiffs argue that that they "do not allege that these sales tactics are inherently improper or fraudulent," but rather that they are "unsustainable because they depend on the continued participation and willingness of customers to accept excess, unneeded inventory, which cannot be guaranteed." ECF 118 at 12. Thus, the failure to disclose the incentives is

actionable because the Defendants attributed Hain's sales results to a variety of organic factors, such as "strong brand contribution," SAC ¶ 165, "expanded distribution," *id.* ¶ 251, "strong demand" and "momentum for organic and natural products," *id.* ¶¶181, 190, Hain's "diverse portfolio" of brands, *id.* ¶ 219, "solid execution of [Hain's] operational initiatives, *id.* ¶ 242, "deeper penetration in key accounts" and "strong consistent consumer demand," *id.* ¶¶ 257, 260, 266, and "demand for healthy [ ] products," *id.* ¶¶ 269, 272.

However, the Defendants were under no generalized obligation to disclose wholly legal sales incentives simply because the Lead Plaintiffs allege those incentives to be unsustainable. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (collecting cases) ("Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources' violated section 10(b) is likewise unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing.").

The Second Circuit recognizes that "'up to a point, companies must be permitted to operate with a hopeful outlook,' and that as a result, executives 'are not required to take a gloomy, fearful or defeatist view of the future.'" *In re Nokia Oyj (Nokia Corp.) Secs. Litig.*, 423 F.Supp.2d 364, 397–98 (S.D.N.Y.2006) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)). Moreover, "[a] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock." *In re Donna Karan Intern. Secs. Litig.*, No 97-cv-2011, 1998 WL 637547, at *13 (E.D.N.Y. Aug.14, 1998).

In *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012), the plaintiffs argued that the defendant corporation's "statements about its earnings were actionable, even though literally true, because they did not acknowledge the long-term

25

unsustainability of its business model." *Id.* at 38. The Second Circuit "easily rejected" the argument, explaining that "[t]o the extent that investors might impute a positive corporate outlook from omissions in earnings reports, we have explained that general expressions of corporate optimism are 'too indefinite to be actionable under the securities laws.'" *Id.* (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998)).

In *In re Axis Capital Holdings Ltd. Securities Litigation*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006), the plaintiffs claimed that the defendants' disclosures of net income, gross premiums and net premiums were materially misleading, because "the flow of [the defendants'] business as received from brokers, was inherently precarious in that financial results and the nature of its business operations were reliant upon and unsustainable at historical levels in the absence of its participation in a scheme to manipulate the insurance market through improper and illegal anticompetitive agreements." *Id.* at 586. The United States District Court for the Southern District of New York found that "[a]ssuming, arguendo, that an anticompetitive scheme was adequately pled, defendants were under no duty to disclose the risk that contingent commission agreements might be discontinued. . . . As a matter of law, no statements regarding AXIS's accurately reported revenue and income have been rendered materially misleading by failing to disclose that such income was 'unsustainable.'" *Id.* at 586–87.

The Lead Plaintiffs argue that these cases are distinguishable because the Defendants put the source of Hain's revenue at issue, namely, attributing it to factors such as strong demand and strong brand contribution, requiring them to "disclose the true source of such revenue." ECF 118 at 14. The Lead Plaintiffs base this argument on *In re Van der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005) and several out-of-circuit cases. *See Murphy v. Precision Castparts Corp.*, No. 16-cv-00521, 2017 WL 3084274, at *8–9 (D. Or. June 27, 2017);

*In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1362–63 (N.D. Ga. 2002); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 587–89 (D.N.J. 2001); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 890–91 (D. Minn. 2011); *Cunha v. Hansen Nat. Corp.*, No. 08-cv-1249, 2012 WL 12886194, at *3 (C.D. Cal. Oct. 22, 2012).

*Van der Moolen Holding N.V. Securities Litigation* did not recognize a general duty for companies to disclose all "information concerning the source of [their] success" every time they "put[] the topic of the cause of [their] financial success at issue." 405 F. Supp. 2d at 401; *see also Richman v. Goldman Sachs Group, Inc.*, 868 F.Supp.2d 261, 274 (S.D.N.Y. 2012) ("[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead."). It merely held that defendants engaged in *illegal* behavior—there, illegal propriety trading in violation of New York Stock Exchange Rules—had to disclose such information when attributing their success to specific revenue streams. *See Van der Moolen N.V. Securities Litigation*, 405 F. Supp. 2d at 400 (rejecting argument that statements "non-actionable because federal securities laws do not require a company to accuse itself of wrongdoing."). Thus, "[w]here a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of *improper or illegal business practices.*" *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 165 (S.D.N.Y. 2018) (emphasis added).

