**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
In Re The Hain Celestial Group Inc.

Securities Litigation
-------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

2:16-CV-04581 (JS) (LGD)

**LEE G. DUNST**, Magistrate Judge:

For more than six years, Plaintiffs have been seeking to pursue a putative class action alleging that defendant The Hain Celestial Group, Inc. ("Hain" or the "Company") and four of its present or former officers—Irwin Simon ("Simon"), Pasquale Conte ("Conte"), John Carroll ("Carroll"), and Stephen Smith ("Smith" and together with Simon, Conte, and Carroll, the "Individual Defendants")—violated federal securities laws from November 5, 2013 through February 10, 2017 (the "Class Period"). *See generally* Second Amended Consolidated Class Action Complaint For Violations Of Federal Securities Laws, filed at Electronic Case File number ("ECF No.") 110 (the "SAC"). Presently before the Court, pursuant to the June 14, 2022 referral from the Honorable Joanna Seybert for a Report And Recommendation, are the latest motions from Hain and the Individual Defendants (together, "Defendants") to dismiss the remaining claims in the SAC. *See* Notice Of Hain's Motion To Dismiss The SAC, ECF No. 113; Notice Of Individual Defendants' Motion To Dismiss The SAC, ECF No. 116. For the reasons set forth below, the undersigned respectfully recommends that the Court grant Defendants' motions to dismiss the SAC with prejudice.

## I.    FACTUAL BACKGROUND

Unless otherwise specified, the facts set forth herein are taken from the SAC, documents incorporated into the SAC by reference, and Hain's public disclosure documents filed with the SEC. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (discussing permissible sources of facts for addressing a motion to dismiss claims for violations of securities laws).

**A.    The Parties**

Defendant Hain manufactures, markets, distributes, and sells more than forty brands of organic and natural food products in the United States and several other countries.  *See* SAC ¶ 25.  During the Class Period, approximately 60% of Hain's consolidated net sales were generated within the United States.  *Id.*  Hain's largest customer during the Class Period was United Natural Foods, Inc. ("UNFI"), a distributor that accounted for 20% of Hain's U.S. sales during the Class Period.  *Id.*

Defendant Simon founded Hain and served as its President, Chief Executive Officer ("CEO"), and Chairman of the Board until June 2018.  *Id.* ¶ 26.  Defendant Smith was Hain's Chief Financial Officer ("CFO") and Executive Vice President from September 3, 2013 to September 30, 2015.  *Id.* ¶ 28.  Defendant Conte served in multiple roles at Hain over time, including as Treasurer and Vice President from July 2009 to October 2014, Senior Vice President of Finance from October 2014 to September 2015, and then CFO and Executive Vice President of Finance from September 2015 to June 2017 (as successor to Smith).  *Id.* ¶ 27.  Finally, Defendant Carroll was Hain's Executive Vice President and CEO for Hain Celestial North America from February 2015 to March 6, 2017, and has been the Executive Vice President for Global Brands, Categories, and New Business Ventures since March 6, 2017.  *Id.* ¶ 29.

Co-Lead Plaintiff Rosewood Funeral Home ("Rosewood") is a funeral home based in Houston, Texas that lost approximately $1,548,333 on Hain call options purchased during the Class Period.  *Id.* ¶ 23.  Co-Lead Plaintiff Salamon Gimpel ("Gimpel" and together with Rosewood, "Plaintiffs") lost approximately $822,519 from his purchases of Hain common stock during the Class Period.  *Id.* ¶ 24.

**B.    The Alleged Fraudulent Scheme**

According to the SAC, Hain began suffering from increased competition in the early 2010s as generic brands and chain stores began offering natural and organic foods.  *See id.* ¶¶ 50-52.  That

increased competition rendered Hain unable to meet its own revenue targets and Wall Street's projections.  *See id.* ¶ 58.

Without explicitly using the term in the SAC, Plaintiffs allege that Defendants responded to those market conditions by engaging in a "channel stuffing" scheme.  *See* SAC ¶ 3.  Channel stuffing is "a scheme which temporarily overstates revenues by persuading customers to accept product deliveries despite the absence of commensurate demand, often on the understanding that excess product can be returned to the seller at a later time."[1]  *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 375 n.2 (S.D.N.Y. 2007).  Defendants allegedly engaged in channel stuffing by shipping extra inventory to its distributors, beyond the distributors' needs, with financial incentives and an absolute right to return the products.  *See* SAC ¶¶ 53-60.

The finer details are as follows.  In the middle of each financial quarter, Carroll obtained Hain's financial sales to estimate the given quarter's anticipated "sales shortfall."  SAC ¶ 63.  Carroll then arranged for Hain's distributors to purchase the amount of inventory needed to make up the anticipated shortfall (referenced in the SAC as "Excess Inventory") in exchange for credits and "off-invoice" concessions from Hain.  *See id*.  Carroll and Simon then told the brand managers how much Excess Inventory to load onto the distributors' trucks and, at the end of the financial quarter, Hain sent the Excess Inventory to the distributors with the understanding that the distributors could later return it without consequence.  *See id*.  As soon as the Excess Inventory shipped, the supply chain/operations finance group that worked under James Meiers ("Meiers"), Hain's former Chief Operating Officer ("COO"), booked revenue on those sales without reducing it by the credits and off-invoice

---

[1] Put differently, "[c]hannel stuffing is the practice of intentionally oversupplying distributors with products in order to artificially inflate sales and revenue. In so doing, a company that stuffs its distribution channels essentially 'robs Peter to pay Paul'—that is, the company inflates revenue for one financial quarter by stealing revenue from a future financial quarter or quarters; and it misrepresents the company's financial status." *Subramanian v. Lupin Inc.*, No. 17-CV-5040, 2020 WL 7029273, at *1 (S.D.N.Y. Aug. 21, 2020) (internal quotations omitted).

concessions the Company provided. *See id.* ¶¶ 62, 64. "Meiers and his inner circle then smoothed out the sales and revenue numbers to avoid the discovery of the fraud." *Id.* ¶ 64. Meiers then sent the modified sales and revenue numbers to Hain's CFO—depending on the point in time, either Smith or Conte—who included those numbers in Hain's SEC filings. *See id.* Subsequently, the distributors returned the Excess Inventory in the following financial quarter. *See id.* ¶ 65. As a result of this repeated practice, the deficit between Hain's actual and reported sales increased with each financial quarter. *See id.*

### C.    The Confidential Witnesses And Their Allegations

In support of its allegations, the SAC relies upon eight confidential witnesses ("CWs"), most of whom previously worked at Hain. Each is described in turn below.

- CW 1 worked at the Company from September 2012 through June 2016 as Hain's Senior Finance Manager responsible for domestic manufacturing costs, including posting accruals quarterly to Hain's accounting department. *Id.* ¶ 32. CW 1 also was "responsible for reporting Hain's financial results," including credits and returns.[2] *Id.* ¶ 83. CW 1 reported to Hain's Senior Director of Supply Chain Finance, who in turn reported to Meiers. *Id.* ¶ 32.

- CW 2 worked at the Company from January 2016 through February 2017 as Hain's Senior Sales Analyst responsible for forecasting, trade planning, and profit and loss analysis at Hain's BluePrint brand.[3] *Id.* ¶ 33. CW 2 reported to the General Manager for BluePrint, who in turn reported to Simon. *Id.*

- CW 3 worked at the Company from June 2014 to July 2016 as an Executive Assistant to Meiers and was responsible for general administrative duties as well as reviewing and formatting Hain's financial results prior to their quarterly public release. *Id.* ¶ 34.

- CW 4 worked at the Company from January 2012 through June 2014 as a Brand Manager and from June 2014 to June 2017 as a Senior Brand Manager. *Id.* ¶ 35. CW 4 was responsible for product development and strategy, profit and loss analysis, and budgeting for non-dairy products. *See id.* CW 4 reported to Hain's former Director of Marketing, who in turn reported to Hain's Vice President of Marketing. *Id.*

- CW 5 worked for UNFI from August 2011 to 2013 as a Senior General Manager in an Ontario,

---

[2] CW 3 confirmed that CW 1 was responsible for the paperwork related to the returns and credits. *See* SAC ¶ 83.

[3] BluePrint products are delivered nationwide and "consist of raw, organic cold-pressed fruit and vegetable juice beverages, including a raw juice cleanse program designed to detoxify the body." SAC ¶ 33.

Canada warehouse that UNFI leased from Hain.  *See id*. ¶ 36.

- CW 6 worked at the Company from 2000 until October 2016 as the Senior Manager of Customer Support and was responsible for customer service tasks, including processing the Company's quarterly numbers and product returns with its financial operations and accounting departments.  *Id*. ¶ 37.  CW 6 reported to Hain's Director of Customer Satisfaction, who in turn reported to Meiers.  *Id*.

- CW 7 worked at the Company from January 2005 until August 1, 2017, most recently as the Senior Director of Supply Chain Finance.  *Id*. ¶ 38.  CW 7 was responsible for managing the supply chain financials, such as profit and loss analysis, cost accounting, and sales reporting. *Id*.  CW 7 reported to Meiers.  *Id*.

- CW 8 was the Company's Manager of Sales Planning for the entirety of the Class Period and was responsible for supporting Hain's Field Sales Team and driving retail sales.  *Id*. ¶ 39.

     1.    <u>The Channel Stuffing Practices</u>

The SAC explains how the Defendants engaged in the alleged channel stuffing scheme.  Per CW 6, Hain would coordinate with UNFI and other distributors to make up for earnings shortfalls by giving the distributors "off-invoice" concessions, and the resulting Excess Inventory deliveries accounted for approximately 20% of Hain's total sales each quarter.  *See id.* ¶ 71.  Approximately six to eight weeks after each quarter ended, UNFI and other distributors began to return the Excess Inventory.  *See id.* ¶ 72.  Returns "normally were heavily scrutinized, but no one asked any questions about UNFI's product returns."  *Id*.  According to CW 6, he processed at least $500,000 in returns each quarter, including a $700,000 return in 2015, and frequently spent entire days processing returns of inventory that were sold to distributors in previous quarters.  *See id*.

Similarly, CW 4 reportedly saw on shipping reports approximately $5 million in transactions during the final weeks of the fiscal quarters.  *See id.* ¶ 81.  CW 4 "kn[ew] they could not be real" because distributors typically took two months of inventory but, by August 2016, UNFI was receiving nearly five months of inventory.  *See id*.  CW 4 stated that this channel stuffing took place throughout his five-year tenure at the Company and that Hain offered concessions to distributors at each quarter end by saying "here's a discount to load"—all before ultimately accepting returns of those items in the

next quarter. *See id*. ¶ 73.

Other CWs likewise described Hain's quarter end "loading" practices. For example, CW 7 explained how, at quarter ends, Hain offered distributors unconditional return rights to push out inventory—which CW 7 referred to as "customer loading." *See id*. ¶¶ 74-75. CW 2 also claimed that the practice of loading and de-loading was part of Hain's "core business practice" with the goal of increasing financial reporting. *See id*. ¶ 77. CW 2 further detailed an instance from 2016 where it was decided that the BluePrint brand would miss its quarterly Wall Street estimates "because of a concern that if [it] ran too many promotions to get inventory out the door, it would negatively impact subsequent quarters." *Id*. ¶ 78. But CW 2 reported that after that initial decision was made, Simon called BluePrint's General Manager and told him to reverse course and that BluePrint needed to "make" the forecasted sales estimates for that quarter. *See id*. Due to Simon's call, BluePrint "pushed" inventory to one of its distributors to make the sales forecasts. *See id*. CW 2 claimed that every Hain brand utilized this practice. *See id*.

2.    Senior Management's Involvement In And Awareness Of Channel Stuffing

The CWs contends that senior management directed the channel stuffing at Hain. For example, CW 4 recalled that employees and executives referred to the shipping of Excess Inventory as "loading" and recounted that Carroll attended numerous brand strategy meetings where loading was discussed, which included discussions about reduced shipments in the given quarter due to loaded inventory in the previous quarter. *See id*. ¶¶ 91-92. CW 4 stated that, after August 2016, Carroll directed employees to stop using the word "loading" and instead use the phrase "inventory reduction." *Id*. CW 7 also confirmed that the term "loading" was used freely among senior executives, including by Carroll and Meiers, and claimed that Simon encouraged Hain's customers to buy more product at the end of the quarter by offering material concessions (and in one instance, those concessions totaled several million dollars). *Id*. ¶¶ 91, 94.

The CWs also addressed Simon and Carroll's quarter end practice with one of Hain's largest customers, UNFI.  CW 6 reported that Carroll asked him to provide "certain numbers, usually by mid-quarter" so that Carroll could determine Hain's quarterly sales shortfall prior to negotiations with UNFI for the latter to take Excess Inventory.  *Id*. ¶ 93.  CW 7 explained that UNFI's owner dealt directly with Simon when it came to anything related to revenue, and Simon could "always make them [UNFI] buy more if needed." *Id.* ¶ 94 (brackets in original).  CW 6 reported that he participated in internal sales calls where Carroll admitted that he negotiated concessions with UNFI to make up for the given quarter's sales deficit.  *See id*. ¶ 93.  CW 7 also explained that Simon granted UNFI a right of return.  *See id*. ¶ 94.

CW 7 alleged that he heard Carroll and Simon discuss loading even though they tried to be "secretive" about it.  *Id.* ¶ 95.  CW 7 explained that he heard Simon and Carroll discuss Hain's financial arrangements with UNFI and that, when they realized that CW 7 heard these conversations, Simon and Carroll said they were "not supposed" to discuss those arrangements in front of others.  *Id.*

According to CW 7, Simon had "special powers" when it came to interfacing with Hain's customers and "only the higher-ups" had the power to make "special deals" with distributors.  *Id.* CW 2 similarly believed that the channel stuffing directives came from Hain's "upper management" based on discussions with Hain's General Manager for the BluePrint brand, who reported directly to Simon.  *Id.* ¶ 96.

### 3.    Revenue Recognition Accounting

The CWs further recounted how the Company accounted for the Excess Inventory in its financial results.  Per CW 6, Hain recognized revenue as soon as the Excess Inventory was "off the dock." *Id*. ¶ 82.  CW 4 corroborated that Hain recognized revenue as soon as the shipments left the warehouse, based on shipment reports.  *See id.*  CW 1 claims that she "was instructed"—although the SAC does not specify by whom—to book credits from the Excess Inventory transactions onto Hain's

"internal financial overview" for "unofficial reporting." *Id.* ¶ 83.   But CW 1 stated that the credits from the Excess Inventory sales were booked on Hain's actual "financial system" as money the distributors owed to Hain (i.e., the credits were posted as accruals due to the Company, otherwise known as accounts receivable).  *See id.*

CW 7 reportedly became weary of the legitimacy of the credits and accruals as they increased relative to historic levels.  According to CW 7, the accruals started at around $200,000, which seemed reasonable at the time, but became suspicious when they grew to approximately $1.5 million.  *See id.* ¶ 85.  CW 7 stated that there was a "correlation" between Hain's quarterly performance and the amount of the accruals.  *Id.*

CW 1 added that by June 2015, he became suspicious of the credit numbers because they continued to grow—despite declining sales—and "reached millions of dollars each quarter." *Id.* ¶ 89. CW 1 left Hain in June 2016 because he believed that the numbers were being manipulated "to fill in [the] gap" between Hain's quarterly estimated and actual performance.  *Id.*

Finally, CW 7 and CW 8 explained that Hain's deficient accounting protocols rendered it susceptible to the improper accounting.   CW 7 reported that Hain lacked an internal audit department, a compliance department, a revenue recognition policy, and a proper internal audit function.  *See id.* ¶¶ 113, 115.  According to CW 7, Hain failed to properly document sales contracts because of those deficiencies.  *See id.* ¶ 115.  CW 8 similarly alleged that Hain failed to properly account for customer billbacks (i.e., rebates or discounts given after transactions) and contract-related issues, which was "compounded by the fact that the people at Hain 'doing the books' did not understand the customer contracts." *Id.* ¶ 116; *see id.* ¶ 117 (similar).  As an example, CW 8 recounted how he learned about "contract-related deals" from the production department because the accounting department failed to inform him of those deals.  *See id.* ¶ 116.