Courts have not extended its reasoning to allegations like the one here, where the Defendants engaged in no misconduct and the statements at issue "attributed [the company's] growth to broad trends and corporate strengths, without pointing to any specific factors or sources of revenue." *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 297 (S.D.N.Y. 2019) (statements that company had "continue[d] strengthening [its] footprint with expansion projects"

and "solid asset base together with [its] unique portfolio of building solutions, [would] allow [it] to continue promoting growth in [its] markets" did not require disclosure of alleged bribery scheme); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) ("[T]he connection between the misleading statement, *i.e.*, the source of ESI's success, and the alleged omission, *i.e.*, the nondisclosure of the predatory business model, is far more tenuous than the connections between statement and alleged omission at issue in the cases cited by Plaintiff.").

The out-of-circuit cases are similarly unpersuasive because they rely on a premise rejected by the aforementioned authority, that omissions based on "unsustainable" practices are actionable. *See Boca Raton Firefighters & Police Pension Fund*, 506 F. App'x 32 at 39; *Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. at 586–87; *Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 377. They also contradict cases in this circuit establishing that there is no general duty to disclose totally legal discounting strategies. *See In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 587 (S.D.N.Y. 2005) ("[T]he Court of Appeals has declined to find a duty to disclose a major marketing plan.[]"); *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209 (S.D.N.Y. 1996) ("[P]laintiffs point to no statement of the defendants that could even arguably be rendered misleading by omission of a discounting plan. Plaintiffs merely sound the familiar refrain that any comment by a corporation imposes an affirmative duty to disclose all marginally-related material information. There is no such obligation or duty.").

Therefore, the Court finds that the SAC fails to allege a violation of Section 10(b) and Rule 10b-5(b) based on the Defendants' failure to disclose the alleged channel stuffing scheme.

**3. As to Whether the Lead Plaintiffs Allege Scienter Without the Allegations Relating to the Channel Stuffing Scheme.**

In the Order, the Court found that the CAC failed to allege scienter based on conduct unrelated to the purported channel stuffing scheme through either circumstantial evidence of misbehavior or recklessness or allegations regarding motive and opportunity. The Court finds that the SAC fails to remedy these inadequacies.

  a. <u>As to the Remaining Circumstantial Evidence of Misbehavior or Recklessness.</u>

After evaluating the alleged departure of senior management, the presence of the scheme in Hain's core U.S. segment, and the Individual Defendants' access to reports, the Court found that the Lead Plaintiffs failed to meet their burden of alleging circumstantial evidence of misbehavior or recklessness supporting a strong inference of scienter. ECF 106 at 36–37. The SAC adds no new allegations regarding the Individual Defendants' access to reports but supplements the CAC's allegations regarding the departure of senior management and Hain's core U.S. segment.

  *i. As to the "Suspicious" Circumstances Regarding the Demotions, Resignations, and Terminations of Hain's Senior Management.*

The CAC pointed to the terminations and resignations of several senior employees at Hain, Conte, Smith, Ng, Powhida, Weiner, Hyndman, and Guerrero, as well as the demotions of Carroll and Meiers, as evidence of scienter. The Court found that these individuals' departures failed to support a strong inference of scienter because their "connections to the purported scheme are vague and often based on multiple layers of belief or hearsay" and "it is just as plausible that these individuals resigned, were demoted, or were fired because of negligence and mismanagement." ECF 106 at 35.

The SAC includes allegations from a new confidential witness, CW 7, that Ng and Powhida were terminated supposedly to cover up the Defendants' misbehavior. SAC ¶¶ 113–14. In addition, the SAC alleges that Simon left Hain in 2018. These new allegations correct none of the deficiencies identified by the Court. The former are the same as the vague, hearsay allegations previously rejected by the Court. The latter occurred eighteen months after the end of the Class Period and well after the Defendants restated their revenue, so that it is not probative of scienter.