4.    Senior Management's Involvement In Accounting Decisions

The Company's upper managers allegedly were aware of and participated in the accounting decisions for transactions involving the Excess Inventory.  According to CW 4, Hain's sales, inventory, and targets were tracked weekly and included in reviews and reports that were sent each week to Hain's most senior management, including Simon and Carroll.  *See id.* ¶ 97.

Several CWs addressed Meiers' alleged involvement in improper accounting.  CW 1 asserts that the finance team at Hain was run by groups reporting to Meiers and Carroll.  *See id.* ¶ 101.  CW 3 reported that Meiers was "well known for changing numbers left and right," which CW 3 found "hard to believe because they were sales results for the quarter, not forecasts."  *Id.* ¶¶ 100, 104.  CW 3 also recounted that he was directed to print multiple copies of the same finance reports for Meiers and Carroll's assistants—but the numbers in those reports changed with each subsequent print request.  *See id.* ¶ 104.  According to CW 3, Meiers "would sit in a room for a week to make the numbers 'look pretty.'"  *Id.*

CW 1 explained that when Meiers wanted to change the financial numbers, he would tell the accounting team "this number has to change."  *Id.* ¶ 102.  CW 1 reported that Marla Hyndman ("Hyndman"), Hain's Senior Vice President and Controller, and Rose Ng ("Ng"), the Senior Vice President of Finance and Business Planning, asked Meiers to justify his proposed changes.  *See id.* Both CW 3 and CW 7 confirmed that Ng routinely requested that Meiers justify these proposed changes.  *See id.* ¶ 112 (CW 3 recalling that Ng "attempted to operate as a check and balance" on Hain's finance team and "was always chasing Meiers" in connection with the numbers); *id.* ¶ 113 (CW 7 recalling that "Ng was considered internally to be the 'police'" and that her endeavor "to dig into" Meiers' numbers made Meiers "uncomfortable").  Nonetheless, CW 1 reported that "ultimately Meiers could get what he wanted done."  *Id.* ¶ 102.

Similarly, CW 1 and CW 7 described Meiers' involvement with accounting decisions.

According to CW 7, Meiers supervised Stephen Powhida ("Powhida"), Senior Vice President of

Manufacturing, and relied on Powhida to create accruals that "always magically made it so Hain was

no longer short." [4]  *Id*. ¶ 86; *see also id*. ¶ 87 (CW 7 explaining how accruals were communicated

internally and reiterating that Powhida "ma[d]e the numbers just right" before each quarter end).

CW 7 described the accruals as Powhida's "creativity." *Id*. ¶ 86.  Similarly, CW 1 reported that

Meiers directed Powhida to "book . . . with accounting" the credits connected with the Excess

Inventory shipments. *Id*. ¶ 98.  CW 1 recalled one instance when Powhida submitted a $3 million

credit to accounting that later was included in Hain's financial reports. *See id*.  CW 1 reportedly

questioned Powhida and Meiers about the credits, but they responded "don't worry about it."

*Id*. ¶ 103.

### 5.    September 2015 Employee Terminations

The complaint alleges that in September 2015 "[e]mployees who questioned the [channel

stuffing] practices were fired." *Id*. ¶ 108.  For example, Smith left Hain on September 8, 2015—after

only two years as CFO—and CW 1 believes Smith was forced out because he was "not willing to be

one of Simon's puppets." [5]  *Id.* ¶¶ 109-10. Although Smith allegedly left to pursue other

opportunities, he had not secured new employment as of December 2016. *See id*. ¶ 111.

Ng also was fired in September 2015 because, according to CW 1, she was a "bottleneck" to

Meiers' accounting manipulations. *Id*. ¶ 112.  CW 3 corroborated that Hain fired Ng "after she was

constantly butting heads with Meiers because she was unwilling to manipulate the Company's

financial numbers." *Id*.  CW 7 reported that, after Ng was terminated, "there was no one" at Hain to

push back on Meiers' improper accounting. *Id*. ¶ 113.

---

[4] CW 3 characterized Powhida as Meiers' "right hand man" stemming from their days working together at Heinz. SAC ¶ 100.

[5] CW 1 also claimed that the head of Human Resources and unnamed others were replaced for disagreeing with Simon.  *See* SAC. ¶ 110.

Hain also fired Powhida in September 2015.  *Id.* ¶ 114.  CW 1 believes Powhida was fired "to take the hit for the credits scheme."  *Id.*  CW 7 similarly believed Powhida was fired to make him the "scapegoat" for Meiers.  *Id.*

6.   <u>Discovery of the Channel Stuffing</u>

However, new employees later joined the Company and learned of the channel stuffing at Hain.  For example, James Langrock ("Langrock") joined the Company in November 2015 as Senior Vice President, Finance and Treasurer, and Michael McGuinness ("McGuinness") joined the Company in March 2016 as Senior Vice President, Finance and Chief Accounting Officer.  *See* Hain 8-K dated February 29, 2016, filed with the SEC on March 1, 2016 (announcing McGuinness' hiring at Hain); Hain 8-K dated June 20, 2017, filed with the SEC on June 22, 2017 (describing Langrock's employment at Hain).  According to CW 7, both Langrock and McGuinness "were surprised to find what was going on at Hain," and they undertook an accounting review that led to Hain subsequently delaying the filing of its financials and ultimately adjusting previously-filed financials.  *See id.* ¶ 115. CW 8 likewise reported that the accounting problems were uncovered once Langrock joined Hain and began reviewing the books.  *Id.* ¶ 117.  As a result, per CW 8, "it became clear to Langrock" that Hain made significant deals with customers at quarter ends, and CW 8 "heard that Langrock questioned 'if we are doing that, how are we accounting for that?'" *Id.* ¶ 117.  CW 8 reported that Langrock ultimately brought his finding to the Company's outside auditors.  *Id.*  Similarly, several CWs reported that EY (formerly Ernst & Young) conducted an external audit of Hain around December 2015.  *See id.* ¶ 119.  CW 4 "heard" that EY had identified the channel stuffing as an accounting issue. *Id.*  CW 6 further asserted that EY "caught" Hain during the audit and that "UNFI kept popping up" in the audit.  *Id.*

**D.   Defendants' Class Period Statements**

Plaintiffs allege that Hain's failure to disclose that it (1) recorded revenue from inventory

forced onto distributors—even though the distributors were not obligated to pay for the shipments and had an absolute right to return the products the next quarter; (2) relied on certain "unsustainable" practices to generate sales (such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and an absolute right of return); and (3) lacked adequate accounting controls rendered a plethora of Defendants' Class Period statements materially false or misleading.  The SAC places those statements into three general categories:

- Statements in the Company's SEC filings between November 2013 and May 2016 regarding Hain's sales, including the representation of Hain's sales numbers in Forms 8-K and 10-K. *See id.* ¶¶ 163-250.

- Statements during the Company's investor calls between January 14, 2014 and May 4, 2016 in which the Individual Defendants discussed sales, revenue, inventory, and sales demand. *See id.* ¶¶ 251-292.

- Statements in various SEC filings during the Class Period concerning Hain's accounting policies, revenue recognition practices, sales/promotion incentives, trade promotions, Sarbanes-Oxley certifications, and internal controls.  *See id.* ¶¶ 292-319.

The SAC alleges that Hain partially disclosed the effects of its channel stuffing practices in January, August, and November 2016 before fully disclosing the truth of those practices in February 2017.

### 1.    January 2016 Reduced Sales And Earnings Estimates

On January 11, 2016, Hain announced it was cutting its anticipated full year sales and earnings per share.  *See id.* ¶ 121.  Hain reduced (1) anticipated sales revenues from approximately $3.04 billion to approximately $2.97 billion and (2) estimated earnings from approximately $2.19 per share to approximately $2.02 per share.  *Id.*  On January 21, 2016, Hain revealed in a Form 8-K that Ross Weiner ("Weiner") had resigned as Vice President of Finance and Chief Accounting Officer. *Id.* ¶ 122.  CW 6 asserts that Weiner left because "he did not like what he was seeing regarding [the channel stuffing]."  *Id.*   The next day, Simon assured Wall Street analysts that there was "nothing wrong with Hain's accounting at all."  *Id.* ¶ 123.

Between January 21, 2016 and January 25, 2016, Hain's shares declined 7%—from $36.10 per share to $33.46 per share. *Id*. ¶ 124. Plaintiffs maintain Simon's remarks to Wall Street analysts artificially propped up Hain's stock price and kept it from falling further. *Id*.

          2.       August 2016 Audit Committee Revenue Recognition Review, Resulting Delay
                    <u>In Filing Financials with the SEC, And Failure To Meet Performance Estimates</u>

On August 15, 2016, Hain announced in a Form 8-K that it "will delay the release of its fourth quarter and fiscal year 2016 financial results." *Id*. ¶ 125. That filing explained that the Company historically "recognized revenue pertaining to the sale of its products to certain distributors at the time the products are shipped" but the Board's Audit Committee was "evaluating whether the revenue associated with the concessions granted to certain distributors should instead have been recognized at the time the products sell through its distributors to the end customers." *Id*.; Hain 8-K dated August 15, 2016 and attached Exhibit 99.1, filed with the SEC on August 15, 2016 ("August 2016 Form 8-K"). The Company reported that it expected any potential changes in revenue recognition timing "should not impact the total amount of revenue ultimately recognized by the Company with respect to such distributors and does not reflect on the validity of the underlying transactions with respect to such distributors." August 2016 Form 8-K. The Company further disclosed that it "will not be in a position to release financial results until the completion of the independent review of the Audit Committee and of the audit process relating to the 2016 fiscal year." *Id*. Given that ongoing review, Hain cautioned "[t]here can be no assurance that the Company will complete the preparation and filing of the Form 10-K within the extension period." *Id*. The Company also disclosed that "[s]eparately, the Company does not expect to achieve its previously announced guidance for fiscal year 2016." *Id*.

Over the course of the day on August 16, 2016, Hain's shares fell 26%—from $53.40 per share when the market closed on August 15, 2016 to $39.35 per share by the time the market closed on August 16, 2016. SAC ¶ 126. This represented a loss of $1.6 billion in market capitalization,

and Wall Street analysts accordingly lowered their price targets for Hain stock. *See id.* ¶¶ 126-27.

On August 30, 2016, Hain filed a Notification of Late Filing with the SEC on Form 12b-25 providing that the Company was unable to file its Fiscal Year 2016 annual Form 10-K report by the filing deadline. *See id.* ¶ 129. Hain reiterated that the delay resulted from the Company's review of "whether the revenue associated with those concessions was accounted for in the correct period" and its review of "its internal control over financial reporting." *Id.* On November 2, 2016, NASDAQ granted Hain an extension of time to file its reports with the SEC through February 27, 2017. *See id.* ¶ 130.

### 3.   November 2016 Results From Audit Committee Review

On November 16, 2016, Hain issued a press release announcing the completion of the internal review of its accounting. The press release stated that the Audit Committee found no evidence of "intentional" wrongdoing in connection with Hain's financial statements—but nonetheless said that "Hain Celestial has begun to implement a remediation plan to strengthen its internal controls and organization." *Id.* ¶ 132. Hain further stated that it would be unable to release its financial results until it completed the "audit process" and review of accounting procedures. *Id.* ¶ 134.

### 4.   February 2017 Expanded Accounting Review and SEC Investigation

On February 10, 2017, Hain filed another Notification of Late Filing on Form 12b-25—which stated Hain had expanded the scope of its internal accounting review "to perform an analysis of previously-issued financial information in order to identify and assess any potential errors." *Id.* ¶ 137. That filing also revealed that the "SEC has issued a formal order of investigation and, pursuant to such order, the SEC issued a subpoena to the Company seeking relevant documents." *Id.*

Between the market's close on February 10, 2017 and the close on February 13, 2017, which was the next trading day, Hain's share price fell 8%—from $38.53 to $35.10 per share. SAC ¶ 138.

**E.    Relevant Periodic Reports Filed After The Class Period**

On June 22, 2017 (after obtaining two extensions from NASDAQ and five waivers from its credit facility lenders), Hain filed its Form 10-K for the fiscal year 2016 ending June 30, 2016 ("2016 Form 10-K"), as well as the Company's Forms 10-Q for the first, second, and third quarters of fiscal year 2017.  *See id*. ¶ 146.  The Company again reported that it delayed those filings to allow the Audit Committee and the Board of Directors to "separately conduct[] an independent review" of (1) revenue recognition on transactions with "additional concessions to certain distributors" and (2) "the Company's internal control over financial reporting."  2016 Form 10-K at 3.  The Company reiterated that the Audit Committee's independent review "found no evidence of intentional wrongdoing in connection with the preparation of the Company's financial statements."  *Id.*

1.    Weaknesses In Financial Reporting

The 2016 Form 10-K disclosed that Hain had material weaknesses in its control environment and revenue recognition.  Hain's material weakness in its "Ineffective Control Environment" was that it "did not sufficiently promote effective internal control over financial reporting."  *Id.* at 110.  Principle contributing factors included:

> (i) an insufficient number of personnel appropriately qualified to perform control design, execution and monitoring activities; (ii) an insufficient number of personnel with an appropriate level of U.S. GAAP knowledge and experience and ongoing training in the application of U.S. GAAP commensurate with our financial reporting requirements; and (iii) in certain instances, insufficient documentation or basis to support accounting estimates.

*Id.*

As to revenue recognition, the Company's material weakness was that its "internal controls to identify, accumulate and assess the accounting impact of certain concessions or side agreements on whether the Company's revenue recognition criteria had been met were not adequately designed or operating effectively."  *Id.*  Hain provided further detail on the shortcomings of its controls:

The Company's controls were not effective to ensure (i) consistent standards in the level of documentation of agreements required to support accurate recording of revenue transactions, and (ii) that such documentation is retained, complete, and independently reviewed to ensure certain terms impacting revenue recognition were accurately reflected in the Company's books and records. In addition, the Company did not design and maintain effective controls over the timing and classification of trade promotion spending.

*Id.*

However, Hain maintained that those weaknesses in internal controls "did not result in a restatement to previously filed financial statements" and instead "resulted in immaterial adjustments to our consolidated financial statements as of and for the years ended June 30, 2015 and 2014." *Id.* at 110-11. At the same time, Hain implemented various "remediation efforts" to address those systemic weaknesses. *See* 2016 Form 10-K at 111. The Company also announced that Langrock would replace Conte as the Company's CFO. *See* SAC ¶ 146.

2.    Adjustments To Financial Results

***Adjusted Fiscal 2014 and Fiscal 2015 Revenue.*** Hain further detailed that the review of its revenue recognition practices concerned "side agreements and concessions provided to distributors in the United States, including payment terms beyond the customer's standard terms, rights of return of product and post-sale concessions, most of which were associated with sales that occurred at the end of the quarter." 2016 Form 10-K at 67. The Company concluded that "its historical accounting policy for these distributors is appropriate as the sales price is fixed or determinable at the time ownership transfers to these distributors, based on the Company's ability to make a reasonable estimate of future returns and certain concessions at the time of shipment." *Id*.

In its note of "Correction of Immaterial Errors to Prior Period Financial Statements," the Company identified and corrected immaterial errors that affected previously issued financial statements. Hain explained that it

- reduced revenue by $26,144,000 in fiscal year 2015 and $630,000 in fiscal year 2014 to "correct[] errors in the timing of revenue recognition for customers whose

ownership transferred when the product is delivered to the customer;"

- reduced revenue by $5,796,000 in fiscal year 2015 and $6,854,000 in fiscal year 2014 "to correct for errors related to the appropriate timing of customer payments and incentives associated with trade promotions;" and

- reduced revenue by $46,962,000 in fiscal year 2015 and $38,305,000 in fiscal year 2014 to "reclassify certain customer payments and incentives related to trade promotions from selling, general and administrative expense and cost of goods sold . . . ."