Therefore, the Court finds the departures do not support a strong inference of scienter.

*ii. As to Hain's "Core" U.S. Segment.*

In the Order, the Court assessed the CAC's assertion of scienter based on the fact that the purported fraud took place in Hain's core U.S. segment. The Court rejected this argument because "'the Second Circuit has expressed doubt as to whether the core operation doctrine has survived,'" ECF 106 at 35 (quoting *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 474 (S.D.N.Y. 2017))," and, in any event, the CAC failed to allege that the "magnitude" of the fraud was sufficiently "startling" to support a strong inference of scienter. *Id.* (citing *In re Salix Pharm., Ltd.*, No. 14-cv-8925, 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016)).

To cure this deficiency, the SAC alleges that the SEC's investigation found that Hain "was selling more than 15% of its total quarterly sales in the final month of the quarter to just one distributor [UNFI]." SAC ¶ 369. According to the SEC Order, UNFI purchased 52–64% of its inventory in or around the last month of the quarter, and Hain's quarterly inventory purchasing targets for UNFI ranged up to $90 million. SEC Order ¶¶ 6, 10. Because Hain's overall net sales for its U.S. Business Segment were approximately $300 million, *id.* ¶ 6, the Lead Plaintiffs estimate that UNFI purchased approximately between $46.8–57.6 millions of inventory in the last month of a quarter, equaling approximately 15% of Hain's quarterly sales.

However, this calculation erroneously assumes that *all* inventory sold to UNFI in the last month of a quarter was fraudulent. The SEC found that "[t]he vast majority of the products purchased in connection with EOQ sales to [UNFI] ultimately sold through to retailers." *Id.* ¶ 8. As the Court previously explained, the Lead Plaintiffs' revisions to account for the accounting errors related to end-of-quarter sales only amounted to between 1.9 and 2.9 percent of total net sales. Thus, it is unclear why the mere fact that Hain made substantial end-of-quarter sales to UNFI makes the fraud of sufficient magnitude to support a strong inference of scienter.

### iii. As to the Allegations of Recklessness Considered as a Whole.

Considering the circumstantial evidence of misbehavior or recklessness as a whole, as the Court must, *Tellabs*, 551 U.S. at 326, the Court finds that the Lead Plaintiffs failed to meet their burden. Although the Court recognized in the Order that the Lead Plaintiffs came "quite close" to doing so, the SAC failed to bring their claims any closer. The SAC only added cursory facts raising the same allegations, with the same flaws, as the CAC. Even with these new allegations, the Court finds that the Lead Plaintiffs "have failed to show that Defendants engaged in conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ECF 106 at 36 (parenthetically quoting *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 165 (D. Conn. 2007)).

### b. As to the Allegations Regarding Motive and Opportunity.

The Court also found that the CAC's allegations that the Defendants possessed the requisite scienter by means of the ways in which they benefitted from the fraud, namely, insider stock sales, Individual Defendants' bonuses, and Hain's acquisitions during the Class Period, were insufficient. *Id.* at 37. The only new allegations in the SAC concern the insider stock sales.

31

The Court rejected the allegations in the CAC because it only alleged the "sheer volume and dollar numbers" of the stock sales by "two individual defendants" and "did not address the percentage of stock sold by those two Defendants." *Id.* at 37–38. The SAC now alleges that Carroll sold 74% of his total shares and that Simon sold 66% of his total shares during the Class Period. SAC ¶¶ 358–59.

Although the Lead Plaintiffs now provide the alleged percentages sold by Simon and Carroll, the SAC fails to allege scienter based on their stock sales. "To create an inference of scienter through the stock sales of insiders, plaintiffs must establish that the stock sales during the class period were 'suspicious' or 'unusual.'" *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 58 (E.D.N.Y. 1998). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001).