*Id*. at 68. "In total, these three revenue corrections reduced revenue $78,902[,000] and $45,789[,000] for the years ended June 30, 2015 and 2014, respectively." *Id*. For context, the Company reported $2,688,515,000 and $2,153,611,000 in revenue for the years ended June 30, 2015 and 2014, respectively. *See id*. at 71 (listing the reported revenue figures as "[n]et sales" and reconciling the financial adjustments with previously reported figures).

***Adjusted Fiscal 2014, Fiscal 2015, and Nine Month 2016 Net Sales, Net Income, and Earnings Per Share.*** The Company acknowledged that, while they "were immaterial" to previously issued financial statements, the "cumulative correction" of the revenue reductions described above "had a material impact." *Id*. Accordingly, Hain adjusted (among other things) its net sales, net income, and diluted earnings per share for fiscal year 2014, fiscal year 2015, and the first nine months of 2016. Altogether, Hain reduced (1) net sales by approximately $166.5 million, or 6.9%; (2) net income by approximately $14 million, or 9.7%; and (3) diluted earnings per share by $0.13, or 8.9%.[6]

---

[6] For fiscal year 2014, Hain reduced (1) its net sales by approximately $45.7 million, or about 2.1%; (2) net income by approximately $9.9 million, or about 7.1%; and (3) diluted earnings per share by approximately $0.10, or about 7%. *See* Hain 10-K for the fiscal year ending June 30, 2015, filed with the SEC August 21, 2015 ("2015 Form 10-K"), at 27 (originally disclosing $1.42 diluted earnings per share for fiscal year 2014); 2016 Form 10-K at 32 (disclosing revised diluted earnings per share of $1.32 for fiscal year 2014); *id*. at 71 (detailing revisions to net sales and net income for fiscal year 2014); *see also* SAC ¶ 148.

For fiscal year 2015, Hain reduced (1) its net sales by approximately $78.9 million, or about 2.9%; (2) net income by approximately $2.9 million, or about 1.7%; and (3) diluted earnings per share by approximately $0.02, or about 1.2%. *See* 2015 Form 10-K at 27 (originally disclosing $1.62 diluted earnings per share for fiscal year 2015); 2016 Form 10-K at 32 (disclosing revised diluted earnings per share of $1.60 for fiscal year 2015); *id*. at 71 (detailing revisions to net sales and net income for fiscal year 2015); *see also* SAC ¶ 148.

For the first nine months of fiscal year 2016, Hain reduced (1) its net sales by approximately $41.8 million, or about 1.9%; (2) net income by approximately $1.2 million, or about 0.9%; and (3) diluted earnings

***Underperforming 2017 U.S. Net Sales, Net Income, and Earnings Per Share.*** Additionally, Hain reported—with respect to the first nine months of fiscal 2017—a 14% decrease in U.S. net sales, a 51.1% decrease in net income, and a 51.1% decrease in diluted earnings per share compared to the first nine months of fiscal 2016.[7] *See* SAC ¶ 153. On the June 22, 2017 earnings call, Hain attributed the sales decline to "an inventory realignment at certain customers and a SKU rationalization." SAC ¶ 154. Further, the 2016 Form 10-K disclosed, with respect to Hain's U.S. business, that "both fiscal 2016 and fiscal 2015 net sales benefited from certain concessions provided to our largest distributors, including payment terms beyond the customer's standard terms, rights of return of product and post-sale concessions, most of which were associated with sales that occurred at the end of each respective quarter." *Id*. ¶ 146.

### 3. The Relationship To Prior Wall Street Estimates

The SAC alleges that the channel stuffing scheme's true purpose was to meet Wall Street's expectations. *See id*. ¶ 151. To that end, the SAC explains whether certain Class Period quarters originally beat Wall Street estimates but fell short of those estimates when accounting for Hain's adjusted financials—which purportedly "show[s] that the Company relied on undisclosed, unsustainable pull-in sales practices to beat consensus estimates for the third and fourth quarter of Fiscal Year 2015 and the second quarter of Fiscal Year 2016." *Id*. ¶¶ 151-52.

Hain later issued its fourth quarter 2017 and fiscal year 2017 forecast, which again fell short of

---

per share by approximately $0.01, or about 0.7%. Hain 10-Q for the quarter ending March 31, 2016, filed with the SEC May 10, 2016 ("2016 Q3 Form 10-Q"), at 9 (originally disclosing $1.32 earnings per share for the first nine months of fiscal year 2016); Hain 10-Q for the quarter ending March 31, 2017, filed with the SEC June 22, 2017 ("2017 Q3 Form 10-Q"), at 16 (disclosing revised diluted earnings per share of $1.31 for the first nine months of fiscal year 2016); *id.* at 12 (detailing revisions to net sales and net income for the first nine months of fiscal year 2016); *see also* SAC ¶ 148.

[7] *Compare* 2016 Q3 Form 10-Q at 9, 23 (reporting approximately (1) $137.2 million in net income; (2) $1.025 billion in U.S. net sales; and (3) $1.33 diluted earnings per share for the first nine months of fiscal 2016); *with* 2017 Q3 Form 10-Q at 16, 29 (reporting approximately (1) $67.1 million in net income; (2) $882.2 million in U.S. net sales; and (3) $0.65 diluted earnings per share for the first nine months of fiscal 2017).

Wall Street expectations. *See id.* ¶ 154. Hain projected that its revenue would be between $2.84 billion and $2.86 billion, which was approximately $50 million dollars below the consensus estimate of approximately $2.9 billion. *See id.*

**F.     The SEC Order Addressing Class Period Conduct**

On December 11, 2018, the SEC announced that it reached a settlement with Hain concluding the SEC's investigation of the Company and agreeing to a consent "Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order" (the "SEC Order"). *See id.* ¶ 13. More than two years earlier, on August 15, 2016, Hain self-reported to the SEC that the Company was investigating its financial reporting controls and its accounting in connection with quarter end sales incentives granted to certain U.S. distributors.[8] *See* SEC Order ¶ 19. The SEC Order recognizes that Hain "promptly self-reported to the Commission" and "assisted with the Commission's investigation, including by providing regular updates and analyses related to its internal investigation." *Id.* ¶ 25.

Hain admitted in the SEC Order to asking distributors to purchase specific dollar values of inventory by quarter-end in exchange for additional incentives. *See id.* ¶ 5. The SEC investigated four sales practices Hain undertook for its two largest U.S. distributors: (1) cash incentives, (2) extended payment terms, (3) discounts off list price, and (4) "spoils coverage, whereby Hain agreed to reimburse the distributor for products that spoiled or expired before the distributor could sell through to retailers." *Id.* The SEC concluded that "[n]one of these types of incentives are improper; however, they could have financial reporting implications." *Id.*

1.     Distributor 1 - UNFI

The SEC investigated Hain's practices with "Distributor 1," which the parties agree is UNFI.

---

[8] Citations to the SEC Order are to the copy filed with the Declaration Of John M. Hillebrecht In Support Of Hain's Motion To Dismiss ("Hillebrecht Declaration") as Exhibit A, ECF No. 115-1.

*See id*. ¶¶ 6-12 (reporting investigation into "Distributor 1"); SAC ¶ 15 (identifying Distributor 1 as

UNFI); Memorandum Of Law In Support Of Defendant The Hain Celestial Group Inc.'s Motion To

Dismiss The Second Amended Consolidated Class Action Complaint, ECF No. 114 ("Hain Mem."),

at 20 (recognizing that Distributor 1 is UNFI).   During the Class Period, Hain executed annual sales

contracts with UNFI stipulating to quarterly sales growth targets, totaling up to $90 million per

quarter, and providing financial incentives to UNFI if it met those targets.  *See* SEC Order ¶ 6.

UNFI communicated to Hain's sales personnel over time that it might not purchase sufficient

inventory to meet the relevant quarterly target, potentially missing the target by as little as $10 million

or as much as $30 million.  *See id*.  In response, Hain renegotiated the terms to incentivize UNFI to

meet or exceed the sales growth targets.  In exchange for meeting a renegotiated inventory purchasing

target, UNFI generally received extra-contractual incentives, such as (1) cash financial incentives, (2)

spoils coverage, and/or (3) occasionally extended payment terms.  *See id.* ¶ 7.

Regarding the spoils coverage, Hain reimbursed UNFI for products purchased in quarter end

sales that expired or spoiled before UNFI sold them to retailers.  *See id.* ¶ 8.  During the Class Period,

Hain paid out increasing amounts to UNFI under that spoils coverage, rising from $0.5 million in

fiscal year 2013 to $1.6 million in fiscal year 2016.  *See id.*  But given that Hain's annual net sales to

UNFI during that time period exceeded $325 million, the SEC concluded that "[t]he vast majority of

the products purchased in connection with EOQ sales to [UNFI] ultimately sold through to

retailers." *Id.*

The SEC, however, found that the quarter end incentives were inappropriately documented

because they were typically memorialized only in email correspondence or agreed to orally without

formally amending the annual sales contract.  *See id.* ¶ 9.  In addition, the end of quarter incentives

"were not fully communicated . . . to the appropriate personnel in Hain's accounting and finance

departments, to take into consideration any relevant accounting implications."  *Id*. ¶ 12.  Moreover,

"Hain lacked clear policies and procedures regarding when distributor incentives required approval and/or notification beyond the sales team (whether based on the concession's size or character)." *Id.*

### 2. Distributor 2

The SEC also investigated Hain's practices with "Distributor 2," its second-largest U.S. distributor.[9]  Unlike UNFI, Distributor 2 was never subject to any contractual provisions related to quarterly sales growth targets. *See id.* ¶ 13.  Nonetheless, Hain requested that Distributor 2 purchase a specific amount of inventory by quarter end in exchange for additional incentives.  *See id.* Distributor 2 countered Hain's requested volume target with a lower figure due to its pre-existing inventory levels and concerns that additional inventory would expire. *See id.*

In addition to a volume target, Hain's quarter end sales to Distributor 2 included incentives such as (1) off-invoice discounts (increasing from \$200,000 to \$1.5 million), (2) extended payment terms, and (3) spoils coverage (increasing to a maximum of \$430,000).  *See id.* ¶ 14.  As with UNFI, the SEC similarly found that the "vast majority of the products purchased in connection with EOQ sales to Distributor 2 ultimately sold through to retailers." *Id.*

The SEC also found that Hain utilized the same deficient accounting practices for its quarter end sales to Distributor 2 that the SEC found Hain used for its quarter end sales to UNFI.  *See id.* ¶¶ 15–17.

### 3. The SEC's Conclusions

The SEC concluded that Hain violated Section 13(b)(2)(A) of the Securities Exchange Act of 1934 ("Exchange Act") (which requires Hain to make and keep records which accurately and fairly reflect Hain's transactions) and Section 13(b)(2)(B) of the Exchange Act (which requires Hain to devise and maintain a system of internal accounting controls sufficient to provide reasonable

---

[9] "Plaintiffs believe that . . . 'Distributor 2' is Walmart" based on disclosures in Hain's Class Period SEC filings about its top customers.  SAC ¶ 15.  Hain has not confirmed the identity of Distributor 2.

assurance that transactions are executed in accordance with management's authorization and in conformity with GAAP).  *See id.* ¶¶ 23–24.  Per the SEC Order, Hain agreed to remedial efforts, including establishing an internal audit function; implementing changes to its revenue recognition practices; and developing a revenue recognition and contract review training program.  *See id.* ¶¶ 25– 27.

## G.   Additional Evidence Of Alleged Scienter

### 1.   Personnel Changes

In addition to the previously described executive terminations that occurred during the Class Period, the SAC focuses on the Company's COO change near the end of the Class Period.  On December 7, 2016, the Company announced that Meiers would be replaced by Gary Tickle, move to Hain's Pure Protein Corporation, and retain COO responsibilities for Hain's Project Terra.[10]  *See* SAC ¶ 344.  CW 1 categorized this change as "a demotion for Meiers."  *Id.*  The SAC also cites several post-Class Period terminations and position changes.  *See id.* ¶¶ 345 (alleging the Company removed Carroll on March 6, 2017 as Hain North America's CEO and installed him as Hain's Executive Vice President, Global Brands, Categories and New Business Ventures); 346-47 (describing Hain's June 22, 2017 announcement that Conte immediately resigned as Hain's CFO); 348 (alleging that, on an unspecified date in 2018, Hain terminated Hyndman, the former Senior Vice President and Controller); 349 (alleging that, in June 2018, "Hain announced that Simon was leaving Hain").

According to Plaintiffs, this executive turnover after the end of the Class Period "indicates that certain individuals at the Company (e.g., the Board of Directors) had determined that Defendants were aware of the deficiencies in their accounting staff and intentional and/or reckless conduct with respect

---

[10] During fiscal year 2016, the Company commenced a strategic review called "Project Terra" that resulted in the Company redefining its core platforms.  2016 Form 10-K at 5.

to its financial reporting . . . ." *Id*. ¶ 350.

2.  Carroll and Simon's Stock Sales and Bonusses

During the Class Period, Simon and Carroll allegedly "reaped the rewards of their fraud" by selling Hain stock while its price was artificially inflated. *Id*. ¶ 353. According to Plaintiffs, Simon and Carroll sold a substantially larger number of shares during the 1,193 day long Class Period than they sold during the preceding 1,193 days (the "Control Period"):

| Person | Control Period | | Class Period | |
|---|---|---|---|---|
| | Number of Shares Sold | Net Proceeds | Number of Shares Sold | Net Proceeds |
| Carroll | 100,000 | $3,816,328 | 308,916 | $24,388,112 |
| Simon | 915,000 | $42,052,050 | 983,798 | $80,227,263 |

*Id*. ¶ 355; *see also id* ¶¶ 356-59 (describing and characterizing these sales).

Simon and Carroll also allegedly were "motivated to misrepresent Hain's financial results" because, as the Company disclosed in its October 9, 2015 proxy statement, "executive compensation was tied to the Company hitting target net sales, diluted earnings per share, and [earnings before interest, taxes, depreciation, and amortization] adjusted." *Id*. ¶ 363. In fiscal year 2015, Simon received a $1.85 million salary, a $5,656,725 bonus, and $8,787,355 in stock awards. *See id*. ¶ 364. That same year, Carroll received a $693,000 salary, a $711,711 bonus, and $1,119,854 in stock awards. *See id*.

3.  Hain's Acquisitions Using Company Stock

Plaintiffs assert that "Defendants were further motivated to artificially inflate Hain's share price" to complete acquisitions "using fewer shares than if Defendants had fully revealed the Company's reliance on undisclosed, unsustainable pull-in sales practices to generate sales." *Id*. ¶¶ 366-67. In support of that assertion, the SAC cites four Class Period acquisitions. First, on

January 13, 2014, Hain acquired Tilda Limited in exchange for, *inter alia*, 1,646,173 shares of Hain

stock valued at $148,400,000.  *Id.* ¶ 366.  Second, on April 28, 2014, Hain acquired Charter Baking

Company in exchange for, *inter alia*, 133,744 shares of Hain stock valued at $11,168,000.  *Id*.  Third,

on July 17, 2014, Hain acquired the remaining 51.3% of Hain Pure Protein Corporation that it did not

already own in exchange for, *inter alia*, 231,428 shares of Hain stock valued at $19,690,000.  *Id.*

Fourth, on July 24, 2015, Hain acquired Formatio Beratungs und Beteiligungs GmbH and its

subsidiaries in exchange for, *inter alia*, 240,207 shares of Hain stock valued at $16,308,000.  *Id*.

4.    Core Operations And Remedial Measures

The SAC argues that the Individual Defendants "had knowledge of" or "had full and

unfettered access" to "all material facts" regarding Hain's U.S. business because, as the generator of

approximately 60% of Hain's net sales, the U.S. business comprised Hain's "core operations."