The mere fact that Carroll and Simon sold a significant percentage of their shares during the Class Period fails to make those transactions suspicious or unusual. "The sale of a large volume of stock alone . . . is not enough to adequately plead scienter." *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10-cv-975, 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012); *Reilly v. U.S. Physical Therapy, Inc.*, No. 17-cv-2347, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) ("But without more, the amount of stock sold cannot be determinative. Otherwise, any corporate insider who divests his stock holdings would furnish opportunistic plaintiffs with the requisite scienter to survive a motion to dismiss. To the contrary, courts routinely find that raw sales numbers alone are insufficient to establish scienter."). Courts have rejected claims of scienter premised on insider sales of similar percentages of stock. *See, e.g., Micholle v. Ophthotech Corp.*, No. 17-cv-210, 2019

WL 4464802, at *15 n.18 (S.D.N.Y. Sept. 17, 2019) (82%). The inadequacy of this allegation is especially apparent here, where other facts weigh against finding Carroll and Simon's transfers to be suspicious.

The SAC alleges insider trading by only two insiders. *See, e.g., San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("The fact that [other insiders] did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'"); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271–72 (S.D.N.Y. 2009) ("Plaintiffs have alleged insider trading by only two Gildan insiders; the absence of any allegations of other insider trades before Gildan announced the impact of the issues at the Dominican facility and the KDH integration undercuts any finding of the requisite strong inference of scienter.").

Furthermore, Simon and Carroll made their last Class Period sales in April and March 2015 respectively—long before even the first alleged partial corrective disclosure in January 2016, and the announcement of potential accounting issues in August 2016. All disposals after those dates were actually transactions in shares "withheld to pay taxes incident to the vesting of restricted stock" or "in connection with . . . stock option exercise[s]." ECF 115-6 at 7, 18, 20, 66; ECF 115-7 at 2, 7, 8. These sort of disposals are not indicative of fraud. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) ("Indeed, the documents reflecting the Individual Defendants' trading in BMS stock during the Class Period6 show a consistent pattern of trading undertaken primarily to make payments required for the exercise of stock options or to pay

33

taxes."); *Ressler v. Liz Claiborne Inc.*, 75 F.Supp.2d 43, 59–60 (S.D.N.Y.1999) (sales to meet tax obligations not indicative of fraud).

"[C]ourts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure." *Reilly*, 2018 WL 3559089, at *14 (collecting cases); *accord In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003) ("Although the complaint does allege that the May 2001 sales occurred just before the Company's July 17, 2001 announcement of problems at Roy Kay, the court does not find the two-month gap to be strongly suspicious in light of the other factors weighing against an inference of fraud."); *Ressler*, 75 F. Supp. 2d at 60 ("The Court further notes that the stock sales at issue took place, for the most part, over six months prior to the release of the negative disclosure . . . . Such timing does not suggest that the defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price.").

Therefore, Carroll and Simon's stock sales are insufficient to establish motive. Here, the Lead Plaintiffs add no other allegations regarding opportunity and motive. Therefore, the Court, considering the allegations of motive and opportunity as a whole, *Tellabs*, 551 U.S. at 326, finds that the Lead Plaintiffs fall short of raising a strong inference of scienter.

### c.   As to the Other Elements of the Lead Plaintiffs' Section 10(b) Claims.

As the Court finds that the Lead Plaintiffs have failed to plead a strong inference of scienter, the Court does not assess the remaining elements of their Section 10(b) claim. *See Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011).

**4. As to the Lead Plaintiffs' Claims Brought Under Section 20(a) of the Exchange Act.**

The Lead Plaintiffs also bring claims against the Individual Defendants pursuant to Section 20(a) of the Exchange Act. Section 20(a) imposes liability on individuals who control Section 10 violators. *See* 15 U.S.C. § 78t(a). To assert a *prima facie* case under Section 20(a), a plaintiff "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996) (internal citations and quotation marks omitted). Here, the Complaint has not stated a primary violation under Section 10(b) and Rule 10b-5, so that the Section 20(a) claims must likewise be dismissed. *Rombach,* 355 F.3d at 177–78.

## III. CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) is granted in its entirety. The Court finds that any future amendments would be futile. The Court already gave the Lead Plaintiffs a chance to remedy the deficiencies in their allegations, and the SAC failed to include sufficient facts to address the CAC's inadequacies. Further, the Lead Plaintiffs have not sought leave to submit any additional amendments or communicated that they possess facts that could overcome the problems identified by the Court. Therefore, the Court dismisses the SAC with prejudice. The Clerk of the Court is respectfully directed to close the case.

**SO ORDERED.**
Dated: Central Islip, New York
April 6, 2020

/s/Arthur D. Spatt

ARTHUR D. SPATT
United States District Judge

36