*Id*. ¶¶ 351-52.

The SAC also argues that Hain's "remediation efforts" described in the 2016 Form 10-K and

the SEC Order—generally concerning "organizational enhancements," "Revenue Practices," and

"Training Practices"— demonstrate "the utter lack of oversight and control that needed correction"

and "strongly support an inference of scienter."  *Id*.  ¶¶ 360-62.

## II.    PROCEDURAL HISTORY

The lengthy procedural history of this case includes several decisions from the District Court

and the Second Circuit.

### A.    Original District Court Proceedings

On August 17, 2016, three plaintiffs filed separate securities fraud actions against Hain.  *See*

Stipulation And Order, ECF No. 12, at 2 (addressing anticipated motions to consolidate cases).  On

June 5, 2017, District Judge Arthur D. Spatt consolidated the cases and appointed Plaintiffs as the lead

plaintiffs.  *See* Order For Consolidation, Appointment Of Co-Lead Plaintiffs, And Approval Of

Selection Of Co-Lead Counsel, ECF No. 56.

On September 7, 2017, Plaintiffs filed a Corrected Consolidated Class Action Complaint for Violations of Federal Securities Laws that asserted (1) claims against all Defendants under the Exchange Act for violations of 15 U.S.C. § 78j(b) ("Section 10(b)") and the regulations promulgated thereunder at 17 C.F.R. § 240.10b–5 ("Rule 10b-5"), and (2) claims against the Individual Defendants as control persons under the Exchange Act for violations of 15 U.S.C. § 78t(a) ("Section 20(a)"). *See* ECF No. 75.

On October 3, 2017, Defendants moved to dismiss that complaint for failure to state a claim. *See* ECF No. 81.  On April 4, 2018, Judge Spatt ordered additional briefing on whether and how Plaintiffs' claims would be affected if the Court found that Plaintiffs failed to adequately plead that the channel stuffing practices were illegal.  *See* Short Form Order, ECF No. 98.  On March 29, 2019, after receiving the additional briefing, the Court granted Defendants' motion to dismiss without prejudice and granted Plaintiffs leave to amend their complaint.  *See In re The Hain Celestial Grp. Inc. Sec. Litig.*, No. 16-CV-04581, 2019 WL 1429560 (E.D.N.Y. Mar. 29, 2019).

On May 6, 2019, Plaintiffs filed the SAC, which principally added allegations concerning the SEC Order, CW 7, and CW 8 to support the claims described above.  *See* SAC.  The SAC sets forth three causes of action: Count I alleged violations of Section 10(b) and Rule 10b-5(b) by all Defendants arising from the materially false or misleading statements described above; Count II alleged violations of Section 10(b) and Rule 10b-5(a) and (c) by all Defendants arising from the conduct of the channel stuffing practices; and Count III alleged violations of Section 20(a) by the Individual Defendants as control persons of Hain arising from the foregoing statements and conduct. *See id*. ¶¶ 348-365.  On June 20, 2019, Defendants again moved to dismiss for failure to state a claim. *See* ECF Nos. 113 (Hain's motion to dismiss the SAC), 116 (Individual Defendants' motion to dismiss the SAC).  On April 6, 2020, Judge Spatt granted Defendants' motions and dismissed the

SAC with prejudice (the "2020 Dismissal Decision"). *See In re Hain Celestial Grp. Inc. Sec. Litig.*, No. 16-CV-04581, 2020 WL 1676762 (E.D.N.Y. Apr. 6, 2020).

### B.    The Second Circuit Appeal

On May 5, 2020, Plaintiffs noticed their appeal of the 2020 Dismissal Decision to the Second Circuit. *See* Notice Of Appeal, ECF No. 124. Ultimately, Plaintiffs appealed only the dismissal of their Rule 10b-5(b) claim and abandoned their Rule 10b-5(a) and (c) claims. *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 136 (2d Cir. 2021); *see also id.* at 137 (reiterating that the "conclusion that the Complaint could not succeed under [Rule 10b-5] clauses (a) or (c)" was "a question we do not consider as Plaintiffs have not appealed from dismissal of the Complaint under those clauses").

In its December 17, 2021 decision, the Second Circuit recounted that the 2020 Dismissal Decision found that the alleged channel stuffing was not inherently fraudulent—thus not violative of Rule10-b(5)(a) and (c)—and, based on that finding, concluded that Rule 10b-5(b) did not require Hain to disclose the channel stuffing. *See id.* at 136-37 (citing *In re Hain*, 2020 WL 1676762, at *12). But the Second Circuit disagreed and concluded that a "[v]iolation of clause (b), unlike violations of clauses (a) and (c), does not require that the defendant have used a fraudulent or otherwise illegal device, scheme, artifice, act, practice, or course of business. Its focus is rather on whether something said was materially misleading." *Id.* at 136.

Applying that principle, the SAC's assertion that Defendants violated Rule 10b-5(b) when they made false or misleading statements about Hain's strong sales, which omitted to state Hain achieved those sales in the face of increased competition largely by unsustainable channel stuffing, "does not depend on whether the alleged channel stuffing practices themselves were fraudulent or otherwise illegal." *Id.* at 137; *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007) (explaining the practice of channel stuffing is illegitimate when a company "writ[es] orders for

products customers had not requested" but may be legitimate when a company "offer[s] customers discounts as an incentive to buy"). Accordingly, the Second Circuit concluded that the 2020 Dismissal Decision's disposition of the Rule 10b-5(b) claim, based on the conclusion that the channel stuffing practices did not require disclosure for being fraudulent and violative of Rule 10b-5 (a) and (c), "reflects a misunderstanding of the requirements of clause (b), as well as of Plaintiffs' theory." *In re Hain*, 20 F.4th at 137.

The Second Circuit also vacated the 2020 Dismissal Decision's finding that the SAC failed to adequately plead that Defendants acted with the requisite wrongful state of mind. First, "[t]he district court's mistaken understanding" of the interplay between the channel stuffing and statements challenged under Rule 10b-5(b) "inevitably affected the district court's view" of whether those statements were made with scienter. *Id*. Second, while it separately considered both (1) the allegations of the Individual Defendants' motive and opportunity to act with scienter and (2) the circumstantial allegations of scienter, the 2020 Dismissal Decision failed to assess "the total weight" of all the scienter allegations. *See id*. at 137-38. Notably, the Second Circuit "express[ed] no views on whether, when weighed cumulatively, these allegations are sufficient to plead scienter." *Id*. at 138.

In light of Judge Spatt's death during the pendency of the appeal, the Second Circuit instructed that "the newly assigned judge should consider afresh whether the [SAC] adequately stated a claim under Rule 10b-5(b)" and also "reasses the sufficiency of the scienter allegations, considering the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity." *Id*.

### C.    District Court Proceedings On Remand

On February 1, 2022, the case was reassigned to District Judge Joanna Seybert. ECF No. 128. At Judge Seybert's direction, the parties informed the Court on April 11, 2022 of their positions regarding how to proceed following the Second Circuit's decision. *See* ECF Nos. 129 (Plaintiffs'

letter to the Court), 130 (Defendants' letter to the Court).

On April 14, 2022, the parties participated in a conference before Judge Seybert, during which Plaintiffs and Defendants agreed that the pending motions to dismiss the SAC are limited to the SAC's Count I (concerning Section 10(b) and Rule 10b-5(b)) and its Count III (concerning Section 20(a)), and that Plaintiffs had abandoned all of their remaining claims in Count II. *See* FTR Log # 2:06 - 2:16. Judge Seybert then set a supplemental briefing schedule. *See* ECF No. 131.

On May 12, 2022, Defendants filed their supplemental memorandum of law in support of dismissing the SAC. *See* ECF No. 134 ("Supp. Mem."). On June 9, 2022, Plaintiffs filed their supplemental opposition to dismissing the SAC. *See* ECF No. 136 ("Supp. Opp."). On June 14, 2022, Judge Seybert referred Defendants' motions to dismiss the SAC to the undersigned for a Report and Recommendation. *See* June 14, 2022 Order Referring Motions. Supplemental briefing closed on June 23, 2022, when Defendants filed their supplemental reply in support of dismissing the SAC. *See* ECF No. 137 ("Supp. Reply").

## III.    LEGAL STANDARDS

### A.    The Motion to Dismiss

Courts evaluate motions to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6) by determining whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That standard requires the Court to accept as true all well-pled factual allegations in the SAC and consider attachments to the SAC, documents incorporated by reference in the SAC, and Hain's public disclosure documents filed with the SEC. *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). While the Court accepts the SAC's well-pled allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 664; *see also id*. at 678

(explaining that a complaint must contain "more than an unadorned, the defendant-unlawfully-harmed-me accusation"). Determining whether the SAC states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 664.

In addition to these universal pleading requirements, Plaintiffs face two additional burdens at this stage of litigation—Rule 9(b), which heightens pleading standards for all allegations of fraud, and the portion of the Private Securities Litigation Reform Act of 1995 codified at 15 U.S.C. § 78u-4 ("PSLRA"), which heightens pleading standards for certain elements of Plaintiffs' Exchange Act claims.

### B.     The Remaining Claims

Rule 10b-5(b) provides that, in connection with the purchase or sale of any security, it is "unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To support a claim under that rule, a plaintiff must plead: (1) a material misrepresentation or omission (i.e., materiality and falsity), (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation. *See, e.g.*, *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 102 (2d Cir. 2022). As discussed further below, "[t]he first two elements must be pled with heightened specificity pursuant to the Private Securities Litigation Reform Act of 1995 and Federal Rule of Civil Procedure 9(b)." *Id*..

Section 20(a) provides that every person "who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable . . . to the same extent as such controlled person . . . unless the controlling person acted in good faith . . . ." 15 U.S.C. § 78t. To state a claim of control person liability under Section 20(a), a

plaintiff must show (1) a primary Exchange Act violation by the controlled person, (2) that the defendant controlled the primary violator, and (3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *E.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

## IV.   DISCUSSION

### A.   Plaintiffs Abandoned Claims Concerning Hain's Financial Results and Related Accounting Practices

Defendants argue that Hain's Class Period financials were not actionable because the post-Class Period reduction to them was immaterial qualitatively and quantitatively. *See* Hain Mem. at 24-25.  According to Plaintiffs, that argument "misrepresents" their position because they reportedly challenge as materially omissive not the financial figures but instead the failure to disclose Hain's "reliance on pull-in sales tactics to generate sales" as the force that generated those figures. *See* Plaintiffs' Opposition to Hain's Motion To Dismiss The SAC, ECF No. 118 ("Opposition" or "Opp."), at 15.

Thus, despite the SAC's challenges to Hain's reported financial numbers, the methods used to calculate them, their compliance with SOX, and their compliance with GAAP,[11] Plaintiffs have now "abandoned this category of claims" in the SAC.  *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 793 (S.D.N.Y. 2020) (dismissing Rule 10b-5(b) claim as to certain statements because the opposition to dismissal asserted plaintiffs did not challenge those statements); *see Doubleline Capital LP v.*

---

[11] *See, e.g.*, SAC ¶¶ 164-247, 250 (alleging financials, including net sales, U.S. sales, net income, and earnings per share were "materially false and misleading when made" because Hain allegedly "improperly . . . book[ed] shipments to distributors as sales and revenue"); *id.* ¶ 250 (alleging that "all of the announced net sales relating to the corresponding fiscal quarter and fiscal year were artificially overstated . . . during the Class Period"); *id.* ¶¶ 294-97, 302, 305, 310, (alleging statements about the calculation of net sales, calculation of accruals, SOX compliance of reported financials, and GAAP compliance of reported financials were "materially false and misleading when made" because Hain allegedly "improperly . . . book[ed] shipments to distributors as sales and revenue"); *id.* ¶ 318 (alleging "Hain's controls were deficient, *rendering its financial statements false and misleading*") (emphasis added).

*Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 449 (S.D.N.Y. 2018) ("Defendants argue that Plaintiffs'

allegations that [certain statements] were false and misleading . . . fail to state a Section 10(b) claim.

Plaintiffs do not oppose this argument and have, therefore, abandoned their Section 10(b) claim in

connection with this misstatement.").

That Plaintiffs abandoned their claims concerning Hain's financial results, the methods used to

calculate them, their compliance with SOX, and their compliance with GAAP obviates the need for

the Court to substantively analyze the SAC's allegations concerning those issues.  *See Miao*, 442 F.

Supp. 3d at 793-94 (treating Rule 10b-5(b) claims as "withdrawn" and not subject to substantive

analysis because they were affirmatively "abandoned" in the opposition to dismissal); *Levitt v. J.P.*

*Morgan Sec., Inc.*, 9 F. Supp. 3d 259, 266 (E.D.N.Y. 2014) ("[G]iven the Plaintiffs' own admission"

regarding Section 10(b) and Section 20(a) claims, "the Court need not evaluate either of these causes

of action and dismisses them as abandoned by the Plaintiffs")

As Plaintiffs have abandoned certain claims, the undersigned recommends Plaintiffs' Count I

be dismissed to the extent it challenges Hain's financial results, the reported methods of calculating

them, their compliance with SOX, and their compliance with GAAP.

## B.    The Attribution Statements Trigger General Disclosure Obligations

The SAC separately challenges statements in Hain's SEC filings between November 2013 and

May 2016 that attributed the financial results to various causes.  Specifically, those statements

attributed Hain's successful financials to "strong brand contribution;" "expanded distribution;" the

"strong demand" and "momentum" for organic and natural products; Hain's "diverse portfolio" of

brands; and/or "solid execution of [Hain's] operational initiatives" (together, the "Attribution

Statements").  SAC ¶ 248.[12]  Plaintiffs allege that the failure to disclose that the earnings resulted

---

[12] *See also* SAC ¶¶ 165, 174, 181, 190, 198, 204, 210, 219, 227 (describing individual statements in
each SEC filing that explained the reported financial success).

from Hain's "unsustainable" business practices rendered the Attribution Statements materially omissive. *See Id*.  In turn, Defendants argue that there was no duty to disclose facts reflecting "unsustainable" practices because the Attribution Statements were puffery and were issued with unmanipulated corporate earnings.  The Court disagrees with Defendants.

### 1.   The Attribution Statements Are Not Puffery

Under the Exchange Act, disclosure is necessary if (1) the law imposes a particular duty to disclose or (2) it is "necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 353 (2d Cir. 2022).  As noted above, Plaintiffs rely on the second option to challenge the Attribution Statements, while Defendants contend that the Attribution Statements are non-actionable puffery.  *See* Supp. Mem. at 2; Supp. Reply at 4.  "Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them and thus cannot have misled a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (internal quotations and alterations omitted).  Quintessential examples of puffery are "general statements about reputation, integrity, and compliance with ethical norms." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

Whether statements constitute puffery requires considering the "context" in which they are made, including the "specific[ity]" of the statements and whether the statements are "clearly designed to distinguish the company" to the investing public in some meaningful way.  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016); *see also Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless . . . .").  "[M]ore definite statements about a company's business practices may invoke reasonable reliance by investors, particularly if the

32

statements relate to aspects of a company's *brand* or reputation that are *touted as sources of its success*." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017) (emphasis added).

Reviewing them in context, the Attribution Statements specify the sources of the Company's already-achieved success in a manner designed to distinguish Hain from competitors. Courts generally find similar statements are not puffery. *See Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591, 2020 WL 1877821, at *10 (S.D.N.Y. Apr. 14, 2020) ("Defendants touted its *brand* as a source of PSG's success. Reasonable investors might have relied on those statements when choosing whether to invest in PSG . . . .") (emphasis added); *In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-01428, 2019 WL 8638851, at *12 (E.D.N.Y. Sept. 27, 2019) (rejecting puffery arguments and finding statements concerning defendants' *distribution* market were actionable); *Cheng v. Canada Goose Holdings Inc.*, No. 19-CV-8204, 2021 WL 3077469, at *7 (S.D.N.Y. July 19, 2021) (rejecting puffery arguments and finding that statements concerning the increase in the *demand* for defendants' products were actionable); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (finding statements that there was "strong worldwide *demand*" for defendant's software were actionable) (emphasis added). As such, the Attribution Statements trigger a duty for Hain to disclose any information necessary to make them not misleading.[13] *See Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 353.

---

[13] Having found the Attribution Statements are not puffery, the Court need not reach Plaintiffs' argument that the Attribution Statements fall into an exception making puffery actionable where the statements contradict facts known to a defendant. *See* Supp. Opp. at 3. In any event, the Second Circuit appears to have rejected Plaintiffs' argument. *See SAIC*, 818 F.3d at 97-98 ("Plaintiffs' claim that these [puffery] statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment.") (quoting *UBS AG*, 752 F.3d at 183); *In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 751 (2d Cir. 2020) (same); *but see Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173–74 (2d Cir. 2020) (acknowledging that in the past "[w]e have found 'puffery' . . . actionable only when the speaker 'knew that the contrary was true'" and finding puffery statements non-actionable given possibility that defendants believed them) (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)).

2.      There Is No Rule Categorically Precluding An Obligation To Disclose That
Unsustainable Sales Practices Contributed To Unmanipulated Earnings

Defendants next argue that there was no obligation for Hain to disclose facts reflecting

unsustainable sales practices—even where such disclosure would be necessary to make the

Company's statements about earnings not materially misleading—and rely chiefly on *Boca Raton*

*Firefighters and Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012), a nonprecedential

summary order detailed below.[14]  *See* Supp. Mem. at 2-4 (arguing that  "There Is No Duty to Disclose

'Unsustainable' Practices"); Supp. Reply at 1-4 (arguing "that investors . . . may not maintain a

securities action based on their opinion that the company's business practices are 'unsustainable.'").

This Court disagrees.

As a threshold matter, Defendants' effort to categorically preclude any obligation under any

circumstances to disclose facts constituting unsustainable sales practices, so long as

contemporaneously disclosed earnings are unmanipulated, is untenable.  "[I]t bears emphasis that

§ 10(b) and Rule 10b–5(b)" require disclosure "when necessary to make statements made, in the light

of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v.*

*Siracusano*, 563 U.S. 27, 44 (2011) (internal alterations and quotations omitted).   The Supreme Court

has made clear "the rule that half-truths—representations that state the truth only so far as it goes,

while omitting critical qualifying information—can be actionable misrepresentations." *Universal*

*Health Servs. v. United States*, 579 U.S. 176, 188 & n.3 (2016)  (holding this "rule" applies under the

False Claims Act in the same way it applies under "securities law") (citing *Matrixx*, 563 U.S. at 44);

*see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192

(2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by

saying one [true] thing and holding back another."); *id*. at 193 (rejecting argument that would "punch

---

[14] "Rulings by summary order do not have precedential effect."  2d Cir. Local R. 32.1.1(a).

a hole in the statute for half-truths").

By insisting that statements omitting to disclose facts reflecting "unsustainable" practices issued contemporaneously with unmanipulated earnings are categorically excepted from the rule that half-truths are actionable under the securities laws, Defendants run afoul of the well-recognized mandate that only the Supreme Court may create exceptions to its holdings.  *See United States v. Aquart*, 912 F.3d 1, 49 (2d Cir. 2018) ("[O]nly the Supreme Court can overrule [its precedent] or *recognize exceptions thereto*.") (emphasis added)*; Campanale v. Harris*, 724 F.2d 276, 279 (2d Cir. 1983) (refusing to adopt an exception to a Supreme Court standard because doing so "would violate fundamental principles of comity"); *see also State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents.").  Such a result would be impermissible.[15]

Even assuming Defendant's position could be consistent with Supreme Court precedent (as noted above, it is not), Defendants' reliance on *Boca Raton* is misplaced because the summary order does not categorically preclude challenging half-truths that fail to disclose facts reflecting unsustainable practices so long as the omissive statements are connected to unmanipulated earnings.

The Circuit in *Boca Raton* considered whether "public statements about the *honesty* and *integrity* of S&P's credit-ratings services" were actionable if the defendants made those statements "while knowing that [the] ratings method was basically a sham."  506 F. App'x at 34 (emphasis added).   The Court found those statements were "the type of mere 'puffery' that we have previously held to be not actionable." *Id*. at 37.  Because those statements were non-actionable puffery, the Court

---

[15] Defendants' argument would also contravene precedential Second Circuit decisions that acknowledge "the law is well settled that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud."  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (quoting *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011)); *see also Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 (2d Cir. 2022) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth.") (internal quotations omitted).

held that similar statements made in connection with unmanipulated earnings were likewise not actionable. *See id.* at 38 ("To the extent that investors might impute a positive corporate outlook from [the] omissions in earnings reports, we have explained that [these] general expressions of corporate optimism are too indefinite to be actionable under the securities laws.") (internal quotations omitted).

After concluding that the statements about the credit services were non-actionable puffery, the *Boca Raton* Court held that the unmanipulated corporate earnings did not present "half-truths" necessitating additional disclosures. *See id.* ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings."). Finding that accurately reported financials alone do not implicate further disclosure obligations is consistent with Second Circuit precedent. *See Plumber & Steamfitters Local 773 Pension Fund, Bos. Ret. Sys. v. Danske Bank A/S*, 11 F.4th 90, 98-99 (2d Cir. 2021) ("[A]ccurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results.").

But that is distinct from the circumstances alleged here. Hain issued the Attribution Statements concerning its financials, which this Court has found not to be mere puffery. Under these circumstances, where the challenged statements amount to more than puffery, *Boca Raton* does not support dismissal. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-CV-3461, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (rejecting dismissal arguments relying on *Boca Raton* because the challenged statements were unlike the "open-ended, indefinite" puffery statements in *Boca Raton*); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 n.7 (S.D.N.Y. 2017) (finding *Boca Raton* inapplicable where challenged statements were not puffery). In sum, *Boca Raton* does not stand for the broad proposition that the Attribution Statements could not impose a duty to disclose

unsustainable business practices.[16]

Moreover, Defendants ignore case law holding that statements attributing corporate earnings to certain factors, as the Attribution Statements did, are actionable when materially omissive.  For example, the decision in *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.* 367 F. Supp. 3d 16 (S.D.N.Y. 2019) is instructive.  There, like here, plaintiffs challenged as materially omissive Lexmark's statements that its revenue growth was primarily attributable to "robust," "good," or "strong" end-user demand because those statements failed to disclose that demand was decreasing and those revenues resulted from channel stuffing.  *Id.* at 32.  The court acknowledged that the challenged statements were not the reported financials themselves but rather the statements that "misattributed the source of Lexmark's revenue."  *Id.* at 33.  The court nonetheless held that those statements obligated defendants to disclose the channel stuffing because "a reasonable investor would likely have found it significant that printer supplies revenues were driven by inflated channel inventory and not increased end-user demand because those forces fundamentally differ in *sustainability*."  *Id.* at 33 (emphasis added).

Other courts have similarly found that statements are actionable when they misattribute the forces that drove earnings.  *See Solomon v. Sprint Corp.*, No. 19-CV-05272, 2022 WL 889897, at *6 (S.D.N.Y. Mar. 25, 2022) (finding that statements attributing growth to increased post-paid phone line

---

[16] Defendants' other cited cases, *see* Supp. Mem. at 3-4, likewise do no support that overly broad proposition.  *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 529 (S.D.N.Y. 2020) (finding disclosure of service subscription numbers did not necessitate disclosures about the distinct subject matter of subscription "churn" rates); *Villare v. Abiomed, Inc.*, No. 19-CV-7319, 2021 WL 4311749, at *12-14 (S.D.N.Y. Sept. 21, 2021) (finding challenged statements about the company's anticipated growth rate "constitute[d] non-actionable puffery"); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-CV-04844, 2019 WL 6877195, at *11, *15 (N.D. Cal. Dec. 17, 2019) (rejecting challenges to statements about future growth because, as it turned out, the "revenue concededly grew as predicted"); *Yaron v. Intersect ENT, Inc.*, No. 19-CV-02647, 2020 WL 6750568, at *9 (N.D. Cal. June 19, 2020) (dismissing claims on falsity grounds because plaintiff "fail[ed] to allege facts to show that channel stuffing covered up hidden declining demand");  *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 184, 194 (D. Conn. 2014) (dismissing claims alleging disclosed earnings drivers were unsustainable—which is distinct from the allegations here that undisclosed earnings drivers were unsustainable, *see* SAC ¶ 248).

subscriptions were actionable for failing to disclose a decrease to those subscriptions); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 239 (S.D.N.Y. 2018) (holding statements attributing earnings to sales to third parties were actionable for failing to disclose sales to a stockholder); *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672, 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) (finding statements attributing sales success to "the improving macroeconomic situation, product quality and efficient sales and marketing efforts" were actionable for failing to disclose that the sales resulted from bribery); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016) (holding statements attributing sales of fund's shares to underlying investment performance were actionable for failing to disclose that those sales were attributable to a certain trading strategy).

As these cases make clear, because Defendants "put the sources of [Hain's] revenue at issue . . . the alleged failure to disclose the true sources of such revenue could give rise to liability under Section 10(b)." *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (finding that statements asserting that revenues resulted from stock transactions based on "trading volumes and volatility" were actionable for omitting that a substantial portion of those revenues came from trading ahead of clients); *see also In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) (recognizing that "a company's misleading statements about the sources of its revenue" may give rise to Rule 10b-5 liability). But as explained below, the SAC's allegations are nonetheless insufficient to withstand the instant motions to dismiss.

**C.    Plaintiffs Failed To Plead An Actionable Misstatement Or Omission**

The SAC challenges the Company's statements as materially false or omissive for failing to disclose that Hain relied on "unsustainable practices" to generate sales and/or that Hain lacked adequate accounting controls. For the reasons provided below, the Court concludes that the SAC fails to plead an actionable misstatement or omission.

1.   <u>Unsustainable Practices</u>

Plaintiffs' Rule 10b-5 claim is premised on Hain's failure to disclose that it undertook certain "unsustainable" practices, such as "offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return." *See, e.g.*, SAC ¶ 248.  The SAC's allegations focus most on the absolute right of return.  The remainder of those practices may be broadly categorized as sales incentives and promotions.  As discussed herein, the SAC fails to plead that any statements are actionable for failing to disclose those practices.

a)   *The SAC Fails To Plead An Absolute Right Of Return*

The SAC's falsity allegations are subject to the heightened pleading standards of Rule 9(b) and the PSLRA.  Together, "Rule 9(b) and the PSLRA require a securities fraud complaint to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Gamm*, 944 F.3d at 462; *see also Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) (similar).  On that last point, "[P]laintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018) (internal quotations omitted), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019). Thus, "[a]llegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

At the heart of Plaintiffs' claims is the allegation that Hain drove sales by granting distributors a right to return Excess Inventory, the exercise of that right in turn increased the deficit between Hain's actual and reported sales each financial quarter, and the failure to disclose this circumstance rendered public statements materially false or misleading.  *See* SAC ¶ 65.  Plaintiffs rely on CWs for these claims, but the SAC's allegations on this point are too conclusory and/or vague to sufficiently

plead that Hain generated sales by relying on such a right of return.  For example, CW 3 reported that he "constantly" saw products being returned and credits being issued, "especially" with UNFI. SAC ¶ 75.  CW 4 also reported that "Hain would ship inventory to distributors . . . to increase reported revenue and then 'de-load' (i.e., return the product) in the following quarter" and that he "knew" unspecified quarter-end transactions "could not be real."  *Id*. ¶¶ 73, 81; *see also id*. ¶¶ 71-72 (CW 6 reported, among other things, that he generally processed $500,000 in returns each quarter, that he once processed a $700,000 return in 2015,[17] and that unnamed distributors were "free to return" Excess Inventory); *id*. ¶75 (CW 7 reported that "Hain had an agreement with its customers that if the customers could not sell the excess inventory, they could return the unsold inventory").

These CW allegations are too conclusory and generic to support an allegation that Hain relied on the right of return as alleged in the SAC.  *See In re IAC/Interactivecorp Sec. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010) (finding allegations from confidential witnesses "stated in the most general of terms" and lacking "facts that might corroborate [them]" failed to plead statements were false); *In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019) (finding confidential witness' conclusory statement and dearth of supporting facts "fail[ed] to establish that these statements were false and that Qudian was engaged in a widespread practice of lending to college students at the time of the IPO."); *In re Coty Inc. Sec. Litig.*, No. 14-CV-919, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) ("Plaintiffs rely on a series of conclusory, nonspecific statements from confidential informants . . . Such generic allegations fail to raise a plausible inference that the Registration Statement omitted a fact, much less a material fact, that required

---

[17] Alleging that CW 6 processed $500,000 or even $700,000 in returns in a given quarter does not indicate whether those figures represent abnormal or substantial returns for Hain.  To the contrary, as Judge Spatt previously explained, "[r]eturns of $500,000 per quarter would represent .08% of net sales in 2015, and .09% of sales in 2016" and "[r]eturns of $700,000 per quarter would represent and .1% of sales in 2015 or 2016."  *Hain*, 2019 WL 1429560, at *16.

disclosure . . . .").[18]  Accordingly, the SAC failed to plead that any statements were omissive for failing to disclose a right of return.

### b) Hain Disclosed That It Offered Sales Incentives and Promotions

"Although the underlying philosophy of federal securities regulation is that of full disclosure, there is no duty to disclose information to one who reasonably should be aware of it."  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (quoting *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).   To be sure, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *see Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021) ("Alleged misstatements are not material where the truth was fully disclosed or concerned a matter of public knowledge."); *In re KeySpan Corp. Sec. Litig.*, 383 F.Supp.2d 358, 377 (E.D.N.Y. 2003) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this information.").  Here, Plaintiffs admit that "if Defendants had simply told the market at the time they disclosed Hain's financial results that Hain had engaged in these business practices in order to make its numbers, there would have been no deception and no fraud."  Opp. at 12.

However, that is precisely what Hain did with respect to sales incentives and promotions.  The Company's SEC filings disclosed that Hain undertook "[s]ales incentives and promotions" and specified without limitation that those incentives and promotions included "price discounts, slotting fees and coupons" in an effort to "support sales of the Company's products."  Hain 10-K for the fiscal

---

[18] In addition, the SEC Order undermines Plaintiffs' theory regarding distributors exercising the right of return.  The SEC Order concluded that "[t]he vast majority of the products purchased in connection with [end-of-quarter] sales" to major distributors, including UNFI (as Distributor 1), "ultimately sold through to retailers."  SEC Order ¶¶ 8, 14; see *also id*. ¶ 8 (explaining that the spoils coverage Hain provided to Distributor 1 amounted to less than 1% of net sales).

year ending June 30, 2014, filed with the SEC August 27, 2014 ("2014 Form 10-K"), at 37, 54; 2015 Form 10-K at 42, 61.  Plaintiffs concede that "[t]hroughout the Class Period" the Company disclosed its use of these sales incentives and specified that its reported sales figures were net of those incentives.  SAC ¶ 297; *see also* 2014 Form 10-K at 37 ("Sales are reported net of sales and promotion incentives . . . ."); 2015 Form 10-K at 42 (same).

It is axiomatic that "defendants cannot be held liable for failing to disclose something that they disclosed." *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017) (findings statements not actionable for omitting information disclosed in SEC filings), *aff'd*, 731 F. App'x 35 (2d Cir. 2018). That Hain disclosed its reliance on incentives and promotions to support sales precludes challenges to statements for their failure to further disclose that business practice.  *See, e.g., Colbert v. Rio Tinto PLC*, 392 F. Supp. 3d 329, 339-40 (S.D.N.Y. 2019) (finding the disclosure of information in the company's annual report filed with the SEC precluded a duty to later disclose the same information); *Monroe Cnty. Emps. Ret. Syst. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 355-56 (S.D.N.Y. 2014) (finding no duty to disclose information that was "disclosed in public filings throughout the Class Period"); *In re IAC/Interactivecorp Secs. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y. 2010) (finding no duty to disclose information discussed in the company's annual report filed with the SEC).[19]

That Plaintiffs label the sales incentives and promotions as "unsustainable" is of no moment. "Corporations are not required to phrase disclosures in pejorative terms."  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 186-87 (2d Cir. 2014).  For that reason, disclosures of "factual information" do not become insufficient simply because they did "not use the eye-catching or negative phrasing that

---

[19] Plaintiffs' contention that the "truth-on-the-market defense is intensely fact specific and is rarely an appropriate basis for dismissing a § 10(b) complaint" is insufficient to overcome Defendants' disclosures. Supp. Opp. at 6 (internal quotations omitted). "Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."  *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 107 (E.D.N.Y. 2021).

plaintiffs would have wished." *Singh v. Schikan*, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015) (finding disclosures of a study's design precluded a duty to disclose that it "drastically lessened" its enrollment criteria or was specifically "designed to recruit to a younger age"); *see Dalberth* 766 F.3d at 187 ("That Plaintiffs wish that more was said, perhaps in more evocative language, is simply insufficient to establish a genuine dispute as to whether the market was adequately informed . . . ."); *In re MGT Cap. Invs., Inc. Sec. Litig.*, No. 16-CV-7415, 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) (recognizing that a company's disclosure of "factual matters" regarding performance did not require it to "editorialize on those facts in any particular way") (internal quotations omitted).

### 2.  Accounting Controls

Plaintiffs allege that Hain's statements about its accounting were false and misleading.  The Court already has rejected challenges to those statements to the extent they are premised on inaccurate financial reporting or the failure to disclose reliance on the alleged "unsustainable" business practices. Plaintiffs further assert that the statements about accounting controls were false and misleading because they omitted that these Company controls were inadequate.  To establish the falsity of those statements, Plaintiffs rely on the Company's admission in the SEC Order that it violated Section 13(b)(2)(B) of the Exchange Act, which requires Hain to devise and maintain an adequate system of internal accounting controls.  *See* SAC ¶¶ 311, 319, 328; SEC Order ¶ 24.  While this may appear logical on its face, that argument fails under scrutiny.

#### a)  The SEC Order Does Not Indicate The SOX Statements Were False

Plaintiffs challenge (1) statements in Hain's periodic SEC filings that management "evaluated" the Company's internal controls and "concluded" that they were "effective" and compliant with "Rule 13a-15(e) of the Exchange Act," *see* SAC ¶¶ 313-19; and (2) the SOX certifications signed by Simon, Smith, and Conte attesting to the just-described statements, *see id.* ¶¶ 306-12.  The Court will evaluate these collectively as the "SOX Statements."  *See Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 125,

135 (E.D.N.Y. 2020) (analyzing collectively as "ICFR Statements" both (1) statements in periodic SEC filings that "management determined that the Company's internal control over financial reporting was effective" and (2) their related SOX certifications); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545, 2019 WL 4257110, at *24 (S.D.N.Y. Sept. 9, 2019) (analyzing collectively Form 10-K disclosures regarding internal controls and related SOX certifications).

The SOX Statements "concern the conclusions of management.  Accordingly, they are statements of opinion . . . ." *AmTrust*, 2019 WL 4257110, at *25.  The assertion in each of the SOX certifications here that its signatory signed the document "based on my knowledge," SAC ¶ 307, cements that the SOX Statements are statements of opinion.  *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-CV-08585, 2022 WL 4085677, at *40 (S.D.N.Y. Sept. 2, 2022) (explaining that this qualifier renders SOX certifications statements of opinion); *Lachman*, 487 F. Supp. 3d at 134 (same); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017) (same).  An opinion statement is actionable under the Exchange Act only if it (1) contains an affirmative "factual and falsifiable statement" alleged to be false or (2) "implies facts or the absence of contrary facts, *and* the speaker knows or reasonably should know of different material facts that were omitted." *Abramson*, 965 F.3d at 175 (emphasis added).

The SEC Order fails to satisfy either of the two methods for challenging opinion statements under *Abramson*.  First, the SEC Order does not even discuss, let alone disprove, the assertions in the SOX Statements that management reviewed Hain's internal controls and concluded that the controls were effective.  *See In re PetroChina Co.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (dismissing challenges to SOX certifications partly because plaintiffs failed to plead "that PetroChina failed to evaluate its internal controls"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (dismissing challenges to statements in SOX certifications given the failure to "allege any particularized facts which would suggest that the actions articulated in the SOX Certifications were

not undertaken").  Second, the post-Class Period SEC Order does not indicate that Defendants "kn[ew] or reasonably should [have known] of different material facts" about the Company's internal controls contemporaneously with the SOX Statements.  *Abramson*, 965 F.3d at 175.  Of course, a "post-Class Period identification of control deficiencies" is insufficient to show that the Individual Defendants "knew—at the time they signed their certifications—of any . . . deficiencies in the Company's internal controls."  *In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19-CV-6180, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021); *see Lachman*, 487 F. Supp. 3d at 134 ("Plaintiffs fail to allege that Revlon's SOX certifications were materially false or misleading simply because a weakness in Revlon's ICFR was later discovered.").

> b)    *The SEC Order Does Not Support Falsity of The Audit Committee Results And Simon's Related Statements*

Plaintiffs also allege that the SEC Order renders false and misleading (1) the Company's November 16, 2016 disclosure that the Audit Committee's investigation into the Company's accounting practices "found no evidence of intentional wrongdoing in connection with the Company's financial statements" and (2) Simon's related comments that Hain "is committed to transparency of our financial reporting and we are taking concrete measures to remediate as well as strengthen our internal controls."  *See* SAC ¶¶ 326-28.  In fact, the SEC Order said nothing about whether the Company's deficient accounting controls were intentional.  *See* SEC Order ¶ 24.  And the SEC Order supports, rather than undermines, Simon's statement that the Company took remedial measures to strengthen its internal controls.  The SEC Order contains a section entitled "Hain's Remedial Efforts" that describes "remedial acts promptly undertaken by [Hain]," including that Hain (1) "made a number of organizational changes, such as hiring staff in compliance positions and establishing an internal audit function;" (2) implemented four changes to revenue recognition practices; and (3) developed a revenue recognition and contract review training program.  *Id.* ¶¶ 26-27; *see also, e.g. Cohen v. Capital One Funding, LLC*, 489 F. Supp. 3d 33, 46 (E.D.N.Y. 2020) ("If a plaintiff's

allegations are contradicted by a document attached to or incorporated by reference into the complaint, those allegations are insufficient to defeat a motion to dismiss.") (internal quotations and alterations omitted).

*   *   *

Based on the foregoing, the undersigned recommends that the Court find the unabandoned portion of the SAC's Count I failed to state a claim under Rule 12(b)(6) due to Plaintiffs' failure to plead an actionable misstatement or omission.  Given this finding, "the Court need not address [D]efendants' other arguments." *Brady v. Top Ships Inc.*, No. 17-CV-4987, 2019 WL 3553999, at *17 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom*. Onel v. Top Ships, Inc., 806 F. App'x 64 (2d Cir. 2020). Therefore, this finding obviates the need to address Defendants' other contentions that the SAC fails to adequately plead scienter and loss causation.  *See, e.g., Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) ("Because we agree with the District Court regarding the absence of a material, false statement, we need not reach the issue of scienter."); *Oklahoma L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 214 (S.D.N.Y. 2021) ("Because the Court holds that Plaintiff has not adequately pled a material misrepresentation or omission under Section 10(b) or Rule 10b-5, the Court has no occasion to address Defendants' alternative grounds for dismissal, based on alleged deficiencies in Plaintiff's pleadings as to scienter and loss causation."); *Reiner v. Teladoc Health, Inc.*, No. 18-CV-11603, 2021 WL 4451407, at *17 (S.D.N.Y. Sept. 8, 2021) ("Because plaintiffs have failed to plead any actionable misstatements or omissions, the Court need not reach the issue of scienter."), *report and recommendation adopted*,  2021 WL 4461101 (S.D.N.Y. Sept. 29, 2021).

Nonetheless, in light of the specific mandate from the Second Circuit, the undersigned will "reassess the sufficiency of the scienter allegations" in the SAC.  *In re Hain*, 20 F.4th at 138.

### D.    Plaintiffs Failed To Plead Scienter

Scienter allegations are subject to the heightened pleading standards of Rule 9(b) and the

PSLRA.  The former requires the SAC to "state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  The latter similarly requires that the SAC "shall, with respect to each act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *Ganino*, 228 F.3d at 168).  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

With respect to the Individual Defendants, Plaintiffs "can satisfy [the scienter] requirement by 'alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Setzer*, 968 F.3d at 212 (quoting *ATSI*, 493 F.3d at 99).  Establishing scienter for Hain "requires pleading facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).  Plaintiffs fail to do so.

### 1.   Individual Defendants' Motive and Opportunity

To raise a strong inference of scienter through "motive and opportunity" to defraud, Plaintiffs must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 307–08).  "General allegations that the defendants acted in their economic self-interest are not enough." *Ganino*, 228 F.3d at 170.  Plaintiffs claim that Defendants had motive based on (1) their stock sales; (2) their compensation and bonuses; and

(3) their use of Company stock in certain acquisitions.

          *a)*     *Stock Sales*

The requisite showing of scienter is generally met when insiders make a misrepresentation to sell shares at a profit.  *See ECA*, 553 F.3d at 198.  But "[t]he mere fact that insider stock sales occurred does not suffice to establish scienter." *E.g.*, *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 543 (S.D.N.Y. 2020) (internal quotations omitted).  Instead, Plaintiffs must establish that the sales at issue were "unusual" or "suspicious."  *E.g., In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 256 (S.D.N.Y. 2020).  Relevant factors to that determination include "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) (quoting *In Re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001)).  Also relevant is "whether sales occurred shortly before corrective disclosures or materialization of the alleged risk."  *Glaser v. The9*, Ltd., 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

***Plaintiffs' Fail To Allege Net Profits***.  "The SAC does not identify the profits realized by either [Carroll or Simon] for any of the sales, which does not help to establish motive and opportunity as 'proceeds alone say nothing about a seller's motive.'"  *Chapman v. Mueller Water Prods.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (quoting *Glaser*, 772 F. Supp. 2d at 592); *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825, 2021 WL 212337, at *8 (S.D.N.Y. Jan. 21, 2021) (finding no scienter because plaintiffs alleged the "*proceeds* from the sales, rather than profit"), *aff'd sub nom. Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, No. 21-909-CV, 2021 WL 5142702 (2d Cir. Nov. 5, 2021);[20] *see also In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596,

---

[20] *See also Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 235-36 (S.D.N.Y. 2020) (rejecting scienter

622 (S.D.N.Y. 2017) ("A number of courts in this district have found that allegations do not support a finding of 'motive and opportunity' when net profits are not pleaded") (collecting cases).

*Timing Of The Sales Cut Against Scienter.* "[C]ourts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure." *Chapman*, 466 F. Supp. 3d at 412 (internal quotations omitted); *Reilly v. U.S. Physical Therapy, Inc.*, No. 17-CV-2347, 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) (collecting cases). Here, neither Carroll nor Simon "sold any stock in the final 100 days of the class period—the exact timing 'when insiders would have rushed to cash out.'" *Chapman*, 466 F. Supp. 3d at 412 (quoting *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013)); *see City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (similar). Instead, Plaintiffs allege that Carroll and Simon's last Class Period stock sales were on March 5, 2015 and April 30, 2015, respectively—each over eight months before the first allegedly negative disclosure in January 2016 (which reduced sales and earnings estimates) and over twenty-one months before the end of the Class Period. These circumstances undermine any inference of scienter. *See, e.g., Chapman*, 466 F. Supp. 3d at 412-13 (finding stock sales not "unusual" because they occurred eight months before the end of the class period); *Woolgar*, 477 F. Supp. 3d at 235 (finding stock sales not "unusual" or "suspicious" because they occurred more than three months before the first disclosure); *Evoqua*, 450 F. Supp. 3d at 420 (finding stock sales not indicative of scienter because they occurred more than seven months before the end of the class period and did not occur "in the weeks surrounding the first allegedly negative disclosure").

*Absence of Challenged Sales By Smith, Conte, And Other Insiders.* "Plaintiffs do not allege that [Smith and Conte] made suspicious sales during the Class Period," which "'undermines plaintiffs'

---

allegation that defendant "made 'net proceeds' of approximately $1.3 million" because "proceeds alone are insufficient to demonstrate unusual or suspicious trading activity;" collecting similar cases).

claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.'"

*Chapman*, 466 F. Supp. 3d at 412 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir.1995)).

To be sure, "Plaintiffs have alleged insider trading by only two [Company] insiders; the absence of

any allegations of other insider trades before [the Company] announced the impact of the

issues . . . undercuts any finding of the requisite strong inference of scienter."  *In re Gildan*

*Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271-72 (S.D.N.Y. 2009); *see also Scholastic*

*Corp.*, 252 F.3d at 75 (noting that the failure to challenge sales by some individual defendants

undermined the plaintiffs' allegations that any defendant intended to inflate stock for personal profit);

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801,

814 (2d Cir.1996) (similar).

> ***Portion of Stockholdings Sold and Volume Of Sales.***  The parties disagree about the number

and percentage of shares that Carroll and Simon sold during the class period (based on SEC filings).

Plaintiffs allege Carroll sold 308,916 shares, representing 74% of his holdings, and that Simon sold

983,798 shares, representing 66% of his holdings.  *See* SAC ¶¶ 355-59; Opp. at 22-23; Supp. Opp. at

8.  Defendants contend that Carroll sold 512,524 shares, representing 49% of his holdings, and that

Simon sold 2,260,797 shares, representing 55% of his holdings.  *See* Hain Mem. at 21-22.  Plaintiffs

also contend that Carroll sold 300% more shares during the Class Period than in the Control Period.

SAC ¶ 357.   For purposes of this analysis, the Court takes Plaintiffs' calculations as true and assumes

(without deciding) that this factor supports an inference of scienter because (as explained below) it

would not change the result of the "motive and opportunity" analysis.

> ***Collective Evaluation.***  Viewing the above factors collectively, Plaintiffs' "motive and

opportunity" allegations fail to raise an inference of scienter as compelling as the competing non-

fraudulent inference.  As discussed above, the failure to plead (1) profits from the challenged sales,

(2) that any challenged sales occurred close in time to corrective disclosures or the end of the class

period, and (3) that more than two executives allegedly engaged in unusual or suspicious sales all

undermine an inference that the subject stock sales were undertaken with scienter.

The only factor that, for purposes of the analysis, the Court assumes could favor an inference

of scienter is the sales volume and the holdings portion they constituted.  But "without more, the

amount of stock sold cannot be determinative. Otherwise, any corporate insider who divests his stock

holdings would furnish opportunistic plaintiffs with the requisite scienter to survive a motion to

dismiss." *Reilly*, 2018 WL 3559089, at * 15.  For that reason, "courts agree that the mere fact that

insiders sold a large quantity of stock during the Class Period, by itself, is insufficient to establish an

inference of motive" for scienter.  *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,

565 F. Supp. 3d 478, 488 (S.D.N.Y. 2021) (internal quotations and alterations omitted); *see Reilly*,

2018 WL 3559089, at * 15 (similar; collecting cases).  Thus, even when insider stock sales are

substantial, "Plaintiffs would still need to plausibly allege that the sales are connected to some kind of

plan to defraud, for example by alleging that the timing of the sales matches up with the alleged

material false statements or omissions." *Coral Springs*, 565 F. Supp. 3d at 488; *see In re Lululemon

Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014) ("Though the proceeds of the alleged stock sales

are, by any measure, considerable, more is required in order for these trades to give rise to a strong

inference that Wilson and Day acted with an intent to deceive through their public statements during

the Class Period"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  Plaintiffs have not sufficiently alleged that

Carroll and Simon's stock sales reflect the motive sufficient to establish their scienter.[21]

_____

[21] Given that Plaintiffs failed to adequately plead Simon and Carroll's stock sales reflect a motive
sufficient to raise an inference of scienter, the Court will not consider Defendants' arguments that any such
inference is undermined by the statements in the relevant Forms 4 (submitted as Exhibits F and G to the
Hillebrecht Declaration) that the sales were undertaken to pay taxes on the vesting of restricted stock and the
exercise of expiring stock options.  *See* Hain Mem. at 22; Supp. Mem. at 7.  Further, Defendants' argument
would require the Court to accept the truth of the statements in the Forms 4 regarding why the sales were
undertaken—but Courts disagree about whether that is appropriate for a motion to dismiss.  *Compare Gagnon
v. Alkermes PLC*, 368 F. Supp. 3d 750, 764 (S.D.N.Y. 2019) ("Courts in this district have regularly considered
Forms 4 on motions to dismiss, even for the truth of their contents.") *with Donoghue v. Gad*, No. 21-CV-7182,

b)   *Bonuses*

The Second Circuit has repeatedly held that yearning for an increase in stock prices to improve executive compensation does not support scienter because virtually all corporate insiders share that desire. *See, e.g., S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("[I]t is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as . . . the desire to maintain a high stock price in order to increase executive compensation.") (internal quotations omitted).  Otherwise stated, "[i]f performance-based compensation were a sufficient predicate for fraud, then 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 313 (S.D.N.Y. 2021) (quoting *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004)) (internal alterations omitted).  Therefore, Plaintiffs' allegation that the Individual Defendants were motivated to inflate the Company's stock price to increase their compensation is doomed because "the law is clear that the desire of individual defendants to keep their jobs or increase their compensation by artificially inflating stock price is not sufficient to establish motive." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 160 (S.D.N.Y. 2015) (internal quotations omitted).

c)   *Using Hain Stock For Acquisitions*

"Courts . . . recognize that inflation of stock value to compete more effectively in the acquisition market can redound to shareholders' benefit and thus figure within a general, non-fraudulent scheme of corporate growth." *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11-CV-7968, 2013 WL 144041, at *12 (S.D.N.Y. Jan. 14, 2013) (collecting cases), *aff'd sub nom. Forsta AP-*

---

2022 WL 3156181, at *5 & n.7 (S.D.N.Y. Aug. 8, 2022) (explaining that courts can consider Forms 4 "'only to determine what the documents stated,' and 'not to prove the truth of their contents'") (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

*Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013); *see Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001) (explaining that aiming to achieve "a superior merger" is a "generalized desire [that does] not establish scienter" because it pursues an end that "benefits all shareholders"). Nonetheless, "the artificial inflation of stock prices in order to acquire another company may, 'in some circumstances,' be sufficient for scienter." *ECA*, 553 F.3d at 201 n.6 (quoting *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000)). The requisite showing requires "extremely contextual" allegations demonstrating "a unique connection between the fraud and the acquisition." *Id.* Courts interpret that rule "narrowly," *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 492 (S.D.N.Y. 2021) (quoting *Agnico-Eagle Mines*, 2013 WL 144041, at *12), and "ordinarily require evidence that the allegedly fraudulent inflation of stock prices was aimed at the specific acquisitions identified in the pleadings," *Agnico-Eagle Mines*, 2013 WL 144041, at *12 (collecting cases). For example, in *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, the plaintiffs' allegations were sufficient because they directed the Court to statements that the company's "stock price would increase in such a way to allow for its use as currency to fund transactions," including the subject acquisition. 432 F. Supp. 3d 131, 169 (D. Conn. 2019).

Plaintiffs fail to make the requisite showing in the SAC. They assert in a conclusory fashion that Defendants acted with scienter to inflate Hain stock to complete three acquisitions in 2014 and one acquisition in 2015. *See* SAC ¶¶ 366-67. That these acquisitions concluded over five months before the first alleged corrective disclosure and over eighteen months before the end of the class period "renders any connection between the[se] events dubious at best." *ECA*, 553 F.3d at 201 (rejecting allegation defendants inflated company stock with scienter to complete an acquisition because the alleged misstatements "ended years afterward"). And while Plaintiffs allege the number of shares used in the acquisitions and their value, Plaintiffs offer nothing to demonstrate that Defendants made material misstatements or omissions to inflate Company stock price for any of the

acquisitions.  The same circumstances arose in *Born*, where the plaintiffs failed to establish scienter with their allegations that an inflated stock price allowed the company to use fewer shares to fund a $1.4 billion acquisition.  *See* 521 F. Supp. 3d at 491.  There, as here, plaintiffs offered no connection between the acquisition and the challenged statements "such as facts demonstrating that the inflation of [the company]'s stock price was necessary" to consummate the acquisition.  *Id*.  And *Born* recognized the common sense notion that an acquisition-based motive to inflate stock, even if substantiated, would not apply to statements made in the lengthy period after the subject acquisitions. *See id.* at 492 ("Even were the Court to credit Plaintiffs' theory of motive with respect to Defendants' actions and statements leading up to the announcement of the LSC acquisition, it does not explain Defendants' motive with respect to their statements *after* Quad announced the LSC acquisition.").

Thus, Plaintiffs fail to adequately plead motive and opportunity to satisfy this prong of scienter.

### 2.   Individual Defendants' Conscious Misbehavior or Recklessness

Plaintiffs also seek to establish scienter through circumstantial evidence of recklessness, which requires "a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016); *see UBS AG*, 752 F.3d at 184 (explaining that sufficient recklessness is shown by "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it").  The Second Circuit recognizes four circumstances that, when sufficiently alleged, give rise to a strong inference of the requisite recklessness: where the defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a

duty to monitor." *ECA*, 553 F.3d at 199 (internal quotations omitted).  Because Plaintiffs here have

not shown motive (even taking the motive allegations collectively), "the circumstantial evidence of

conscious misbehavior must be correspondingly greater." *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355.

       Plaintiffs' remaining scienter arguments rely on the theory that Defendants knew or had access

to information suggesting the inaccuracy of the challenged statements.  Critical to this analysis is that

"[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the

reports or statements containing this information." *Jackson*, 960 F.3d at 99 (quoting *Dynex*, 531 F.3d

at 196).  The Court concludes that Plaintiffs fail to do so sufficiently to survive dismissal.

       *a)*     *The Absolute Right Of Return*

   In addition to failing to adequately plead that Hain offered the right of return alleged in the

SAC, Plaintiffs fail to set forth sufficient facts to support an inference of scienter in connection with

those allegations.  The SAC's allegations regarding the right of return rely entirely on the CWs. "As

with all allegations going to scienter, confidential source allegations must show that individual

defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory

statements . . . are insufficient." *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16-CV-3495,

2017 WL 4049253, at *8 (S.D.N.Y. June 28, 2017) (quoting *Glaser*, 772 F. Supp. 2d at 591) (internal

alterations omitted), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55

(2d Cir. 2018).

       The SAC's allegations regarding Defendants' knowledge of the right of return are too sparse.

*See, e.g., id*. ¶¶ 91-92 (CW 4 reporting Carroll asked unnamed "employees" and "executives" to stop

referring to unspecified "sales practices" as "loading"); *id*. ¶ 93 (CW 6 reporting that Carroll provided

unspecified "concessions" and "incentives" to UNFI at unspecified times); *id*. ¶ 95 (CW 7 reporting

Carroll and Simon's furtive conversations about unspecified "financial arrangements" with UNFI);

*id*. ¶ 96 (CW 2 reporting that he "believed" that "upper management" directed employees to engage in

"undisclosed, unsustainable pull-in sales practices"). The most direct allegation on this point—that, according to CW 7, Simon at some point negotiated a right of return with UNFI—is bereft of particulars. *See id.* ¶ 94.

Accordingly, as to the right of return that Hain offered to its distributors, "the confidential witnesses' allegations are too vague, speculative, and conclusory to contribute to an inference of scienter." *Schiro v. Cemex*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019); *see In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 232, 237 (S.D.N.Y. 2021) (finding confidential witness's "vague and conclusory" allegations failed to establish falsity and scienter); *see also Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009) ("[G]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA]."), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).[22]

b)    *Hain's Reliance On Sales Incentives and Promotions.*

As discussed above, Defendants contemporaneously disclosed Hain's use of incentives and promotions to support sales.  That finding "precludes scienter" because making an adequate disclosure is the antithesis of the "reckless conduct [that] must be 'highly unreasonable' and constitute 'an extreme departure from ordinary standards of care'" needed to substantiate scienter.  *Bank of Am.*, 980 F. Supp. 2d at 586 (quoting *Chill v. GE*, 101 F.3d 263, 269 (2d Cir. 1996)).  Moreover, even assuming the Individual Defendants pushed the Company to offer sales and promotions to meet revenue targets, that would "contribute[] little to a strong inference of fraud because such actions are common

---

[22] Plaintiffs' misplace their reliance on *Lexmark* and *Salix* to argue that Plaintiffs need not show scienter as to the right of return.  *See* Supp. Opp. at 7.  Here, Plaintiffs put the right of return at issue by challenging Hain's failure to disclose it.  The plaintiffs in *Lexmark* and *Salix*, on the other hand, challenged statements for failing to accurately disclose inventory levels, which were not alleged to be manipulated based on any right of return.  *See Lexmark*, 367 F. Supp. 3d at 37 ("Plaintiffs allege that the Individual Defendants were reckless in ignoring those spiraling inventory levels . . . ."); *In re Salix Pharms., Ltd.*, No. 14-CV-8925, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (alleging scienter in connection with "true inventory levels").

practice." *S.E.C. v. Espuelas*, 698 F. Supp. 2d 415, 430 (S.D.N.Y. 2010) (internal quotations and

alterations omitted); *see Bristol-Myers Squibb*, 312 F. Supp. 2d at 566 ("Offering incentives to meet

sales or earnings goals is a common practice, and, without additional allegations not present here, the

allegation that the sales at issue were made pursuant to incentives to meet goals set by management is

an insufficient basis on which to infer conscious misbehavior or recklessness."); *Gavish v. Revlon,

Inc.*, No. 00-CV-7291, 2004 WL 2210269, at \*15 (S.D.N.Y. Sept. 30, 2004) (same).

> c) *SOX Certifications and Internal Controls*

Plaintiffs argue that the Individual Defendants made the SOX Statements with scienter

because the Individual Defendants signed SOX certifications and Hain later admitted that it lacked

adequate accounting controls and undertook remedial efforts to strengthen its internal controls.  *See*

SAC ¶¶ 311, 319, 328, 360-62.  These arguments fail too.

 "[C]ourts in this circuit regularly hold that the signing of a SOX certification, without more, is

insufficient to plead scienter." *Zheng v. Pingtan Marine Enter.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y.

2019) (collecting cases).  "Indeed, 'these certifications typically add nothing substantial to the scienter

calculus because allowing Sarbanes-Oxley certifications to create an inference in every case would

eviscerate the pleading requirements for scienter set forth in the PSLRA.'"  *Id.* (quoting *Reilly*, 2018

WL 3559089, at \*19); *Int'l Ass'n of Heat v. Int'l Bus. Machines Corp.*, 205 F. Supp. 3d 527, 536

(S.D.N.Y. 2016) (similar).  For that reason, "[a] Sarbanes–Oxley certification is probative of scienter

only if the complaint alleges specific contrary information, such as glaring accounting irregularities or

other red flags, of which the certifying defendant had reason to know."  *In re Take-Two Interactive

Sec. Litig.*, 551 F. Supp. 2d 247, 304–05 (S.D.N.Y. 2008) (internal quotations omitted); *see Reilly*,

2018 WL 3559089, at \*19 (similar).  That is why SOX certifications are actionable only when

plaintiffs plead facts supporting a "concomitant awareness of or recklessness to the materially

misleading nature of the statement." *Diebold*, 2021 WL 1226627, at \*14 (quoting *Plumbers &

*Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015)).

As discussed above, Plaintiffs neither undermined the assertions in the SOX Statements that management reviewed Hain's internal controls and concluded that the controls were effective nor adequately pled that Defendants knew or were reckless in not knowing that the Company's internal controls were deficient. To this point, Plaintiffs "have not adequately alleged that defendants had any knowledge of 'glaring accounting irregularities' when they executed the SOX certifications . . . ." *Reilly*, 2018 WL 3559089, at *19. Instead, Plaintiffs "rel[y] only on facts occurring after Individual Defendants signed their certifications, namely the post-Class Period disclosures of material weaknesses in [Hain]'s internal controls . . . That dog won't hunt." *Diebold*, 2021 WL 1226627, at *14.

That Hain undertook remedial efforts after the Class Period to strengthen its internal controls "was a prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (internal quotations omitted) (discussing remedial act of ordering an investigation). Further, the Company's remediation efforts and the SEC Order do not support an inference of scienter "because they do not establish what specific contradictory information the makers of the statements had" at the time they made the challenged statements. *Lachman*, 487 F. Supp. 3d at 137 (internal quotations omitted); *see Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (rejecting argument that a company's remediations to its accounting policy supported scienter); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

Rather than pleading an inference of scienter, "the more plausible inference—based on the

facts alleged in the [SAC]—is a 'nonculpable' one: any inadequacy in [the Company]'s . . . internal controls were, at the most, a result of inactionable corporate mismanagement. And it is well established that mismanagement is not actionable under the securities laws." *Woolgar*, 477 F. Supp. 3d at 240; *see Lefkowitz v. Synacor, Inc.*, No. 18-CV-2979, 2019 WL 4053956, at *10 (S.D.N.Y. Aug. 28, 2019) (rejecting scienter allegations regarding internal control deficiencies because "an equally plausible inference is that Defendants believed that any deficiencies were not so acute as to rise to the level of an internal control weakness."), *aff'd sub nom.*, *Shreiber v. Synacor, Inc*, 832 F. App'x 54 (2d Cir. 2020).

### d)   Senior Executive Employment Changes

Plaintiffs argue that the terminations and resignations of several Hain senior employees (Conte, Smith, Simon, Ng, Powhida, Weiner, and Hyndman) and the demotions of Carroll and Meiers support an inference of scienter. However, "[t]erminations or resignations of corporate executives are insufficient alone to establish an inference of scienter." *Woolgar*, 477 F. Supp. 3d at 240; *see Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605 (S.D.N.Y. 2016) ("Courts, however, have consistently held that an officer's resignation, without more, is insufficient to support a strong inference of scienter."). To raise a strong inference of scienter, the employment change "must be highly unusual and suspicious." *E.g.*, *Schiro*, 396 F. Supp. 3d at 303 (quoting *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 499 (S.D.N.Y. 2017)). That is, an employment change can establish scienter only where plaintiffs plead "independent evidence" corroborating that the employee whose employment circumstances changed "held a culpable state of mind." *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 321 (S.D.N.Y. 2021) (quoting *Schiro*, 396 F. Supp. 3d at 303). This arises when independent facts indicate that the employment change was "tied to" the alleged fraud, the employment change alerted others to the alleged fraud, or the employee's scienter "was otherwise evident." *Glaser*, 772 F. Supp. 2d at 598. Plaintiffs fail to make this showing.

59

Plaintiffs assert Smith's September 2015 resignation supports scienter because he resigned after "only two years" as CFO, he was still unemployed as of December 2016, and CW 1 "believed" Smith was forced out because he was "not willing to be one of Simon's puppets." *See id.* ¶¶ 109-10, 340. Courts routinely hold that, without more, resigning after an even shorter tenure than Smith's does not support scienter. *See Woolgar*, 477 F. Supp. 3d at 240 (rejecting scienter arguments based on executive's resignation seven months into a three-year employment period); *In re DRDGold Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 575 (S.D.N.Y. 2007) (rejecting scienter arguments based on director's resignation "after being in the position just three weeks"). Plaintiffs cite no authority for the proposition that Smith's post resignation unemployment supports scienter. And the SAC provides an insufficient basis for CW 1's subjective belief that Smith was forced out for unwillingness to support Simon. *See Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 340 (S.D.N.Y. 2011) (holding that "the unsupported belief" of a confidential witness does not contribute to scienter); *see also Campo v. Sears Holdings Corp.*, 635 F.Supp.2d 323, 330 n.50 (S.D.N.Y. 2009) ("No amount of investigation can transform information and belief-hearsay, essentially-into personal knowledge.") (internal quotations omitted), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).

Similarly, Plaintiffs point to the Company's March 6, 2017 announcement that it was removing Carroll as Executive Vice President and CEO for Hain North America and moving him to Executive Vice President, Global Brands, Categories and New Business Ventures of Hain—which allegedly removed Carroll from involvement with U.S. sales. SAC ¶ 345. This change is not "highly unusual and suspicious." *Schiro*, 396 F. Supp. 3d at 303. Plaintiffs pled that Carroll regularly changed positions within Hain. *See id.* ¶ 29 (alleging Carroll became Hain's Executive Vice President of Melville Businesses in February 2004; President of Grocery and Frozen in July 2004; CEO of Hain Celestial United States, President of Grocery and Snacks Division in September 2005; and President of Personal Care in May 2008 before he became Executive Vice President and CEO for Hain Celestial

North America in February 2015). And Plaintiffs do not allege that Carroll's move to another

Executive Vice President position was a demotion. In fact, given that Carroll's prior position was

limited to Hain North America and his new position concerned "Global Brands" for all of Hain, this

change may have been a promotion. Plaintiffs failed to plead independent facts indicating that

Carroll's employment change was tied to the alleged fraud, alerted defendants to the alleged fraud, or

that Carroll's scienter was otherwise evident.[23] *Glaser*, 772 F. Supp. 2d at 598.

Plaintiffs allege Conte resigned from his position as CFO and Executive Vice President,

Finance on June 22, 2017—the same day Hain filed the 2016 Form 10-K that announced it was taking

remedial measures to correct material weaknesses in its internal controls. *See* SAC ¶¶ 12, 346.

However, Plaintiffs fail to allege sufficient facts to support that Conte acted with scienter in

connection with the challenged statements, that his resignation somehow alerted anyone at Hain to the

alleged fraud, or that his scienter was otherwise evident. *See Glaser*, 772 F. Supp. 2d at 598. The

more cogent inference is not of scienter, but that Conte resigned because the 2016 Form 10-K

indicated he may have been "negligent in overseeing the responsible employees" or because he

believed that, in the wake of the 2016 Form 10-K, "the optics of changing management are better for

investors and regulators." *Schiro*, 396 F. Supp. 3d 283 at 303 (confirming that "Section 10(b),

however, requires more than mere negligence: it requires recklessness"); *see Lighthouse Fin. Grp. v.

Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012) (finding resignations

were "consistent with punishing those at the helm for their poor judgment and leadership" rather than

"concocting a scheme to defraud shareholders"), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr.*

---

[23] At first blush, it might seem notable that this employment change occurred one month after Hain's February 2017 disclosure of the SEC inquiry. *See* SAC ¶ 137. But this timing is not suspect because, assuming Hain wanted to move Carroll due to his involvement with the alleged misconduct, Hain could have moved Carroll much earlier in the Class Period. Carroll changed jobs seven months after Hain's August 2016 disclosure of its accounting review and disclosure of that review to the SEC, *see* SAC ¶ 125; SEC Order ¶ 19, and four months after Hain's November 2016 disclosure that the Audit Committee completed its review. *See* SAC. ¶ 132.

*Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015).  Even if the Court found the timing of Conte's resignation suspicious, it would not contribute to a finding of scienter.  *See Francisco v. Abengoa, S.A.*, No. 15-CV-6279, 2022 WL 3902852, at *26 (S.D.N.Y. Aug. 30, 2022) ("As there is no other circumstantial evidence of fraud, even if the Court were to find [the timing of] Sanchez Ortega's resignation suspicious, it would not be enough to rescue plaintiffs' claims.").

Plaintiffs next allege that in June 2018 the Company "announced that Simon was leaving Hain."  SAC ¶ 349.  Plaintiffs do not explain why Simon's resignation supports an inference of scienter.  Under these circumstances, the timing of Simon's resignation—sixteen months after the Class Period ended—cuts against such an inference.  *See Wilbush*, 271 F. Supp. 3d at 499 (finding resignations were not "highly unusual or suspicious" because they occurred eight and eleven months after the class period); *see N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15-CV-6034, 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016) (finding defendants' resignations that occurred "several months after the Class Period ended" were not highly unusual or suspicious).

Finally, Plaintiffs' allegations regarding the demotion of Meiers and the terminations of Powhida, Ng, and Hyndman are irrelevant to the Individual Defendants' scienter because Plaintiffs do not allege the Individual Defendants were involved in those employment changes.  *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018) (finding that an inference of scienter on the part of defendants "would be inappropriate" because plaintiff "does not allege that [defendants] were involved" in the subject terminations); *In re UBS AG Sec. Litig.*, No. 07-CV-11225, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) (finding that the "terminations do not support a strong inference of scienter" given the lack of "additional factual allegations" linking the defendants to the

employee terminations and the fraud).[24]

e)    *Access To Reports and Core US Business*

The SAC argues that the Individual Defendants "had knowledge of" or "had full and unfettered access" to "all material facts" regarding Hain's U.S. business because, as the generator of approximately 60% of Hain's net sales, the U.S. business comprised Hain's "core operations." *Id*. ¶¶ 351-52.  These generic allegations are insufficient to raise the requisite inference of scienter. *See Dynex*, 531 F.3d at 196 (rejecting scienter allegations asserting that senior executives "had access to 'collection data'" that revealed certain undisclosed facts about bond collateral); *IKB Int'l S.A. in Liquidation v. Bank of Am. Corp.*, 584 F. App'x 26, 28 (2d Cir. 2014) (finding scienter allegations insufficient because "IKB's complaint does not specifically identify the contemporaneous Clayton reports containing inconsistent information"); *San Leandro Emergency*, 75 F.3d at 812-13 ("Plaintiffs' unsupported general claim of the existence of confidential company . . . reports . . . is insufficient to survive a motion to dismiss.").

Plaintiffs contend that these allegations are sufficient to invoke the "core operations" theory of scienter, i.e. the core operations doctrine.  *See* Opp. at 21.  The core operations doctrine provides that plaintiffs who "plead that a defendant made false or misleading statements when contradictory facts of *critical importance* to the company either were apparent, or should have been apparent" can rely on "an inference . . . that high-level officers and directors had knowledge of those facts by virtue of their positions within the company."  *Zheng*, 379 F. Supp. 3d at 181 (emphasis added).  "In other words,

---

[24] Non-party Weiner's resignation is likewise not relevant to the Individual Defendants' scienter.  *See Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 162 (D. Conn. 2007) ("Madsen and Bannerman are not named as Defendants in this action. Therefore, even if Plaintiffs had alleged facts linking their terminations to the alleged fraud, 'it is hard to see how the resignation of an executive who has not been named as a defendant in this action could create an inference of scienter with respect to the . . . individuals who have been named.'") (quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 447 (S.D.N.Y. 2005)), *aff'd*, 312 F. App'x 400 (2d Cir. 2009); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 CIV. 975 RPP, 2012 WL 1646888, at *29 (S.D.N.Y. May 10, 2012) (finding a non-party director's resignation "creates no inference of scienter on the part of any of the named defendants.").

this doctrine allows courts to draw an inference of scienter where the misrepresentations and omissions allegedly made by defendants were about their core operations." *Evoqua*, 450 F. Supp. 3d at 423. But "the plain language of the PSLRA, which requires facts supporting the scienter inference to be 'state[d] with particularity,' would seem to limit the force of general allegations about core company operations." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (Sullivan, J.) (quoting 15 U.S.C. § 78u–4(b)). "The Second Circuit has not expressly determined if the 'core operations' doctrine remains applicable to provide scienter after the enactment of the PSLRA." *Francisco*, 559 F. Supp. 3d at 320 (citing *Frederick v. Mechel OAO*, 475 F. App'x 353, 356 & n.5 (2d Cir. 2012) ("[W]e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter")). On this issue, "courts within the Second Circuit have come to conflicting decisions, with the majority finding that the 'core operations' doctrine may provide support for but not an independent basis of scienter." *Lipow*, 131 F. Supp. 3d at 163 n.11 (collecting cases); *see Zheng*, 379 F. Supp. 3d at 181 (similar). "Moreover, in deciding whether to apply the core operations doctrine, courts in this District have required that the operation at issue make up nearly all of a company's business or be essential to its survival." *Francisco*, 559 F. Supp. 3d at 320.

Even assuming the U.S. business is essential to Hain's survival because it generates approximately 60% of the Company's net sales, Plaintiffs' reliance on the core operations doctrine is misplaced given that the SAC fails to plead separate facts raising an inference of scienter to be supplemented by the core operations doctrine. *See id*. at 320-21 (assuming *arguendo* a business unit generating 60% of sales could invoke the core operations doctrine but finding the allegations "insufficient, on the basis of the core operations doctrine alone, to establish scienter . . . ."); *Evoqua*, 450 F. Supp. 3d at 424 ("But even if Plaintiffs' Complaint did support this theory, the core-operations doctrine would be insufficient by itself to support strong circumstantial evidence of scienter.");

*Sachsenberg v. IRSA Inversiones Y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 184 (S.D.N.Y. 2018) ("Therefore, without other evidence of conscious misbehavior or recklessness, Plaintiff cannot exclusively rely on the 'core operations' doctrine to save his claim."). In other words, Plaintiffs' core operations doctrine arguments fail because they "could not substitute specific factual allegations linking [the Individual Defendants] to the alleged . . . fraud." *Francisco*, 559 F. Supp. 3d at 320–21.

### 3.    Collective Evaluation

Even though the Court has rejected all of Plaintiffs' scienter arguments individually, it must still consider whether the allegations and other proper sources of facts "give rise to a strong inference of scienter" when "taken collectively." *Tellabs*, 551 U.S. at 322-23. The SAC "will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. At most, and taken as a whole, the SAC shows that the Individual Defendants signed Class Period SOX certifications regarding the sufficiency of Hain's internal controls but, after the Company undertook an accounting review and self-reported that review to the SEC, Hain admitted in the post-Class Period SEC Order that its internal controls were deficient. The remaining scienter allegations wilt under examination. The Court is mindful that scienter allegations "need not be irrefutable" or "even the most plausible of competing inferences" to withstand a motion to dismiss. *Tellabs*, 551 U.S. at 324 (internal quotations omitted). But after viewing the scienter allegations collectively, the Court finds "that any reasonable shareholder would deem the inference of scienter to be far less compelling than an inference of, at most, non-actionable mismanagement and negligence" on the part of the Individual Defendants. *Sachsenberg*, 339 F. Supp. 3d at 185; *see Wachovia*, 753 F. Supp. 2d at 367 (finding that scienter allegations collectively reflected "[b]ad judgment and poor management . . . not fraud").

4.   Hain's Corporate Scienter

There are two ways for Plaintiffs to plead Hain's corporate scienter. The first and "most straightforward" way is to impute scienter from an individual defendant, director, or officer who either "made" the challenged misstatement or who, while "not the actual speaker," was "involved in the dissemination of the fraud." *Jackson*, 960 F.3d at 98. The second and "exceedingly rare" way provides "collective corporate scienter may be inferred" where the statement's falsity is exceedingly "dramatic." *Id*. at 99 (internal quotations omitted).

Plaintiffs ask the Court to find corporate scienter by "imput[ing] each Individual Defendant's scienter to Hain." Supp. Opp. at 6. But as explained above, Plaintiffs failed to plead a strong inference of scienter on the part of the Individual Defendants. Accordingly, Plaintiffs' sole proffered basis for finding corporate scienter fails. *See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 529 (S.D.N.Y. 2020) ("As to the first prong, we have already concluded that plaintiffs have failed to adequately plead scienter as to any of the Individual Defendants. Accordingly, plaintiffs cannot plead the corporate scienter by imputing an individual's scienter to the Company.").

Even if Plaintiffs had argued for corporate scienter under the second method, i.e. by way of inference, that argument would fail. While "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant," such an inference requires a false statement "so dramatic" that "it would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Dynex*, 531 F.3d at 195-96 (internal quotations omitted). The classic example of a false statement sufficiently dramatic to allow for an inference of corporate scienter supposes, for example, that an automobile company announces that it sold one million cars in a year but actually sold none. *See id.*; *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 & n.13 (9th Cir. 2014) (finding no inference of corporate scienter because the statements were not as dramatic as the automobile manufacturer

example).  In this Circuit, courts have found an inference of corporate scienter where a company

failed to disclose an $8.1 billion exposure to collateralized debt obligations, *see In re MBIA, Inc., Sec.*

*Litig.*, 700 F. Supp. 2d 566, 574 (S.D.N.Y. 2010), and where a company misrepresented $4.4 billion in

capital costs, *see In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 299-300 (S.D.N.Y. 2009).

Here, Hain's alleged misrepresentations do not even remotely approach that magnitude.  They are

"plainly insufficient to raise a strong inference of collective corporate scienter." *Jackson*, 960 F.3d at

99.

*          *          *

Based on the foregoing, the undersigned recommends that the Court find the unabandoned

portion of the SAC's Count I failed to state a claim under Rule 12(b)(6) not only due to Plaintiffs'

failure to plead an actionable misstatement or omission, but also due to Plaintiff's failure to raise a

strong inference of scienter as to any of the Defendants.

### E.      Section 20(a)

As noted above, the Section 20(a) claim in Count III requires a predicate Exchange Act

violation by the controlled person.  *E.g.*, *Carpenters*, 750 F.3d at 236.  That Plaintiffs failed to plead

their predicate Section 10(b) and Rule 10b-5 violation in Count I for want of an actionable

misstatement or omission and want of scienter necessitates dismissal of their Section 20(a) claim in

Count III.  *See e.g., Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 356-57; *Danske Bank*, 11 F.4th at 98 n.3;

*SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos.*, 829 F.3d 173, 177 (2d Cir. 2016).

## V.      CONCLUSION

The Court recommends that Defendants' motions to dismiss the SAC with prejudice be

granted.  For the reasons described above, the SAC fails to state a claim.  And dismissal with

prejudice is appropriate given the posture of this case, which was filed more than six years ago.

Plaintiffs had numerous opportunities to plead a case adequate to survive dismissal.  Plaintiffs filed

the SAC without sufficiently bolstering their allegations—after they were expressly afforded the opportunity to do so. *See Hain*, 2019 WL 1429560, at *22 (dismissing the Corrected Consolidated Class Action Complaint without prejudice and affording Plaintiffs leave to amend because they "represent[ed] that they have acquired information from additional former employees that were uncovered during Lead Plaintiffs' investigation"). And most recently, since the Second Circuit vacated the 2020 Dismissal Decision, Plaintiffs have neither sought leave to further amend the SAC nor communicated that they possess facts that would bolster it. The Court therefore recommends dismissal of the SAC with prejudice.

## VI.     OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days). Any requests for an extension of time for filing objections must be directed to Judge Seybert. FAILURE TO FILE TIMELY OBJECTIONS SHALL CONSTITUTE A WAIVER OF THOSE OBJECTIONS BOTH IN THE DISTRICT COURT AND ON LATER APPEAL TO THE UNITED STATES COURT OF APPEALS. *See Thomas v. Arn*, 474 U.S. 140, 154-55 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *F.D.I.C. v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995).

**SO ORDERED:**

Dated:      Central Islip, New York
            November 4, 2022

                                        s/ Lee G. Dunst
                                        _____

                                        **LEE G. DUNST**
                                        United States Magistrate Judge